UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RITCHIE CAPITAL MANAGEMENT, L.L.C., RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED, RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND) II, LIMITED, WALKERS SPV LIMITED, as trustee for Ritchie Risk-Linked Life Strategies Trust I and Ritchie Life Strategies Master Trust, and RITCHIE RISK-LINKED STRATEGIES TRADING, LTD., | 07 Civ. 3494 (DLC)   ECF Case   **COMPLAINT** |
| Plaintiffs, | |
| v. | |
| COVENTRY FIRST LLC, THE COVENTRY GROUP, INC., MONTGOMERY CAPITAL, INC., LST I LLC, ALAN BUERGER, CONSTANCE BUERGER, REID S. BUERGER, ANTONIO MUNIZ, ALEX SELDIN, NEAL JACOBS, EILEEN SHOVLIN, and JIM DODARO, | |
| Defendants. | |

Plaintiffs, through their attorneys, for their complaint against defendants allege as follows:

## NATURE OF THE ACTION

1.       This is an action under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), and for fraud, fraudulent inducement, breach of fiduciary duty, and breach of contract. This action is brought to recover damages caused to Plaintiffs by Defendants' pervasive fraud in the "life settlements" industry – that is, the secondary market for life insurance policies. In a life settlement transaction, an investor

buys a life insurance policy from the policy's owner at a discount, pays the policy's premiums as they come due, and then collects the death benefits.

2.     Defendant Coventry First LLC owns Defendant LST I LLC and is owned by Defendant Montgomery Capital, Inc. and affiliated with Defendant The Coventry Group, Inc. (all four entities, together with affiliates, to be referred to collectively as "Coventry"). Coventry is a major player in this industry. Coventry is owned and controlled by the Buerger family, which includes Defendants Alan Buerger, Constance Buerger, and Reid S. Buerger. Defendant Antonio Muniz is the chief financial officer of Coventry First LLC and Montgomery Capital, Inc. The other individual defendants are or were executives and employees of Coventry.

3.     Coventry partnered with Plaintiffs (collectively "Ritchie Capital") and their affiliates to invest in life insurance policies with a view toward re-selling them through a securitization transaction. Defendants, however, concealed from Ritchie Capital that Defendants were systematically defrauding the owners of the policies, and then further deceived Ritchie Capital as to the existence of an investigation by the Attorney General of New York into Defendants' misconduct. Coventry, moreover, falsely represented on numerous occasions that Coventry was in compliance with all applicable laws and regulations. Coventry's misconduct has damaged Plaintiffs, as described herein.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Plaintiffs bring claims under RICO, 18 U.S.C. § 1962. The Court has supplemental jurisdiction over the Plaintiffs' state-law claims pursuant to 28

U.S.C. § 1367(a). In the alternative, the Court has original subject matter jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1332(a). While Plaintiffs cannot yet calculate their damages with precision, it is likely at least 700 million dollars.

5.     The Court has personal jurisdiction over Defendants because: (1) Defendants regularly transact business in New York and have entered into contracts with Plaintiffs in New York; (2) Defendants have committed tortious acts within New York; (3) Defendants have committed tortious acts outside New York causing injury to Plaintiffs and others in New York as set forth in this complaint, and regularly do business and derive substantial revenue from services rendered in New York, and expect or should reasonably expect their acts to have consequences in New York. Defendants derive substantial revenue from interstate commerce. Coventry, moreover, submitted in a series of agreements with Plaintiffs to the jurisdiction of the courts sitting in the State of New York for purposes of disputes arising out of Coventry's relationship with Plaintiffs.

6.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and 1965(a). In the alternative, venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2). Coventry waived any objection to venue in this Court in a series of agreements with Plaintiffs.

## THE PARTIES

7.     Plaintiff Ritchie Capital Management, L.L.C. ("RCM") is a limited liability company with its principal place of business in Geneva, Illinois. Its members are citizens of Illinois, Wyoming, Utah, and Arizona.

8.      Plaintiffs Ritchie Risk-Linked Strategies Trading (Ireland), Limited ("Ritchie I") and Ritchie Risk-Linked Strategies Trading (Ireland) II, Limited ("Ritchie II") are Irish corporations with offices in Ireland.

9.      Plaintiff Walkers SPV Limited, a Cayman Islands company with its principal place of business in the Cayman Islands, is sole trustee of Ritchie Risk-Linked Life Strategies Trust I ("Ritchie Trust I") and Ritchie Life Strategies Master Trust ("Ritchie Master Trust"), each of which is a class of Ritchie Risk-Linked Strategies Series Trust, a Cayman Islands unit trust.

10.     Plaintiff Ritchie Risk-Linked Strategies Trading, Ltd. ("Ritchie Risk-Linked") is a Bermudan limited company with its principal place of business in Bermuda.

11.     Defendant Coventry First LLC ("Coventry First") is a limited liability company with its principal place of business in Fort Washington, Pennsylvania. Coventry First's sole member is Montgomery Capital, Inc., a Delaware corporation with its principal place of business in Pennsylvania. The officers of Coventry First include Alan Buerger, CEO and Treasurer; Constance Buerger, President and Secretary; and Reid S. Buerger, Vice President.

12.     Defendant Montgomery Capital, Inc. is a Delaware corporation with its principal place of business in Fort Washington, Pennsylvania. The shareholders of Montgomery Capital, Inc. are Alan Buerger, Constance Buerger, Reid S. Buerger, and the Reid S. Buerger Trust. The officers of Montgomery Capital, Inc. include Alan Buerger, Constance Buerger, and Reid Buerger.

13.     The Coventry Group, Inc. is a Pennsylvania corporation with its principal place of business in Fort Washington, Pennsylvania. Its shareholders are Alan and

Constance Buerger. Its officers include Alan Buerger, President, and Constance Buerger, Treasurer and Vice President.

14.     Defendant LST I LLC ("LST") is a limited liability company. It is a wholly-owned subsidiary of Coventry First, which on information and belief is its sole member. LST's chief executive officer is Alan Buerger.

15.     Defendants Alan Buerger, Constance Buerger, and Reid S. Buerger are individuals residing in Pennsylvania. They own and control Coventry. Reid Buerger is the son of Alan Buerger, the founder and chief executive of the Coventry group. Constance Buerger, Alan Buerger's wife and Reid Buerger's step-mother, is president of Coventry First and chief operating officer of the Coventry group.

16.     Defendant Antonio Muniz has served as chief financial officer of Coventry First and of Montgomery Capital, Inc. since 2003. On information and belief, he is a resident of Pennsylvania.

17.     Defendant Alex Seldin is General Counsel of Coventry. On information and belief, he is a resident of Pennsylvania.

18.     Defendant Neal Jacobs is Coventry's Director of Financial Underwriting. On information and belief, he is a resident of Pennsylvania.

19.     Defendant Jim Dodaro is Coventry's Vice President of Financial Underwriting. On information and belief, he is a resident of Pennsylvania.

20.     Eileen Shovlin is a Coventry Regional Vice President. On information and belief, she is a resident of Pennsylvania.

## BACKGROUND: THE SECONDARY MARKET FOR LIFE INSURANCE

21.     The life insurance policies at issue in this case insured persons, typically wealthy individuals 65 years of age and older, who have determined that they prefer (a) an immediate, lump-sum payment to (b) a payment to their beneficiaries when they die, along with the ongoing expense of premium payments. In a typical situation, a policy owner's children have become financially independent, or the policy was purchased by a corporation that hired the insured as an executive but for which the insured no longer works.

22.     The life settlement payment will be more than the "surrender value" of the policy – the contractual price at which a policy owner can return the policy to the insurance company that issued it – but less than the death benefit. The buyer of the policy continues to pay premiums until the insured's death, at which point the buyer claims the death benefit. Thus the investor is wagering that the value of the future death benefit will exceed the life settlement payment and the costs of paying premiums until the insured's death.

23.     An insured can enter into a life settlement transaction in one of two ways. First, the insured (typically through a representative such as a financial advisor or planner, insurance agent, accountant, or attorney) might hire a life settlement broker to mount the equivalent of an auction, collecting bids on the policy from buyers (or from other brokers who in turn represent buyers). Second, the insured (again through a representative) might make direct contact with a buyer.

24.     Coventry is one such buyer. Coventry's work force includes persons with deep experience in the life insurance industry. Coventry specializes in understanding life

insurance policies. Coventry's expertise includes, among other things, the actuarial and financial knowledge required to optimize the profitability of a life insurance policy by minimizing premium payments.

25.     Coventry is a leading player in the secondary market for life insurance policies. Coventry entered that market as a buyer in 2001, purchasing 436 policies representing $720 million in total death benefits in 2002. By 2005, Coventry had purchased 1,318 life insurance policies representing more than $3 billion in death benefits.

26.     Coventry sells the policies that it purchases to institutional investors. Such investors have included the American International Group ("AIG"), Citigroup, Berkshire Hathaway, and Ritchie Capital.

### DEFENDANTS' ILLEGAL CONDUCT

#### A.     Coventry Partners With Ritchie Capital

27.     Beginning in 2005, Ritchie Capital began negotiating with Defendants an arrangement under which Ritchie Capital would partner with Coventry for the purpose of investing in life insurance products and then re-selling them at a future point through a securitization transaction.

28.     In the spring and summer of 2005 and afterwards, Alan Buerger, Reid Buerger, Constance Buerger, and Antonio Muniz, in connection with the negotiations with Ritchie Capital, represented to Ritchie Capital and its representatives (including John ("Jeff") Mulholland, Duncan Goldie-Morrison, and Thane Ritchie) that the life insurance policies in which Coventry transacts have no legal taint and that Coventry purchases policies and otherwise conducts itself in accordance with law.

29.     Rounds of negotiations were concluded in June 2005, September 2005, December 2005, and June 2006. Each round culminated in the commitment by Ritchie Capital of additional capital.

30.     The purchasers of the policies were Plaintiffs Ritchie I and Ritchie II. Ritchie Capital (specifically, through Ritchie Trust I and Ritchie Master Trust, whose sole beneficiary is Plaintiff Ritchie Risk-Linked) and Coventry jointly committed capital to, and became owners of subordinated securities in, Ritchie I and Ritchie II, which entitled Ritchie Capital and Coventry to receive the profits of Ritchie I and Ritchie II after other debts have been paid.

31.     Ritchie Capital was a partner, joint venturer, and co-venturer of Coventry. While Ritchie Capital's representatives contributed the great majority of the financing to the partnership and venture, Coventry's specialty was in analyzing and servicing life insurance policies.

32.     Plaintiffs relied at all times on Defendants' expertise, as well as their honesty and integrity. It was Coventry's responsibility to seek out and purchase individual policies that met certain pre-defined criteria that the parties had agreed on. Each month, pursuant to contractual arrangements, Coventry would notify Ritchie I and Ritchie II that Coventry had a certain dollar amount's worth of qualifying policies to sell. Ritchie I and Ritchie II then would pay the necessary funds to Coventry, which would transfer the policies to Plaintiffs.

33.     It was, moreover, Coventry's responsibility to service the policies, including, among other things, tracking premium payments and claims for death benefits from the issuing life insurance companies, determining when a claim for a death benefit

could be made and placing the claim, monitoring the health of the insureds, and maintaining current information on the issuing life insurance companies. Day-to-day administration of the policies, in other words, was in the hands of Coventry. Ritchie I and Ritchie II had only to send to a third-party intermediary a check for the total premium payments due each month, and Coventry First directed the intermediary to disburse the appropriate amounts to each issuing life insurance company.

