# Exhibit 5

**EXECUTION COPY**

**MASTER POLICY PURCHASE AGREEMENT**

by and between

LST I LLC,

as Seller

and

RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND) IV, LIMITED,
as Purchaser

Dated as of June 30, 2006

**EXECUTION COPY**

TABLE OF CONTENTS

Page

ARTICLE I        DEFINITIONS ................................................................1

ARTICLE II       CONVEYANCE OF LIFE SETTLEMENT POLICIES ......................2

ARTICLE III      REPRESENTATIONS, WARRANTIES AND COVENANTS .........3

ARTICLE IV     FUNDING PROCEDURES ...........................................12

ARTICLE V      CONFIDENTIALITY ................................................14

ARTICLE VI     TERMINATION.......................................................16

ARTICLE VII    MISCELLANEOUS PROVISIONS ...............................17


SCHEDULE 1  Schedule of Conveyed Life Settlement Policies ...............................1-1

EXHIBIT A  Eligibility Certificate .........................................................A-1

EXHIBIT B  Information and Confidentiality ……………………………….. B-1

**EXECUTION COPY**

## MASTER POLICY PURCHASE AGREEMENT

This MASTER POLICY PURCHASE AGREEMENT, dated as of June 30, 2006 (this "Agreement"), is entered into by and between LST I LLC, a Delaware limited liability company, as seller (in such capacity, the "Seller"), and RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND) IV, LIMITED, an Irish private limited company, as purchaser (in such capacity, the "Purchaser").

WHEREAS, the Purchaser desires to purchase from the Seller certain life insurance polices comprising Eligible Life Settlement Policies, subject to the terms and conditions of this Agreement; and

WHEREAS, the Seller desires to sell to the Purchaser certain life insurance polices comprising Eligible Life Settlement Policies, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01    <u>Definitions</u>.  Capitalized terms used and not otherwise defined in this Agreement have the respective meanings ascribed to them in the Glossary of Defined Terms attached hereto.

SECTION 1.02    <u>Usage of Terms</u>.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; article, section, subsection, exhibit and schedule references contained in this Agreement are references to articles, sections, subsections, exhibits and schedules in or to this Agreement unless otherwise specified; with respect to all terms in this Agreement, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form; references to agreements and other contractual instruments include all subsequent amendments, amendments and restatements and supplements thereto or changes therein entered into in accordance with their respective terms and not prohibited by this Agreement; references to Persons include their permitted successors and assigns; references to laws include their amendments and supplements, the rules and regulations thereunder and any successors thereto; and the term "including" means "including without limitation."

EXECUTION COPY

## ARTICLE II

## CONVEYANCE OF LIFE SETTLEMENT POLICIES

SECTION 2.01    Conveyance of Life Settlement Policies Generally.

(a)    Agreement to Sell and Purchase.  Subject to the terms and conditions of this Agreement, the Seller agrees to sell to the Purchaser, and the Purchaser agrees to purchase from the Seller, each such sale to be without recourse to the Seller (except under Section 3.06):

all right, title and interest of the Seller in and to the Life Settlement Policies offered by the Seller to the Purchaser pursuant to Section 4.01 and as to which ownership of such Life Settlement Policies has been transferred from the LST Securities Account to the Purchaser's Securities Account (subject to the retention of servicing rights contemplated hereby and by the Transaction Documents and the covenants herein of the Purchaser and each subsequent transferee with respect to the servicing thereof), and all proceeds thereof, including, without limitation, the right to collect Net Death Benefits from the related Issuing Insurance Companies, the right to proceeds of Policy Loans or withdrawals post-purchase, the right to proceed against any state guarantee fund and other property and interests in property related thereto, including, without limitation, all monies due and to become due in respect to any of the foregoing (whether in respect of principal, interest, fees, expenses, indemnities, rescission payments or otherwise);

(the property, rights and amounts described in this Section 2.01(a) referred to collectively herein as the "Conveyed Property").

(b)    Purchase Obligation.  During the term of this Agreement, the Purchaser  (i) shall not enter into any agreement or arrangement whereby the Purchaser or any third party is prohibited from doing business with the Seller and the Seller's Affiliates, (ii) shall be obligated to purchase each Life Settlement Policy that satisfies all of the Eligibility Criteria as of the related Funding Date that is offered pursuant to Section 4.01 from amounts on deposit in the Draw Account and available therefor and (iii) shall deposit or cause the prompt deposit into the Draw Account and Servicing Account of immediately available funds pursuant to Section 4.02.

(c)    Intent of the Parties.  It is the intention of the Seller and the Purchaser that the conveyance, transfer and assignment of each Conveyed Life Settlement Policy contemplated by this Agreement shall constitute a sale of such Life Settlement Policy from the Seller to the Purchaser, and that all of the Seller's beneficial interest in and title to each Conveyed Life Settlement Policy (other than the retained right to service as contemplated by the Transaction Documents), shall not be part of the Seller's estate in the event of the filing of a bankruptcy petition by or against the Seller under any bankruptcy law.  As a precautionary measure, in the event that notwithstanding the

contrary intention of the Seller and the Purchaser, the sale of any Life Settlement Policy or group of Life Settlement Policies is recharacterized as a loan, the parties intend that this Agreement constitute a security agreement under applicable law, and the Seller hereby grants to the Purchaser a first priority perfected security interest in, to and under each such Conveyed Life Settlement Policy and all related Conveyed Property and all proceeds of any of the same for the purpose of securing payment and performance of the Seller's obligations under this Agreement and the repayment of any amounts owed to the Purchaser by the Seller.

## ARTICLE III

## REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 3.01    <u>Representations and Warranties of the Seller and Purchaser</u>. (a) The Seller hereby represents and warrants to the Purchaser as of the Closing Date and each Funding Date that:

(i)    <u>Organization and Good Standing</u>. The Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware and has organizational power and authority to own its properties and to conduct its business as such properties shall then be owned and such business is then conducted, and had at all relevant times, and shall then have, organizational power, authority and legal right to acquire, own and sell the Life Settlement Policies as contemplated by this Agreement.

(ii)    <u>Due Qualification</u>. The Seller is duly qualified to do business as a foreign limited liability company in good standing, and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such qualifications, licenses or approvals.

(iii)    <u>Power and Authority</u>. The Seller has full power, authority and right to execute and deliver this Agreement, and has full power and authority to perform its obligations hereunder, including the power and authority to transfer Life Settlement Policies to the Purchaser as contemplated hereby, and has taken all necessary action to authorize and has duly authorized the execution and delivery of this Agreement and the performance of such obligations.

(iv)    <u>Binding Obligation</u>. This Agreement constitutes the legal, valid and binding obligations of the Seller enforceable against the Seller in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally or by general principles of equity.

(v)     <u>No Violation</u>.  The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof will not violate any United States federal, state or local law or regulation, violate, result in the breach of any terms and provisions of, nor constitute an event of default under, the certificate of formation or the operating agreement of the Seller, or violate or breach any of the terms or provisions of, or constitute an event of default under, any agreement to which the Seller is a party or by which it shall be bound; nor violate any order, judgment or decree applicable to the Seller of any United States federal or state court, regulatory body, administrative agency or other United States federal or state governmental instrumentality having jurisdiction over the Seller or its properties.

(vi)     <u>No Proceedings</u>.  There is no action, suit or proceeding before or by any court, regulatory body, administrative agency or other governmental agency or body, domestic or foreign, now pending, or to the Seller's knowledge, threatened, against or affecting the Seller or its assets or properties: (A) asserting the invalidity of this Agreement, (B) seeking to prevent the consummation of any of the transactions contemplated by this Agreement, or (C) seeking any determination or ruling that might materially and adversely effect the performance by the Seller of its obligations under, or the validity or enforceability of, this Agreement.

(vii)     <u>No Consents</u>.  No consent, approval, permit, license, authorization or order of or declaration or filing with any governmental authority is required to be obtained by the Seller for the consummation of the transactions contemplated by this Agreement, except such as have been duly made or obtained.

(viii)     <u>Patriot Act</u>.  No Affiliate or Person affiliated with the Seller or that makes funds available to any Affiliate of the Seller in order to allow the Seller to fulfill its obligations under the Transaction Documents or for the purpose of funding the investment in the Purchaser made by such Affiliate of the Seller is: (A) a Person listed in the Annex to Executive Order No. 13224 (2001) issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), (B) named on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Assets Control, (C) a non-U.S. shell bank or is providing banking services indirectly to a non-U.S. shell bank, (D) a senior non-U.S. political figure or an immediate family member or close associate of such figure or (E) otherwise prohibited from investing in the Purchaser pursuant to applicable U.S. anti-money laundering, anti-terrorist and asset control laws, regulations, rules or orders.

(b)     The Purchaser hereby represents and warrants to the Seller as of the Closing Date and each Funding Date that:

(i)     <u>Organization and Good Standing</u>.  The Purchaser is an Irish private limited company, duly organized, validly existing and in good standing under the

laws of the Republic of Ireland, and has organizational power and authority to own its properties and to conduct its business as such properties shall then be owned and such business is then conducted, and had at all relevant times, and shall then have, organizational power, authority and legal right to acquire and own the Life Settlement Policies as contemplated by this Agreement.

(ii)     <u>Due Qualification</u>.  The Purchaser is duly qualified to do business in, and is in good standing in, and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of the Purchaser's business shall require such qualifications, licenses or approvals.

(iii)     <u>Power and Authority</u>.  The Purchaser has full power, authority and right to execute and deliver this Agreement and has full power and authority to perform its obligations hereunder, including the power to purchase the Conveyed Life Settlement Policies and related Conveyed Property as contemplated hereby and has taken all necessary action to authorize the execution and delivery of this Agreement and the performance of such obligations.

(iv)     <u>Binding Obligation</u>.  This Agreement constitutes the legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally or by general principles of equity.

(v)     <u>No Violation</u>.  The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms thereof shall not violate any Irish law or regulation or any United States federal, state or local law or regulation, result in the breach of any terms and provisions of, nor constitute an event of default under its organizational documents, or violate or breach any of the terms or provisions of, or constitute an event of default under, any agreement to which the Purchaser is a party or by which it shall be bound; nor violate any order, judgment or decree applicable to the Purchaser of any Irish court, regulatory body or administrative agency or other Irish governmental instrumentality having jurisdiction over the Purchaser or its properties, or of any United States federal or state court, regulatory body or administrative agency or other United States federal or state governmental instrumentality having jurisdiction over the Purchaser or its properties.

