# Exhibit 6

**Execution Copy**

RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED

ABN AMRO BANK N.V.

RITCHIE RISK-LINKED STRATEGIES TRADING, LTD.

RITCHIE CAPITAL MANAGEMENT (BERMUDA), LTD.

SANDY RUN CAPITAL LLC

COVENTRY FIRST LLC

RITCHIE RISK-LINKED STRATEGIES, L.L.C.

MONTGOMERY LIMITED

U.S. BANK, NATIONAL ASSOCIATION,
*as Policy Payment Agent*

ABN AMRO BANK N.V. (LONDON BRANCH),
*as Paying Agent,*

ABN AMRO TRUSTEES LIMITED,
*as Indenture Trustee*

and

Each holder of Subordinated Securities or Junior
Notes deemed to be a party hereto

AMENDED AND RESTATED INTERCREDITOR AGREEMENT

*September 8, 2005*

TABLE OF CONTENTS

Page

ARTICLE I  DEFINITIONS...............................................................................................4

Section 1.1.  Defined Terms.............................................................................................4

ARTICLE II  PRIORITY OF PAYMENTS.......................................................................9

Section 2.1.  Establishment of Payment Account. .........................................................9
Section 2.2.  Deposits; Priority of Payments...................................................................9
Section 2.3.  Payments Upon Liquidation.....................................................................11
Section 2.4.  Inconsistencies ..........................................................................................11
Section 2.5.  Limitations on Available Funds ................................................................12
Section 2.6.  Interest in Respect of Junior Notes ..........................................................12
Section 2.7.  Guaranteed Revenue Deficit Amount ......................................................12
Section 2.8.  Borrowing Base Reserve Subacccount; Payments Therefrom..................12

ARTICLE III  REPRESENTATIONS AND WARRANTIES .........................................13

ARTICLE IV  APPOINTMENT OF PAYING AGENT.................................................15

Section 4.1.  Appointment of Paying Agent..................................................................15
Section 4.2.  Compensation............................................................................................15
Section 4.3.  Successor Paying Agent. ..........................................................................15
Section 4.4.  Indemnification .........................................................................................16
Section 4.5.  Waiver of Set-Offs ...................................................................................16
Section 4.6.  Custodial Arrangements ...........................................................................17

ARTICLE V  SUBORDINATION .................................................................................17

Section 5.1.  Payment Subordination. ...........................................................................17
Section 5.2.  Provisions Solely to Define Relative Rights............................................17
Section 5.3.  Paying Agent to Effectuate Subordination ..............................................17
Section 5.4.  No Waiver of Subordination Provisions ..................................................17
Section 5.5.  Reliance on Judicial Order or Certificate of Liquidating Agent .............18
Section 5.6.  Return of Payments ..................................................................................18
Section 5.7.  Negative Covenants...................................................................................18
Section 5.8.  Affirmative Covenants. ............................................................................19
Section 5.9.  Notices......................................................................................................19
Section 5.10. Non-Interference; Etc...............................................................................19
Section 5.11. Joinder of Subsequent Holders of Junior Notes and Subordinated Securities ........20
Section 5.12. Reports by Independent Accountants........................................................20

i

ARTICLE VI FURTHER AGREEMENTS .......................................................................20

Section 6.1.  Appointment of Directors...................................................................20

ARTICLE VII MISCELLANEOUS ...............................................................................21

Section 7.1.   Notices.................................................................................................21
Section 7.2.   Amendments; Waivers ........................................................................23
Section 7.3.   Continuing Rights ...............................................................................23
Section 7.4.   Successors and Assigns; Third Party Beneficiaries ............................24
Section 7.5.   Severability..........................................................................................24
Section 7.6.   Binding Effect .....................................................................................24
Section 7.7.   Governing Law; Consent to Jurisdiction.............................................24
Section 7.8.   Trial by Jury Waived...........................................................................24
Section 7.9.   Execution in Counterparts...................................................................24
Section 7.10.  Entire Agreement ................................................................................25
Section 7.11.  No Recourse ........................................................................................25
Section 7.12.  No Partnership or Joint Venture..........................................................25
Section 7.13.  Headings..............................................................................................25
Section 7.14.  Conditions ...........................................................................................25

INTERCREDITOR AGREEMENT

THIS AMENDED AND RESTATED INTERCREDITOR AGREEMENT (this "**Agreement**"), dated as of September 8, 2005 is entered into among RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED, a private limited company incorporated under the laws of the Republic of Ireland (the "Issuer"), ABN AMRO BANK N.V., a banking corporation organized under the laws of The Netherlands, acting out of its London branch (the "**Senior Lender**") RITCHIE RISK-LINKED STRATEGIES TRADING, LTD., a mutual fund organized under the laws of Bermuda ("**Ritchie**"), SANDY RUN CAPITAL LLC, a limited liability company organized under the laws of the State of Delaware ("**Sandy Run**"), RITCHIE RISK-LINKED STRATEGIES, L.L.C., a limited liability company organized under the laws of the State of Delaware ("**Ritchie U.S.**"), MONTGOMERY LIMITED, a corporation organized under the laws of Bermuda (the "**Bermuda Servicer**"), RITCHIE CAPITAL MANAGEMENT (BERMUDA), LTD., a corporation incorporated under the laws of Bermuda (the "**Investment Manager**"), COVENTRY FIRST LLC, a limited liability company organized under the laws of the State of Delaware (the "**Servicer**"), U.S. BANK, NATIONAL ASSOCIATION, a national banking association ("**U.S. Bank**") as Policy Payment Agent under the Policy Payment Agency Agreement (the "**Policy Payment Agent**"), ABN AMRO BANK N.V., acting out of its London branch, as Principal Paying Agent (the "**Paying Agent**"), ABN AMRO TRUSTEES LIMITED, a corporation organized under the laws of England and Wales, as indenture trustee (the "**Indenture Trustee**") and each holder of Subordinated Securities or Junior Notes deemed to be a party hereto.

### WITNESSETH:

WHEREAS, the Issuer intends to purchase a portfolio of U.S. life insurance policies (the "**Policies**"), pursuant to that certain Master Policy Purchase Agreement (the "**Master Policy Purchase Agreement**"), dated as of June 30, 2005, as amended, between the Issuer and LST (as defined below), that satisfy certain eligibility criteria; and

WHEREAS, in order to obtain funds for its purchases of the Policies, the Issuer will issue certain debt as described below; and

WHEREAS, the Issuer intends to issue and sell from time to time an aggregate principal amount of U.S.$96,500,000 of junior notes (in both certificated and bearer form) (the "**Junior Notes**"); and

WHEREAS, the Issuer intends to issue and sell from time to time an aggregate principal amount of U.S.$64,500,000 of subordinated securities (in both certificated and bearer form) (collectively, the "**Subordinated Securities**"); and

WHEREAS, the parties hereto intend that Ritchie, Ritchie U.S. and Sandy Run, as the initial holders of the Subordinated Securities, (collectively, the "**Principal Holders**") shall be granted exclusive rights to appoint the directors of the Issuer; and

WHEREAS, the parties hereto wish to provide for the orderly payment of amounts received by the Issuer as mutually agreed herein for the ultimate payment of amounts owed the parties under the Transaction Agreements (as defined herein); and

WHEREAS, the Issuer, Ritchie, Sandy Run, Ritchie U.S., the Investment Manager, the Servicer and U.S. Bank entered into an Intercreditor Agreement dated as of June 30, 2005; and

WHEREAS, the parties hereto wish to amend and restate such agreement in its entirety and to add additional parties thereto;

NOW, THEREFORE, for full and fair consideration, the parties hereto agree as follows:

## ARTICLE I

### DEFINITIONS

Section 1.1.    *Defined Terms.* As used herein, the following terms have the following meanings set forth below, and each shall include the singular as well as the plural. Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings set forth in the Glossary of Defined Terms appended to the Master Policy Purchase Agreement.

"**Accreted Principal Amount**," with respect to any Junior Note, has the meaning specified therein.

"**Administration and Servicing Fee**" has the meaning set forth in the Bermuda Servicing Agreement.