34.    In drafts of an agreement between Ritchie I and LST sent by email on, among other occasions, June 20, 24, and 30, 2005, to Ritchie Capital's representatives, including, among others, John (Jeff) Mulholland, Coventry represented that:

(a)  "The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof will not violate any United States federal, state or local law or regulation, violate, result in the breach of any terms and provisions of, nor constitute an event of default under, the certificate of formation or the operating agreement of the Seller, or violate or breach any of the terms or provisions of, or constitute an event of default under, any agreement to which the Seller is a party or by which it shall be bound; nor violate any order, judgment or decree applicable to the Seller of any United States federal or state court, regulatory body, administrative agency or other United States federal or state government instrumentality having jurisdiction over the Seller or its properties."

(b)  "There is no action, suit or proceeding before or by any court, regulatory body, administrative agency or other governmental agency or body . . . now pending, or to the Seller's knowledge, threatened, against or affecting the Seller or its assets or properties: . . . seeking to prevent the consummation of any of the transactions contemplated by this Agreement, or . . . seeking any determination or ruling that might materially and adversely [a]ffect the performance by the Seller of its obligations under, or the validity and enforceability of, this Agreement."

(c)  "With respect to each Life Settlement Policy: . . . Prior to the transfer of each Life Settlement Policy to [Ritchie I], the Seller shall have taken all action under applicable law in each relevant jurisdiction in order to protect and perfect the ownership of the Seller in such policy . . . ."

(d) "All Life Settlement Policies the purchases of which are being funded . . . have been (A) Originated by the Seller or an Affiliate of the Seller in one or more transactions that in all material respects were in accordance with and in compliance with all applicable United States federal, state and local laws, rules and regulations applicable to life settlement transactions and the purchase and resale of life insurance policies, or (B) purchased from an unaffiliated third party in one or more transactions that, to the Seller's knowledge, were in accordance with and in compliance with, in all material respects, all applicable United States federal, state and local laws, rules and regulations applicable to the purchase of life insurance policies from third persons that are not the Original Sellers."

35.     These drafts culminated in an agreement between Ritchie I and LST for the sale of policies. The amended and restated version of that agreement, dated as of September 8, 2005 (the "Ritchie I Policy Purchase Agreement") was signed for Coventry by Alex Seldin. In this document, Coventry made representations substantially identical to those referred to in paragraph 34 above.

36.     In drafts of an agreement between Ritchie II and LST sent by email on, among other occasions, December 7, 2005, to Ritchie Capital's representatives, including, among others, John (Jeff) Mulholland, Coventry made representations substantially identical to those referred to in paragraph 34 above.

37.     These drafts culminated in a Master Policy Purchase Agreement between Ritchie II and LST dated as of December 15, 2005 (the "Ritchie II Policy Purchase Agreement"), and signed for Coventry by Alex Seldin. In this document, Coventry made representations identical to those made in the Ritchie I Policy Purchase Agreement.

38.     Plaintiffs reposed their trust and confidence in Defendants, who were in a position of superior knowledge and information with respect to the purchase of the policies. Plaintiffs were not involved in the purchase of the policies from the insureds and

had no information about what the insureds were told and what they knew in connection with the sale of their policies.

39.     Plaintiffs had no reason to believe that Defendants were engaging in misconduct in the purchase of the policies, much less that Coventry was under investigation for that misconduct. Ritchie Capital had conducted due diligence on Defendants and relied on them precisely because they had a reputation for integrity in the life settlements industry and projected an image of cleanliness. The Coventry executives with whom Ritchie Capital dealt – in particular Defendants Reid Buerger, Antonio Muniz, and Alan Buerger – appeared to be legitimate businessmen and frequently assured Ritchie Capital that Coventry, unlike some of its competitors, was scrupulous about complying with regulatory requirements.

**B.**     **Defendants' Fraud**

40.     In fact, however, Defendants were engaged in pervasive fraud. The fraud was three-fold: first, Defendants systematically defrauded the insureds from whom Coventry purchased policies; second, Defendants defrauded Plaintiffs in concealing from them the dishonest and unlawful conduct; and third, Defendants defrauded Plaintiffs in concealing from them that Coventry was under investigation by the Attorney General of New York.

    **Defendants' Fraud Against Sellers of Policies**

41.     Coventry's fraud against those from whom it purchased policies took two general forms. First, when life settlement brokers pretended to conduct auctions, Coventry would pay the brokers undisclosed fees not to relay or otherwise act on offers from Coventry's competitors. Second, Coventry would provide brokers with a "gross

offer" – a lump sum to be divided between a broker and policy owner with the seller never learning the amount of the sum and therefore the amount retained by the broker – and then falsify documentation in order to conceal from the seller part or all of the broker's compensation.

42.     Following are some illustrative examples, taken from the complaint filed by the Attorney General of New York in October 2006, of the first category of fraud against those from whom Coventry purchased policies.

(a)     In 2003, a 79-year-old living in Hawaii decided to sell his $400,000 life insurance policy. He sold the policy to Coventry on April 16, 2003 for $102,000, of which he received $78,000 and a broker received $24,000. But another broker, Life Settlement Alliance ("LSA"), had a better offer, for $108,000, from another buyer. Coventry paid $12,000 to Life Settlement Alliance not to present the higher bid, and never disclosed the fee to the seller of the policy.

(b)     A family trust hired a broker to put on the market a $4.9 million policy insuring an 80-year-old woman. The broker solicited bids from Coventry and from AllSettled, a broker. In September 2004, Coventry submitted an offer of $705,000 and learned the next month of a competing offer for $880,000 submitted by AllSettled. Neal Jacobs, Coventry's Director of Financial Underwriting, contacted AllSettled's President Michael Krasnerman to work out a deal, and Krasnerman requested a 1.5% payoff to step aside. Coventry and AllSettled eventually agreed that Coventry would pay $49,000, or 1% of the death benefit, and in exchange AllSettled would stand down. An email from Jacobs to Krasnerman on November 2, 2004 stated: "for [insured's initials], the number is 49." On November 11, 2004, Lenore Saracino, a vice president at AllSettled, wrote a

note: "Close file[.] Have a co-brokering fee with Coventry." On December 28, 2004, the trust received $800,000, of which $142,500 went to the broker.

(c)     In late 2004, Coventry offered a broker $3.1 million for a policy with a $10 million death benefit. The policy insured a 79-year-old man from New Jersey and was owned by a family member. Near the end of the bidding process, AllSettled's Saracino forwarded a competing offer of $3,525,000 to Coventry's Jacobs, who forwarded it to Reid Buerger. Rather than compete with AllSettled, Coventry entered into a side deal under which AllSettled would receive $200,000 in exchange for not presenting the higher offer. Jacobs sent AllSettled's Krasnerman an email on December 16, 2004 stating "number is 200" and then followed up with an email to Coventry's accounting department: "[AllSettled is] now co-broker for $200K." The purchase closed on December 28, 2004 with Coventry paying $3.1 million, of which the seller's broker received $153,053 and the seller received the remainder without ever learning of the better offer.

43.     The foregoing are merely illustrative examples. The New York Attorney General's complaint (attached hereto as Exhibit A) sets forth many more examples of bid-rigging, and notes (at paragraph 46) that beyond those, the Attorney General's office "has revealed literally dozens of other examples of bid rigging by Coventry and Brokers." Plaintiffs hereby incorporate by reference paragraphs 27 to 45 of the New York Attorney General's complaint as if fully set forth herein.

44.     The second type of fraud against those from whom Coventry purchased policies involved the allocation of payments as between policy sellers and their brokers. As the New York Attorney General's complaint explains, brokers, with the knowledge

and assistance of Coventry, frequently concealed from policy sellers the gross payment from Coventry – and thus concealed as well the amount of their compensation.

45.     In some states – including Arkansas, Florida, Indiana, Kansas, Kentucky, Nebraska, Nevada, North Carolina, North Dakota, Ohio, Pennsylvania, Tennessee, and Utah – buyers of life insurance policies are required to disclose to sellers the amount of the broker's compensation. In other states, there is no such requirement. In both types of states, however, Coventry presented sellers with false documentation.

46.     For example, in one case Coventry purchased a policy insuring an 80-year-old man in New York. The seller of the policy received $317,000, the primary broker received $11,250, and another broker received $3,750. On July 27, 2004 Coventry sent offer sheets to the brokers reflecting this compensation. The brokers signed and returned the sheets to Coventry, and that ended the bidding process. But later an advisor of the seller inquired of the first broker how much compensation the broker had or would receive. At the broker's request, Coventry supplied falsified offer sheets making it appear as if the first broker had received only $1,250 in compensation instead of the $11,250 he actually received. On August 31, 2004 Coventry emailed the falsified offer sheets to the second broker for his signature. The second broker signed and returned the new offer sheets on September 2, 2004.

47.     In another case involving a policy insuring an 87-year-old man from Nevada, Coventry agreed to pay $42,000 in broker compensation: $21,000 to LSA and $21,000 to a brokerage known as Advanced. A Coventry vice president named Jim Dodaro emailed Reid Buerger and others at Coventry on December 22, 2004 to suggest that they falsify the disclosure forms attached to the purchase agreement: "Total comp is

42K to LSA (they were paying Advanced 21K of it). Looks like we have to do a new Ex A disclosing comp. Can we lower the gross offer by 22K, put 20K comp on the Ex A, defer 1K to LSA and pay 21K to Advance as a co-broker?" Following Dodaro's suggestion, Coventry disclosed only $20,000 on the "Exhibit A" disclosure form attached to the purchase agreement. The remaining $22,000 was paid to the brokers as a co-broker payment and deferred compensation but was never disclosed to the seller.

### **Defendants' Fraud Against Ritchie Capital**

48.     Defendants deceived Plaintiffs as to Defendants' practices in the purchase of life insurance policies. Plaintiffs knew nothing of, and in fact had no reason to know of, Defendants' systemic misconduct. Plaintiffs learned of the misconduct only when the Attorney General of New York brought suit against Coventry in October 2006.

49.     Defendants also deceived Plaintiffs as to the existence and target of the Attorney General's investigation. Defendants first of all failed to disclose to Plaintiffs that an investigation was under way. Plaintiffs learned of the investigation from the Attorney General's lawsuit. In fact, the investigation began in or about June 2005, and Defendants, on information and belief, knew of it no later than August 2006 and quite possibly earlier.

50.     Coventry received a subpoena requesting documents from the New York Attorney General in March 2006 but did not disclose the subpoena to Plaintiffs until a telephone conference on June 26, 2007, and even then did not describe the subpoena fully and accurately.

51.     During this telephone conference and one held the next day, Coventry's counsel stated on behalf of Coventry had "received requests for additional information"

and that "NFP was likely the target." ("NFP" is National Financial Partners, a network of financial planners that, according to a June 12, 2006 article in TheStreet.com, was being investigated by the New York Attorney General. NFP owns a brokerage specializing in life settlements. On information and belief, some of NFP's members had worked with Coventry on the sale of life insurance policies.) Coventry's counsel stated, among other things, that the focus of the Attorney General's request was compensation arrangements between providers and brokers, as well as disclosure to sellers; that one question on the subpoena asked whether Coventry had paid fees to brokers to provide non-competitive bids; that the Attorney General was interested in suppression of competition through commissions; and that the Attorney General was looking for bid-rigging. Coventry's disclosures to Plaintiffs about the subpoena were false and misleading, because, among other reasons, Coventry did not disclose that it was engaged in precisely the conduct targeted by the subpoena, and in fact affirmatively implied the opposite. Participants in these telephone conferences included Coventry's in-house counsel Alex Seldin as well as Coventry's outside counsel; Mulholland, who represented Plaintiffs; and Ritchie Capital's counsel.