(vi)     <u>No Proceedings</u>.  There is no action, suit or proceeding before or by any court or governmental agency or body, domestic or foreign, now pending, or to the Purchaser's knowledge, threatened, against or affecting the Purchaser or its assets or properties: (A) asserting the invalidity of this Agreement, (B) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or (C) seeking any determination or ruling that might materially and

adversely affect the performance by the Purchaser of its obligations under, or the validity or enforceability of, this Agreement.

(vii)    No Consents.  No consent, approval, permit, license, authorization or order of or declaration or filing with any governmental authority is required to be obtained by the Purchaser for the consummation of the transactions contemplated by this Agreement, except such as have been duly made or obtained.

(viii)    Investment Company Act.  The Purchaser is not required to be registered under the Investment Company Act of 1940 (as amended).

(ix)    Regulation S.  The Purchaser is purchasing the Conveyed Life Settlement Policies in reliance on, and satisfies the requirements of, Regulation S under the Securities Act of 1933.

(x)    Patriot Act.  No Affiliate or Person affiliated with the Purchaser or that makes funds available to any Affiliate of the Purchaser in order to allow the Purchaser to fulfill its obligations under the Transaction Documents or for the purpose of funding the investment in the Purchaser made by such Affiliate of the Purchaser is:  (A) a Person listed in the Annex to Executive Order No. 13224 (2001) issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), (B) named on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Assets Control, (C) a non-U.S. shell bank or is providing banking services indirectly to a non-U.S. shell bank, (D) a senior non-U.S. political figure or an immediate family member or close associate of such figure or (E) otherwise prohibited from investing in the Purchaser pursuant to applicable U.S. anti-money laundering, anti-terrorist and asset control laws, regulations, rules or orders.

(c)    The representations and warranties set forth in this Section 3.01 shall survive for a period of one year following the last Funding Date under this Agreement.

SECTION 3.02    Representations and Warranties of the Seller as to the Life Settlement Policies.

(a)    As of each Funding Date, the Seller conveying Life Settlement Policies represents and warrants to the Purchaser:

(i)    Eligible Life Settlement Policies.  All of the Life Settlement Policies the purchases of which are being funded on such Funding Date are Eligible Life Settlement Policies.

(ii)    Quality of Title/Valid Transfer.  With respect to each Life Settlement Policy:

(A)     Prior to the transfer of each Life Settlement Policy to the Purchaser, the Seller shall have taken all reasonable actions under applicable law in each relevant jurisdiction in order to protect and perfect the ownership of the Seller in such policy and the related Conveyed Property against all creditors of, and purchasers from, the Seller;

(B)     Upon the transfer of such Life Settlement Policy to the Purchaser, such policy and the related Conveyed Property shall be free and clear of any Lien imposed by Coventry First or its Affiliates and, to the Seller's knowledge, free of any Lien imposed in favor of any third party (other than any Policy Loan or claim of the Issuing Insurance Company to any part of the cash surrender value or other value thereof, or any other lien if the amount of such lien has been taken into account in the pricing of the Life Settlement Policy);

(C)     Subject to the preceding clause (B), upon the transfer of each Life Settlement Policy, the Purchaser shall acquire a valid and perfected ownership or security interest in such policy and the related Conveyed Property.

(b)     <u>Compliance with Statutes and Regulations</u>.  All Life Settlement Policies the purchases of which are being funded on such Funding Date have been (i) Originated by the Seller or an Affiliate of the Seller in one or more transactions that in all material respects were in accordance with and in compliance with all applicable United States federal, state and local laws, rules and regulations applicable to life settlement transactions and the purchase and resale of life insurance policies, or (ii) purchased from an unaffiliated third party in one or more transactions that, to the Seller's knowledge, were in accordance with and in compliance with, in all material respects, all applicable United States federal, state and local laws, rules and regulations applicable to the purchase of life insurance policies form third persons that are not the Original Sellers.

(c)     The Seller makes no representation or warranty as to (i) the fitness of any Life Settlement Policy for any particular use or business purpose of the Purchaser, (ii) the accuracy of any assessment of Life Expectancy or the Mortality Rating provided by any Medical Underwriter, or the appropriateness of the methodology used by any Medical Underwriter to assess a Life Expectancy or assign a Mortality Rating, (iii) the accuracy of any Mortality Table, (iv) the amount the Purchaser ultimately will recover as proceeds of any Life Settlement Policy or the timing of its receipt of any such amounts, or (v) the amount of the premiums required to maintain any Life Insurance Policy in effect.

(d)     <u>Survival of Representations and Warranties</u>.  The representations and warranties set forth in this Section 3.02 as to each Life Settlement Policy shall survive until (i) $100,000,000 of the Expected Capital have been utilized to acquire Life

Settlement Policies, or (ii) if all the Expected Capital is raised, all such Expected Capital has been utilized to acquire Life Settlement Policies, whichever occurs last.

SECTION 3.03    Covenants of the Seller.

(a)    Acknowledgement of Conveyances.  The Seller hereby covenants that (i) it will take no action inconsistent with the Purchaser's ownership of a Conveyed Life Settlement Policy, (ii) any financial statements of the Seller and its Affiliates that are published, made publicly available or delivered to creditors or investors (or potential creditors or investors) will not indicate or imply that the Seller or any Affiliate thereof has any ownership interest in the Conveyed Life Settlement Policies (other than the servicing rights and other rights specified in the Transaction Documents, or rights arising from the ownership by the Seller or its Affiliates of debt of or equity or similar interests in the Purchaser), and (iii) if a third party that has a legal or equitable right to obtain such information (including any creditor, potential creditor, investor or potential investor in the Seller or its Affiliates, or any regulator or court of competent jurisdiction) should inquire, the Seller will promptly indicate that the Conveyed Life Settlement Policies have been sold to the Purchaser and will not claim ownership interests therein, and if any other third party should inquire, the Seller will not make any statement that implies that the Seller has retained any ownership interest therein.

(b)    No Creation of Adverse Interests.  Except for the conveyances hereunder and pursuant to the other Transaction Documents, the Seller will not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien on any interest in any Conveyed Life Settlement Policies, and the Seller shall defend the right, title, and interest of the Purchaser in, to and under the Conveyed Life Settlement Policies against all claims of third parties claiming through or under the Seller.

(c)    Records.  The Seller shall keep complete and accurate records of the business transacted by it under this Agreement.  The Seller shall retain such records until the later of (i) two (2) years after the termination of this Agreement pursuant to Section 6.01 hereof and (ii) the termination of the Servicing Agreement, or such longer period as may be required by applicable United States law.

(d)    Portfolio Target.  The Seller agrees to exert commercially reasonable efforts to offer for purchase Life Settlement Policies as to which the related Acquisition Costs approximately equal the projected volume targets agreed to by the Seller and the Purchaser.  The Seller will offer for purchase pursuant to Section 2.01(a) only Life Settlement Policies that, in the aggregate will not cause the Purchaser to have purchased Conveyed Life Settlement Policies as to which (measured by dividing the related Acquisition Costs of all relevant Conveyed Life Settlement Policies by the Expected Capital of the Purchaser) more than 15% of the Portfolio were issued by any one Issuing Insurance Company that is rated at or below "A+" by Standard & Poor's, or more than 20% of the Portfolio were issued by any one Issuing Insurance Company that is rated

above "A+" by Standard & Poor's (except that up to 30% of the Portfolio may have been issued by life insurance companies which are directly or indirectly wholly owned by American International Group, Inc. and which share the Standard & Poor's rating of its principal operating companies). In case the Conveyed Life Settlement Policies that remain in the Portfolio of the Purchaser do not comply with the standards in the previous sentence, the Seller will offer for purchase only Life Settlement Policies that taken in the aggregate with Conveyed Life Settlement Policies that remain in the Portfolio, will bring the Portfolio closer to compliance with the standards in the previous sentence.

SECTION 3.04    Covenants of Purchaser.

(a)    Limitation on Resale of Life Settlement Policies. Except as otherwise provided in this Section 3.04 and Exhibit B, the Purchaser will not sell, transfer, convey or assign (i) any Conveyed Life Settlement Policy to (A) any natural person or (B) any Person that does not have at least $100 million in Managed Assets immediately prior to such transaction, or (ii) any direct or indirect beneficial or ownership interest in any Conveyed Life Settlement Policy or a pool or group of Conveyed Life Settlement Policies to any Person in a transaction or series of transactions in which the transferee also receives information concerning the identity of the related Insureds that would or could reasonably be expected to allow (or be used by) such transferee to identify or contact such Insureds (including, without limitation, the names, addresses or social security numbers of the Insureds or their Representatives, the related insurance policy numbers or medical information (other than Life Expectancy delivered by a Medical Underwriter or other than in an aggregate or statistical presentation that does not relate the information to a specific Insured)). Each permitted transfer, sale, conveyance or assignment of a Conveyed Life Settlement Policy will be effectuated (iii) in accordance with all federal, state, and local law governing the Underlying Sale Agreement under which the Seller or the Originator, as applicable, Originated such Conveyed Life Settlement Policy, (iv) in accordance with the terms and remaketing and sale provisions set forth in Section 3.04(b), (v) pursuant to a document or instrument in which the transferee agrees that the Servicer shall continue to service such Conveyed Life Settlement Policy under terms and conditions substantially similar to the set forth in the Servicing Agreement, (vi) pursuant to a document or instrument in which the transferee agrees to confidentiality provisions substantially identical to those set forth in Article V, and (vii) in accordance with Exhibit B.

(b)    Remarketing of Life Settlement Policies. In connection with any sale, transfer, conveyance or assignment of a Conveyed Life Settlement Policy, the Purchaser shall first provide the Seller or its Affiliates with the opportunity to make an offer for the purchase of such Conveyed Life Settlement Policy before offering to sell such Conveyed Life Settlement Policy to another Person. If the Seller and its Affiliates do not make an offer to purchase any such Conveyed Life Settlement Policy, or the offer made is (in good faith) deemed insufficient by the Purchaser, then the Purchaser may solicit offers from third parties in accordance with Section 3.04(c). The reasonable out-of-pocket

9

expenses of the Seller in connection with any remarketing or sale to a third party will be reimbursed by the Purchaser. If a third party makes an offer to the Purchaser to purchase any such Conveyed Life Settlement Policy, then the Purchaser will offer to sell such Conveyed Life Settlement to the Seller or its Affiliates on the terms offered by such third party, and if the Seller or its Affiliates agree to such terms, the Purchaser will instead sell such Conveyed Life Settlement Policy to the Seller or its Affiliates. If the Seller or its Affiliates do not accept such offer from the Purchaser reasonably promptly, then the Purchaser may agree to sell such Conveyed Life Settlement Policy to such third party on the terms offered by such third party.