"**Affected Party**" has the meaning specified in the Senior Term Loan and Liquidity Agreement.

"**Agreement**" has the meaning specified in the recitals hereto.

"**Bermuda Servicing Agreement**" means that certain Servicing Agreement entered into between the Bermuda Servicer and the Issuer date as of September 8, 2005.

"**Bermuda Servicer**" means Montgomery Limited.

"**Borrowing Base Reserve Allocation Date**" means any date prior to the Stated Maturity Date on which any Advances are outstanding on which the outstanding principal amount of the Subordinated Securities is less than 14.9% of the outstanding principal amount of all Term Loan Advances and Liquidity Advances, all Junior Notes and all Subordinated Securities.

"**Borrowing Base Reserve Release Date**" means the earliest to occur of (i) an Event of Default on or after the Stated Maturity Date, (ii) the date as of which all outstanding Term Loan Advances and Liquidity Advances have been paid in full whether before or after the Stated Maturity Date, and (iii) (a) prior to September 8, 2006, the date as of which the aggregate outstanding balance of the sum of the funded Junior Notes and funded Subordinated Securities is equal to at least 37.9% and (b) on or after September 8, 2006, the date as of which the funded Subordinated Securities is equal to or greater than 14.9% of the outstanding principal amount of

all Term Loan Advances and Liquidity Advances, all Junior Notes and all Subordinated Securities.

"**Borrowing Base Reserve Subaccount**" means a subaccount of the Payment Account created and maintained by the Paying Agent pursuant to Section 2.8 of the Intercreditor Agreement to which the Paying Agent will allocate amounts specified by the Issuer as being allocable thereto pursuant to Section 2.2(d)(viii) of the Intercreditor Agreement, and from which the Paying Agent will make payments as and when specified in such Section 2.8(b) of the Intercreditor Agreement.

"**Business Day**" means any day on which banks are not required or authorized by law to close in New York, New York, Dublin, Ireland or Hamilton, Bermuda.

"**Calculation Date**" means, with respect to a Payment Date, the fifth (5th) Business Day preceding the applicable Payment Date.

"**Call Premium**" with respect to any Junior Note, has the meaning specified therein.

"**Closing Date**" means June 30, 2005.

"**Control Agreement**" means that certain Multiparty Control Agreement dated as of September 8, 2005 among the parties hereto and LST I LLC.

"**Coventry First Guaranty**" means that certain Guaranty, dated as of June 30, 2005, executed by the Servicer in favor of the Issuer, as amended.

"**Euro**" means the currency introduced at the start of the third stage of the European economic and monetary union pursuant to the treaty establishing the European Community, as amended by the Treaty on European Union.

"**Event of Default**" means an Event of Default as defined in the Senior Term Loan and Liquidity Agreement.

"**Final Date**" means the date on which the loan commitments under the Senior Term Loan and Liquidity Agreement have been terminated and all obligations owing to the Senior Lender have been paid in full or otherwise discharged.

"**General Account**" means a segregated, interest bearing demand deposit account, designated as the "General Account," over which the Issuer shall have control and dominion and the sole right of withdrawal, for the purpose of paying general expenses of the Issuer.

"**Guaranteed Revenue Deficit Amount**" has the meaning specified in the Senior Term Loan Agreement.

"**Indenture**" means the Junior Indenture, dated as of September 8, 2005, among the Issuer, the Paying Agent and the Indenture Trustee.

"**Indenture Trustee**" has the meaning specified in the recitals hereto.

5

"**Investment Management Agreement**" means that certain Investment Management Agreement to be entered into between the Issuer and the Investment Manager.

"**Investment Manager**" has the meaning specified in the recitals hereto.

"**Issuer**" has the meaning specified in the recitals hereto.

"**Joinder Agreement**" has the meaning specified in Section 5.11 hereto.

"**Junior Note Maturity Date**," with respect to any Junior Note, has the meaning specified therein.

"**Junior Note Purchase Agreement**" means each of that certain Junior Note Purchase Agreement, dated as of June 30, 2005, between the Issuer and Ritchie, and each other Junior Note Purchase Agreement and Junior Bearer Note Purchase Agreement that may be entered into by the Issuer for the purchase and sale of Junior Notes.

"**Junior Notes**" has the meaning specified in the recitals hereto.

"**Liquidity Facility**" means the liquidity facility established under the Senior Term Loan and Liquidity Agreement.

"**LST**" means LST I LLC, a Delaware limited liability company.

"**LST Securities Account Control Agreement**" means that certain Securities Account Control Agreement, dated as of June 28, 2005, between LST and U.S. Bank, as Securities Intermediary.

"**Master Policy Purchase Agreement**" has the meaning specified in the recitals hereto.

"**Monthly Service Fees**" means the Servicing Fees and Servicer Extraordinary Expenses due to the Servicer on any applicable Payment Date.

"**Obligations**" has the meaning specified in the Senior Term Loan and Liquidity Agreement.

"**Original Principal Amount**" with respect to any Junior Note, has the meaning specified therein.

"**Paying Agent**" has the meaning specified in the recitals hereto.

"**Payment Account**" has the meaning specified in Section 2.1(a) hereof.

"**Payment Date**" means the 20th day of each calendar month following the Closing Date, provided that if any Payment Date is not a Business Day, such Payment Date shall be the next succeeding Business Day.

"**Permitted Investment**" shall have the meaning specified in the Policy Payment Agency Agreement.

"**Person**" means any individual, partnership (whether general or limited), corporation (including a business trust), joint stock company, limited liability company, trust, estate, association, custodian, nominee, joint venture or other entity, or a government or any political subdivision thereof.

"**Policy**" has the meaning specified in the recitals hereto.

"**Policy Payment Agency Agreement**" means the Policy Payment Agency Agreement, dated as of June 30, 2005, among the Seller, the Purchaser and the Policy Payment Agent, as amended.

"**Policy Payment Agent**" has the meaning specified in the recitals hereto.

"**Policy Proceeds**" means all amounts received by the Issuer with regard to (i) the Policies, including death benefits and dividends, the proceeds from the resale of Policies to Persons other than LST or the Servicer and the proceeds from the sale of securities by the Issuer secured by the Policies, other than the Senior Debt, but excluding the proceeds of Policy Loans, and (ii) from and after (A) the occurrence of an Event of Default or (B) the date on which the loan commitments under the Senior Term Loan and Liquidity Agreement have been terminated, all payments received by or on behalf of the Issuer as a result of the purchase or repurchase obligation of LST (and/or the Servicer) under the Master Policy Purchase Agreement or any other Transaction Agreement.

"**Principal Holders**" has the meaning specified in the recitals hereto.

"**Priority of Payments**" has the meaning specified in Section 2.2(d) hereof.

"**Purchaser's Securities Account Control Agreement**" means that certain Securities Account Control Agreement, dated as of June 30, 2005, between the Issuer and U.S. Bank, as Securities Intermediary, as amended.

"**Ritchie**" has the meaning specified in the recitals hereto.

"**Ritchie Guaranty**" means that certain Guaranty, dated as of June 30, 2005, executed by Ritchie U.S. in favor of LST, as amended.

"**Ritchie U.S.**" has the meaning specified in the recitals hereto.

"**Ritchie U.S. Guaranty**" means that certain Guaranty, dated as of June 30, 2005, executed by Ritchie U.S. in favor of LST, as amended.

"**Sandy Run**" has the meaning specified in the recitals hereto.

"**Senior Lender**" has the meaning specified in the recitals hereto.

7

"**Senior Debt**" means the term loan facility established under the Senior Term Loan and Liquidity Agreement.

"**Senior Debt Maturity Date**," with respect to the Senior Debt, has the meaning specified in the Senior Term Loan and Liquidity Agreement.

"**Senior Term Loan and Liquidity Agreement**" means the Senior Term Loan and Liquidity Agreement dated as of September 8, 2005 between the Issuer and the Senior Lender.

"**Servicer**" has the meaning specified in the recitals hereto.

"**Servicer Extraordinary Expenses**" has the meaning specified in the Servicing Agreement.

"**Servicing Account**" means the account by that name established under the Policy Payment Agency Agreement.