52.    On June 22, 2006, Alan Buerger had emailed to Mulholland the article from TheStreet.com, and led Mulholland to believe that the New York Attorney General was interested only in NFP, and that Coventry had nothing to do with the practices being investigated by the New York Attorney General.

## THE PATTERN OF UNLAWFUL RACKETERRING ACTIVITY

53.    As described in the preceding paragraphs, the Defendants conspired with one another to defraud the Plaintiffs and the policy owners from whom Coventry

purchased life insurance policies. The Defendants participated in numerous racketeering activities in order to accomplish the purposes of their fraudulent scheme, namely, to induce policy owners to sell their policies in an unfairly rigged bidding process and to induce institutional investors, such as Ritchie Capital, to partner with Defendants to obtain those policies.

54. As part of the scheme to defraud, Defendants conspired together to devise and participate in a plan of deception, whereby they would and did use false and fraudulent pretenses, representations, promises, and statements calculated to deceive persons of ordinary prudence and due care and make material nondisclosures and concealment of fact and information essential to policy owners in deciding whether and for how much to sell their policies, and essential to institutional investors in deciding whether and on what terms to partner with Coventry in the secondary life insurance market.

55. Thus, Defendants unlawfully, intentionally, and willfully, and with the intent to defraud, that is, knowingly and with specific intent to deceive in order to cause financial gain, procured or caused Coventry to procure life insurance policies, and sold or caused Coventry to sell those policies to institutional investors to the detriment of such investors, including Plaintiffs.

56. In carrying out the scheme to defraud policy owners and Plaintiffs, Defendants engaged in conduct in violation of the federal laws, including mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, as set forth below.

(a)     Defendants have engaged in a scheme or artifice to defraud in which they have fraudulently and with fraudulent intent obtained life insurance policies and fraudulently induced institutional investors to purchase those policies from Defendants. This scheme entailed bid-rigging, bribery, and the falsification of documents pertaining to purchases of life insurance policies from policy owners. The scheme also included concealing from Plaintiffs both that conduct and the New York Attorney General's investigation into that conduct.

(b)     Defendants' fraud was material, in that it influenced whether and at what price policy owners sold life insurance policies to Defendants. Defendants' fraud likewise influenced whether and on what terms Plaintiffs agreed to invest with Defendants in life insurance policies.

(c)     Defendants through their fraudulent scheme obtained property from policy owners and from Plaintiffs. From policy owners, Defendants obtained life insurance policies. From Plaintiffs, Defendants obtained payment for life insurance policies, and therefore a profit, because Plaintiffs paid Defendants more for each policy than Defendant had paid for it.

(d)     Defendants' fraudulent scheme was furthered by numerous uses of interstate wires and mail, some of which are described below.

(e)     Neal Jacobs's e-mail message to Michael Krasnerman on November 2, 2004, described in paragraph 42(b) of this complaint and paragraph 30 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(f)     Neal Jacobs's e-mail message to Michael Krasnerman on December 16, 2004, described in paragraph 42(c) of this complaint and paragraph 32 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(g)     The e-mailing of falsified offer sheets on August 31, 2004, described in paragraph 46 of this complaint and paragraph 62 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(h)     Jim Dodaro's e-mail message to Reid Buerger on December 22, 2004, described in paragraph 47 of this complaint and paragraph 64 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(i)     Jim Dodaro's e-mail message to Reid Buerger on March 5, 2003,
described in paragraph 28 of the New York Attorney General's
complaint, violated the federal wire fraud statute (18 U.S.C.
§ 1343) and constitutes a predicate act of racketeering under 18
U.S.C. § 1961(b).

(j)     Reid Buerger's e-mail message to Jim Dodaro on or about
November 18, 2004, described in paragraph 33 of the New York
Attorney General's complaint, in which Reid Buerger approved a
co-broker payment to the East Coast Settlement Company, violated
the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a
predicate act of racketeering under 18 U.S.C. § 1961(b).

(k)     Each and every e-mail message sent by Jim Dodaro described in
paragraphs 37 to 39 of the New York Attorney General's
complaint violated the federal wire fraud statute (18 U.S.C.
§ 1343) and constitutes a predicate act of racketeering under 18
U.S.C. § 1961(b).

(l)     Jim Dodaro's e-mail message to Coventry's accountant on May 5,
2005, described in paragraph 40 of the New York Attorney
General's complaint, violated the federal wire fraud statute (18
U.S.C. § 1343) and constitutes a predicate act of racketeering
under 18 U.S.C. § 1961(b).

(m)     Jim Dodaro's e-mail message to Eileen Shovlin on July 20, 2005,
described in paragraph 43 of the New York Attorney General's

complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(n)   Eileen Shovlin's e-mail message to Jim Dodaro on July 20, 2005, described in paragraph 43 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(o)   Jim Dodaro's e-mail message to Neal Jacobs on February 8, 2005, described in paragraph 44 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(p)   The "co-broker" payments discussed in paragraphs 42 to 47 of this complaint and paragraphs 27 to 45 of the New York Attorney General's complaint, as well as other such payments not specifically enumerated in the complaints, were made in furtherance of Defendants' fraudulent scheme. To the extent that any of those "co-broker" payments were made by interstate wires or mail, defendants violated 18 U.S.C. § 1343 and 18 U.S.C. § 1341, respectively. Each violation of these statutes is a predicate act of racketeering.

(q)     The purchase agreements relating to the transactions described in paragraphs 42 to 47 of this complaint or paragraphs 27 to 45 of the New York Attorney General's complaint, as well as other such purchase agreements not specifically enumerated in the complaints, made material misrepresentations and/or omissions of fact in furtherance of Defendants' fraudulent scheme. In particular, the purchase agreements did not disclose to policy holders that Defendants had fraudulently influenced the purchase of their life insurance policies through tactics such as bid-rigging and co-broker payments. To the extent that any of those purchase agreements were transmitted by interstate wires or mail, defendants violated 18 U.S.C. § 1343 and 18 U.S.C. § 1341, respectively. Each violation of these statutes is a predicate act of racketeering.

(r)     In the negotiations that culminated in. among other things, the Ritchie I Policy Purchase Agreement and the Ritchie II Policy Purchase Agreement, as well as in the negotiations that culminated in the Ritchie IV arrangement (described and defined in paragraph 64 below), Alex Seldin, Reid Buerger, and Antonio Muniz transmitted or caused to be transmitted over email documents containing the statements set forth in paragraphs 34 to 37 above. The transmission of these statements violated the federal wire

fraud statute (18 U.S.C. § 1343) and constitutes predicate acts of racketeering under 18 U.S.C. § 1961(b).

(s) During the interstate telephone conference occurring in or about June 2006, as described in paragraphs 50-51 of this complaint, Reid Burger and Coventry's counsel acted in furtherance of Defendants' fraudulent scheme by misrepresenting to Plaintiffs the nature of the New York Attorney General's investigation. That misrepresentation violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

57. This enumeration of predicate acts of racketeering is not exhaustive. As explained in the New York Attorney General's complaint, Defendants used interstate wires and mail on numerous other occasions in furtherance of their fraudulent scheme.

**DAMAGE TO PLAINTIFFS CAUSED BY DEFENDANTS' ILLEGAL CONDUCT**

58. Ritchie I and Ritchie II own the life insurance policies at issue. The market value of those policies has greatly diminished since the New York Attorney General's action was commenced.

59. Each of the plaintiffs anticipated a profit from the planned sale of the policies in a securitization transaction. For purposes of completing the securitization transaction, Plaintiffs, with the support and encouragement of Coventry, had obtained a pre-sale report and a rating from the Moody's service on a number of the policies.

60.     When the Attorney General's action became public, Moody's withdrew its rating "in light of the uncertainty surrounding the transaction in light of the complaint filed by the New York State Attorney General."

61.     On information and belief, Moody's had lost confidence in the health of the collateral – i.e., the policies. Specifically, Moody's no longer believed in the representations and warranties made by Ritchie I and Ritchie II to potential investors in the securitization, which themselves relied on representations and warranties made by Coventry to Ritchie I and Ritchie II. Moody's, that is, no longer believed that the policies had been purchased in compliance with applicable legal requirements.

62.     Defendants' misconduct has thus directly interfered with the salability and value of the life insurance policies at issue. Defendants' misconduct therefore harmed not only Ritchie I and Ritchie II, but the entities (such as Ritchie Trust I, Ritchie Master Trust, Ritchie Risk-Linked, and RCM) that own or are beneficially interested in Ritchie I and Ritchie II and that were owed fiduciary duties and other duties breached by Coventry.

63.     Ritchie I and Ritchie II continue to pay enormous amounts in premiums and fees to service the policies, the salability of which has been impaired by Defendants' misconduct.

64.     Moreover, in or about June 2006, Ritchie Capital committed additional capital to the arrangement with Coventry. The June 2006 commitment was known as "Ritchie IV." The Ritchie IV transaction never resulted in the purchase of policies, but Ritchie Capital (including Ritchie Trust I, Ritchie Master Trust, Ritchie Risk-Linked, and RCM) – which was induced to enter into the Ritchie IV arrangement by Coventry's

fraudulent conduct in connection with Ritchie I and Ritchie II, including the representations described in paragraphs 34 to 37 above – suffered substantial transaction costs and opportunity costs in connection with Ritchie IV.

65.    It was entirely foreseeable that Defendants' misconduct would damage Plaintiffs in these ways. Defendants represented that the policies had been purchased in compliance with law. Defendants knew that Plaintiffs' reason for purchasing the policies was to realize a profit by securitizing and selling them. Defendants also knew that they were participating in fraud on the owners of the policies – fraud that, if it came to light, would greatly diminish the salability and value of the policies and destroy the possibility of realizing a profit through the securitization. Defendants therefore knew that they were creating serious risks for Plaintiffs.

66.    Coventry in substance was using Plaintiffs' capital to acquire assets that, because of Coventry's own misconduct, turned out to be worth far less than what Plaintiffs had reason to believe they were worth. At the same time, Coventry was profiting from its misconduct, because it sold the policies to Plaintiffs at prices higher than those Coventry paid.

67.    Had Plaintiffs known that Coventry engaged in bid-rigging and other illegal practices, Plaintiffs never would have done business with Coventry, let alone continued to commit additional capital to the arrangement with Coventry.

## COUNT ONE

### (Violation of RICO, 18 U.S.C. § 1962(a) – against all defendants)

68.    Each of the foregoing allegations is incorporated herein by reference.

69.     All Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(a).

70.     Ritchie I and Ritchie II are enterprises within the meaning of 18 U.S.C. § 1961(4).

71.     Ritchie I and Ritchie II engage in interstate commerce, as well as activities affecting interstate commerce, by obtaining life insurance policies from Coventry in Pennsylvania for the purpose of selling those policies in securitization transactions occurring in other states, such as New York.

72.     Defendants have received income or proceeds derived directly or indirectly from a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)and 1961(5) and § 1962(a), to wit:

　　　　(a)     Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and

　　　　(b)     Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

73.     Defendants used or invested the income and/or proceeds of this pattern of racketeering activity, namely insurance policies, in the acquisition of an interest in or the establishment or operation of, Ritchie I and Ritchie II, in violation of 18 U.S.C. § 1962(a).