(c)    <u>Information Sharing in Context of Remarketing</u>. The Purchaser's solicitation of offers from third parties to purchase Conveyed Life Settlement Policies shall comply with the information sharing and confidentiality provisions included in <u>Exhibit B</u> attached hereto.

(d)    <u>Exclusivity; No Solicitation of Brokers, Agents, Sellers or Producers</u>. For so long as it is the case that either (i) Senior Notes have not been issued such that proceeds of all securities issued by the Purchaser equal the Expected Capital as of the Closing Date, (ii) through the last day of the most recently ended period of six consecutive calendar months (starting from the Closing Date), the aggregate amount of funds that has been withdrawn from the Draw Account and used to fund Acquisition Costs equals or exceeds the cumulative total of $110,000,000 for each such six-month period that has ended, or (iii) the Purchaser has failed to deposit into the Draw Account and make available to fund Acquisition Costs the amount specified by the Seller under Section 4.02 with regard to the following two calendar months, the Purchaser and its Affiliates will not purchase any Life Settlement Policy other than from the Seller and Affiliates of the Seller or otherwise invest in, finance, take risk or provide advice in connection with the life settlement sector, and will not contact any agent, broker, seller or producer (including, without limitation any national marketing organization) engaged in the sale, financing, solicitation or origination of Life Settlement Policies. Notwithstanding the foregoing: (1) the above restrictions will not remain in effect for longer than the term of this Agreement and for one year after its termination; (2) the above restrictions shall cease to be in effect if the Seller terminates this Agreement without cause; and (3) the above restrictions shall not be deemed to prevent the Purchaser or its Affiliates from: (A) acquiring an entity whose then-existing business would violate such restrictions (provided that the revenues for such violative business do not exceed ten percent (10%) of the total revenues of such entity and the Purchaser causes such entity to dispose of such violative business within six months); (B) investing in a private investment fund that engages in a violative business, for so long as the Purchaser and its Affiliates are not aware of such business; or (C) continuing any violative business that the Purchaser or its Affiliates are engaged in on the date hereof, so long as there is no material increase in the level of investment in or competitive activity of such violative business. Also, for the duration of this Agreement and for one year after the termination of this Agreement, the Purchaser will not use or disseminate to any other Person, without

the prior written consent of the Seller, information supplied by the Seller and its Affiliates concerning the identity of any such agent, broker, seller or producer (including, without limitation, any national marketing association). The documentation pursuant to which the Purchaser sells, transfers, conveys or assigns any Conveyed Life Settlement Policy or sells, transfers, conveys or assigns any interest therein shall contain a covenant identical to the preceding sentence of this Section 3.04(d).

SECTION 3.05    Waiver of Breach. If either party hereto has actual knowledge thereof, it will promptly notify the other (in all cases within thirty (30) Business Days of obtaining such actual knowledge), of any breach or event or circumstance that, with the passage of time might become a breach, of any provision of any Transaction Document by such party. Notwithstanding any provision of this Agreement to the contrary, if an Authorized Officer of either party has actual knowledge of any such breach, but does not deliver notice of its intention to invoke or avail itself of the remedies afforded by this Agreement with respect to such within thirty (30) Business Days of obtaining such actual knowledge, then such breach (and all claims with respect to any resulting damages, losses relating thereto or arising therefrom or in connection therewith) shall have been waived by such party in all respects and such party will thereafter have no right to take any action, invoke any remedy or recover any losses or damages with respect thereto. Notwithstanding the foregoing, any waiver or deemed waiver of any such breach or of the resulting damages or losses relating thereto or arising therefrom will not constitute a waiver or deemed waiver of any subsequent breach or of the resulting damages or losses relating thereto or arising therefrom.

SECTION 3.06    Remedies; Repurchase of Life Settlement Policies. (a) Within fifteen (15) Business Days of receipt of notice by an Authorized Officer of Seller from the Purchaser of any breach of the Seller's representations, warranties and covenants contained in Section 3.02(a), including any failure of a Conveyed Life Settlement Policy to be an Eligible Life Settlement Policy arising from the circumstances described in the last sentence of Section 4.01 hereof, the Seller or its Affiliate shall, at its discretion, (i) repurchase the affected Conveyed Life Settlement Policy from the Purchaser for the applicable Repurchase Price, or (ii) replace the affected Conveyed Life Settlement Policy with a Replacement Life Settlement Policy reasonably acceptable to Purchaser. If after the related Funding Date (but within the related Rescission Period) the Original Seller of any Conveyed Life Settlement Policy exercises any statutory or contractual right of rescission, then the Seller or its Affiliate shall, at its discretion (A) repurchase such Conveyed Life Settlement Policy from the Purchaser for the applicable Rescission Price, or (B) replace such Conveyed Life Settlement Policy with a Replacement Life Settlement Policy reasonably acceptable to Purchaser. Any purchase or repurchase under this Section 3.06(a), including the execution and delivery of any documents and instruments (including any necessary change of ownership and beneficiary forms, policy service forms or other similar forms, entitlement orders or regulatory filings or notices) necessary to effectuate the conveyance or reconveyance, shall be effected in accordance with Section 3.06(b). In the event that the Seller or its

Affiliate has repurchased a Conveyed Life Settlement Policy that reaches Maturity prior to the Issuing Insurance Company processing the change of ownership forms in connection with such repurchase (and not during any applicable Rescission Period), upon receipt by the Purchaser's Securities Intermediary of the proceeds thereof from the Issuing Insurance Company, the Purchaser shall cause such proceeds to be conveyed to or as directed by the Seller. The remedies provided for in this Section 3.06 shall be the sole remedies of the Purchaser for a breach of the representations and warranties of the Seller in Section 3.02(a).

(b)    Any repurchase of a Conveyed Life Settlement Policy shall be effected by (i) the wire transfer to, or to the order of, the Purchaser in an amount equal to the related Repurchase Price or Rescission Price, as applicable, and (ii) the contemporaneous release by the Purchaser of all of its rights and interests (including any security interests) in and to such Conveyed Life Settlement Policy, and of any third party (if such third parties acquired an interest therein due to actions or inactions of the Purchaser). Each such release will be accompanied by delivery (A) to the relevant Securities Intermediary of appropriate entitlement orders and/or to the relevant Issuing Insurance Company of any relevant change of ownership and beneficiary forms, policy service forms or other similar forms, and (B) such additional instruments of transfer or assignment as the Seller or its Affiliates may reasonably deem as necessary to vest in the Seller all right, title and interest in and to such Conveyed Life Settlement Policy, which instruments shall be prepared by the Seller or its Affiliates and shall be reasonably acceptable to the Purchaser and relevant Securities Intermediary. From and after any such repurchase, the Purchaser shall have no further responsibility with respect to the payment of Premiums or interest on Policy Loans due after the date of repurchase or any other obligation with respect to such Conveyed Life Settlement Policy. Any repurchase of a Conveyed Life Settlement Policy shall include the reconveyance of the related Conveyed Property (and in particular, subject to Section 3.06(a), the right to receive any payment of any related Net Death Benefit paid after the date on which such repurchase is effected).

ARTICLE IV

FUNDING PROCEDURES

SECTION 4.01    Seller's Entitlement Order. With respect to any Life Settlement Policy being sold pursuant to Section 2.01 above, the Seller shall execute and deliver to the Purchaser's Securities Intermediary by electronic mail the related Seller's Entitlement Order. The Seller shall also complete and deliver an Eligibility Certificate (substantially in the form attached hereto as Exhibit A), to the Purchaser to allow the Purchaser to set up wire transfers to fund the Acquisition Costs on the related Funding Date. For each Conveyed Life Settlement Policy, on or before the related Funding Date, the Seller will deliver to the Purchaser by electronic mail a spreadsheet setting forth the following information with respect to such Conveyed Life Settlement Policy (but a single spreadsheet may be supplied that supplies all such information for all Life Settlement

12

Policies being conveyed): the related Insured Data, Issuing Insurance Company, Net Death Benefit, Death Benefit, cash value, Acquisition Cost, Life Expectancy of each Insured based on the Mortality Rating supplied by the related Medical Underwriter, the related Medical Underwriter, the related Funding Date, Mortality Rating, projected Premiums, as applicable, amount of any Policy Loans and amount of any projected interest payments on Policy Loans, in each case as of such Funding Date, and a copy of the Seller's Entitlement Order. The Seller will have no liability for any calculation or projection of Premiums payable with respect to any Conveyed Life Settlement Policy as to which the related Issuing Insurance Company later specifies different minimum Premiums due to avoid lapse, unless such differences (a) are caused by the bad faith or gross negligence of the Seller, (b) reflect a consistent pattern of calculations or projections that are incorrect and have resulted in adverse pricing to the Purchaser hereunder, or (c) are material differences caused by the Servicer's or Seller's input of incorrect data into the pricing model or arithmetic mistakes with respect to such data, or for any similar differences in Premiums calculated or projected by the Servicer, and the sole remedy with respect to any differences arising as described in clauses (a), (b) and (c) shall be the repurchase or replacement by the Seller of each affected Conveyed Life Settlement Policy pursuant to Section 3.06 hereof.

SECTION 4.02    Draw Account.    The Purchaser shall maintain the Draw Account with US Bank National Association. On the date hereof and on or before the 21st calendar day of each month (or if such day is not a Business Day, the next succeeding Business Day), the Seller will deliver to the Purchaser written notice of its projection of the amounts that it reasonably believes could be spent on Acquisition Costs for Conveyed Life Settlement Policies during each of the following two calendar months. In addition, from time to time the Seller may deliver additional or supplemental notices of increased amounts that it reasonably believes could be utilized to fund additional Acquisition Costs within the current or succeeding calendar month. No later than the first Business Day of each calendar month, the Purchaser shall deliver to the Seller notice of the amounts of proceeds of the issuance of equity or debt securities (or other borrowings or capital arrangements) that it expects will be received by or available to it during such calendar month and the succeeding calendar month, specifying any portion thereof that will not be available to fund Acquisition Costs because they are to be allocated to fund any reserves for interest expenses or other expenses as contemplated by the Transaction Documents (including deposits into the Servicing Account), Ongoing Servicing Costs or operating costs of the Purchaser. The Purchaser shall cause there to be immediately available funds on deposit in the Draw Account (and not allocated or segregated for any other purpose) no later than the fifth Business Day of each calendar month (or in the case of any additional or supplemental notice of increased ability to fund Acquisition Costs, within five Business Days of receipt of such notice) in an amount equal to the lesser of (a) the amounts specified by the Seller as projected monthly Acquisition Costs for the current calendar month in the most recently delivered such monthly projection of Acquisition Costs, and (b) the aggregate amount of capital or funding projected by the Purchaser to be available, or actually currently available to the

Purchaser, to fund Acquisition Costs during such calendar month (i.e., the projected Expected Capital). Without limitation of the foregoing, at all times prior to the actual receipt by the Purchaser of proceeds of debt securities issuances or borrowing arrangements of at least $50,000,000 that are available to fund the Acquisition Costs, or the execution and delivery of documentation creating a liquidity facility available to fund Premiums and maintenance expenses in respect of the Conveyed Life Settlement Policies, the Purchaser shall cause an amount at least equal to the greater of (a) $2,000,000 or (b) the sum of (y) $750,000 plus (z) the projected Ongoing Servicing Costs related to the next two calendar months out of the proceeds of its issuances of equity or debt securities or of any actual borrowings, to be reserved to fund Premiums and administrative expenses directly related to the maintenance of the Conveyed Life Settlement Policies by deposit of such amounts into the Servicing Account. On and after the Closing Date, the Purchaser shall deposit or cause to be deposited into the Draw Account (i) any and all amounts received by the Purchaser as proceeds of or in relation with Policy Loans and (ii) any and all amounts received by the Purchaser Seller as proceeds from the repurchase of Life Settlement Policies by the Seller pursuant to Section 3.06 hereof.