"**Servicing Agreement**" means that certain Servicing and Monitoring Agreement, dated as of June 30, 2005, between the Issuer and the Servicer, as amended.

"**Servicing Fees**" has the meaning specified in the Servicing Agreement.

"**Subordinated Administrative and Servicing Fee**" shall have the meaning specified in the Subordinated Securities.

"**Subordinated Indenture**" means the Subordinated Indenture, dated as of September 8, 2005, among the Issuer, the Paying Agent and the Indenture Trustee.

"**Subordinated Interest Amount**" with respect to any Subordinated Securities, has the meaning specified therein.

"**Subordinated Securities**" has the meaning specified in the recitals hereto.

"**Subordinated Security Purchase Agreement**" means each of that certain Subordinated Security Purchase Agreement, dated as of June 30, 2005, between the Issuer and Sandy Run, that certain Subordinated Security Purchase Agreement, dated as of June 30, 2005, between the Issuer and Ritchie U.S. and each other Subordinated Security Purchase Agreement and Subordinated Bearer Security Purchase Agreement that may be entered into by the Issuer for the purchase and sale of Subordinated Securities.

"**Transaction Agreements**" means this Agreement, the Junior Notes, the Subordinated Securities, each Junior Note Purchase Agreement, each Subordinated Security Purchase Agreement, the Master Policy Purchase Agreement, the Policy Payment Agency Agreement, the LST Securities Account Control Agreement, the Purchaser's Securities Account Control Agreement, the Coventry First Guaranty, the Ritchie Guaranty, the Ritchie U.S. Guaranty, the Servicing Agreement, the Bermuda Servicing Agreement, the Investment Management Agreement, the Indenture and the Subordinated Indenture.

8

ARTICLE II

PRIORITY OF PAYMENTS

Section 2.1.    *Establishment of Payment Account.*

(a)    The Paying Agent shall establish at the Paying Agent a segregated account, designated as the "Payment Account" (the "**Payment Account**"), over which the Paying Agent shall have control and dominion and the sole right of withdrawal.  The Paying Agent shall thereafter maintain the Payment Account and deposit all Policy Proceeds received by the Paying Agent from the Issuer or otherwise into the Payment Account for the purpose of allocating funds and making payments as specified in the Priority of Payments.  In addition, the Issuer may in its discretion deposit additional amounts to the Payment Account.  Any and all funds at any time on deposit in, or otherwise to the credit of, the Payment Account shall be segregated on the books and records of the Paying Agent and shall be held by the Paying Agent for the sole and exclusive benefit of the Issuer and the Senior Lender, as a secured party, subject to the terms of this Agreement.  Except as provided in this Agreement, the Paying Agent shall make no withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account.  Funds held in the Payment Account shall be invested by the Paying Agent in such Permitted Investments as directed by the Issuer or, following any Event of Default, the Senior Lender.

(b)    The Policy Payment Agent shall establish the Servicing Account pursuant to the Policy Payment Agency Agreement.  The Paying Agent will deposit therein all amounts to be deposited into the Servicing Account pursuant to the Priority of Payments.  The Paying Agent shall make no withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Servicing Account.

Section 2.2.    *Deposits; Priority of Payments.*

(a)    The Issuer shall (i) on the Closing Date, deposit into the General Account and Servicing Account, respectively, from the proceeds of the sale of the Junior Notes and the Subordinated Securities the reserve amount specified in item (d)(vi) below and (ii) on and after the Closing Date, deposit into the Payment Account any and all Policy Proceeds.

(b)    On each Calculation Date, the Issuer, or its agent, shall calculate as of such Calculation Date the funds available in the Payment Account for distribution in accordance with the Priority of Payments on the immediately following Payment Date and shall instruct the Paying Agent in writing as to the amounts to be paid, distributed or deposited pursuant to each clause of the Priority of Payments and the payee thereof.  Such instructions shall include the payments to be made, the payees, applicable wire transfer instructions and such other information as may be required by the Paying Agent. The Paying Agent shall be entitled to rely conclusively on any such instructions in making any such payments, distributions or deposits, and will not be required to make any such payments, distributions or deposits in the absence of such instructions, or following an Event of Default, in the Senior Term Loan and Liquidity Agreement on instructions from the Senior Lender pursuant to the Control Agreement and following the Senior Lender's written notice to the Paying Agent of the occurrence and continuation of an Event of Default of the type described in Section 2 of the Control Agreement

9

the Paying Agent shall take all further instructions hereunder from the Senior Lender without further notice to or consent of the Issuer and the Paying Agent shall no longer take any instructions with respect to the Payment Account or otherwise hereunder from the Issuer. The Issuer shall notify the Paying Agent in writing as to the identity of any calculation agent appointed by it and the relevant contact information.

(c)     On each Payment Date, the Issuer shall direct the Paying Agent to make payments from funds available in the Payment Account in amounts sufficient to make the payments described in clause (d) below, but only to the extent funds are available to make each such payment, strictly in accordance with the Priority of Payments.

(d)     The parties hereto hereby agree that the priority of payments (the "**Priority of Payments**") for amounts due hereunder and under the Transaction Agreements shall be as follows:

(i)     to pay, on a pro rata basis, fees and other operating expenses of the Issuer owing on such Payment Date including, without limitation, amounts due (a) to the Paying Agent, the Indenture Trustee, any Irish paying agent appointed by the Issuer and any Irish listing agent appointed by the Issuer for fees, expenses, indemnification and any other amounts payable to it pursuant to this Agreement, or any other Transaction Agreement, to the extent not otherwise paid by the Issuer; (b) to the Policy Payment Agent, for fees, expenses, indemnification and any other amounts payable to it pursuant to the Policy Payment Agency Agreement or any other Transaction Agreement, to the extent not otherwise paid by the Issuer; (c) to the Purchaser's Securities Intermediary, for fees, expenses, indemnification and any other amounts payable to it pursuant to the Purchaser's Securities Account Control Agreement or any other Transaction Agreement, to the extent not otherwise paid by or on behalf of the Issuer; (d) to the Investment Manager, amounts due under the Investment Management Agreement; and (e) to the independent accountants appointed pursuant to Section 5.12 of this Agreement.

(ii)     to pay to the Policy Payment Agent for deposit into the Servicing Account amounts necessary to pay Policy Premiums and interest on Policy Loans;

(iii)     to pay to the Policy Payment Agent for deposit into the Servicing Account amounts necessary to fund all Monthly Service Fees;

(iv)     to pay commitment fees to the Senior Lender and interest and principal on the Liquidity Facility;

(v)     to pay the commitment fee to the Senior Lender and interest owing under the Senior Debt;

(vi)     to deposit into the General Account any amounts needed to supplement, on a pro rata basis, the reserve for item (i) above and to pay into the Servicing Account any amounts needed to supplement the reserve for items (ii) and (iii) above in an aggregate amount equal to the greater of $2 million or two months projected Premiums, projected interest on Policy Loans, projected Monthly Servicing Fees and other projected expenses plus $750,000, as

10

determined by the Servicer in accordance with the terms of the Master Policy Purchase Agreement and the other Transaction Agreements;

(vii)    following the stated maturity date under the Senior Term Loan and Liquidity Agreement, to repay principal owing under the Senior Debt, plus all other amounts payable to the Senior Lender at such time;

(viii)    to pay interest plus the excess, if any, of the Accreted Principal Amount over the Original Principal Amount owing under the Junior Notes and the Administration and Servicing Fees in connection therewith determined in accordance with the provisions of the Bermuda Servicing Agreement (allocated pro rata and paid *pari passu*), except that on any Borrowing Base Reserve Allocation Date amounts otherwise available for payment pursuant to this clause (viii) will instead be allocated as reserved in the Borrowing Base Reserve Subaccount of the Payment Account and will be released therefrom only pursuant to Section 2.8(b) of this Agreement;

(ix)    to pre-pay the aggregate amount of principal owing under the Senior Debt, plus all other amounts payable to the Senior Lender (or any Affected Party) at such time or, if the Senior Debt Maturity Date has occurred, to repay the principal thereon plus all other amounts payable to the Senior Lender (or any Affected Party) at such time;

(x)    to pre-pay the Original Principal Amount owing under the Junior Notes (on a pro rata basis) and any Call Premium in respect thereof (allocated pro rata and paid *pari passu*) or, if the Junior Note Maturity Date has occurred, to repay the Original Principal Amount thereon;

(xi)    to pay into the General Account any additional amounts needed to fund a reasonable cash reserve to cover future expenses of the Issuer;

(xii)    to repay principal under the Subordinated Securities and any other subordinated securities of the Issuer that rank *pari passu* therewith;

(xiii)    to pay the aggregate accrued Subordinated Administrative and Servicing Fees, if any, to or to the order of the Bermuda Servicer;

(xiv)    to pay the aggregate accrued Subordinated Interest Amount, if any, to holders of the Subordinated Securities in proportion to the principal amount of the Subordinated Securities held by each holder immediately prior to the repayment thereof in accordance with clause (xii); and

(xv)    to pay any remaining amounts to the shareholders of the Issuer.