74.     Plaintiffs were injured in their business and property within the meaning of 18 U.S.C. § 1964(c) by reason of the violation of 18 U.S.C. § 1962(a) committed by Defendants. Specifically, because the insurance policies used or invested by Defendants were tainted by Defendants' racketeering activities, the salability of those policies now is uncertain, and therefore the policies, for which Plaintiffs expended funds, now are worth

far less than what Plaintiffs expected to be able to sell them for and in any event what Plaintiffs paid for them.

75.     Plaintiffs were injured in an as yet undetermined amount, believed to be not less than approximately $700 million. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages and the cost of this suit, including a reasonable attorney's fee.

## COUNT TWO

### (Violation of RICO, 18 U.S.C. § 1962(c) – against all defendants)

76.     Each of the foregoing allegations is incorporated herein by reference.

77.     There is an enterprise within the meaning of 18 U.S.C. § 1961(4) consisting of all of the individual Defendants, or any combination thereof, or any of the corporate defendants alone.

78.     The enterprise referred to in the preceding paragraph is engaged in interstate commerce, as well as activities affecting interstate commerce, by purchasing life insurance policies in several states, including California, Hawaii, Nevada, and Florida, for the purpose of transferring those policies to Plaintiffs in Ireland and / or other states, such as New York.

79.     Defendants were all (subject to the exception in the final sentence of this paragraph) persons within the meaning of § 1962(c), distinct from the enterprise referred to in paragraph 77, and employed by or associated with that enterprise. Defendants did conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5) and § 1962(c), to wit:

      (a)      Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and

      (b)      Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

To the extent that the enterprise consisted solely of one of the corporate defendants, that defendant was not distinct from the enterprise and did not conduct or participate in the enterprise's affairs for purposes of this paragraph.

80.    Plaintiffs were injured in their business or property within the meaning of 18 U.S.C. § 1964(c) by reason of the violation of 18 U.S.C. § 1962(c) committed by Defendants. Specifically, Plaintiffs were fraudulently induced to invest with Coventry in life insurance policies that, because of Defendants' racketeering activity, actually were worth, unbeknownst to Plaintiffs at the time, either nothing or a tiny fraction of what Plaintiffs paid for the policies. Indeed, because of Defendants' racketeering activities Plaintiffs have received essentially nothing in return for their investment. Moreover, Plaintiffs were injured when they committed capital to Ritchie IV, which turned out to be an abortive venture because of Defendants' racketeering activities.

81.    Plaintiffs were injured in an as yet undetermined amount, believed to be not less than $700 million. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages and the cost of this suit, including a reasonable attorney's fee.

## COUNT THREE

**(Conspiracy to Violate RICO, 18 U.S.C. § 1962(d) – against all defendants)**

82.    Each of the foregoing allegations is incorporated herein by reference.

83.    Defendants were all (subject to the exception in the final sentence of this paragraph) persons within the meaning of § 1962(d) and distinct from the enterprise

referred to in paragraph 77 above. Defendants conspired within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. §§ 1962(c). In particular, Defendants conspired to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5) and § 1962(c), to wit:

      (a)    Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and

      (b)    Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

To the extent that the enterprise consisted solely of one of the corporate defendants, that defendant was not distinct from the enterprise and did not conspire to conduct or participate in the enterprise's affairs for purposes of this paragraph.

84.    Defendants are all persons within the meaning of 18 U.S.C. § 1962(a) who conspired to use or invest the income and/or proceeds of their pattern of racketeering activity, namely insurance policies, in the acquisition of an interest in or the establishment or operation of the enterprises described in paragraph 70 above, in violation of § 18 U.S.C. § 1962(a).

85.    Plaintiffs were injured in their business or property within the meaning of 18 U.S.C. § 1964(c) in an as yet undetermined amount, believed to be not less than approximately $700 million, by reason of Defendants' violation of § 1962(d). Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages and the cost of this suit, including a reasonable attorney's fee.

## COUNT FOUR

**(Fraud – against all corporate defendants,
Alan Buerger, Reid S. Buerger, Antonio Muniz, and Alex Seldin)**

86.     Each of the foregoing allegations is incorporated herein by reference.

87.     As detailed herein, Reid S. Buerger, Alan Buerger, Constance Buerger, and / or Antonio Muniz, acting for themselves and on behalf of Coventry First, The Coventry Group, Inc., Montomery Capital, Inc., and / or LST, made material misstatements to Plaintiffs, and omitted to disclose material information that they were obligated to disclose to Plaintiffs, regarding (1) the circumstances under which owners of life insurance policies were induced to part with their policies, and (2) the existence and target of the New York Attorney General's investigation into Coventry.

88.     These misstatements and omissions were committed knowingly, intentionally, and willfully, and were intended to induce Plaintiffs to rely on them.

89.     Reasonably relying on these misstatements and omissions, Plaintiffs acted to their detriment by investing in life insurance policies worth much less than Plaintiffs had reason to believe they were worth, and committing capital to Ritchie IV.

90.     As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered damages in an amount believed to be not less than $700 million.

## COUNT FIVE

**(Fraudulent Inducement – against all corporate defendants,
Alan Buerger, Reid S. Buerger, Antonio Muniz, and Alex Seldin)**

91.     Each of the foregoing allegations is incorporated herein by reference.

92.     As detailed herein, in connection with, among other agreements, the Ritchie I Policy Purchase Agreement and the Ritchie II Policy Purchase Agreement, Reid

S. Buerger, Alan Buerger, Constance Buerger, and / or Antonio Muniz, acting for themselves and on behalf of Coventry First, The Coventry Group, Inc., Montomery Capital, Inc., and / or LST knowingly or recklessly made false and misleading statements to, and knowingly or recklessly concealed information from and did not disclose information to Plaintiffs regarding Coventry's practices in purchasing life insurance policies.

93.     Under the circumstances, Coventry had a duty to disclose the omitted information.

94.     The misstatements and omissions were intended to induce, and did induce, Plaintiffs to act to their detriment in that (1) Ritchie Capital caused Ritchie I and Ritchie II to enter into, and Ritchie I and Ritchie II in fact entered into, among other agreements, the policy purchase agreements, and (2) Ritchie Capital entered into the Ritchie IV arrangement.

95.     Plaintiffs entered into these arrangements to their detriment, as described herein.

96.     As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered damages in an amount believed to be not less than $700 million.

<u>**COUNT SIX**</u>

**(Breach of Fiduciary Duty – against all corporate defendants)**

97.     Each of the foregoing allegations is incorporated herein by reference.

98.     Coventry was the partner, joint venturer, and co-venturer of Ritchie Capital and in consequence owed Plaintiffs a duty of the highest loyalty. Coventry,

moreover, occupied a position of superior knowledge with respect to the purchase and servicing of life insurance policies.

99.     The fiduciary duty owed by Coventry to Plaintiffs obligated Defendants to make full disclosure of all material circumstances surrounding the purchase of life insurance policies, and of the existence of the New York Attorney General's investigation.

100.     Defendants concealed this information and thereby misled Plaintiffs to their detriment in that they invested in life insurance policies worth much less than Plaintiffs had reason to believe they were worth, and committed capital to Ritchie IV.

101.     As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiffs have suffered damages in an amount believed to be not less than $700 million.

## COUNT SEVEN

### (Breach of Contract – against all corporate defendants)

102.     Each of the foregoing allegations is incorporated herein by reference.

103.     LST is a mere alter ego, agency, and instrumentality of Coventry First and the Coventry corporate family. The affairs of LST, which is wholly-owned by Coventry First, are completely dominated by Coventry First and the Coventry corporate family. On information and belief, LST has no assets of its own, and its officers and directors all are officers and directors of Coventry First and the Coventry corporate family. LST conducts no business of its own but was merely a conduit for Coventry's sale of life insurance policies to Ritchie I and Ritchie II.

104.     Pursuant to the Ritchie I Policy Purchase Agreement and the Ritchie II Policy Purchase Agreement, Coventry represented, among other things, that:

(i)     Coventry's acquisition of policies was in compliance with all laws and regulations, there was no proceeding pending or threatened involving any agency or governmental body seeking to prevent the transactions contemplated by the agreements or seeking a determination that might affect the performance by Coventry of its obligations;

(ii)    before conveying the life insurance policies to Ritchie I or Ritchie II, Coventry would take all reasonable actions under applicable law to protect and perfect its ownership of the policy; and

(iii)   Coventry acquired the policies directly from the insureds in transactions that in all material respects complied with all applicable laws, or acquired the policies from third parties in transactions that to Coventry's knowledge complied in all material respects with all applicable laws.

105.    Coventry breached its contracts with Ritchie I and Ritchie II in that these representations and warranties were false as to some or all of the policies purchased by Ritchie I and Ritchie II from Coventry.

106.    By reason of Coventry's breach, Plaintiffs have suffered damages in an amount believed to be not less than $700 million.

107.    Plaintiffs are entitled pursuant to the policy purchase agreements to rescind the life settlement transactions through which Coventry transferred the life insurance policies to them.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

(a) All damages proven pursuant to RICO, trebled as permitted by law;

(b) All other compensatory damages sustained by Plaintiffs;

(c) Punitive damages, in an appropriate amount to be determined at trial;

(d) Rescission of the relevant life settlement transactions between Plaintiffs and Defendants;

(e) Attorneys' fees and costs;

(f) Prejudgment and post-judgment interest; and

(g) Such other relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

LAW OFFICES OF THOMAS P. PUCCIO

Thomas P. Puccio (TPP-8403)
230 Park Avenue
New York, NY 10169
Tel: (212) 883-6383
Fax: (212) 883-6388

ROBBINS, RUSSELL, ENGLERT,
ORSECK & UNTEREINER LLP

By: _Daniel R. Walfish_
Lawrence S. Robbins (LR-8917)
Gary A. Orseck
Daniel R. Walfish (DW-5916)
1801 K Street, N.W.
Suite 411
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510

*Counsel for Plaintiffs*

Dated: April 27, 2007
    Washington, D.C.

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK          :
by ELIOT SPITZER, Attorney General of
the State of New York,                       :

                    Plaintiff,          :          **COMPLAINT**

          -against-                         :          Index No.

                                :

COVENTRY FIRST LLC, MONTGOMERY
CAPITAL, INC., THE COVENTRY GROUP, INC., and   :
REID S. BUERGER,

                                :

                Defendants.
------------------------------------------------------------------------X

        1.      Plaintiff, the People of the State of New York, by Eliot Spitzer, Attorney

General of the State of New York (the "State"), complaining of the above-named Defendants,

alleges upon information and belief, that:

**PRELIMINARY STATEMENT**

        2.      This case arises from pervasive fraud in what is called the "life

settlements" business, where investors buy life insurance policies from owners at a discount, pay

the premiums as they come due, and ultimately collect the death benefits for a profit. Defendant

Coventry First LLC, a wholly-owned subsidiary of Defendant Montgomery Capital, Inc. and an

affiliate of Defendant The Coventry Group, Inc. (collectively "Coventry"), is one of the major

purchasers of life settlements, and Defendant Reid S. Buerger ("Buerger") is its Executive Vice

President and son of its founder Alan Buerger. The Defendants and other participants in the life

1

settlement business prey on the owners of life insurance policies through two main schemes.