SECTION 4.03    Funding of Life Settlement Policy Purchases. On each Funding Date, the Purchaser shall withdraw from the Draw Account and apply in accordance with the related Seller's Entitlement Order the specified Acquisition Costs for the specified Life Settlement Policies. Each Seller's Entitlement Order will instruct the Purchaser to pay to or to the order of the Seller the specified Acquisition Costs on the related Funding Dates, and the Purchaser shall fund such amounts on such dates as specified in the related Seller's Entitlement Order.

ARTICLE V

CONFIDENTIALITY

SECTION 5.01    General Duty. Each party hereto agrees that, other than Insured Data contained therein, (a) each of the Transaction Documents and their contents (and all drafts thereof), (b) all Policy Information, (c) all medical and personal information concerning the Insureds, Original Sellers and Representatives, (d) each Servicer's Settlement Report and its contents, (e) each report delivered on a Funding Date and its contents, and (f) the identity of and information concerning payments to any third parties involved in any Origination comprise the "Confidential Information."

SECTION 5.02    Reasonable Precautions. Except as expressly provided in Exhibit B attached hereto, each party hereto shall take such precautions as may be lawful and reasonably necessary to restrain its officers, directors, employees, agents or representatives from disclosure of Confidential Information to any other Person; provided, that Confidential Information may be disclosed (a) to the extent that such Confidential Information has become publicly known other than as a result of a breach by the Purchaser, or any of its officers, directors, employees, agents or advisors of any

14

obligation to keep such Confidential Information confidential if disclosed in a manner that does not identify any Insured and could not reasonably be expected to facilitate the identification of any Insured by any other Person that does not have a right to know the identity of such Insured, (b) to the extent ordered to produce such Confidential Information by a court or other Governmental Authority having appropriate jurisdiction over such party and the Confidential Information, but only if (to the extent lawful) such party promptly supplies notice to the other party of such order and the specific Confidential Information identified therein and (to the extent known by such party and lawful) the basis and purpose of such order, so that the other party may, at its sole cost and expense, contest such order, and (c) to the extent necessary or appropriate in support of any claim or motion before any court of competent jurisdiction within the United States in an action including the parties to this Agreement or the other Transaction Documents, underlined provided that such party (i) has petitioned the court to treat such Confidential Information confidentially to the greatest extent permissible under law and in the context of such dispute, and (ii) if the Seller is not a party to such action, has given the Seller five (5) Business Days' prior written notice of the anticipated disclosure.

SECTION 5.03    Dissemination of Certain Information.  Each party hereto shall at all times comply with all laws and regulations applicable to it and affecting the Conveyed Life Settlement Policies and the servicing thereof, including but not limited to laws and regulations regarding the privacy of any Insured and the maintenance of all information obtained by the Purchaser, and the Seller in the performance of their duties in accordance with applicable laws and regulations concerning the dissemination of such information; provided that any party may disclose such information to competent judicial or regulatory authorities in response to a written request therefrom for such information or as otherwise required by law; provided, however, that the Purchaser (a) shall not disclose such information to such judicial or regulatory authorities before the date set forth in such request therefor and (b) shall provide the Seller with prompt notice to the extent permitted by law or regulation of such request, in order to permit the Seller, at its own expense, to seek judicial or other relief before such information is disclosed.

SECTION 5.04    Tax Structure.  Notwithstanding anything to the contrary contained in the Transaction Documents, each party hereto (and each employee, representative or other agent of such party) may disclose to any and all Persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated by the Transaction Documents, and all materials of any kind (including opinions or other tax analyses) that are provided to such party relating to such U.S. tax treatment and U.S. tax structure, other than any information for which non-disclosure is reasonably necessary in order to comply with applicable securities law.

**EXECUTION COPY**

ARTICLE VI

TERMINATION

SECTION 6.01    <u>Termination</u>  This Agreement may be terminated on any date by mutual written agreement of the Purchaser and the Seller.  Moreover:

(a)    the Purchaser, in its sole discretion, may terminate its obligation to purchase additional Life Settlement Policies (other than those as to which offers to purchase have already been made by the Purchaser) by delivery thereby of written notice to the Seller of such termination upon the occurrence of:

(i)    a change in any applicable law or regulation that causes it to be illegal for the Purchaser to continue to perform its material obligations under this Agreement;

(ii)    the occurrence and continuance of an Insolvency Event with respect to the Seller;

(iii)    the occurrence of a material breach of any representation, warranty or covenant of the Seller under any Transaction Document and, to the extent such breach is capable of being cured, such breach continues uncured for more than fifteen (15) Business Days from the date notice thereof was first delivered to the Seller;

(iv)    the Seller's failure to offer for sale to the Purchaser Life Settlement Policies that it reasonably expects would be Eligible Life Settlement Policies and as to which the related Acquisition Costs would equal or exceed (A) $18,500,000 as of September 1, 2006, (B) an additional $18,500,000 during each succeeding period comprised of three calendar months ending June 1, 2009; unless (i) during any such period <u>any</u> Person that has committed to fund purchases of any debt or equity securities of the Purchaser pursuant to a Junior Note Purchase Agreement, a Subordinated Security Purchase Agreement or any other agreement with the Purchaser has failed to fund such purchases, or (ii) on or prior to September 1, 2006, the Purchaser has not issued Senior Notes or secured a comparable senior debt facility to Persons that have committed to fund at least $100,000,000 of debt financing to the Purchaser;

(v)    any material failure of the Seller or any of its Affiliates to comply with the terms of any agreement now or hereafter entered into between the Purchaser and any such Person in connection with the Conveyed Property or the Transaction Documents; or

   (vi) the funding by the Purchaser of Acquisition Costs (less expenses and reserves not previously funded by proceeds from Conveyed Life Settlement Policies), in an aggregate amount equal to the Expected Capital;

   (b) the Seller, in its sole discretion, may terminate its obligations hereunder by delivery of written notice to the Purchaser of such termination upon the occurrence of:

   (i) a change in any applicable law or regulation that causes it to be illegal for the Seller to continue to perform its material obligations under this Agreement;

   (ii) the occurrence and continuance of an Insolvency Event with respect to the Purchaser;

   (iii) the occurrence of a material breach of any representation, warranty or covenant of the Purchaser under any Transaction Document and, to the extent such breach is capable of being cured, such breach continues uncured for more than fifteen (15) Business Days from the date notice thereof was first delivered to the Purchaser;

   (iv) any material failure of the Purchaser or any of its Affiliates to comply with the terms of any agreement now or hereafter entered into between the Seller and any such Person in connection with the Conveyed Property or the Transaction Documents; or

   (v) the failure to deposit or cause to be deposited into the Draw Account funds required to be funded into the Draw Account pursuant to Section 4.02.

## ARTICLE VII

### MISCELLANEOUS PROVISIONS

   SECTION 7.01 <u>Amendment</u>.  This Agreement may be amended from time to time by the Purchaser and the Seller in writing.

   SECTION 7.02 <u>Protection of Right, Title and Interest to Life Settlement Policies</u>.  (a)  The Seller at its expense shall cause this Agreement, all amendments hereto and/or all financing statements, continuation statements, securities account control agreements and any other necessary documents covering the Purchaser's right, title and interest to the Conveyed Life Settlement Policies and other Conveyed Property to be recorded, registered and filed, and at all times to be kept updated (by amendment or renewal as applicable) recorded, registered and filed, all in such manner and in such places as may be required by law fully to preserve and protect the right, title and interest of the Purchaser hereunder to all of the Conveyed Life Settlement Policies and such Conveyed Property.  The Seller shall deliver to the Purchaser file-stamped copies of, or

filing receipts for, any document recorded, registered or filed as provided above, as soon as available following such recording, registration or filing. The Purchaser shall cooperate fully with the Seller in connection with the obligations set forth above and will execute any and all documents reasonably required to fulfill the intent of this subsection.

(b)     No less than thirty (30) days before the Seller makes any change in its name, identity, corporate structure or jurisdiction of organization which would make any financing statement or continuation statement filed in accordance with paragraph (a) above seriously misleading within the meaning of Section 9-506 of the UCC as in effect in the applicable state, the Seller shall give the Purchaser written notice of any such change, shall execute and file, at the Seller's expense, such financing statements or amendments as may be necessary to continue the first priority and perfection of the Purchaser's security interest in the related Conveyed Life Settlement Policies, and the proceeds thereof.

(c)     No less than thirty (30) days before any relocation of any office from which the Seller keeps records concerning the related Conveyed Life Settlement Policies or of its principal executive office the Seller will give the Purchaser written notice of such change and whether, as a result of such relocation, the applicable provisions of the UCC would require the filing of any amendment of any previously filed financing or continuation statement or of any new financing statement, shall execute and file such financing statements or amendments as may be necessary to continue the priority and perfection of the interest of the Purchaser in the related Conveyed Life Settlement Policies and the proceeds thereof.

SECTION 7.03    <u>Payment of Expenses and Fees Upon Breach</u>. Each party hereto agrees to reimburse, or cause to be reimbursed, the other party hereto for any losses, liabilities and/or expenses (including, but not limited to, attorney's fees and other professional fees and expenses incurred in connection with collection efforts or the defense of any suit or action in an amount not to exceed the fees and expenses of counsel or equivalent professionals retained by such party in connection with such suit or action) incurred in connection with the enforcement by such party of its rights under this Agreement.