Section 2.3.    *Payments Upon Liquidation.*  The parties expressly agree that, upon liquidation or winding up of the Issuer, payments and distributions shall be made in accordance with the Priority of Payments.

Section 2.4.    *Inconsistencies.*  All parties hereto agree that any and all amounts due to them by the Issuer pursuant to the Transaction Agreements to which they are a party shall be

11

payable only in accordance with the Priority of Payments and subordination provisions of this Agreement, notwithstanding the provisions of any Transaction Agreement to the contrary. In the event of any inconsistency between the Priority of Payments and subordination provisions of this Agreement and the provisions of any Transaction Agreement, the Priority of Payments and subordination provisions of this Agreement shall govern.

Section 2.5.    *Limitations on Available Funds.*  Except as otherwise provided in the Senior Term Loan and Liquidity Agreement, the parties hereto agree that the sole funds available for the payments pursuant to and in respect of this Agreement shall be funds available from time to time in the Payment Account and, to the extent set forth in Section 2.2(a), the proceeds from the sale of the Junior Notes and the Subordinated Securities. Except as otherwise provided in the Senior Term Loan and Liquidity Agreement, notwithstanding anything contained herein to the contrary, no default shall occur under any Transaction Agreements solely by virtue of any insufficiency of funds in the Payment Account on any Payment Date.

Section 2.6.    *Interest in Respect of Junior Notes.*  Notwithstanding the fact that interest will accrue on the Junior Notes from their date of issue, such interest will be payable on a given Payment Date only if the relevant Calculation Date is later than the earlier of (i) the date the Junior Notes become listed on the Irish Stock Exchange (or such other exchange as may be agreed by the parties) or (ii) September 6, 2006.

Section 2.7.    *Guaranteed Revenue Deficit Amount.*  Each of the parties hereto hereby understands, acknowledges and agrees that pursuant to the terms of the Senior Term Loan and Liquidity Agreement, the Issuer has granted to the Senior Lender a security interest in the Servicing Account to the extent necessary to pay any Guaranteed Revenue Deficit Amount, and each such party further agrees that, notwithstanding anything herein to the contrary, if a Guaranteed Revenue Deficit Amount exists on any Payment Date on or after the stated maturity date under the Senior Term Loan and Liquidity Agreement, each such party hereto (other than the Senior Lender) hereby subordinates its rights to receive any payment from the Servicing Account, until such Guaranteed Revenue Deficit Amount has been paid in full to the Senior Lender.

Section 2.8.    *Reserve Subacccount; Payments Therefrom.*  (a) The Paying Agent shall establish on its books and records a subaccount of the Payment Account (the "Borrowing Base Reserve Subaccount"), over which the Paying Agent shall have control and dominion and the sole right of withdrawal. The Paying Agent shall thereafter maintain the Payment Account and allocate as being reserved therein all Policy Proceeds received by the Paying Agent from the Issuer or otherwise that the Issuer has instructed in writing the Paying Agent are to be allocated as so reserve pursuant to Section 2.2(d)(viii) of this Agreement. Any and all funds at any time allocated by the Paying Agent as so reserved shall be segregated from other funds in the Payment Account on the books and records of the Paying Agent and shall be held by the Paying Agent for the sole and exclusive benefit of the Issuer and the Senior Lender, as a secured party, subject to the terms of this Agreement. The Paying Agent shall make no withdrawal from or application of funds allocated as so reserved to the Borrowing Base Reserve except pursuant to Section 2.8(b) of this Agreement; it being understood that, all such allocations by the Paying Agent shall be based on written instructions received by the Paying Agent from the Issuer or following the Senior Lender's Borrowing Base written notice to the Paying Agent of the occurrence and

12

continuation of an Event of Default of the type described in Section 2 of the Control Agreement, the Senior Lender.

(b)    On any Borrowing Base Reserve Release Date, the Paying Agent will release from the Borrowing Base Reserve Subaccount the following specified amounts from amounts allocated for reserve therein and a pro rata portion of the income or earnings on the Permitted Investments of amounts held in the Payment Account, and will make the following specified payments from such released amounts:

(i)    if such Borrowing Base Reserve Release Date is any of the dates specified in clause (i) of the definition of Borrowing Base Reserve Release Date, to repay principal owing under the Senior Debt, plus all other amounts payable to the Senior Lender at such time, and thereafter to pay the amounts specified in Section 2.2(d)(viii) of this Agreement; or

(ii)    if such Borrowing Base Reserve Release Date is a date specified in clauses (ii) or (iii) of the definition of Borrowing Base Reserve Release Date, to pay the amounts specified in Section 2.2(d)(viii) of this Agreement; and

(iii)    thereafter, any amounts on reserve in the Borrowing Base Reserve Subaccount that are in excess of amounts that are then payable to the Senior Lender or pursuant to Section 2.2(d)(viii) will be reallocated to the Payment Account and deemed available for payment pursuant to the Priority of Payments.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES

Each of the parties hereto hereby represents and warrants for the benefit of the other parties hereto as of the Closing Date that:

(a)    *Organization and Good Standing.*  It is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has organizational power and authority to own its properties and to conduct its business as such properties shall then be owned and such business is then conducted, and had at all relevant times, and shall then have, organizational power, authority and legal right to consummate the transactions contemplated hereunder and under the other Transaction Agreements to which it is party.

(b)    *Due Qualification.*  It is duly qualified to do business in, and has obtained all licenses and approvals, all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such qualifications, licenses or approvals and where the failure to so qualify or to obtain such licenses and approvals will have a material adverse effect on the ability of such party to conduct its business or perform its obligations under the Transaction Agreements to which it is party.

(c)    *Power and Authority.*  It has full power, authority and right to execute and deliver this Agreement and the other Transaction Agreements to which it is party, and has full power

13

and authority to perform its obligations hereunder and under the other Transaction Agreements to which it is party, and has taken all necessary action to authorize and has duly authorized the execution and delivery of this Agreement and the other Transaction Agreements to which it is party and the performance of its obligations hereunder and thereunder.

(d)    *Binding Obligation.* This Agreement and each of the other Transaction Agreements to which it is party constitutes the legal, valid and binding obligations of it enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally or by general principles of equity.

(e)    *No Violation.* The consummation of the transactions contemplated by this Agreement and the other Transaction Agreements to which it is party and the fulfillment of the terms hereof and thereof will not, to the best of its knowledge, violate any United States federal, state or local, or any foreign, law or regulation, violate, result in the breach of any terms and provisions of, nor constitute an event of default under, its organizational documents, or violate or breach any of the terms or provisions of, or constitute an event of default under, any agreement to which it is a party or by which it shall be bound; nor, to the best of its knowledge, violate any order, judgment or decree applicable to it of any United States federal, state or foreign court, regulatory body, administrative agency or other United States federal, state or foreign governmental instrumentality having jurisdiction over it or its properties, which violation, breach or default would have a material adverse effect on its ability to perform its obligations under any Transaction Agreement to which it is party.