3.      First, Defendants and brokers specializing in life settlements pretend to conduct auction-style bidding to get the highest price for owners considering selling their life insurance policies. In fact, the bidding is often rigged, with Coventry paying the brokers undisclosed fees, euphemistically called "co-brokering fees," to "sit on" or reduce competitive bids from other buyers. In a typical case involving a trust-owned policy insuring an elderly New York couple, Coventry offered $880,000 in October 2004 in return for the 80 year-old woman's life insurance policy, which would pay $4.9 million on her death. Shortly thereafter, Coventry learned that another buyer, acting through a broker, AllSettled Group, Inc. ("AllSettled"), was ready to offer over $1,000,000 for the same policy. Coventry offered AllSettled a $49,000 "fee" to suppress this competing bid, sending AllSettled an encoded email on November 2, 2004 stating "for [initials of insured], the number is 49." In return for this secret payment, AllSettled never informed the policy owner of the higher offer and closed its file on the matter. This Office's investigation has revealed dozens of similar examples involving Coventry making payments to suppress competing offers.

4.      Second, Coventry systematically participates in breaches of fiduciary duty by life settlement brokers that hold themselves out to policy owners as faithful agents who will go to the market and obtain the highest possible prices for their clients' insurance policies. In a typical transaction, Coventry secretly provides these brokers with what is called a "gross offer" for the seller's life insurance policy. The gross offer is a lump-sum amount to be divided between the broker and the seller at the broker's discretion. It is never disclosed to the seller.

2

Unbeknownst to the seller, the less the seller gets, the more the broker keeps. The broker thus has

every incentive to convince the owner that his or her policy is worth as little as possible. The

results are not pretty: in one instance a broker took a gross offer of $822,500 for a policy

purchased by Coventry and convinced his client to take $365,000 as a purchase price, keeping

$457,500 for himself as a "commission."

5.      In most states, including New York, Coventry makes no disclosures about

its gross offers. If a seller asks about broker compensation, Coventry typically refuses to answer.

In states where the law requires disclosure, such as Ohio and Nevada, Coventry sometimes

generates false documents that conceal all or a portion of what the broker is getting.

6.      This action seeks damages, including restitution and rescission, on behalf

of the owners of life insurance policies who have been damaged by the schemes described above,

as well as injunctive relief preventing further breaches of law by the Defendants.

## PARTIES

7.      This action is brought by the People of the State of New York by the

Attorney General based upon his authority under the Executive law, the Donnelly Act, the Martin

Act and the General Business Law of New York State.

8.      Defendant Coventry First LLC, a Delaware corporation domiciled in Fort

Washington, Pennsylvania, is in the business of purchasing life insurance policies from sellers, a

process also known as funding of life settlements. Coventry conducts business in New York

State and throughout the United States. Coventry First LLC, formed in October 2001, a wholly-

owned subsidiary of Defendant Montgomery Capital, Inc., is a privately held company owned by

3

(1) Alan Buerger, Chief Executive Officer, (2) Constance Buerger, President and Chief Operating

Officer, and (3) Reid S. Buerger, Executive Vice President.   From 2001 through 2005, Coventry

paid annual management fees roughly equaling its profits to Defendants The Coventry Group,

Inc. and Montgomery Capital, Inc., which are owned by the Buerger family.

9.     Coventry is a leader in the life settlement business and has touted itself as

having a market share exceeding 50%.  (COV 1029983)[1].  It purchases life insurance policies on

behalf of institutional investors such as American International Group ("AIG"), Citigroup, Inc.

and Ritchie Capital, an Illinois hedge fund.  Coventry entered the market in 2002, purchasing 436

life insurance policies representing approximately $720 million in total death benefits.  By 2005,

Coventry purchased 1,318 life insurance policies representing more than $3 billion in death

benefits.

10.     Defendant Reid S. Buerger is an individual residing in Pennsylvania.

Buerger is the Executive Vice President of Coventry.  He owns 20% of Coventry directly and

through a family trust.

## JURISDICTION

11.     The State has an interest in the economic health and well-being of those

who reside or transact business within its borders.  In addition, the State has an interest in

ensuring that the marketplace for insurance policies, securities and other financial products

functions honestly and fairly with respect to all who participate or consider participating in it.

The State, moreover, has an interest in upholding the rule of law generally.  Defendants' conduct

---

[1] Parenthetical citations refer to documents attached as exhibits hereto.

injured these interests.

12.     The State sues in its sovereign and quasi-sovereign capacities, as *parens patriae*, and pursuant to Executive Law §§ 63(1) and 63(12), the New York Donnelly Act, General Business Law, § 340 *et seq*., the Martin Act, General Business Law § 352 *et seq.* and the common law of the State of New York.  The State sues to redress injury to the State and to its general economy and citizenry-at-large.  The State seeks disgorgement, restitution, damages, including rescission, punitive damages and treble damages, and costs and equitable relief with respect to Defendants' fraudulent and otherwise unlawful conduct.

## FACTUAL ALLEGATIONS

### I.     The Life Settlement Industry

#### A.     Background

13.     A "life settlement" is the sale of a life insurance policy in return for a purchase price that typically exceeds the surrender value[2] of the policy.  Such policies are typically involve insureds who are high net worth individuals 75 years or older with more than two years life expectancy.  These policies are often owned by trusts or companies, though in some instances the owners are the elderly insured individuals themselves.  Owners may want to sell their policies for a variety of reasons, including avoiding high premium payments or getting out of what are in essence poorly performing investments.  The buyers are investors who, after buying the policy, continue to pay premiums until the insured dies.  Upon the insured's death, the

---

[2] The surrender value is a contractual price set forth in a life insurance policy at which a policy owner can return or "surrender" the policy to the life insurance company which issued the policy.

5

buyers claim the policy's death benefit.

14.     The economics of these deals are straightforward: the investor wagers that
the value of the future death benefit will exceed the purchase price and costs of paying premiums
until the insured dies. In turn, the seller prefers an immediate lump sum payment as opposed to
the alternative of paying premiums for an eventual death benefit. Given this simple equation, a
life settlement investor gets a higher rate of return the nearer the insured is to death and if the
insured has experienced a decline in health since the policy had been issued. In certain
transactions, for instance, Coventry makes its life settlement offer "contingent on receipt of letter
signed by insured stating they are currently a [c]igarette smoker and how many cigarettes they
smoke per day." (COV-1139212).

### B.     History of Life Settlements

15.     In the 1980s, investors began purchasing life insurance policies from
terminally ill individuals, often afflicted with the HIV virus and in need of immediate cash, in
transactions known as viaticals. However, as HIV medical treatments improved and individuals
lived longer, these types of policies were not as profitable to investors. Furthermore, various
states moved to regulate the industry to curtail fraudulent practices typically involving
middlemen who defrauded the purchasers of policies. Many states, including New York, enacted
laws that require strict licensing and disclosure in all cases where the insured has "a catastrophic
or life threatening illness or condition." See e.g. N.Y. Insurance Law Article 78.

16.     The life settlement industry developed in the late 1990s as an outgrowth of
viaticals, involving older individuals who were not on the brink of death. Under an industry

6

standard that is codified in some states (though not New York), sales in which the insured has

two or more years of life expectancy are life settlements and sales involving those with shorter

life expectancies are considered viaticals. Many states, including New York, do not require

licensing of life settlement brokers or disclosure of compensation practices, and so these

transactions largely occur without regulatory oversight.

       17.     The life settlement industry has grown dramatically in the past ten years.

In 2005, for example, investors purchased life insurance policies with death benefits estimated at

$13 billion. One research analyst has predicted that the business will grow more than ten-fold to

$160 billion over the next several years. (Bernstein Research Call, March 4, 2005). An industry

newsletter recently compared the industry's fast dollars and lack of regulation to that of the Old

West:

> Saddle up partner 'cuz your [sic] in for some kind of ride. It's easy
> to compare the early days of the life settlement industry to the Wild
> West, with its mad rush for gold, freedom to roam, and cowboy-
> like bravado. But the industry has changed quite a bit since then.
> The dust has settled, boundaries have been drawn, and lone rangers
> replaced by corporate giants. Although the industry is much more
> sophisticated today, those early promises of golden nuggets still
> exist. (Cov 1027931).

Similarly, a life settlement broker's website offers a caricature of a prospector in front of a

saloon, with a banner overhead reading: "Welcome to Cashville." (http://www.tecsc.com (last

visited Mar. 29, 2006)).

7

## C.     Structure of the Life Settlement Market

18.     The life settlement business has evolved into a multi-tiered industry, consisting of Sellers, Brokers, and Buyers. The role of each is described below.

19.     First, there is the Seller.  As described above, the Seller is an owner of a policy insuring the life of an elderly person with two or more years of life expectancy.  In a typical case, the Seller discusses with a financial advisor, insurance agent, estate planner or other advisor the option of entering into a life settlement.  If the Seller decides to proceed, the Seller's advisor may hire one or more intermediaries specializing in life settlements ("Brokers") to represent the Seller.  In some cases, the Seller's insurance agent or other advisor may team up with the Broker to shop the policy.  The Broker(s) submit the policy to different buyers ("Buyers") such as Coventry.  If interested, the Buyers bid on the policy.  Coventry and other Buyers may use their own capital to purchase life settlements.  In most cases, however, Coventry acts as a Buyer for institutional investors.  In some cases, Coventry cuts out the middlemen, negotiating Sellers and their representatives directly.

20.     In theory, the industry operates on an auction model, with Brokers serving as auctioneers, soliciting bids from competing Buyers to submit to the Seller for the policy. Brokers act on the Seller's behalf to shop the policy to different Buyers.  Buyers, including Coventry, will submit what is called a "gross offer" to a Broker, which represents a single lump sum offer to the Broker for the purchase of a life insurance policy.  From this "gross" or lump sum amount, the Broker will then determine how much to extend to the Seller as the actual purchase price and how much to keep for itself, the Broker.  Although a Broker solicits gross

8

offers, it usually only presents to the Seller a net price, keeping both the gross offer and the Broker's compensation hidden from the Seller. Like an auction there may be multiple rounds of gross offers submitted by competing Buyers who outbid each other in an effort to win the deal.

21.    Buyers may seek to differentiate their bids by touting their superior credit risk or ability to close transactions quickly, but as in any auction, the main driver for the Seller is the selling price. When the Seller is satisfied that he or she has the highest offer the auction ends. If the highest offer is inadequate, the Seller may decide to keep the policy or offer it for sale in the future. If the offer is accepted, the Broker informs the Buyer of that fact and of how the gross offer will be divided between the Seller and the Broker. The Buyer then pays the selling price to the Seller.

22.    In a typical case, a Broker submits a life settlement application to Coventry. Coventry's Financial Analysis group processes the actuarial data, estimates life expectancies and determines the pricing for the policy. The policy is then sent to the Financial Underwriting group, headed by Defendant Buerger. Buerger and his team then determine the gross offers. As described above, the gross offer encompasses broker compensation, however any special compensation arrangements, including co-broker payments and bonuses, are approved by Buerger himself. As one email explained, "Eileen [Shovlin, Coventry regional manager] talks to [the Broker] about their cases and Reid [Buerger] about co-brokers." (COVJD 00022580).

23.    Brokers owe a fiduciary duty to their client, the Seller. According to an industry association: "It's important to recognize that the broker has a fiduciary role to represent

9

the seller by law...the bottom line is that the broker's job is to fully represent the interests of the policy seller." (Life Insurance Settlement Association White Paper "Cashing in on Unneeded Life Insurance Policies," Aug. 22, 2006). Brokers hold themselves out as representatives of the Seller working to obtain the highest purchase price on his behalf. For example, AllSettled states on its website: "A broker works for you. A broker will check with several providers to find the best offer for you." (http://www.allsettled.com/sellerguide.html (last visited Apr. 27, 2006)). Another broker's website, Advanced Settlements, Inc. ("Advanced"), states: "Having developed relationships with more than 20 funding institutions, the company works with financial professionals, attorneys and charitable organizations to obtain multiple offers on the secondary market in pursuit of the highest possible settlement for the client." (http://advancedsettlements.com /assets/pages/about.php (last visited Apr. 3, 2006))[3].