SECTION 7.04    <u>Governing Law</u>. (a) THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICTS OF LAWS PROVISIONS (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b)     EACH OF THE PARTIES HERETO IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY FEDERAL OR STATE COURT SITTING IN THE COUNTY AND STATE OF NEW YORK IN RESPECT OF ANY

ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH PARTY HERETO HEREBY WAIVES THE RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENTS, OR (ii) IN ANY WAY IN CONNECTION WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES TO THIS AGREEMENT WITH RESPECT TO THE TRANSACTION DOCUMENTS OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

SECTION 7.05     Notices.  All demands, notices, reports and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at, delivered by electronic mail to, mailed by certified mail, return receipt requested, mailed by a nationally recognized overnight courier or sent via facsimile, to (a) in the case of the Seller, to LST I LLC, care of Coventry First LLC, Coventry Corporate Center, 7111 Valley Green Road, Fort Washington, PA 19034, Attention: Legal Department, facsimile: (215) 402-8305, electronic mail: legal@coventryfirst.com; and (b) in the case of the Purchaser, to Ritchie Risk-Linked Strategies Trading (Ireland) IV, Limited, 4th Floor, 25-28 Adelaide Road, Dublin 2, Ireland, Attention: Peter Hughes and Brendan Roche, facsimile: (353) 1605-3010, electronic mail: peter.j.hughes@marsh.com; or, as to any of such Persons, at such other address or facsimile number as shall be designated by such Person in a written notice to the other Persons party hereto.  Notices, demands and communications hereunder given by facsimile shall be deemed given when received.

SECTION 7.06     Severability of Provisions.  If any one or more of the covenants, agreements, provisions or terms of this Agreement shall for any reason whatsoever be held invalid or unenforceable, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions and terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

SECTION 7.07    Further Assurances.  Each party hereto agrees to do and perform, from time to time, any and all acts and to execute any and all further instruments required or reasonably requested by any other party hereto more fully to effect the purposes of this Agreement, including, without limitation, the execution of any financing statements, amendments, continuation statements or releases relating to the Conveyed Life Settlement Policies for filing under the provisions of the UCC or other law of any applicable jurisdiction.

SECTION 7.08    No Waiver; Cumulative Remedies.  Except as otherwise provided in Section 3.05, no failure to exercise and no delay in exercising, on the part of the Purchaser or the Seller, of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

SECTION 7.09    Counterparts.  This Agreement may be executed in two or more counterparts (and by different parties on separate counterparts), each of which shall be an original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopier or by electronic message shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 7.10    No Petition.  The Seller, by entering into this Agreement, hereby covenants and agrees that it will not at any time institute against the Purchaser, or solicit or incite any other Person to institute for the purpose of joining in any such institution against the Purchaser, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law.  This Section 7.10 will survive the termination of this Agreement.

SECTION 7.11    Third-Party Beneficiaries.  This Agreement will inure to the benefit of and be binding upon the parties signatory hereto.  Except as otherwise provided in this Agreement, no other Person will have any right or obligation hereunder.

SECTION 7.12    Merger and Integration.  Except as specifically stated otherwise herein and the other Transaction Documents to which the parties hereto are a party, this Agreement sets forth the entire understanding of the parties hereto relating to the subject matter hereof, and all prior understandings, written or oral, are superseded by this Agreement.  This Agreement may not be modified, amended, waived or supplemented except as provided herein.  The Purchaser expressly acknowledges that the Seller has not made any representations and warranties other than as set forth herein and in the other Transaction Documents.  The Purchaser represents and warrants to the Seller that, independently and without reliance upon the Seller (other than its reliance on the

Seller's representations, warranties and covenants set forth in the Transaction Documents) and based upon such documents and information as it has deemed appropriate, it has made and will continue (to the extent permitted hereunder) to make its own appraisal of and investigation into the business, operations, property, prospects, financial and other conditions and creditworthiness of the Seller, and its own decision to enter into this Agreement and to take, or omit to take, action under any Transaction Document. Except for items specifically required to be delivered hereunder, the Seller shall not have any duty or responsibility to provide the Purchaser or any of its Affiliates any information that comes into the possession of the Seller or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.

SECTION 7.13    Headings.  The headings herein are for purposes of reference only and shall not otherwise affect the meaning or interpretation of any provision hereof.

SECTION 7.14    Tax Classification.  Nothing contained in this Agreement is intended to or shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent (including dependent agent) or of a partnership or joint venture.  The parties hereto agree that they will not take any action contrary to the foregoing intention and agree to report the transaction for all tax purposes consistent with the foregoing intention unless and until determined to the contrary by an applicable tax authority.

SECTION 7.15    Tax Consequences.  Each party hereto (for purposes of this Section 7.15, each, an "Initial Party") acknowledges that no other party hereto, and in each case none of the partners, shareholders, members, owners, managers, agents, officers, employees, Affiliates, investors therein or consultants of such other party (in each case, whether direct or indirect), will be responsible or liable for the tax consequences to such Initial Party or any of such Initial Party's partners, shareholders, members, owners, managers, agents, officers, employees, Affiliates, investors or consultants (in each case, whether direct or indirect), with regard to the tax consequences of the transactions covered by this Agreement, and that such Initial Party (and each of such Initial Party's partners, shareholders, members, owners, managers, agents, officers, employees, Affiliates, investors and consultants (in each case, whether direct or indirect)) will look solely to, and rely upon, such Initial Party's own advisors with respect to such tax consequences.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

**LST I LLC,**
as Seller

By:_____
Name:
Title:

**RITCHIE RISK-LINKED STRATEGIES
TRADING (IRELAND) IV, LIMITED,**
as Purchaser

By:_____
Name:
Title:

S-1

Signature Page - Master Policy Purchase Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

LST I LLC,
as Seller

By:_____
    Name:
    Title:

**RITCHIE RISK-LINKED STRATEGIES**
**TRADING (IRELAND) IV, LIMITED,**
as Purchaser

By:_____
    Name:  JOHN PERHAM
    Title:  C.E.O.

S-1

Signature Page - Master Policy Purchase Agreement

SCHEDULE 1

SCHEDULE OF CONVEYED LIFE SETTLEMENT POLICIES

EXHIBIT A

ELIGIBILITY CERTIFICATE

EXHIBIT B

## INFORMATION SHARING AND CONFIDENTIALITY

The Purchaser shall not, and will cause its Affiliates, subsidiaries and agents not to, supply any Confidential Information to any third Person. If the Purchaser determines that it would like to (or would like to cause or allow any of its Affiliates, subsidiaries or agents to): (a) sell, transfer, convey or assign any Conveyed Life Settlement Policy to any third party (a "Potential Purchaser") or (b) issue, undertake, sell, transfer, convey or assign any security or debt obligation to any third party (a "Potential Investor"), it shall deliver to the Principal Holders of Subordinated Securities (as defined in the Intercreditor Agreement), Seller and Servicer written notice of such determination providing reasonable detail of the identity of such Potential Purchaser or Potential Investor and of the Conveyed Life Settlement Policies and proposed transactions.

The Principal Holders of Subordinated Securities shall have the right to approve or disapprove the Potential Purchaser or Potential Investor, but shall not unreasonably withhold their approvals and shall deliver notice of their approvals or disapprovals in writing within ten Business Day of receiving such notice and information. It shall be reasonable for a Principal Holder of Subordinated Securities to withhold its approval of any Potential Purchaser or Potential Investor on the basis of any of the following considerations, among others, (i) such Person or any of its Affiliates is a present competitor of Coventry First in its life settlement or premium finance businesses, (ii) the Principal Holder of Subordinated Securities reasonably believes that such Person or any of its Affiliates is likely to become or provide financing to such a competitor in the near future or (iii) such Person or any of its Affiliates has been denied (and not subsequently granted) any license relevant to originating or servicing life or viatical settlement policies in any relevant jurisdiction.

Upon mutual written approval by all the Principal Holders of Subordinated Securities of the Potential Purchaser or Potential Investor, the Seller and its Affiliates will cooperate with the Purchaser to remarket and sell, transfer, convey or assign such Conveyed Life Settlement Policies or securities or debt obligations of the Purchaser or its subsidiaries. In addition, the Purchaser shall be permitted to deliver to such Potential Purchaser or Potential Investor the Approved Offering Materials so long as prior to any such delivery, each Potential Purchaser and Potential Investor shall have executed and delivered in favor of the Seller and Servicer a confidentiality agreement containing substantially the same provisions as are set forth in Article V of the Master Policy Purchase Agreement.

If all the principal holders of Subordinated Securities mutually agree in writing that such Potential Purchaser or Potential Investor has demonstrated financial capability and good faith intent to complete a proposed purchase of Conveyed Life Settlement Policies or securities or debt obligations of the Purchaser (or its subsidiaries), the Servicer will, in consultation with the Purchaser, prepare and deliver to such Person or entity (with copies to the Purchaser or its agent), the related Additional Offering Materials. No offering

B-1

materials or orally delivered communications used to market or sell Conveyed Life Settlement Policies or securities or debt obligations of the Purchaser or its subsidiaries shall mention or use the names, trademarks or copyrighted materials of Coventry First or its Affiliates without the express prior written consent of the Seller, provided that such consent will not be unreasonably withheld.  The final sale documents used in connection with any public offering or private placement of securities or debt obligations issued by the Purchaser or its subsidiaries shall not contain any terms or make any representations that are binding on Coventry First or its Affiliates as to which Coventry First or its Affiliates have not given their prior written consent

Any sale, transfer, conveyance or assignment of any Conveyed Life Settlement Policy, and any issuance, offer or sale of securities or the issuance of debt obligations of the Purchaser or any of its subsidiaries that does not comply with this Exhibit B in every material respect, shall be void.

The Purchaser will (and hereby does) indemnify the Seller and its Affiliates, and agrees to hold each of them harmless, with respect to any issuance of debt or equity securities of the Purchaser or its subsidiaries or the marketing, offer or sale thereof or of any Life Settlement Policies to any persons not affiliated with Coventry First by the Purchaser, the Initiator, the Purchaser or any Affiliates or agents of any of them, whether arising under or based on the United States federal or state securities laws or the laws of any foreign jurisdiction, including any liabilities arising from or relating to the accuracy or sufficiency of any information delivered by the Purchaser or such subsidiaries or the agents thereof to Potential Investors (but excluding any information contained therein that has been supplied for inclusion therein by the Seller, Servicer or any of their Affiliates), or any breach or alleged breach of agreements of the Purchaser or its agents with existing or Potential Investors or the accuracy or adequacy of any representations, projections or estimates of performance, yield, marketability or quality of such securities delivered to any Potential Investors.