(f)    *No Proceedings.* There is no action, suit or proceeding before or by any court, regulatory body, administrative agency or other governmental agency or body, domestic or foreign, now pending, or to its knowledge, threatened, against or affecting it or its assets or properties: (i) asserting the invalidity of this Agreement or any other Transaction Agreement to which it is party, (ii) seeking to prevent the consummation of any of the transactions contemplated hereby or thereby or (iii) seeking any determination or ruling that might materially and adversely effect the performance by it of its obligations under, or the validity or enforceability of, this Agreement or any other Transaction Agreement to which it is party.

(g)    *No Consents.* No consent, approval, permit, license, authorization or order of or declaration or filing with any governmental authority is required to be obtained by it for the consummation of the transactions contemplated by this Agreement or any other Transaction Agreement to which it is party, other than any such consent, approval, permit, license, authorization, order, declaration or filing which if not duly made or obtained would not have a material adverse effect on the validity of any Transaction Agreement to which it is party, or on such party's ability to perform its obligations under any Transaction Agreement to which it is party, and except such as have been duly made or obtained.

ARTICLE IV

APPOINTMENT OF PAYING AGENT

Section 4.1.    *Appointment of Paying Agent.*  On the terms and subject to the conditions set forth herein, the Issuer appoints the Paying Agent as Paying Agent for the purpose of performing the services contemplated to be performed by the Paying Agent under this Agreement, and the Paying Agent accepts such appointment and agrees to provide all such services on the terms and conditions set forth herein.

Section 4.2.    *Compensation.*  For so long as it acts as Paying Agent hereunder, the Paying Agent shall be entitled to receive from time to time as compensation for its services and reimbursement for its out-of-pocket expenses amounts payable therefor in accordance with a fee letter entered into between the Paying Agent and the Issuer, which amounts will be distributed pursuant to Section 2.2(d) hereof.

Section 4.3.    *Successor Paying Agent.*

(a)    Any Person into which the Paying Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer its trust business and assets as a whole or substantially as a whole, or any Person resulting from any such conversion, sale, merger, consolidation or transfer to which the Paying Agent is a party, may (provided it is otherwise qualified to serve as the Paying Agent hereunder) be and become a successor Paying Agent hereunder with the prior written consent of the Issuer and, until the Final Date, the Senior Lender.

(b)    The Paying Agent and any successor Paying Agent may at any time resign by giving thirty (30) days' prior written notice by registered, certified or express mail to each party hereto; *provided*, that such resignation shall take effect only upon the date which is the later of the effective date of the appointment of a successor Paying Agent meeting the requirements of Section 4.3(d) and the acceptance in writing by such successor Paying Agent of such appointment and of its obligation to perform its duties hereunder in accordance with the provisions hereof.  Notwithstanding the preceding sentence, if on the thirtieth (30th) day after written notice of resignation is delivered by a resigning Paying Agent as described above no successor Paying Agent has been appointed in accordance herewith, the resigning Paying Agent may petition a court of competent jurisdiction in New York City for the appointment of a successor.

(c)    The Paying Agent may be removed by the Issuer (with the consent of the Principal Holders and, until the Final Date, the Senior Lender, such consent not to be unreasonably withheld) at any time, with or without cause, upon thirty (30) days written notice, by an instrument or concurrent instruments in writing delivered to the Paying Agent and each other party hereto.  Any removal pursuant to the provisions of this clause (c) shall take effect only upon the date which is the latest of the effective date of the appointment of a successor Paying Agent meeting the requirements of Section 4.3(d) and the acceptance in writing by such successor Paying Agent of such appointment and of its obligation to perform its duties hereunder in accordance with the provisions hereof.

15

(d)    Unless otherwise approved by the Principal Holders with, until the Final Date, the approval of the Senior Lender, which approval shall not be unreasonably withheld, any successor Paying Agent shall be a bank or trust company (i) having its principal office in London, England, Dublin, Republic of Ireland or such other jurisdiction as the Issuer may approve, (ii) having a net worth of at least $50,000,000 as of the effective date of appointment, and (iii) whose short-term obligations are rated "F1+" by Fitch IBCA, if rated by Fitch IBCA, "P-1" by Moody's Investors Service, Inc. and "A-1+" by Standard and Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc. The Issuer shall have the sole right to appoint each successor Paying Agent, subject only to the requirements set forth in the preceding sentence and to the approval of the Principal Holders and, until the Final Date, the Senior Lender, which approval shall not be unreasonably withheld. Every successor Paying Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and to each party hereto an instrument in writing accepting such appointment and its obligation to perform its duties hereunder, and the relevant predecessor shall execute, acknowledge and deliver such other documents and instruments as will effectuate such appointment, whereupon such successor, without any further act, deed or conveyance, shall become fully vested with all the estates, properties, rights, powers, duties and obligations of its predecessors.

Section 4.4.    *Indemnification*. The Issuer shall indemnify the Paying Agent, its officers, employees and its agents (each, an "Indemnified Person") for, and hold each Indemnified Person harmless against, any loss, liability, damage, claim, action, demand or expense (including the costs and expenses of defending against any claim of liability) arising out of or in connection with the Paying Agent's acting as Paying Agent hereunder, except such loss, liability, damage, claim, action, demand or expense (including the costs and expenses of defending against any claim of liability) as shall result from the Paying Agent's gross negligence or willful misconduct. Any amount payable to an Indemnified Person in respect of any such loss, liability, damage, claim, action, demand or expense shall be paid from amounts available therefor in the Payment Account in accordance with the provisions of Section 2.2(d) hereof. The obligation of the Issuer under this Section 4.4 shall survive the termination of this Agreement and the resignation or removal of the Paying Agent. Each of the parties hereto agrees that the Paying Agent shall not be liable as a result of the Paying Agent's following, in good faith and in accordance with this Agreement, the written instructions given it by the Issuer or any other party entitled to do so hereunder. The Paying Agent shall not be liable for any loss, liability, claim or expense in connection with its duties under this Agreement, the Indenture, the Subordinated Indenture, or any other Transaction Agreement, or resulting from causes beyond its reasonable control, unless caused by its own gross negligence or willful misconduct. The Paying Agent shall have no duty to investigate the accuracy of any statements contained in any certificate delivered to it pursuant to the terms of the Junior Notes or the Subordinated Securities, its only duty being to receive such certificates in accordance with the terms thereof.

Section 4.5.    *Waiver of Set-Offs*. The Paying Agent hereby expressly waives any and all rights of set-off that the Paying Agent may otherwise at any time have under applicable law with respect to the amounts on deposit in the Payment Account and agrees that the amounts in the Payment Account shall at all times be held and applied in accordance with the provisions of Section 2.2(d) hereof and without set-off, but in each subject to its rights to receive amounts payable to the Paying Agent in accordance with such Section 2.2(d).

16

Section 4.6.    *Custodial Arrangements.*  The Issuer shall cause each Junior Note Purchase Agreement and each Subordinated Security Purchase Agreement entered into on or after the date hereof to contain a provision requiring the holder of the applicable Junior Note or Subordinated Security thereunder (including each assignee) to deposit such Junior Note or Subordinated Security with the Paying Agent as custodian under a custody agreement reasonably acceptable to the Paying Agent.


ARTICLE V

SUBORDINATION

Section 5.1.    *Payment Subordination.*

(a)      Each of the parties hereto hereby postpones and subordinates, to the full extent and in the manner provided in this Agreement, the payment of all amounts due such party under any Transaction Agreement to the payment of all amounts having higher priority pursuant to the Priority of Payments.  In the event that the Issuer is in default in respect of any payment obligation under any Transaction Agreement, the party to whom such payment obligation is owing may only commence the exercise of remedies in respect of such obligation (i) following the commencement of a proceeding seeking reorganization, arrangement, adjustment or composition in respect of the Issuer or appointing a receiver, liquidator, assignee, administrative receiver, examiner, compulsory manager or sequestrator (or similar official) for the Issuer or of any substantial portion of its property, or the issuance of any order or decree ordering the liquidation or winding up of the affairs of the Issuer, (ii) following the indefeasible discharge in full of all obligations having a higher priority of distribution pursuant to Section 2.2(d) or (iii) with the prior written consent of all parties having a higher priority of distribution pursuant to Section 2.2(d); provided, that each party hereto may join in any action initiated by any other party and, provided further, that nothing contained in this Section 5.1(a) shall apply to the rights of the Senior Lender under the Senior Term Loan and Liquidity Agreement and the Control Agreement.