24.     Coventry recognizes that Brokers owe their clients a fiduciary duty. When it is advantageous to Coventry, it steps in to ensure that duty is fulfilled. For example, on May 6, 2005, a Broker refused to present Coventry's offer to the Seller. In response, a Coventry regional vice president suggested, "perhaps I could push the fiduciary duty button and force him into presenting the offer to the client." (COVJD 00031940). In a similar situation earlier in 2005, Coventry was informed that another Broker would not present its higher offer to the Seller. Alan Buerger, Coventry's founder and CEO, directed that the Broker be reminded that it "is to act as a fiduciary for the client and we would be both disappointed and surprised if they chose not to act

---

[3] Advanced is one of the largest life settlement Brokers. It is a wholly-owned subsidiary of National Financial Partners Corporation, a publicly traded Delaware corporation headquartered in New York.

10

as a fiduciary . . . This is all the more relevant given all Coventry's recent conversations with [the Broker] about Spitzer, disclosure and liability. . . you may quote me!"  (COVJD 00021726).

## II.    Coventry's Bid Rigging Scheme

25.    In fact, the above auction model bears little relation to what really happens in the life settlement industry.  Coventry has undermined competition in the life settlements business through a variety of schemes - - the most egregious of which involves rigged bids for insurance policies.

26.    In late 2001, Coventry entered the life settlement industry as a Buyer (it had previously been a Broker).  By early 2002, it had begun to pay undisclosed compensation, called co-broker payments, to Brokers who in exchange refrained from submitting bids, refrained from soliciting competitive bids or squelched higher bids, thus guaranteeing that Coventry won the "auction."  A senior Coventry employee, Neal Jacobs, aptly described these payments as providing Coventry "insurance" that it would win the auction.  (COVNJ 00012957).  Some examples of the scheme are set out below.

### A.    A 79 year-old widower living in Hawaii

27.    In mid-2003, a 79 year-old widower living in Hawaii decided to sell his $400,000 life insurance policy.  The policy was ultimately sold to Coventry on April 16, 2003 for $102,000 - -  the Seller received $78,000 and his Broker received $24,000.

11

28.     The Seller was not aware that another Broker, Florida-based Life

Settlement Alliance ("LSA")[4] had a gross offer of \$108,000, surpassing Coventry's, but refrained

from presenting it in exchange for a co-broker fee. In a March 5, 2003 email Jim Dodaro,

Coventry's Vice President of Financial Underwriting, wrote to Buerger:

> [Jim Nutt, a senior employee of LSA] said he spoke with you a
> while back about co-brokering the . . . case. He is frustrated that
> we have not gotten it accepted. He said he is sitting on a 27%
> gross offer [\$108,000] from Mutual and can probably get more. If
> we can't close he said he could and pay us a co-broker fee. (COV
> 1136766).

Ultimately, Coventry closed with a gross offer of \$102,000 (\$78,000 to the Seller and \$24,000 to

his Broker) and, as arranged by Buerger and Nutt, LSA received a co-broker payment of \$12,000

for not submitting the higher bid. LSA's sole contribution to the life settlement transaction was

to "sit on" a competing offer to the detriment of the Seller. The co-broker fee was not disclosed

to the Seller as part of Coventry's Purchase Agreement. (COV2 0006025).

29.     In September 2006, Buerger invoked the Fifth Amendment when asked

whether he approved the co-broker payment to LSA in exchange for LSA to sit on the higher

offer.

---

[4]   LSA dissolved in mid-2005 after the U.S. Securities and Exchange Commission
("SEC") alleged that Mutual Benefits Corporation, a life settlement and viatical Buyer that was
shut down by the SEC in 2004, violated an asset-freeze order by diverting \$2.8 million from
Mutual Benefits to LSA. In May 2005, LSA's three senior officials left LSA and started a new
Broker called Life Insurance Settlements, Inc. ("LIS") which continues to do business with
Coventry.

12

**B.**    **A trust-owned policy insuring a New York woman in her eighties**

30.    In another case, a family trust decided to put a $4.9 million policy insuring

an 80 year-old woman on the market through a Broker.  The Broker solicited bids directly from

Coventry as well as from AllSettled, a New York Broker[5].  In September 2004, Coventry made a

gross offer of $705,000 for the policy.  (COV 1142334).  Coventry learned in October 2004 that

it was competing against an offer from another Buyer of $880,000 submitted by AllSettled.  Neal

Jacobs, Coventry's Director of Financial Underwriting, contacted AllSettled's President, Michael

Krasnerman ("Krasnerman"), to work out a deal.   According to an October 28, 2004 email from

Jacobs, Krasnerman requested a payoff of 1.5 percent of the death benefit to step aside in the

bidding process.  Jacobs reported, "[Krasnerman] claims he would go well over $1M. [H]e asked

for 1.5 pts.  I offered .5 pt. [D]o we want to do that much?"  (COVNJ 00027506).  Ultimately,

Coventry and AllSettled reached an agreement that Coventry would pay $49,000, equal to 1% (or

1 point) of the death benefit of the policy and in exchange AllSettled would close the file.  The

agreement was memorialized in an encoded email from Jacobs to Krasnerman on November 2,

2004, stating "for [insured's initials], the number is 49."  (COVNJ 00008934).  On November

11, 2004, Lenore Saracino, AllSettled's Vice President of the Life Settlement Division, wrote by

hand on the Status Report "[c]lose file[.]  Have a co-brokering fee with Coventry."  (AS 001166).

---

[5]  At times, AllSettled is the Buyer itself, purchasing policies through vehicles such as
AllSettled Assets LLC and National Consolidated Funding LLC II, which share common
ownership.

31. On December 28, 2004, the trust received $800,000 for a policy and the Broker received $142,500 as compensation. Unbeknownst to the Seller, Coventry also paid AllSettled $49,000 in exchange for stepping out of the bidding process. (COVNY 00013466).

## C. A family-owned policy insuring a 79 year-old man

32. In another transaction in late 2004 involving the policy insuring a 79 year-old man from New Jersey owned by a family member, Coventry offered directly to the Broker (the Seller's financial advisor) a $3,100,000 gross offer for a policy with a $10,000,000 death benefit. On December 15, 2004, near the end of the bidding process, AllSettled's Saracino forwarded Neal Jacobs a competing offer of $3,525,000 she had received from another Buyer. She added in her email to Jacobs: "Call Michael Krasnerman on Thursday." Jacobs immediately forwarded AllSettled's offer to Buerger with the message: "see below for what he says is his latest offer on [case name]." (COV 441616). Rather than compete with AllSettled and raise its gross offer by at least $425,000, Coventry took the cheaper way out, entering into a side deal with AllSettled: AllSettled would receive $200,000 in co-broker fees in exchange for not presenting its higher offer. Using the shorthand Coventry and AllSettled had developed for such matters, Jacobs sent an email to Krasnerman on December 16, 2004, stating "number is 200" (COVNJ 00010364) then followed up a few minutes later with an email to Coventry's accounting department: "[AllSettled is] now co-broker for $200K." (COV 441517). By paying AllSettled a co-broker payment of $200,000 for not competing, Coventry ensured that its gross offer remained unchanged at $3,100,000. The purchase closed on December 28, 2004 with the Seller receiving $2,946,947 and the Seller's original Broker receiving an additional $153,053.

14

The Seller never learned that another Buyer was willing to pay $3,525,000 for the policy, nor that AllSettled received a co-broker payment for $200,000. (COV2 0009660, COV 441517).

### D.   A trust-owned policy insuring an 81 year-old man

33.   In a transaction involving the sale of a trust-owned policy with a death benefit of $2.4 million policy, Stuart Kosloff ("Kosloff"), President of the East Coast Settlement Company,  a Florida-based Broker, contacted Dodaro on October 13, 2004 and informed him that he had a $900,000 bid that had not yet been submitted to the Seller.  Kosloff suggested that the two parties "work together" to ensure that Coventry would win the business.  (COV 1132940). Dodaro sent an email on November 15, 2004 to Buerger seeking approval over the terms of the deal:  "I told Stuart [Kosloff] we could pay 1 pt (24k).  He said that wasn't enough (has around 920k gross) and asked for 50-60K."  (COV 1132946).   Three days later, having not heard from Coventry, Kosloff sent the following email to Dodaro threatening, "I need to hear a yes or a no before the end of the day or I have to up my offer to them."  (COVJD 00025246).  Dodaro repeated his request for Buerger's approval, and within a few hours, Buerger wrote back:  "ok." (COV 1132946).

34.   Kosloff kept up his part of this collusive arrangement by not communicating this higher bid to the Seller and dropping out of the bidding.  In a December 15, 2004 email from Kosloff to Dodaro, relating to a conversation Kosloff had earlier that day with the Seller's advisor, Kosloff wrote that the advisor "called this morning asking if I was all done bidding on [case name].  Told him I hated to say it but he should go with you." (COVJD 00017552).  Coventry purchased the policy on January 31, 2005 for $825,000. As agreed,

15

Coventry then paid Kosloff $50,000. (COVJD 00025357). The Seller was never told about Kosloff's higher offer nor the co-broker payment to Kosloff. (COV2 0007151).

35.     In September 2006, Buerger invoked the Fifth Amendment when asked about the purpose of Coventry's payment to Kosloff.

### E.     A company-owned policy insuring a 79 year-old woman

36.     In a transaction involving a company-owned policy insuring a 79 year-old woman living in New Jersey, Coventry initially bid $620,000 on December 16, 2004. A few days later on December 22, 2004, Coventry increased its offer to $865,000. (COVNJ 00010495). Subsequently, Dodaro sent an email to Buerger on December 28, 2004 informing him that Pete Gaynor, another senior employee at LSA, told him: "We [Coventry] were one of 2 funders that offered on it. [A competing Buyer] was the other and are over 1M. Said he needs to hear from us by today or he is offering." (COVJD 00018719). In other words, LSA demanded to hear from Coventry or else it would compete with the higher offer it had from a competing Buyer. Even though LSA was not the Broker of record, it received $65,000 from Coventry in exchange for not presenting the higher offer. This payoff was directly approved by Reid Buerger. (COVJD 00022656). Ultimately, Coventry closed the deal on February 4, 2005 for a gross offer of $930,000, which was below the competing $1 million gross offer noted by Gaynor. (COV 1194765). Once again, the Seller was not informed of the payoff made to LSA. (COV2 0007161).

16

**F.   A family-owned policy insuring a couple in their eighties**

37.   In April 2005, Coventry extended a gross offer of $650,000 to the family owners of a variable life insurance policy insuring a Florida couple in their eighties with a $4 million death benefit. (COVJD 00032741). On or about May 17, 2005, Jason Wyatt, Vice President of Advanced, contacted Dodaro and told him he had a higher offer from another Buyer and followed up with an email proposing a co-broker payment of 1 percentage point, or $40,000. (COVJD 00032741). That same day, Dodaro reported the conversation to Buerger: "I told [Wyatt] 20K (½ pt). His offer (710K he says) is from [another Buyer] and we have a ton of room." (COVJD 00032741).

38.   Advanced's Wyatt continued to press for a full percentage point co-broker fee but Dodaro responded: "take the bird in the hand" because "a bird in the hand is worth two in the bush." (COVJD 00032760). In other words, a guaranteed one-half percentage point, $20,000, would be worth more to Advanced than submitting to the vagaries of actual competition, which could result in no commission to Advanced if Advanced failed to win the bidding war. Dodaro added: "I think what I offered is a no brainer for you." (COVJD 00032760).