GLOSSARY OF DEFINED TERMS

"Acquisition Cost" means, with respect to any Life Settlement Policy, an amount, calculated as of the related Funding Date, the total of all amounts payable to or to the order of the Seller in connection with the sale and transfer thereof to the Purchaser on such Funding Date, which amount will not exceed an amount that will cause the related Policy IRR to be less than 10%.

"Affiliate" means, with respect to any Person, any other Person controlling or controlled by or under common control with such specified Person. For purposes of this definition, "control," when used with respect to a specific Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the term "controlling" and "controlled" have meanings correlative to the foregoing; provided that, for purposes of the Transaction Documents, the Purchaser is not an Affiliate of the Seller or any of the Seller's affiliates.

"Additional Offering Materials" means the following information and data compiled and presented by the Servicer on a non-aggregated basis with respect to each Conveyed Life Settlement Policy within any specified group of Conveyed Life Settlement Policies or all Conveyed Life Settlement Policies pursuant to Section 3.04(c) of the Master Policy Purchase Agreement: (a) Insured Data, (b) Issuing Insurance Company, (c) most recently calculated Net Death Benefit, (d) Death Benefit, (e) most recently calculated cash value, (f) Life Expectancy determined as described in the Master Policy Purchase Agreement in connection with the purchase thereof by the Purchaser, (g) Mortality Rating supplied in connection with the purchase thereof by the Purchaser, (h) most recent projection of remaining Premiums, (i) most recently calculated balance of any Policy Loans, (j) most recent projection of interest payable on any Policy Loans, (k) Funding Date, (l) Medical Underwriter and (m) Servicing Fees.

"Approved Offering Materials" means:

(a)     With respect to the offer or sale of Conveyed Life Settlement Policies to any third party:

(i)     the related Insured Data;

(ii)     information relating to relevant Conveyed Life Settlement Policies from the three most recently delivered Servicer's Settlement Reports relating to such Conveyed Life Settlement Policies;

(iii)     to the extent specifically requested by a Potential Purchaser, the Servicing Agreement, the Securities Account Control Agreements, and relevant Entitlement Orders; and

(iv)     such other materials as are agreed by the Seller, Servicer and Purchaser and that compile data on the Conveyed Life Settlement Policies in an aggregate format, including aggregated data regarding Life Expectancy, Net Death Benefit, Issuing Insurance Company and Medical Underwriter; or

(b) With respect to the issuance, offer or sale of securities or the issuance of debt obligations of the Purchaser or any of its subsidiaries:

(i)    the Junior Note Offering Materials and the Subordinated Security Offering Materials;

(ii)    information relating to relevant Conveyed Life Settlement Policies from the three most recently delivered Servicer's Settlement Reports;

(iii)    to the extent specifically requested by a Potential Investor and deemed by the Purchaser to be reasonably necessary for such Person's required credit approvals, the Insured Data relating to Conveyed Life Settlement Policies then in the Portfolio, the Master Policy Purchase Agreement, the Servicing Agreement, the Securities Account Control Agreements and relevant Entitlement Orders; and

(iv)    such other materials as are agreed by the Seller, Servicer and Purchaser and that compile data on the Conveyed Life Settlement Policies in an aggregate format;

provided, that in no case will such materials set forth any personal or medical information with respect to any Insured in any manner that would allow any Potential Purchaser or Potential Investor to identify or contact any Insured or Original Seller.

"Authorized Officer" means, with respect to any Person, the President, Chief Executive Officer, Chief Financial Officer, Executive Vice President, Controller, Treasurer, Assistant Treasurer, Senior Vice President, Vice President, attorney in fact, Secretary or Assistant Secretary of such Person, or any other officer thereof performing equivalent function with respect to such Person's duties under any Transaction Document, or designated as such by such Person.

"Available Capital" means, at any time, the amount of available funds on deposit at such time in the Draw Account or Servicing Account that have not already been segregated or identified as being allocated to fund any specific purchase, distribution or other payment or for any other release.

"Bermuda Servicing Agreement" means that certain Investment Administration and Services Agreement entered into between Montgomery Limited, as Bermuda servicer, and the Purchaser, dated as of the Closing Date, as may be amended, restated or otherwise modified from time to time.

"Business Day" means a day other than a Saturday or Sunday on which commercial banks in the City of New York or Dublin, Ireland are not authorized or required to be closed for business.

"Closing Date" means June 30, 2006.

"Confidential Information" shall have the meaning assigned to such term in Section 5.01 of the Master Policy Purchase Agreement.

"Conveyed Life Settlement Policy" means a Life Settlement Policy (including any Replacement Life Settlement Policy) that is sold by the Seller and purchased by the Purchaser pursuant to and in accordance with the Master Policy Purchase Agreement, and that has not been resold, transferred or otherwise liquidated by the Purchaser (and that remains outstanding and in full force), which shall be listed on the Schedule of Conveyed Life Settlement Policies.

"Conveyed Property" shall have the meaning assigned to such term in Section 2.01(a) of the Master Policy Purchase Agreement.

"Coventry First" means Coventry First LLC, a Delaware limited liability company.

"Coventry First Guaranty" means that certain Guaranty, dated as of the Closing Date, executed by the Servicer in favor of the Purchaser, as may be amended, restated or otherwise modified from time to time.

"Credit Entitlement Order" means an entitlement order as defined in Section 8-102(a)(8) of the UCC with respect to any Life Settlement Policy, as executed by the Purchaser in accordance with the Purchaser's Securities Account Control Agreement, pursuant to which, among other things, the Security Entitlement evidencing such Life Settlement Policy is transferred from the Seller to the Purchaser in exchange for the specified consideration.

"Death Benefit" means, with respect to any Life Settlement Policy, the face amount of such Life Settlement Policy (without taking into account any reduction thereof for any related Policy Loans).

"Disease" means each disease referenced in the ICD 9 manual or that is factored into the relevant Mortality Rating by the relevant Medical Underwriter.

"Draw Account" means the draw account established and maintained by the Policy Payment Agent pursuant to Section 2.1 of the Policy Payment Agency Agreement.

"Eligibility Certificate" means the certification to the Purchaser to be executed by the Seller in connection with any Life Settlement Policy, substantially in the form attached to the Master Policy Purchase Agreement as Exhibit A.

"Eligibility Criteria" with respect to each Life Settlement Policy means each of the criteria set forth in **Annex A** attached hereto. Any of these criteria may be waived by mutual agreement of the Seller and the Purchaser.

"Eligible Life Settlement Policy" means a Life Settlement Policy that, as of the applicable Funding Date, satisfies each of the Eligibility Criteria.

"Entitlement Order" means the Credit Entitlement Order or the Seller's Entitlement Order, as indicated by the context.

"Expected Capital" means $161,850,000, or such greater amount as may be agreed by the Purchaser and Seller for the purchase of Life Settlement Policies.

"Expected Income" means, with respect to any Conveyed Life Settlement Policy, each individual payment of Probabilistic Monthly Net Death Benefits, Probabilistic Monthly Policy Loans and Probabilistic Monthly Cash Dividends, in each case, expected to be received in respect of such Conveyed Life Settlement Policy.

"Expected Outgo" means, with respect to any Conveyed Life Settlement Policy, the payment of the Acquisition Cost and each individual payment of Probabilistic Monthly Ongoing Servicing Costs, in each case, expected to be made in respect of such Conveyed Life Settlement Policy.

"Funding Date" means that certain date on which the Purchaser is directed to fund the Acquisition Cost for a Conveyed Life Settlement Policy and such Conveyed Life Settlement Policy is to be transferred to the Purchaser, as specified in the related Seller's Entitlement Order.

"Governmental Authority" means the Republic of Ireland, the United States of America, any state or other political subdivision thereof and any entity of competent jurisdiction exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Insolvency Event" means with respect to any Person either:

(a)     a case or other proceeding shall be commenced, without the application or consent of such Person, in any court, seeking the liquidation, reorganization, debt arrangement, dissolution, winding up, or composition or readjustment of debts of such Person, the appointment of a trustee, receiver, custodian, liquidator, assignee, sequestrator or the like for such Person or all or substantially all of its assets, or any similar action with respect to such Person under any law relating to bankruptcy, insolvency, reorganization, dissolution, winding up or composition or adjustment of debts, and such case or proceeding shall continue undismissed, or unstayed and in effect, for a period of 60 consecutive days; or an order for relief in respect of such Person shall be entered in an involuntary case under the federal bankruptcy laws or other similar laws now or hereafter in effect; or

(b)     such Person shall commence a voluntary case or other proceeding under any applicable bankruptcy, insolvency, reorganization, debt arrangement, dissolution or other similar law now or hereafter in effect, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) for, such Person or for any substantial part of its property, or shall make any general assignment for the benefit of creditors, or shall fail to, or admit in writing its inability to, pay its debts generally as they become due, or, if a corporation or similar entity, its board of directors or managers shall vote to implement any of the foregoing.

"Insolvency Law" means any law related to the: (a) bankruptcy, insolvency, composition, reorganization or relief of debtors; or (b) appointment of a receiver or trustee or other similar official for all or substantially of a Person's property.

"Insured" with respect to any Life Settlement Policy means the person (or each one of the persons) whose life (lives) is (are) insured by such Life Settlement Policy.

"Insured Data" means, with respect to any Insured, age as of last birthday, sex and smoker / non-smoker status.

"Intercreditor Agreement" means that certain Intercreditor Agreement dated as of the Closing Date, among the Purchaser, Ritchie Life Strategies Master Trust, Ritchie Capital Management (Bermuda), Ltd., Sandy Run Ltd., Coventry First LLC, Ritchie Risk-Linked Life Strategies Trust I, Montgomery Limited, U.S. Bank National Association and various other parties identified therein, as such agreement may be amended, supplemented or otherwise modified from time to time.

"Investment Management Agreement" means that certain Investment Management Agreement entered into between Ritchie Capital Management (Bermuda), Ltd., as investment manager, and the Purchaser, dated as of the Closing Date, as may be amended, restated or otherwise modified from time to time.

"Issuing Insurance Company" means, with respect to any Life Settlement Policy, the insurance company that is obligated to pay the related Net Death Benefit upon the death of the related Insured by the terms of such Life Settlement Policy (or the successor to such obligation).

"Junior Notes" means the junior notes issued by the Issuer pursuant to the various Junior Note Purchase Agreements.

"Junior Note Offering Materials" means the materials utilized for the purpose of offering the Junior Notes.

"Junior Note Purchase Agreement" means any of the various Junior Note Purchase Agreements by and among the Issuer and the other parties identified therein, pursuant to which the Issuer issues Junior Notes, as may be amended, restated or otherwise modified from time to time.