Section 5.2.    *Provisions Solely to Define Relative Rights.*  The provisions of this Article V are and are intended solely for the purpose of defining the relative payment rights of the parties hereto.  Nothing contained in this Article V or elsewhere in this Agreement is intended to or shall (a) impair the obligation of the Issuer, which is absolute and unconditional, to pay the obligations under the Transaction Agreements as and when due or (b) prevent any party hereto from exercising all remedies otherwise permitted by applicable law upon default under this Agreement or any applicable Transaction Agreement.

Section 5.3.    *Paying Agent to Effectuate Subordination.*  Each party by its acceptance hereof authorizes and directs the Paying Agent on its behalf to take such action as may be necessary or appropriate to effectuate the subordination provided in this Article V and appoints the Paying Agent as its attorney-in-fact for any and all such purposes.

Section 5.4.    *No Waiver of Subordination Provisions.*  No right of any present or future party hereto to enforce the subordination as herein provided shall at any time in any way be

prejudiced or impaired by any act or failure to act on the part of the Issuer or any party hereto by any non-compliance by the Issuer with the terms, provisions and covenants of this Agreement, regardless of any knowledge thereof which such party may have or be otherwise charged with.

Section 5.5.    *Reliance on Judicial Order or Certificate of Liquidating Agent.* Upon any payment or distribution of assets of the Issuer referred to in this Article V, the Paying Agent (subject to the provisions of Section 2.2(d) hereof) and the parties hereto shall be entitled to rely upon any order or decree entered by any court of competent jurisdiction in which such insolvency, receivership, liquidation, reorganization, dissolution, winding up or similar case or proceeding is pending, or a certificate of the receiver, liquidating trustee, custodian, assignee for the benefit of creditors, agent or other Person making such payment or distribution, delivered to the Paying Agent or to any of such Persons for the purpose of ascertaining the Persons entitled to participate in such payment, the amount distributable to each such Person and all other facts pertinent thereto or to this Article V.

Section 5.6.    *Return of Payments.* In the event that, notwithstanding the foregoing provisions of this Article, a party hereto shall have received any payment or distribution of assets or collateral of the Issuer in kind or character, whether in cash, property or securities, before all amount owing to another party hereto having a higher priority of distribution pursuant to the Priority of Payments has been paid in full, then in such event such party shall pay over or deliver such amount to the Paying Agent for distribution pursuant to the Priority of Payments and shall be deemed to hold such payment or property in trust until so delivered to the Paying Agent.

Section 5.7.    *Negative Covenants.*

(a)    The Issuer shall not change its name or identity in any manner unless it shall have given each party hereto at least sixty (60) days' prior written notice thereof.

(b)    The Issuer shall not relocate its chief executive office or principal place of business unless it shall have given each party hereto at least ninety (90) days' prior written notice thereof. If the Issuer relocates its chief executive office or principal place of business from Ireland, the Issuer shall give prior notice thereof to the parties hereto.

(c)    The Issuer shall not amend its constitutive documents in any material respect unless it has received the prior written consent of the Principal Holders and, until the Final Date, the Senior Lender. The Issuer shall not engage in any activity in contravention of its constitutive documents.

(d)    Except as otherwise provided in the Transaction Agreements, the Issuer shall not merge, consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

(e)    The Issuer shall not create or acquire any subsidiary other than to facilitate the transactions contemplated by the Transaction Agreements and the Senior Term Loan and Liquidity Agreement.

18

(f)    The Issuer shall not engage in any business or activity of any kind or enter into any transaction or obligation that is not contemplated by the Transaction Agreements and the Senior Term Loan and Liquidity Agreement or its constitutive documents.

(g)    The Issuer shall not issue any additional share capital or issue any dividends in respect of its share capital, nor permit its issued share capital to be transferred or held other than to the pursuant to Transaction Agreements and its constitutive documents.

(h)    The Issuer shall not sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (permit such to occur or suffer such to exist), any of its assets, except as expressly permitted by the Transaction Agreements.

Section 5.8.    *Affirmative Covenants.*

(a)    The Issuer shall maintain all licenses, permits, charters and registrations, if any, which are material to the conduct of its business.

(b)    The Issuer shall observe and comply in all material respects with all laws, ordinances, orders, judgments, rules, regulations, certifications, franchises, permits, licenses, directions and requirements of all governmental authorities which may then be applicable to the Issuer, a violation of which could reasonably be expected to have a material adverse effect, except such thereof as shall be contested in good faith and by appropriate proceedings diligently conducted by the Issuer; *provided*, that the Issuer shall give the parties hereto prompt notice of such contest and that a reserve or other appropriate provision as shall be required in accordance with Irish generally accepted accounting principles shall have been made therefor.

(c)    The Issuer shall observe and comply in all material respects with all provisions of the Transaction Agreements and the Senior Term Loan and Liquidity Agreement.

(d)    The Issuer shall pay or cause to be paid taxes, if any, levied or assessed upon the Issuer, all or any part of its property and assets, or in respect of amounts owing by the Issuer in respect of the Senior Debt, Junior Notes or Subordinated Securities, if any.

Section 5.9.    *Notices.*  In the event the Issuer (including through its agents) acquires knowledge of the occurrence of any default, event of default, or like event, howsoever described or called, hereunder or under any of the other Transaction Agreements, or the occurrence of any event which, with the giving of notice, the passage of time or both, would constitute any of the foregoing hereunder or under the other Transaction Agreements, the Issuer shall immediately give notice thereof to the other parties hereto (including, until the Final Date, the Senior Lender).

Section 5.10.    *Non-Interference; Etc.*  The Issuer shall not (i) waive or alter any of its rights under the Transaction Agreements (or any agreement or instrument relating thereto) without the prior written consent of the Principal Holders and, until the Final Date, the Senior Lender, such consent not to be unreasonably withheld, (ii) fail to pay any tax, assessment, charge or fee levied or assessed against it, or to defend any action, if such failure to pay or defend may adversely affect the priority or enforceability of the Issuer's right, title or interest in and to the Policies; (iii) except as provided in clause (iv) below, directly or indirectly avail itself of any

19

right, benefit, power, authority or remedy conferred on it pursuant to the provisions of any Transaction Agreement, whether through action or inaction, except as may be expressly directed from time to time by one of the Principal Holders or (iv) take any action, or fail to take any action, if such action or failure to take action will interfere with the enforcement of any rights under the Transaction Agreement.

Section 5.11. *Joinder of Subsequent Holders of Junior Notes and Subordinated Securities.* Any subsequent holder or transferee of one or more Junior Notes or Subordinated Securities may join this Agreement, without the necessity of obtaining the consent of any of the parties hereto, by executing and delivering to each of the parties hereto an agreement in substantially the form of Exhibit A hereto (a "**Joinder Agreement**"), duly completed, accepting all the terms and conditions of this Agreement. Upon execution and delivery of such Joinder Agreement, and subject to such consent, such subsequent holder shall be a party hereto for all purposes of this Agreement and the other Transaction Documents. It shall be a condition to the valid transfer of any Junior Note or any Subordinated Security that the transferee thereof shall simultaneously with such transfer execute and deliver a Joinder Agreement as provided above.

Section 5.12. *Reports by Independent Accountants.*

(a)     The Issuer shall appoint a firm of independent accountants for the purpose of preparing and delivering the reports or certificates required by this Agreement to be prepared by accountants and shall notify the other parties hereto of the same. Upon any resignation by such firm the Issuer shall promptly appoint by Corporate Certificate delivered to the other parties hereto a successor firm of independent accountants. If the Issuer shall fail to appoint a successor within fifteen (15) days after the resignation of the resigning independent accountants, the Issuer shall promptly notify the other parties hereto of such failure in writing. If the Issuer shall not have appointed a successor within ten (10) days thereafter, the Investment Manager, with the consent of the parties hereto, shall promptly appoint a successor firm of independent accountants. The fees of such independent accountants and any successor shall be payable by the Issuer as pursuant to Section 2.2(d)(i) of this Agreement.