39.   Two days later, on May 19, 2005, Dodaro reached out to Wyatt, asking: "we good?" On May 23, 2005, Wyatt responded: "I guess I will take the bird in the hand. I will call him Larry. I will send Eileen [Shovlin, Coventry Regional Vice President] the file so you can put us down for 20k. Good job!" (COVJD 00033623). Even after Wyatt agreed to the payment, doubts remained. Dodaro wrote to Neal Jacobs: "I am nervous that Advanced will try

17

to pull a fast one. Please make sure the regional [manager] stays on top of this – I want to know if Advanced tries anything to win the case." (COVJD 00033539). Both parties kept their word: Coventry closed the deal on July 18, 2005, Advanced received a co-broker fee of $20,000 (AS 0008072), and the Sellers never learned that Advanced had received a co-broker fee and had sold them out. (COV2 0005404).

### G.   A 79 year-old man living in California

40.    In another transaction in 2005, Coventry offered $135,000 to a California Broker on a policy belonging to a 79 year-old California man with a death benefit of $1.2 million. Upon learning that LSA had a higher competing gross offer for $185,000, on May 5, 2005, Dodaro sent an email to Buerger asking him, "Do you want me to work out with LSA or let them have it?" (COVJD 00033016). The following day, Dodaro sent the following email to Coventry's accountant, "2 pts to LSA - co-broker." (COVJD 00033116). In return, LSA's higher offer was not presented to the client. LSA did in fact receive a co-broker payment of 2 percent of the $1.2 million death benefit, or $24,000.

41.    Prior to closing this case, on May 20, 2005, Jacobs emailed Dodaro that a third Broker, Trinity Financial Services LLC, also had a higher gross offer of $150,000: "Trinity has 150k and want to cooperate...I think I could get away w/5k..." (COVJD 00033131). Like LSA, Trinity received a co-broker payment of $5,000 for "cooperating" with Coventry. (COVJD 00035057).

42.    With LSA and Trinity satisfied, Coventry purchased the policy on June 22, 2005 for a gross amount of $140,000. The Seller never learned that two higher offers were made

18

or that LSA and Trinity both received payoffs in exchange for suppressing the higher bids. (COV2 0007162).

### H.    A company-owned policy insuring an 83 year-old man

43.    In another case, Coventry and Advanced (acting on behalf of another Buyer) were competing to purchase an $800,000 life insurance policy insuring an 83 year-old Florida man. In June 2005, Advanced had a bid from another Buyer for $231,000, higher than Coventry's offer at that time of $204,000. (AS008117). Scott Kirby, Co-President of Advanced, contacted Eileen Shovlin, Coventry's Regional Vice President, to discuss the policy. On July 20, 2005, she sent an email to Buerger and Dodaro noting that although Coventry and Advanced had been competing for the policy, "now that we are talking...they called me to discuss." Seeking approval of a co-broker payment to Advanced, she wrote: "Scott thinks 2 pts is fair on this. Pls advise." Dodaro responded by asking Jacobs whether there was any "room" to pay Advanced, and Jacobs replied "you can throw them [a] little cash." (COVJD 00009237-38). That same day, Dodaro sent an email to Shovlin and Coventry's accounting department, "1.5 pts to Advanced – Co-broker." (COVJD 00038350). Coventry purchased the policy for less than Advanced's $231,000 competing offer on September 8, 2005: it paid $185,000 to the Seller and $19,000 in compensation to the Broker who closed the case. Coventry did "throw cash" to Advanced, specifically Coventry paid Advanced $12,000 (1.5% of the death benefit). Not surprisingly, the payoff to Advanced was not disclosed to the Seller. (COV2-0001267).

19

**I.      A policy insuring an 85 year-old man**

44.     In January 2005, Coventry made a gross offer of $135,000 on the policy insuring an 85 year-old Florida man with a $400,000 death benefit. (COVNJ 00028146). On February 8, 2005, Dodaro emailed Jacobs stating that LSA, representing a competing Buyer, had received a higher offer for the policy: "LSA can beat our 135K. How confident are we?" (COVNJ 00012075). Jacobs explained that he lacked confidence that the Seller would close with Coventry if LSA did indeed have a higher offer noting, "Is LSA offer still good? if so, this guy would switch in a second so [I am] not very confident." (COVNJ 00012075).

45.     To ensure that Coventry would close the deal, Dodaro arranged for a $5,000 co-broker payment to LSA and for Coventry to close the deal through another Broker, telling Jacobs, "I bought insurance for 5K." (COVJD 00023061, COVNJ 00012075). The $5,000 payoff, or "insurance," guaranteed that LSA would not submit a competing offer and therefore allow Coventry to close the deal at the original gross offer of $135,000. Jacobs responded, "good idea even if they were bluffing." (COVNJ 00012075). Coventry then purchased the policy on March 28, 2005, paying the Seller $120,000 and the Broker who closed the deal $15,000. Coventry also paid $5,000 to LSA as a co-broker payment. The $5,000 payment to LSA was never disclosed to the Seller.

\*                          \*                          \*

46.     The above are illustrative cases; this Office's investigation has revealed literally dozens of other examples of bid rigging by Coventry and Brokers. Coventry has concluded that, in many cases, it is cheaper to pay off corrupted Brokers than to engage in

20

marketplace competition.

## III.   Coventry's Right of Last Offer

47.   Until 2005, Coventry required nearly every Broker with which it does business to sign an agreement (never disclosed to Sellers), providing among other things that the Broker will provide Coventry with a "right of last offer to contract for a Life Settlement in respect of such Policy on terms that with respect to purchase price of the policy are more favorable to the seller than those set forth in the Competing Offer." (AS 020704). By exercising this provision, Coventry has the right to hold back in early stages of the bidding process, and then swoop down at the last moment with a matching or better offer. Under the terms of Coventry's contracts, and in violation of duties owed by the Broker to the Seller, the Broker cannot then return to the market to shop for a higher offer. As one Coventry manager put it: "We will always get right of last offer. The bidding system is simply for aesthetic reasons." (COVJD 20709). In September 2006, Buerger invoked the Fifth Amendment when asked whether the purpose of the right of last offer clause was to prevent Brokers from soliciting competitive offers after Coventry invokes this right.

## IV.   Coventry's Corrupt Broker Compensation Practices

48.   Coventry's gross offers corrupt the Broker-Seller relationship by undermining the Broker's duties to the Seller and creating perverse incentives to negotiate lower, instead of higher, selling prices for Sellers. While the Broker may profess to represent the client, in many cases the Broker conceals its conflict of interest and hides the fact that both the Broker and the Seller are competing for a slice of Coventry's gross offer. Coventry benefits from this

21

scheme by obtaining lower prices for the policies it purchases and by creating incentives for Brokers to steer additional business to it.

49.     For example, if Coventry extends a gross offer of $100,000 to purchase a life settlement, the Broker may decide to pass on $70,000 to the Seller and keep $30,000. However, if the Broker wishes to increase its compensation, it may try to convince the Seller to accept only $60,000 for the policy, leaving $40,000 for the Broker.  In many cases, the Seller is never informed of the full amount or mechanics of Coventry's gross offer, and so never learns the full amount that Coventry was willing to pay for the policy or the amount of compensation taken by the Broker.

50.     In one case already noted above, Coventry extended a gross offer of $3.1 million to the Seller of a $10 million life insurance policy. On or about December 6, 2004, prior to making the offer, a Coventry regional manager wrote to Neal Jacobs, asking whether the Broker, Eikonglobal, Inc., a New York City financial advisor, could allocate the $3.1 million gross offer as $2.8 million to the Seller and $300,000 to the Broker. However, in a prior communication the Seller had demanded $3,000,000 for his policy and Jacobs replied: "what happened to the client needing 3m." The Coventry regional manager replied: "I just want to let him [Eikonglobal] know whether he can keep the difference if [he] gets the offer accepted for less." (COV 462713). The next day, the Coventry regional manager updated Jacobs: "Client is holding out for 3m. [Eikonglobal] doesn't want to do the case for 100k comp. He is still trying to get client to take less." (COV 462717). Ultimately, Eikonglobal was successful in persuading the Seller to take less and thereby allowing Eikonglobal to take more:  Coventry paid out a total

22

of $3.1 million, the Seller received $2,946,947 and Eikonglobal received $153,053 in compensation. Coventry induced and participated in Eikonglobal's breach of duty to the Seller and no disclosure was made to the Seller regarding the Broker's compensation. (COV2 0009660).

51.     To sweeten the offer, on or about December 8, 2004, Coventry also promised Eikonglobal another $50,000 in deferred compensation contingent on Eikonglobal agreeing that it would not use Coventry's offer "to entice competitors to beat this offer." (COV 441505). Eikonglobal accepted the no-shopping language and Coventry made a record to pay Eikonglobal another $50,000 on the next case it closed for Coventry. (COV 1119841, COV1 10137).

52.     Brokers frequently negotiate gross offers for their sole benefit when they know they have reached an agreeable offer in the eyes of the Seller. In one case involving a family trust-owned policy on the life of a 77 year-old Nevada woman, Coventry was finalizing the contracts on a life settlement in which the Seller would receive $275,000 for two policies and the Broker, Cavalier Associates, would receive $31,000 in compensation. On or about June 20, 2005, Cavalier Associates emailed Coventry, stating "I just got an offer from Advanced [working on behalf of a competing Buyer] at 400K for both policies. . .this is enough for me to stop the Coventry paperwork. . .and start with [sic] over with the new offer. . .I don't need you to match it. . . but I do expect you to increase your offer to something close to that. . .I need to know today. . . this is a great file and I know you have room. . .let me know asap." (COVNJ 00021301). Not wanting to risk losing the case to the higher offer, the next day, Coventry increased Cavalier

23

Associates's compensation from $31,000 to $100,000 and also paid Advanced $100,000 as a co-broker payment. (COVNJ 00024690). All the while, the Seller's compensation remained the same and no disclosure was made to the Seller of the co-broker payment or the higher offer. (COV2 007156, 007165).

53.     Ostensibly to prevent Brokers from grabbing the lion's share of the compensation in every case, Coventry has adopted general "guidelines" that limit Broker compensation to the lesser of 6 percent of the life insurance policy's death benefit or 50 percent of its offer to the Seller. However Coventry frequently pays Brokers amounts in excess of these limits, using hidden deferred compensation or bonuses. Deferred compensation has two purposes: it allows Coventry to exceed its guidelines and it incentivizes Brokers to steer future clients to Coventry in order to collect the payoff.

54.     In one case, Coventry extended a gross offer of $2.535 million to purchase three policies with an aggregate death benefit of $8 million insuring the lives of a couple in their eighties. The Broker, Cale W. Carson (also known as "Kit" Carson), divided this amount between himself and the Seller, and ultimately offered the Seller $1,625,000, keeping $910,000 for himself. Carson's proposed compensation, however, exceeded 6 percent of the $8 million death benefit, and in a December 28, 2004 email, Reid Buerger told him that Coventry would not pay him more than 6 percent of the death benefit. Carson retaliated in an email to Coventry: "You are hereby notified that you are not to proceed further (send change forms to the carriers) on the above case until we speak, and get this situation clarified." (COV 1120238).