"Lapse Notice" means a notice from any Issuing Insurance Company with respect to a Life Settlement Policy providing that the payment of any Premiums or interest due on Policy Loans under such Life Settlement Policy have not been made on or prior to the related due date and, that if not made by a specified date, coverage under such Life Settlement Policy will lapse.

"Latest Conversion Date" means, with respect to any Life Settlement Policy that is not a plan of permanent issuance, the date specified therein or in any written communication with the related Issuing Insurance Company that amends or supersedes the text thereof, as the last date on which the terms of such Life Settlement Policy may be converted to a plan of permanent insurance.

"Lien" means any interest in property securing an obligation owed to, or a claim by, a Person, whether such interest is based on the common law, statute or contract, and including but not limited to the security interest lien arising from a mortgage, encumbrance, judgment, pledge, conditional sale or trust receipt for a lease, consignment or bailment for security purposes, but, with respect to a Life Settlement Policy, does not include the interest of

the Issuing Insurance Company therein if such interest arises solely from or with respect to a related Policy Loan.

"Life Expectancy" means, with respect to any Life Settlement Policy, the related Insured's life expectancy, which shall be measured in months and shall be calculated by applying the Mortality Rating to the Mortality Table.

"Life Settlement Policy" means an entire policy of life insurance, or, as indicated by the context, a specific Conveyed Life Settlement Policy.

"LST Securities Account" means the securities account established by the LST Securities Intermediary for the benefit of the Seller pursuant to the LST Securities Account Control Agreement.

"LST Securities Account Control Agreement" means that certain Securities Account Control Agreement entered into between U.S. Bank National Association, as securities intermediary, and the Seller, dated as of June 28, 2005, as may be amended, restated or otherwise modified from time to time.

"LST Securities Intermediary" means U.S. Bank National Association, not in its individual capacity, but solely in its capacity as Securities Intermediary with respect to the LST Securities Account pursuant to the LST Securities Account Control Agreement.

"Managed Assets" means, with respect to assets of any Person, (a) securities of issuers that are not Affiliates of such Person, or (b) other investment assets that do not represent obligations of Affiliates of such Person.

"Master Policy Purchase Agreement" means that certain Master Policy Purchase Agreement dated as of the Closing Date, entered into by and between the Seller and the Purchaser, as may be amended, restated or otherwise modified from time to time.

"Maturity" means, with respect to a Life Settlement Policy, the date on which the Net Death Benefit under such Life Settlement Policy becomes payable to the beneficiary of such Life Settlement Policy.

"Medical Underwriter" means AVS Underwriting Services, Fasano Associates or another medical underwriter reasonably acceptable to the Purchaser (as determined solely by the mutual written agreement of both of the principal holders of Subordinated Securities), that is identified by the Seller as having supplied the applicable Mortality Rating.

"Medical Underwriter Agreements" means, initially, the agreements entered into by and among the Seller, on the one hand, and, separately, by AVS Underwriting Services, and Fasano Associates, on the other, each dated as of the Closing Date, and as the context requires, any subsequent agreement with any additional or replacement Medical Underwriter, as may be amended, restated or otherwise modified from time to time.

"Minimum Servicing Fee" means $15,000 per month.

"Mortality Rating" means, in connection with any Insured, the Medical Underwriter specified by the Seller that provides the related mortality rating (using its standard estimation process).

"Mortality Table" means initially, the 2001 VBT table with the adjustments to the select factors performed by AVS on its AVS2 table, or the mortality table approved by the Purchaser (as determined solely by the mutual written agreement of both of the principal holders of Subordinated Securities), in consultation with the Seller to be used to derive a Life Expectancy. When necessary, each annual mortality rate in the Mortality Table will be converted to a monthly mortality rate based on the following formula: 1 minus the result of raising (x) to the power of (y), where (x) equals the result of 1 minus the appropriate mortality rate based on the Mortality Table expressed on an annual basis, and (y) equals 1/12.

"Net Death Benefit" means, with respect to any Life Settlement Policy, as of any date of determination, the death benefit payable under such Life Settlement Policy net of any Policy Loan (and accrued Policy Loan interest not yet paid on or capitalized into any related Policy Loan) as of such date of determination.

"Ongoing Servicing Costs" means, with respect to any Conveyed Life Settlement Policy, the ongoing Premium payments and interest on Policy Loans paid in cash (excluding any Premiums and interest on Policy Loans that have been included in the related Acquisition Cost), Servicing Fees and expenses (including Servicer Extraordinary Expenses), and all other known or reasonably expected administrative expenses incurred with respect to such Conveyed Life Settlement Policy.

"Original Seller" means the owner of a Life Settlement Policy that first sells such Life Settlement Policy in a life settlement transaction pursuant to an Underlying Sale Agreement, whether to the Seller or an Affiliate thereof or to another Person.

"Origination", "Originate" or "Originated" means the process conducted by an Originator of soliciting the sale by the Original Seller of and purchase by such Originator of a Life Settlement Policy, including the negotiation, execution and delivery of the agreements, documents and instruments evidencing such transaction and/or evidencing consents, acknowledgements and waivers delivered in connection therewith by the related Insured, any spouse of the Insured, any related beneficiary, any Original Seller or any third party, and the acquisition and verification by such Originator of information concerning the related Insured, Original Seller and Life Settlement Policy.

"Originator" with respect to any Life Settlement Policy, the Person that Originated such Life Settlement Policy.

"Paying Agent" shall have the meaning assigned to such term in the Intercreditor Agreement.

"Payment Account" shall have the meaning assigned to such term in the Intercreditor Agreement.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated association, Governmental Authority or any other entity.

"Policy Information" with respect to each Conveyed Life Settlement Policy means the following documents and their contents:

(a)    one of the following:  (i) the original life insurance policy, (ii) a copy of the life insurance policy, (iii) a certificate of insurance or (iv) a lost policy form; and

(b)    a change of ownership form/change of beneficiary form executed by the related Original Seller.

"Policy IRR" with respect to any Conveyed Life Settlement Policy that has not reached Maturity and has not generated Residual Cash Flows and any date of determination, means the discount rate which if applied from such date would cause the present value of the related Expected Income to equal the present value of the related Expected Outgo.

"Policy Loan" means, with respect to any Life Settlement Policy, any loan or other cash advances against, or cash withdrawals from, the cash value of such Life Settlement Policy, pursuant to the terms and conditions of such Life Settlement Policy.

"Policy Payment Agent Fee Letter" means that certain letter agreement dated as of the Closing Date, between the Policy Payment Agent and the Purchaser, specifying the fees and reimbursable expenses of the Policy Payment Agent in connection with the performance of its duties under the Policy Payment Agency Agreement.

"Policy Payment Agency Agreement" means that certain Policy Payment Agency Agreement dated as of the Closing Date, by and between Ritchie Risk-Linked Strategies Trading (Ireland) IV, Limited, a private limited company organized under the laws of the Republic of Ireland, as the purchaser, LST I LLC, a Delaware limited liability company, as the Seller, Coventry First LLC, a Delaware limited liability company, as the servicer, and U.S. Bank National Association, a national banking association, as payment agent, as may be amended, restated or otherwise modified from time to time.

"Policy Payment Agent" means U.S. Bank National Association, a national banking association.

"Portfolio" means as of any given date collectively a given combination of Life Settlement Policies.

"Potential Investor" means any third party to whom the Purchaser proposes to issue, undertake, sell, transfer, convey or assign any security or debt obligation of the Purchaser.

"Potential Purchaser" means any third party to whom the Purchaser proposes to sell, transfer, convey or assign any Conveyed Life Settlement Policy.

"Premium" means, with respect to any Life Settlement Policy, as indicated by the context, any past due premium with respect thereto, or any scheduled premium, determined and projected as of the Funding Date by the Seller and, after the Funding Date, by the Servicer, including, if applicable, premiums or other payments in connection with the conversion of such Life Settlement Policy from a term life policy to a permanent life policy.

"Probabilistic Monthly Cash Dividends" means with respect to any Life Settlement Policy that has not reached Maturity and has not generated Residual Cash Flows, for each month after the date of determination for which the probability of death under the Mortality Table is less than 1, the product of (a) the probability that such Life Settlement Policy will not have reached Maturity before the beginning of such month, as determined by the Mortality Table, and (b) cash dividends expected to be received in respect of such Life Settlement Policy in such month.

"Probabilistic Monthly Net Death Benefits" means with respect to any Life Settlement Policy that has not reached Maturity and has not generated Residual Cash Flows, for each month after the date of determination for which the probability of death under the Mortality Table is less than 1, the product of (a) the probability that such Life Settlement Policy will not have reached Maturity before the beginning of such month, as determined by the Mortality Table, (b) the probability that such Life Settlement Policy will reach Maturity in that month, as determined by the Mortality Table, and (c) the Net Death Benefit for such Life Settlement Policy on such date.

"Probabilistic Monthly Ongoing Servicing Costs" means, with respect to any Life Settlement Policy that has not reached Maturity and has not generated Residual Cash Flows, Probabilistic Monthly Premiums and Probabilistic Monthly Servicing Fees expected to be paid in respect of such Life Settlement Policy for each month.

"Probabilistic Monthly Policy Loans" means with respect to any Life Settlement Policy that has not reached Maturity and has not generated Residual Cash Flows and, for each month after the date of determination for which the probability of death under the Mortality Table is less than 1, the product of (a) the probability that such Life Settlement Policy will not have reached Maturity before the beginning of such month, as determined by the Mortality Table, and (b) Policy Loans expected to be received in respect of such Life Settlement Policy in such month.

"Probabilistic Monthly Premiums" means with respect to any Life Settlement Policy that has not reached Maturity and has not generated Residual Cash Flows, for each month after the date of determination for which the probability of death under the Mortality Table is less than 1, the product of (a) the probability that such Life Settlement Policy will not have reached Maturity before the beginning of such month, as determined by the Mortality Table, and (b) cash payments of Premiums and interest on Policy Loans expected to be paid in respect of such Life Settlement Policy in such month (excluding any Premiums and interest on Policy Loans that have been included in the related Acquisition Cost).

"Probabilistic Monthly Servicing Fee" means with respect to any Life Settlement Policy that has not reached Maturity and has not generated Residual Cash Flows, the sum of (i)

the greater of (a) for each month after the date of determination for which the probability of death under the Mortality Table is less than 1, the product of (a) the probability that such Life Settlement Policy will not have reached Maturity before the beginning of such month, as determined by the Mortality Table, multiplied by (b) 20 basis points per annum of the face amount of the Life Settlement Policies outstanding at the beginning of each month, divided by (c) 12.