(b)     The Investment Manager on behalf of the Issuer shall cause the firm of independent accountants to deliver annual audited financial statements of the Issuer to the parties hereto within ninety (90) days of the end of the Issuer's fiscal year which shall be June 30 of each year, beginning June 30, 2006.


ARTICLE VI

FURTHER AGREEMENTS

Section 6.1. *Appointment of Directors.* The Principal Holders, as the initial holders of the Subordinated Securities, shall have the right, such right to be exercised by the Principal Holders from time to time by majority vote to appoint the Directors of the Issuer and to maintain and remove such Directors in or from office, subject at all times to the provisions of the Irish Companies Acts 1963 to 2003. Ritchie, Ritchie U.S. and Sandy Run shall have the right to vote 31.0%, 45.7% and 23.3%, respectively, of the interests of the Principal Holders set forth above.

## ARTICLE VII

### MISCELLANEOUS

Section 7.1. *Notices*. Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be delivered by the following means: (i) hand delivery; (ii) overnight courier service (*e.g.*, FedEx, Airborne Express, or DHL); (iii) registered or certified U.S. mail, postage prepaid and return receipt requested; or (iv) facsimile transmission provided that the fax is confirmed by delivery using one of the three methods identified in clauses (i) through (iii). All such notices shall be delivered to the parties as follows:

    (1)    If to the Issuer, then to:

          Ritchie Risk-Linked Strategies Trading (Ireland), Limited
          c/o Marsh Management Services (Dublin) Ltd.
          4th Floor, 25/28 Adelaide Road
          Dublin 2, Ireland
          Attention: Peter Hughes
          Facsimile No.: 353-1-605-3010

    (2)    If to the Senior Lender, then to:

          ABN AMRO, Derivative Operations
          250 Bishopsgate
          London, England, EC2A 4AA
          Attention: Terry Brennan and Paul Turnock
          Facsimile: 44 (0) 207-875-9428/9430

    (3)    If to Ritchie, then to:

          Ritchie Risk-Linked Strategies Trading, Ltd.
          30 East Broadway, "Malabar Gates"
          Pembroke HM19 Bermuda
          Attention:
          Facsimile No.: 441-278-0778

(4)    If to Sandy Run, then to:

       Sandy Run Capital LLC
       c/o Coventry First LLC
       Coventry Corporate Center
       7111 Valley Green Road
       Fort Washington, Pennsylvania  90341
       Attention:  Legal Department
       Facsimile No.:  (215) 402-8305

(5)    If to Ritchie U.S., then to:

       Ritchie Risk-Linked Strategies, L.L.C.
       c/o Ritchie Capital Management LLC
       2100 Enterprise Avenue
       Geneva, Illinois  60134
       Attention:  provide details
       Facsimile No.:  (630) 345-7932

(6)    If to the Bermuda Servicer, then to:

       Montgomery Limited
       Canon's Court
       22 Victoria Street
       Hamilton, HM 12 Bermuda
       Attention:
       Facsimile No.:

(7)    If to the Investment Manager, then to:

       Ritchie Capital Management (Bermuda), Ltd.
       Malabar Gates
       30 East Broadway
       Pembroke HM 19 Bermuda
       Attention:
       Facsimile No.: 441-278-0778

(8)    If to the Servicer, then to:

       Coventry First LLC
       Coventry Corporate Center
       7111 Valley Green Road
       Fort Washington, Pennsylvania 90341
       Attention:  Legal Department
       Facsimile No.:  (215) 402-8305

(9)     If to the Policy Payment Agent, then to:

U.S. Bank National Association
60 Livingston Avenue, EP-MN-WS3D
St. Paul, Minnesota  55107-2292
Attention:  Life Settlements Manager
Facsimile No.:  (651) 495-8093

(10)    If to the Paying Agent, then to:

ABN AMRO Bank N.V. (London Branch)
82 Bishopsgate
London EC2N 4BN
Attention: GSTS-ABS-Ritchie
Facsimile No.:  020 76784470

(11)    If to the Indenture Trustee, then to:

ABN AMRO Trustees Limited
82 Bishopsgate
London EC2N 4BN
Attention: GSTS-ABS-Ritchie
Facsimile No.:  020 76784470

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 7.2.    *Amendments; Waivers.*  No amendment or waiver of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by the parties hereto.  Each such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise of that right, power or privilege or the exercise of any other right, power or privilege.

Section 7.3.    *Continuing Rights.*  The provisions of this Agreement are intended solely for the purpose of defining the relative payment rights of the parties hereto.  Nothing contained herein is intended to or shall impair the obligations of the Issuer to the holders of the Junior Notes, the Subordinated Securities, the Senior Lender or the other parties to the Transaction Agreements; nor shall anything herein prevent any of the parties hereto from accepting any payment from the Issuer or from exercising all remedies otherwise permitted by applicable law and any agreements with the Issuer upon default by the Issuer under such agreements, subject only to the rights, if any, of the parties under this Agreement.

Section 7.4.    *Successors and Assigns; Third Party Beneficiaries.*  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Agreement shall not be transferred or assigned under any circumstances without the prior written consent of the parties hereto; *provided, however,* that any permitted transferee of any Junior Note or Subordinated Securities shall automatically become a party hereto without such prior written consent.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto and their respective successors and permitted transferees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

Section 7.5.    *Severability.*  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 7.6.    *Binding Effect.*  This Agreement shall remain in full force and effect until such time as all of the obligations under the Transaction Agreements have been paid in full.

Section 7.7.    *Governing Law; Consent to Jurisdiction.*  THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO ITS CONFLICTS OF LAWS PROVISIONS (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).  EACH PARTY HERETO AGREES THAT ANY SUIT FOR THE ENFORCEMENT OF THIS AGREEMENT MAY BE BROUGHT IN ANY NEW YORK STATE COURT OR ANY FEDERAL COURT, IN EITHER CASE, SITTING IN THE BOROUGH OF MANHATTAN, AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURT AND TO SERVICE OF PROCESS IN ANY SUCH SUIT BEING MADE UPON SUCH PARTY BY MAIL AT THE ADDRESS SPECIFIED IN SECTION 6.1.  EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH SUIT OR ANY SUCH COURT OR THAT SUCH SUIT IS BROUGHT IN AN INCONVENIENT COURT.

Section 7.8.    *Trial by Jury Waived.*  Each party hereby waives, to the fullest extent permitted by law, any right to a trial by jury in respect of any litigation arising directly or indirectly out of, under or in connection with any of the Transaction Agreements or any of the transactions contemplated thereunder.  Each party hereto (a) certifies that no representative, agent or attorney of any party hereto has represented, expressly or otherwise, that it would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it has been induced to enter into the Transaction Agreements to which it is a party by, among other things, this waiver.

Section 7.9.    *Execution in Counterparts.*  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page

24

of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 7.10. *Entire Agreement.* This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

Section 7.11. *No Recourse.* No recourse for or under any obligation, covenant or agreement of the parties hereto contained in this Agreement, or any other agreement, document or instrument executed in connection herewith, shall be had against any member, shareholder, officer, director, employee or agent of the parties hereto, by any proceeding, by virtue of any statute or otherwise; it being expressly agreed and understood that this Agreement is a corporate obligation of the parties hereto, and that no personal liability shall attach to or be incurred by the members, shareholders, officers, directors, employees or agents of the parties hereto, as such, or any of them under or by reason of any of the obligations, covenants or agreements of the parties hereto contained in this Agreement or implied therefrom, and that any and all personal liability for breaches of any such member, shareholder, officer, director, employee or agent of any of such obligations, covenants or agreements, either at law or in equity is hereby expressly waived by the parties hereto as a condition of and in consideration for the execution of this Agreement.