24

55. Rather than lose the deal, Buerger wrote back the next day: "as a follow up to our conversation compensation for the above case will be 6%, or 480k. In addition, per our conversation we will be paying the 120k." (COV-1102963). Coventry's internal accounting records show that Carson, indeed, received $480,000 compensation plus an additional $120,000 in bonus for a total of $600,000 for the transaction. Coventry also awarded Carson an additional $75,000 in deferred compensation, for a total compensation package of $675,000. (COV 32402-32403). Notably, Coventry's records provide no indication that the Seller was informed that Coventry was actually willing to buy the policy for $2.535 million (as opposed to $1.625 million), and that at least $675,000 was siphoned off in Broker compensation. (COV2 0009657-58). In September 2006, Reid Buerger invoked the Fifth Amendment when asked why he agreed to pay Carson above the 6% guideline.

56. In certain instances Broker compensation in fact exceeded the selling price offered to the Seller. The egregious nature of such deals was not lost on the participants in the life settlement. In an email dated October 20, 2004, a representative from Berkshire Hathaway, one Coventry investor, wrote to AIG, another Coventry investor, to question Broker compensation on a life settlement negotiated for them by Coventry: "Can I get a little color on this one, please. $130,875 to the seller, and $857,500 of commissions??? Am I missing something?" In separate emails, AIG and Coventry's CEO Alan Buerger responded, noting that deducting Coventry's $400,000 customary fee, Broker compensation was only $457,500, and taking into account a premium reimbursement payment, Seller's compensation would be

25

$365,000. (COV. 1066288). After these adjustments, Coventry still paid the Broker $92,500 more than the Seller.

57. Coventry and its founder Alan Buerger are familiar with gross offers because prior to becoming a Buyer, Coventry benefitted from gross offers as a Broker. In 2000, Coventry, as a Broker, worked out an arrangement whereby it would split 50-50 with a Buyer any savings it obtained by negotiating a lower sales price with a Seller of a policy insuring a 66 year-old man from California. Thus, in the September 2000 transaction, where Coventry negotiated a $20,000 reduction in the purchase price, the Buyer wrote Coventry: "On the 2mill policy we gave you an offer of $450,000 you negiotiated [sic] a new purchase price of $430,000 split 50/50 extra 10k to you." In other words, since Coventry convinced the Seller to take $20,000 less than what the Buyer offered, Coventry and Buyer would split the difference and each walk away with an extra $10,000. Not content with his 50 percent cut on the reduced purchase price, Reid Buerger responded, with a copy to Coventry's CEO Alan Buerger, "We were not supposed to split this one 50/50, it was to be 100% to us." The Buyer, confused by this departure from the usual practice of evenly splitting the savings, replied: "Why would we not split this one. Our policy was everything negiotiated [sic] down we always split 50/50. Who approved this!!!" (COV-1032560).

*                              *                              *

58. The above, again, are illustrative cases; this Office's investigation has revealed literally hundreds of examples of gross offers extended by Coventry and other Buyers.

26

In more than 200 cases, the Broker receives half or more of what the Seller receives. The use of gross offers has become pervasive in the life settlement business.

## V.    Coventry Creates False and Misleading Documentation

59.    Coventry touts itself as having "exacting" due diligence and "conduct[ing] our business transparently." (COV1 00322). However, in many instances it directly participates in the Broker's breach of its duty to the Seller by failing to disclose Broker compensation to the Seller and by falsifying any paperwork the Seller sees to show less compensation than is actually paid.

60.    Coventry has two major incentives not to disclose the full measure of compensation to the Seller: (1) providing sweetheart deals to Brokers incentivizes Brokers to continue to do business with Coventry, and (2) disclosing compensation, especially when compensation is high in relation to the purchase price, may cause a Seller to reconsider closing a deal or rescind a deal that is still within the rescission period[6].

61.    Coventry's standard practice when the Seller or a representative of the Seller inquires about Broker compensation is to direct the Seller to the Broker. For example, on April 22, 2003, the trustee of a New York life insurance trust contacted Coventry seeking information about how much Advanced, the Broker on the deal, would be paid on the life settlement. Reid Buerger responded: "just tell him this is not information we are at liberty to

---

[6]In most states, life settlements and viaticals are subject to a two-week rescission period, during which the Seller can unwind the transaction for any reason. (National Association of Insurance Commissioners (NAIC) model regulations providing for a fifteen day rescission period.)

provide." (COV 1113128). In September 2006, Buerger invoked the Fifth Amendment when asked about this matter. In another email dated March 25, 2003, a Coventry Regional Director wrote to a Broker: "Compensation disclosure is determined by state regulation. Assuming the policy owner resides in the state of Wisconsin (life settlements are not regulated in Wisconsin), there would not be any compensation disclosure. Coventry First would direct any inquiries by the policy owner and/or insured regarding compensation to your office." (COV-1112858).

62.     When pressed, Coventry has agreed to falsify documents. In one example, involving a policy insuring an 80 year-old New York man, the Seller received from Coventry $317,000, the primary Broker received $11,250 and another Broker in the distribution chain received $3,750. (BIS002136). On July 27, 2004, Coventry sent offer sheets to both Brokers reflecting the agreed-upon compensation. The next day, both Brokers signed and returned the offer sheets to Coventry, marking the end of the bidding process. (COV2 0009420-9425). Subsequently, one of the Seller's advisors contacted the first Broker and inquired as to the amount of compensation that he was to receive. In response to this inquiry and at the first Broker's request, Coventry falsified the offer sheets making it appear that the first Broker had only received $1,250 in total compensation instead of the $11,250 he actually received. In fact, the first Broker received the remaining $10,000 as an undisclosed "bonus." (BIS002207-2209). To cover up the scheme, on August 31, 2004, Coventry also emailed the falsified offer sheets to the second Broker for his signature. The second Broker signed and returned the new offer sheets to Coventry on September 2, 2004. (COV2 0009430). The false offer sheets were explicitly created to hide the full measure of compensation paid on this policy.

28

63.     Even in so-called "disclosure states"[7] where Coventry is statutorily required to disclose Broker compensation to the Seller, it often understates or misleads the Seller as to the Broker's compensation. This investigation has uncovered numerous occasions where co-broker fees and/or deferred compensation was not disclosed to the Seller. It was not until July 20, 2006 - - a year after this Office's investigation began - - that Coventry put in writing a policy requiring disclosure of all Broker compensation in such states. (COV2 0009661-662).

64.     For example, in one case involving a family-owned policy insuring an 87 year-old man from Nevada (which requires disclosure), Coventry agreed to pay a total of $42,000 in compensation, $21,000 to LSA and $21,000 to Advanced. Coventry, however, did not want to disclose the entire $42,000 in compensation on the Exhibit A disclosure form attached to the Purchase Agreement, and so, on December 22, 2004, Jim Dodaro emailed Reid Buerger and others at Coventry, suggesting that they could keep $22,000 off the Exhibit A by calling it deferred compensation and co-broker fees: "Total comp is 42K to LSA (they were paying Advanced 21K of it). Looks like we have to do a new Ex A disclosing comp. Can we lower the gross offer by 22K, put 20K comp on the Ex A, defer 1K to LSA and pay 21K to Advance as co-broker?" (COV 1120443). Following Dodaro's suggestion, Coventry disclosed only $20,000 on the Exhibit A to the Seller. The remaining $22,000 was paid to the Brokers as deferred compensation and co-broker payment and never disclosed to the Seller. (COVJD

---

[7] States currently requiring disclosure of Broker compensation include Arkansas, Florida, Indiana, Kansas, Kentucky, Nebraska, Nevada, North Carolina, North Dakota, Ohio, Pennsylvania, Tennessee and Utah. Statutes in these States, though not uniform, generally require that the Buyer of a life settlement disclose to the Seller the amount of Broker compensation being paid.

29

00025548, COV2 0007152). In September 2006, Buerger invoked the Fifth Amendment when asked why he agreed to alter the Exhibit A.

## FIRST CAUSE OF ACTION
(Fraudulent business practices – Executive Law § 63(12))

65.     The acts and practices alleged herein constitute conduct proscribed by § 63(12) of the Executive Law, in that Defendants have engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

## SECOND CAUSE OF ACTION
(Anti-Competitive Behavior – Gen. Bus. L. § 340 *et seq*.)

66.     Beginning no later than 2001 and continuing through in or about 2006, Defendants and others conspired unreasonably to restrain trade and commerce in violation of General Business Law § 340 *et seq*. by, among other things:  (1) providing owners seeking to sell their life insurance policies in the secondary market with collusive, fictitious or otherwise non-competitive bids or other terms of sale; (2) allocating the opportunity to purchase, and the purchase of, life insurance policies to particular Buyers and Brokers; and (3) creating a scheme to pay Brokers to participate in and implement the unlawful conspiracy.

67.     As a result of this conspiracy, Sellers received cash settlements on terms less favorable than would have been available in a competitive market and were denied to opportunity to offer their life insurance policies for sale, and to sell their policies, under free and open competitive conditions.

30

68.     Defendants' acts are *per se* violations of General Business Law § 340 *et*

*seq*.

69.     Various persons, not named as defendants, participated as co-conspirators

in the violations alleged and performed acts and made statements in furtherance of that

conspiracy.

## THIRD CAUSE OF ACTION
(Securities Violations – Gen. Bus. L. § 352 *et seq*.)

70.     To the extent that Defendants engaged in life settlement transactions

involving variable life insurance policies, the acts and practices of Defendants alleged herein

violated Article 23-A of the General Business Law, in that Defendants engaged in the artifice,

agreement, device or scheme to obtain money, profit or property by a means prohibited by

§ 352-c of the General Business Law.

## FOURTH CAUSE OF ACTION
(Common Law Fraud)

71.     The acts and practices of Defendants alleged herein constitute actual

and/or constructive fraud under the common law of the State of New York.

## FIFTH CAUSE OF ACTION
(Unjust Enrichment)

72.     By engaging in the acts and conduct described above, Defendants unjustly

enriched themselves and deprived policy owners and the investing public of a fair market place.

## SIXTH CAUSE OF ACTION
(Inducement of Breach of Fiduciary Duty)

73.     By engaging in the acts and conduct described above, Coventry aided and

31

abetted, participated in, and benefitted from Brokers and others' breach of their fiduciary duties to their clients.

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

A.     Enjoining and restraining Defendants, its affiliates, assignees, subsidiaries, successors and transferees, their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with it, from engaging in any conduct, conspiracy, contract, or agreement, and from adopting or following any practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above.

B.     Directing that Defendants, pursuant to section 63(12) of the Executive Law and the common law of the State of New York, disgorge all gains and pay all restitution and damages as provided by law and caused, directly or indirectly by the fraudulent and deceptive acts complained of herein;

C.     Directing that Defendants, pursuant to section 63(12) of the Executive Law, offer the right of rescission to all Sellers who entered into Purchase Agreements with Defendant Coventry from 2001 to the present;

D.     Directing that Defendants pay punitive damages;

E.     Directing that Defendants pay three-fold damages;

F.     Directing that Defendants pay Plaintiff's costs, including attorneys' fees as provided by law;

32

       G.     Directing such other equitable relief as may be necessary to redress

Defendants' violations of New York law; and

       H.     Granting such other and further relief as may be just and proper.

Dated:     New York, New York
          October 26, 2006

                            ELIOT SPITZER
                            Attorney General of the State of New York
                            120 Broadway, 23rd Floor
                            New York, New York 10271
                            (212) 416-8995

                            By: _____
                            David D. Brown, IV
                            Assistant Attorney General

Of Counsel:
Maria Filipakis
David Axinn
J. Jennifer Koh
Assistant Attorneys General