"Purchaser" means Ritchie Risk-Linked Strategies Trading (Ireland) IV, Limited, in such capacity under the Master Policy Purchase Agreement and the Servicing Agreement, and its successors and assigns in such capacity.

"Purchaser's Securities Account" means the securities account established by the Purchaser's Securities Intermediary for the benefit of the Purchaser pursuant to the Purchaser's Securities Account Control Agreement.

"Purchaser's Securities Account Control Agreement" means that certain Securities Account Control Agreement entered into between the Purchaser's Securities Intermediary and the Purchaser dated as of the Closing Date, as may be amended, restated or otherwise modified from time to time.

"Purchaser's Securities Intermediary" means U.S. Bank National Association, not in its individual capacity, but solely in its capacity as Securities Intermediary with respect to the Purchaser's Securities Account pursuant to the Purchaser's Securities Account Control Agreement.

"Replacement Life Settlement Policy" means an Eligible Life Settlement Policy that, as of the date it replaces a Conveyed Life Settlement Policy pursuant to the first sentence of Section 3.06(a) of the Master Policy Purchase Agreement or Section 3.05 of the Servicing Agreement, has a Net Death Benefit equal to or in excess of that of Conveyed Life Settlement Policy that is being replaced and the Life Expectancy of the related Insured is the same or shorter than that of the related Insured with respect to the Conveyed Life Settlement Policy that is being replaced.

"Report Date" means the fifteenth (15th) day of each calendar month or, if such day is not a Business Day, then the immediately succeeding Business Day.

"Representative" means, with respect to each Insured, the natural person or persons designated by the Insured as persons with whom the Servicer or its designee may make contact for the purposes of obtaining updated information concerning the health and residency of the Insured and/or communicating information concerning the related Life Settlement Policy.

"Repurchase Price" means, with respect to any repurchase of a Conveyed Life Settlement Policy pursuant to the first sentence of Section 3.06(a) of the Master Policy Purchase Agreement or Section 3.05 of the Servicing Agreement, an amount equal to (a) the related Acquisition Cost plus (b) any Premiums and interest on Policy Loans paid through the date of repurchase in connection with such Conveyed Life Settlement Policy (excluding any Premiums and interest on Policy Loans that have been included in the related Acquisition Cost) plus (c) all

Ongoing Servicing Costs incurred by the Purchaser in connection with such Conveyed Life Settlement Policy without duplication of the amounts specified in clauses (a) or (b) above.

"Rescission Period" means, with respect to any Life Settlement Policy, the period in which any statutorily or contractually created right of rescission inures to the benefit of the Original Seller of such Life Settlement Policy until such right terminates.

"Rescission Price" means, with respect to any repurchase of a Conveyed Life Settlement Policy pursuant to the second sentence of Section 3.06(a) of the Master Policy Purchase Agreement, an amount equal to (a) the related Acquisition Cost plus (b) any Premiums and interest on Policy Loans paid through the date of repurchase in connection with such Conveyed Life Settlement Policy (excluding any Premiums and interest on Policy Loans that have been included in the related Acquisition Cost).

"Residual Cash Flow" means, with respect to any Conveyed Life Settlement Policy, the net cash proceeds actually received by the Purchaser from any sale or transfer by or on behalf of the Purchaser of such Conveyed Life Settlement Policy.

"Responsible Officer" when used with respect to (a) the Policy Payment Agent, means any officer assigned to the principal corporate office of the Policy Payment Agent, including any Vice President, Assistant Vice President, Assistant Treasurer, Assistant Secretary, trust officer and any other officer thereof that customarily performs functions similar to those of the above-designated officers and that has direct responsibility for the administration of the Transaction Documents as Policy Payment Agent, and also, with respect to a particular matter, any other officer of the Policy Payment Agent to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject, (b) the Paying Agent, means any officer assigned to the principal corporate office of the Paying Agent, including any Vice President, Assistant Vice President, Assistant Treasurer, Assistant Secretary, trust officer and any other officer thereof that customarily performs functions similar to those of the above-designated officers and that has direct responsibility for the administration of the Transaction Documents as Paying Agent, and also, with respect to a particular matter, any other officer of the Paying Agent to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject, (c) LST Securities Intermediary, means any officer assigned to the principal corporate office of LST Securities Intermediary, including any Vice President, Assistant Vice President, Assistant Treasurer, Assistant Secretary, trust officer and any other officer thereof that customarily performs functions similar to those of the above-designated officers and that has direct responsibility for the administration of the Transaction Documents as LST Securities Intermediary, and also, with respect to a particular matter, any other officer of LST Securities Intermediary to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject, and (d) the Purchaser's Securities Intermediary, means any officer assigned to the principal corporate office of the Purchaser's Securities Intermediary, including any Vice President, Assistant Vice President, Assistant Treasurer, Assistant Secretary, trust officer and any other officer thereof that customarily performs functions similar to those of the above-designated officers and that has direct responsibility for the administration of the Transaction Documents as Purchaser's Securities Intermediary, and also, with respect to a particular matter, any other officer of the

Purchaser's Securities Intermediary to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"Ritchie Master Trust Guaranty" means that certain Guaranty, dated as of the Closing Date, executed by Ritchie Life Strategies Master Trust in favor of the Seller, as may be amended, restated or otherwise modified from time to time.

"Ritchie Trust I Guaranty" means that certain Guaranty, dated as of the Closing Date, executed by Ritchie Risk-Linked Life Strategies Trust I in favor of the Seller, as may be amended, restated or otherwise modified from time to time.

"Schedule of Conveyed Life Settlement Policies" means a schedule of the Life Settlement Policies attached to the Master Policy Purchase Agreement as Schedule 1 identifying the Conveyed Life Settlement Policies, as the same may be modified or amended from time to time in accordance with the Master Policy Purchase Agreement.

"Securities Account Control Agreements" means collectively the LST Securities Account Control Agreement and the Purchaser's Securities Account Control Agreement.

"Securities Act" means the Securities Act of 1933, as amended.

"Securities Intermediary" means the LST Securities Intermediary or the Purchaser's Securities Intermediary, as indicated by the context.

"Security Entitlement" means the rights and property interests of an entitlement holder as defined in Section 8-102(a)(17) of the UCC.

"Seller" means LST I LLC, a Delaware limited liability company.

"Seller's Entitlement Order" means an entitlement order as defined in Section 8-102(a)(8) of the UCC with respect to any Life Settlement Policy, as executed by the Seller in accordance with the LST Securities Account Control Agreement, pursuant to which, among other things, the Security Entitlement evidencing such Life Settlement Policy is transferred from the Seller to the Purchaser in exchange for the specified consideration.

"Senior Notes" means the senior note(s) to be issued pursuant to a term loan facility to be entered by and between the Purchaser and a lending institution.

"Servicer" means Coventry First, in its capacity as such under the Servicing Agreement, and its successors and assigns in such capacity.

"Servicer's Extraordinary Expenses" means the extraordinary expenses payable or reimbursable to the Servicer pursuant to Section 4.02 of the Servicing Agreement.

"Servicer's Settlement Report" means the report of such name delivered to the Purchaser as described in Section 3.03(d) of the Servicing Agreement.

**Execution Copy**

"Servicing Account" means the servicing account established and maintained by the Policy Payment Agent pursuant to Section 2.1 of the Policy Payment Agency Agreement.

"Servicing Agreement" means that certain Servicing and Monitoring Agreement dated as of the Closing Date, entered into by and between the Purchaser and the Servicer, as may be amended, restated or otherwise modified from time to time.

"Servicing Fees" means the fee to the Servicer, payable on each Settlement Date in an amount equal to the greater of (a) the quotient of (i) 0.20% of the aggregate Net Death Benefits for the Portfolio of Conveyed Life Settlement Policies on such Settlement Date divided by (ii) 12, or (b) the Minimum Servicing Fee.

"Settlement Date" means the 20th day of each calendar month.

"Subordinated Securities" means the subordinated securities issued by the Purchaser.

"Subordinated Security Offering Materials" means the materials utilized for the purpose of offering the Subordinated Securities.

"Subordinated Security Purchase Agreement" means any of the various Subordinated Security Purchase Agreements by and among the Issuer and the other parties identified therein, pursuant to which the Issuer issues Subordinated Securities, as may be amended, restated or otherwise modified from time to time.

"Transaction Documents" means the Master Policy Purchase Agreement, the Servicing Agreement, the Medical Underwriter Agreements, the LST Securities Account Control Agreement, the Purchaser's Securities Account Control Agreement, each Seller's Entitlement Order, each Credit Entitlement Order, the Policy Payment Agency Agreement, the Bermuda Servicing Agreement, the Investment Management Agreement, the Coventry First Guaranty, the Ritchie Master Trust Guaranty, the Ritchie Trust I Guaranty, the Intercreditor Agreement, each Junior Note Purchase Agreement, the Junior Notes, each Subordinated Security Purchase Agreement, and the Subordinated Securities, in each case as the same may be amended, supplemented or modified from time to time and all other instruments, financing statements, documents and agreements executed in connection with any of the foregoing.

"UCC" means the Uniform Commercial Code as in effect in any applicable jurisdiction.

"Underlying Sale Agreement" means, with respect to any Life Settlement Policy, the purchase agreement executed by an Original Seller and the life settlement provider that Originated such Life Settlement Policy.

Execution Copy

## ANNEX A

### Eligibility Criteria

An Eligible Life Settlement Policy is one that meets the following criteria:

(1)     The Life Settlement Policy is in force as of the related Funding Date, and must be a universal life, whole life or term policy (but each term policy must be convertible into permanent insurance), and may be a survivorship second-to-die policy;

(2)     As of the related date on which the Life Settlement Policy was purchased by the Purchaser (the "Funding Date"), the documentation containing the Mortality Ratings that are the basis for determining eligibility and pricing are not older than 180 days;

(3)     The Policy IRR calculated in accordance with the Seller's model projected in the Seller's model as of the assumed related Funding Date shall be at least 10% per annum;

(4)     As of the date of the most current related Life Expectancy Report, the related Insured has a Life Expectancy of no less than 24 months and no more than 210 months;

(5)     As of the related Funding Date, the applicable contestability and suicide periods have expired;

(6)     As of the related Funding Date, the related Insured is not less than 60 years of age;

(7)     The aggregate of the Acquisition Costs for all Life Settlement Policies relating to any one Insured shall not be greater than $12 million;

(8)     The aggregate of the Death Benefits for all Life Settlement Policies relating to any one Insured shall not be less than $100,000; and

(9)     The Issuing Insurance Company (or its parent) shall be rated at least "A" by Standard & Poor's or A3 by Moody's.

Any of the foregoing criteria may be waived by mutual written agreement between the Seller and the Purchaser.

LA1:1107295.5