Section 7.12. *No Partnership or Joint Venture.* The parties are not entering into a partnership or joint venture, and none of the provisions of this Agreement shall be deemed to constitute a partnership or joint venture between or among the parties

Section 7.13. *Headings.* Article and Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 7.14. *Conditions.* Acceptance by the Paying Agent of its duties under this Agreement is subject to the following terms and conditions, which all parties to this Agreement hereby agree shall govern and control the rights, duties and immunities of the Paying Agent:

(a)     The duties and obligations of the Paying Agent shall be determined solely by the express provisions of this Agreement and the Paying Agent shall not be liable except for the performance of such duties and obligations as are specifically set out in this Agreement. The Paying Agent shall not be required to inquire as to the performance or observation of any obligation, term or condition under any agreement or arrangement by the Issuer or any other party to this Agreement. The Paying Agent shall not be bound by any waiver, modification, termination or rescission of this Agreement or any of the terms hereof, unless evidenced by a writing delivered to the Paying Agent signed by the other parties hereto and, if the duties or rights of the Paying Agent are affected, unless it shall give its prior written consent thereto. This Agreement shall not be deemed to create a fiduciary relationship between the parties hereto under state or federal law.

(b)     The Paying Agent shall not be responsible in any manner for the validity or sufficiency of this Agreement or for any representations made or obligations assumed by any party other than the Paying Agent. Nothing herein contained shall be deemed to obligate the

25

Paying Agent to deliver any cash, instruments, documents or any other property referred to herein, unless the same shall have first been received by the Paying Agent pursuant to this Agreement.

(c)     The Paying Agent shall be fully protected in acting on and relying upon any written notice direction, request, waiver, consent, receipt or other paper or document which the Paying Agent in good faith believes to have been signed and presented by the proper party or parties.

(d)     The Paying Agent shall not be liable for any error of judgment, or for any act done or step taken or omitted by it in good faith for any mistake in act or law, or for anything which it may do or refrain from doing in connection herewith, except for the breach of its express duties hereunder and for its own negligence, willful misconduct or bad faith.

(e)     The Paying Agent may seek the advice of legal counsel in the event of any dispute or question as to the construction of any of the provisions of this Agreement or its duties hereunder, and it shall incur no liability and shall be fully protected in respect of any action taken, omitted or suffered by it in good faith in accordance with the advice or opinion of such counsel.

(f)     No provision of this Agreement or any other Transaction Agreement shall require the Paying Agent to expend or risk funds or otherwise incur any financial liability in the performance of any of its rights or powers hereunder or under any other Transaction Agreement if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it.

(g)     The right of the Paying Agent to perform any discretionary act enumerated in this Agreement or in any other Transaction Agreement shall not be construed as a duty, and the Paying Agent shall not be answerable for other than bad faith, negligence or willful misconduct in the performance of any such act.

(h)     Whenever, in the administration of this Agreement or any other Transaction Agreement, the Paying Agent shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any discretionary action hereunder or thereunder, it may (unless other evidence be herein or therein specifically prescribed), in the absence of bad faith on its part, rely on a certificate of any Authorized Officer of the appropriate Person.

(i)     The Paying Agent shall not be under any obligation to appear in, prosecute or defend any legal action that is not incidental to its duties in accordance with this Agreement or any other Transaction Agreement and that in its reasonable judgment may involve it in any expense or liability.

(j)     The Paying Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instruction, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document, but, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit.

(k)     The Paying Agent may execute any of its powers under this Agreement or any other Transaction Agreement or perform any of its duties under this Agreement or any other Transaction Agreement either directly or by or through agents, accountants or attorneys and shall not be liable for the negligence or willful misconduct of such agents, accountants or attorneys appointed with reasonable care.

(l)     The agreements set forth in this Section 7.14 shall survive the resignation or removal of the Paying Agent and the termination of this Agreement.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED

By: _____
     Name: PETER HUGHES
     Title: DIRECTOR

ABN AMRO BANK N.V., ACTING OUT OF ITS LONDON BRANCH, as Senior Lender

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

RITCHIE RISK-LINKED STRATEGIES TRADING, LTD.

By: _____
     Name:
     Title:

SANDY RUN CAPITAL LLC

By: _____
     Name:
     Title:

S-1

Signature Page – Intercreditor Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

> RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED
>
> By: _____
>     Name:
>     Title:
>
> ABN AMRO BANK N.V., ACTING OUT OF ITS LONDON BRANCH, as Senior Lender
>
> By: _____
>     Name:                    Roger Manger
>     Title:                   Authorised Signatory
>
> By: _____
>     Name:    Denis Viskovich
>     Title:   Authorised Signatory
>
> RITCHIE RISK-LINKED STRATEGIES TRADING, LTD.
>
> By: _____
>     Name:
>     Title:
>
> SANDY RUN CAPITAL LLC
>
> By: _____
>     Name:
>     Title:

S-1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED

By: _____
Name:
Title:

ABN AMRO BANK N.V., ACTING OUT OF ITS LONDON BRANCH, as Senior Lender

By: _____
Name:
Title:

By: _____
Name:
Title:

RITCHIE RISK-LINKED STRATEGIES TRADING, LTD.

By: _____
Name: Jeff Mulholland
Title:

SANDY RUN CAPITAL LLC

By: _____
Name:
Title:

S-1

Signature Page – Intercreditor Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED

By: _____
     Name:
     Title:

ABN AMRO BANK N.V., ACTING OUT OF ITS LONDON BRANCH, as Senior Lender

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

RITCHIE RISK-LINKED STRATEGIES TRADING, LTD.

By: _____
     Name:
     Title:

SANDY RUN CAPITAL LLC

By: _____
     Name:
     Title:

S-1

Signature Page – Intercreditor Agreement

RITCHIE RISK-LINKED STRATEGIES, L.L.C.

BY: _____
     Name: Jeff Mulholland
     Title:

MONTGOMERY LIMITED

BY: _____
     Name:
     Title:

RITCHIE CAPITAL MANAGEMENT (BERMUDA), LTD.

BY: _____
     Name: Jeff Mulholland
     Title:

COVENTRY FIRST LLC

BY: _____
     Name:
     Title:

U.S. BANK NATIONAL ASSOCIATION,
   as Policy Payment Agent

BY: _____
     Name:
     Title:

S-2

Signature Page – Intercreditor Agreement

RITCHIE RISK-LINKED STRATEGIES, L.L.C.


By: _____
      Name:
      Title:


MONTGOMERY LIMITED


By: _____
      Name:
      Title:


RITCHIE CAPITAL MANAGEMENT (BERMUDA), LTD.


By: _____
      Name:
      Title:


COVENTRY FIRST LLC


By: _____
      Name:
      Title:


U.S. BANK NATIONAL ASSOCIATION,
    as Policy Payment Agent


By: _____
      Name:
      Title:


S-2

RITCHIE RISK-LINKED STRATEGIES, L.L.C.


BY:    _____
        Name:
        Title:


MONTGOMERY LIMITED


BY:    _____
        Name:
        Title:


RITCHIE CAPITAL MANAGEMENT (BERMUDA), LTD.


By:    _____
        Name:
        Title:


COVENTRY FIRST LLC

By:    _____
        Name:
        Title:


U.S. BANK NATIONAL ASSOCIATION,
    as Policy Payment Agent


By:    _____
        Name:
        Title:


S-2

Signature Page – Intercreditor Agreement

RITCHIE RISK-LINKED STRATEGIES, L.L.C.

BY: _____
    Name:
    Title:

MONTGOMERY LIMITED

BY: _____
    Name:
    Title:

RITCHIE CAPITAL MANAGEMENT (BERMUDA), LTD.

By: _____
    Name:
    Title:

COVENTRY FIRST LLC

By: _____
    Name:
    Title:

U.S. BANK NATIONAL ASSOCIATION,
    as Policy Payment Agent

By: _____
    Name:  Nancid J. Arvin
    Title:  Vice President

S-2

Signature Page – Intercreditor Agreement

ABN AMRO BANK N.V. ACTING OUT OF ITS
LONDON BRANCH, as Paying Agent

By: _____
Name:
Title:        **JACQUI TATE**
              Authorised Signatory

By: _____
Name:
Title:        PETER ELSWOOD
              Authorised Signatory

ABN AMRO TRUSTEES LIMITED,
      as Indenture Trustee

By: _____
Name:
Title:        JACQUI TATE
              Authorised Signatory

By: _____
Name:
Title:        PETER ELSWOOD
              Authorised Signatory

S-3

Signature Page – Intercreditor Agreement