UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| RITCHIE CAPITAL MANAGEMENT, L.L.C., RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED, RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND) II, LIMITED, WALKERS SPV LIMITED, as trustee for Ritchie Risk-Linked Life Strategies Trust I and Ritchie Life Strategies Master Trust, and RITCHIE RISK-LINKED STRATEGIES TRADING, LTD., | 07 Civ. 3494 (DLC)  ECF Case  **FIRST AMENDED COMPLAINT** |
| Plaintiffs, | |
| v. | |
| COVENTRY FIRST LLC, THE COVENTRY GROUP, INC., MONTGOMERY CAPITAL, INC., LST I LLC, ALAN BUERGER, CONSTANCE BUERGER, REID S. BUERGER, ANTONIO MUNIZ, ALEX SELDIN, NEAL JACOBS, EILEEN SHOVLIN, and JIM DODARO, | |
| Defendants. | |

Plaintiffs, through their attorneys, for their First Amended Complaint against Defendants allege as follows:

## NATURE OF THE ACTION

1.      This is an action under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), and for breach of contract. It is brought to recover damages caused to Plaintiffs by Defendants' pervasive fraud in the "life settlements" industry – that is, the secondary market for life insurance policies. In a life settlement transaction, an investor buys a life insurance policy from the policy's owner at a discount, pays the policy's premiums as they come due, and then collects the death benefits. Coventry First

LLC is a major player in the life settlement industry, but its bid-rigging and fraud have resulted in civil proceedings by the New York Attorney General and the Florida Office of Insurance Regulation against itself and its affiliates.

2.     Defendants Coventry First LLC ("Coventry First") and LST I LLC ("LST") are owned by Defendant Montgomery Capital, Inc. ("Montgomery Capital") and affiliated with Defendant The Coventry Group, Inc. (all four entities, together with affiliates, to be referred to collectively as "Coventry"). Coventry First is the main operating subsidiary for Coventry's activities in the life settlement field. Montgomery Capital is a holding company, and LST is a special-purpose vehicle that serves an alter ego for Montgomery Capital and Coventry First.

3.     Coventry is owned and controlled by the Buerger family, which includes Defendants Alan Buerger, Constance Buerger, and Reid S. Buerger. Defendant Antonio Muniz is the chief financial officer of Coventry First and Montgomery Capital. The other individual defendants are or were executives and employees of Coventry First. Many if not all of these defendants, as well as Coventry's employees generally, held themselves out in emails and otherwise as representing "Coventry" rather than any particular entity or entities in the Coventry corporate family.

4.     Ritchie Capital Management, L.L.C. ("RCM"), as adviser and fiduciary to (as well as holder of pecuniary interests in the value of) Ritchie Risk-Linked Life Strategies Trust I, Ritchie Life Strategies Master Trust, and Ritchie Risk-Linked Strategies Trading, Ltd. (all three entities collectively, the "Investing Plaintiffs"), caused the Investing Plaintiffs to become de facto equity shareholders in Plaintiffs Ritchie Risk-

Linked Strategies Trading (Ireland), Limited ("Ritchie I") and Ritchie Risk-Linked Strategies Trading (Ireland) II, Limited ("Ritchie II").

5.      Coventry (through a shell company known as Sandy Run Ltd.) also became a de facto equity shareholder in Ritchie I and Ritchie II. (Sandy Run is a mere alter ego, agency, and instrumentality of Montgomery Capital and the Coventry corporate family. The affairs of Sandy Run are completely dominated by Montgomery Capital and the Coventry corporate family. On information and belief, Sandy Run's officers and directors all are officers and directors of Coventry First and Montgomery Capital. Sandy Run conducts no business of its own but is merely a vehicle for holding the subordinated securities of Ritchie I and Ritchie II.)

6.      Ritchie I and Ritchie II (collectively, the "Contracting Plaintiffs") each entered into a contract with the Coventry alter ego LST to purchase life insurance policies that Coventry First had acquired on the open market. These contracts – which were only one set out of a large number of contracts governing the relationship between the sides – were known as Master Policy Purchase Agreements, or "MPPAs."

7.      Coventry and the Investing Plaintiffs intended all along that the Contracting Plaintiffs would re-sell the life insurance products at a profit in a securitization transaction.

8.      The Investing Plaintiffs and Coventry, therefore, were carrying on, as the co-owners of Ritchie I and Ritchie II, in an arrangement in which profits and losses would be shared. The Investing Plaintiffs contributed the majority of the financing, while Coventry contributed the majority of the effort and expertise.

9.    Defendants, however, concealed from Plaintiffs that Coventry First was systematically defrauding the owners of the policies, and then further deceived Plaintiffs as to the existence of an investigation by the Attorney General of New York into Defendants' misconduct. Coventry First and its officers, moreover, falsely represented on numerous occasions that Coventry was in compliance with all applicable laws and regulations.

10.    After deceiving Plaintiffs as to the New York Attorney General's investigation, Defendant Reid Buerger repeatedly invoked the Fifth Amendment when questioned in September 2006 about the illegal acts that Coventry had committed in relation to its acquisition of life insurance products from sellers.

11.    Coventry's misconduct has damaged Plaintiffs, as described herein.

### JURISDICTION AND VENUE

12.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Plaintiffs bring claims under RICO, 18 U.S.C. § 1962. The Court has supplemental jurisdiction over the Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a). In the alternative, the Court has original subject matter jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1332(a). While Plaintiffs cannot yet calculate their damages with precision, it is likely at least 700 million dollars.

13.    The Court has personal jurisdiction over Defendants because: (1) Defendants regularly transact business in New York and have entered into contracts with Plaintiffs in New York; (2) Defendants have committed tortious acts within New York; (3) Defendants have committed tortious acts outside New York causing injury to Plaintiffs and others in New York as set forth in this complaint, and regularly do business

and derive substantial revenue from services rendered in New York, and expect or should reasonably expect their acts to have consequences in New York. Defendants derive substantial revenue from interstate commerce.

14.    Coventry First and LST submitted in a series of agreements with Plaintiffs to the jurisdiction of the courts sitting in the State of New York for purposes of disputes arising out of their relationship with Plaintiffs.

15.    Defendant Montgomery Capital, Inc. is subject to general personal jurisdiction in New York because it is licensed to do business in New York under Section 1304 of the New York Business Corporation Law. Indeed, Montgomery Capital, Inc. explicitly conceded in an action brought by the New York Attorney General that "Montgomery Capital is subject to personal jurisdiction in New York."

16.    Defendant The Coventry Group, Inc. receives a substantial portion of the operating income of Coventry First and is under common control with the other Coventry entities. The Coventry Group, Inc. also facilitated Coventry First's misconduct in the marketplace. In particular, The Coventry Group, Inc. assisted Coventry First in its purchases by converting term life policies to universal life insurance, receiving fees from Coventry First in the process.

17.    Discussions between Coventry and representatives of RCM situated in New York began in March 2005. From March 2005 until November 2006, Coventry employees and executives frequently communicated by email and telephone with RCM employees in New York. Among the Coventry executives who frequently placed telephone calls and sent emails to RCM's New York employees were Alan Buerger, Reid Buerger, Antonio Muniz, and Alex Seldin.

18.     Each of the individual defendants has responsibility either for the overall management of Coventry or for Coventry First's acquisition of life insurance policies. These defendants bought hundreds, if not thousands, of life insurance policies – including, on information and belief, policies procured by fraud and bid-rigging, as alleged herein – from New York sellers. These defendants also purchased numerous policies through New York brokers, and communicated and negotiated with brokers in New York in connection with those purchases.

19.     The individual defendants had knowledge of, and control over, Coventry First's purchases of policies in New York. For instance, Neal Jacobs, Jim Dodaro, and Eileen Shovlin negotiated on behalf of Coventry First with brokers in New York for the purchase of policies. All purchases were approved by Reid Buerger.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and 1965(a). In the alternative, venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2). Coventry waived any objection to venue in this Court in a series of agreements with Plaintiffs.

## THE PARTIES

21.     Plaintiff RCM is a limited liability company with its principal place of business in Lisle, Illinois. Its members are citizens of Illinois, Wyoming, Utah, and Arizona.

22.     Plaintiffs Ritchie I and Ritchie II are Irish corporations with offices in Ireland.

23.     Plaintiff Walkers, a Cayman Islands company with its principal place of business in the Cayman Islands, is sole trustee of Ritchie Trust I and Ritchie Master

Trust, each of which is a class of Ritchie Risk-Linked Strategies Series Trust, a Cayman Islands unit trust.

24.     Plaintiff Ritchie Risk-Linked is a Bermudan limited company with its principal place of business in Bermuda.

25.     Defendant Coventry First is a limited liability company with its principal place of business in Fort Washington, Pennsylvania. Coventry First's sole member is Montgomery Capital. The officers of Coventry First include Alan Buerger, CEO and Treasurer; Constance Buerger, President and Secretary; and Reid S. Buerger, Vice President.

26.     Defendant Montgomery Capital is a Delaware corporation with its principal place of business in Fort Washington, Pennsylvania. The shareholders of Montgomery Capital are Alan Buerger, Constance Buerger, Reid S. Buerger, and the Reid S. Buerger Trust. The officers of Montgomery Capital include Alan Buerger, Constance Buerger, and Reid Buerger.

27.     Defendant The Coventry Group, Inc. is a Pennsylvania corporation with its principal place of business in Fort Washington, Pennsylvania. Its shareholders are Alan and Constance Buerger. Its officers include Alan Buerger, President, and Constance Buerger, Treasurer and Vice President.

28.     Defendant LST is a Delaware limited liability company. It is a wholly-owned subsidiary of Montgomery Capital, which is its sole member. LST's chief executive officer is Alan Buerger.

29.     LST is a mere alter ego, agency, and instrumentality of Montgomery Capital and the Coventry corporate family. The affairs of LST are completely dominated

by Montgomery Capital and the Coventry corporate family. On information and belief, LST – whose name is believed to stand for "Life Settlement Transfers" – has no assets of its own, and its officers and directors all are officers and directors of Coventry First and Montgomery Capital. LST conducts no business of its own but was merely a conduit for Coventry's sale of life insurance policies to Ritchie I and Ritchie II.

30.    Defendants Alan Buerger, Constance Buerger, and Reid S. Buerger are individuals residing in Pennsylvania. They own and control Coventry. Reid Buerger is the son of Alan Buerger, the founder and chief executive of the Coventry group. Constance Buerger, Alan Buerger's wife and Reid Buerger's step-mother, is president of Coventry First and chief operating officer of the Coventry group.

31.    Defendant Antonio Muniz has served as chief financial officer of Coventry First and of Montgomery Capital, Inc. since 2003. On information and belief, he is a resident of Pennsylvania.

32.    Defendant Alex Seldin is General Counsel of Coventry. On information and belief, he is a resident of Pennsylvania.

33.    Defendant Neal Jacobs is Coventry's Director of Financial Underwriting. On information and belief, he is a resident of Pennsylvania.

34.    Defendant Jim Dodaro is Coventry's Vice President of Financial Underwriting. On information and belief, he is a resident of Pennsylvania.

35.    Eileen Shovlin is a Coventry Regional Vice President. On information and belief, she is a resident of Pennsylvania.

## BACKGROUND: THE SECONDARY MARKET FOR LIFE INSURANCE

36.    The life insurance policies at issue in this case insured persons, typically wealthy individuals 65 years of age and older, who have determined that they prefer (a) an immediate, lump-sum payment to (b) a payment to their beneficiaries when they die, along with the ongoing expense of premium payments. In a typical situation, a policy owner's children have become financially independent, or the policy was purchased by a corporation that hired the insured as an executive but for which the insured no longer works.

37.    The life settlement payment will be more than the "surrender value" of the policy – the contractual price at which a policy owner can return the policy to the insurance company that issued it – but less than the death benefit. The buyer of the policy continues to pay premiums until the insured's death, at which point the buyer claims the death benefit. Thus the investor is wagering that the value of the future death benefit will exceed the life settlement payment and the costs of paying premiums until the insured's death.

38.    An insured can enter into a life settlement transaction in one of two ways. First, the insured (typically through a representative such as a financial advisor or planner, insurance agent, accountant, or attorney) might hire a life settlement broker to mount the equivalent of an auction, collecting bids on the policy from buyers (or from other brokers who in turn represent buyers). Second, the insured (again through a representative) might make direct contact with a buyer.

39.    Coventry First, together with any subsidiaries and affiliates, is one such buyer. Its work force includes persons with deep experience in the life insurance industry.

Coventry First specializes in understanding life insurance policies. Its expertise includes, among other things, the actuarial and financial knowledge required to optimize the profitability of a life insurance policy by minimizing premium payments.

40.     Coventry First is a leading player in the secondary market for life insurance policies. It entered that market as a buyer in 2001, purchasing 436 policies representing $720 million in total death benefits in 2002. By 2005, Coventry First or its affiliates had purchased 1,318 life insurance policies representing more than $3 billion in death benefits.

41.     Coventry sells the policies that it purchases to institutional investors. Such investors have included the American International Group ("AIG"), Citigroup, Berkshire Hathaway, and the Ritchie group.

<b><u>DEFENDANTS' ILLEGAL CONDUCT</u></b>

**A.**     **<u>Coventry Partners With Ritchie</u>**

42.     Beginning in 2005, the Ritchie group began negotiating with Defendants an arrangement under which Ritchie would partner with Coventry for the purpose of investing in life insurance products and then re-selling them at a future point through a securitization transaction.

43.     In the spring and summer of 2005 and afterwards, Alan Buerger, Reid Buerger, Constance Buerger, and Antonio Muniz, in connection with the negotiations with the Ritchie group, represented to RCM (and in particular to John ("Jeff") Mulholland, Duncan Goldie-Morrison, and Thane Ritchie) that the life insurance policies in which Coventry First transacts have no legal taint and that Coventry purchases policies and otherwise conducts itself in accordance with law.

44.     Rounds of negotiations were concluded in June 2005, September 2005, December 2005, and June 2006. Each round culminated in the commitment by the Investing Plaintiffs of additional capital.

45.     The purchasers of the policies were Plaintiffs Ritchie I and Ritchie II. The Investing Plaintiffs and Coventry jointly committed capital to, and became owners of subordinated securities in, Ritchie I and Ritchie II, which entitled the Investing Plaintiffs and Coventry pursuant to a set of Intercreditor Agreements, among other instruments, to receive the profits of Ritchie I and Ritchie II after other debts have been paid.

46.     The Ritchie group was a partner, joint venturer, and co-venturer of Coventry. While the Investing Plaintiffs contributed the great majority of the financing to the partnership and venture, Coventry's specialty was in analyzing and servicing life insurance policies.

47.     Plaintiffs relied at all times on Defendants' expertise, as well as their honesty and integrity. It was Coventry's responsibility to seek out and purchase individual policies that met certain pre-defined criteria that the parties had agreed on. Each month, pursuant to an elaborate series of contracts, Coventry would notify Ritchie I and Ritchie II that Coventry had a certain dollar amount's worth of qualifying policies to sell. Ritchie I and Ritchie II then would pay the necessary funds to Coventry, which would transfer the policies to Plaintiffs.

48.     It was, moreover, Coventry's responsibility to service the policies, including, among other things, tracking premium payments and claims for death benefits from the issuing life insurance companies, determining when a claim for a death benefit could be made and placing the claim, monitoring the health of the insureds, and

maintaining current information on the issuing life insurance companies. These obligations are set forth in Servicing and Monitoring Agreements between, on the one hand, the Contracting Plaintiffs, and on the other, Coventry First LLC.

49.     Day-to-day administration of the policies, in other words, was in the hands of Coventry. Ritchie I and Ritchie II had only to send to a third-party intermediary a check for the total premium payments due each month, and Coventry First directed the intermediary to disburse the appropriate amounts to each issuing life insurance company.

50.     Coventry also assumed responsibility for helping to market the life insurance policies for resale. In the MPPAs, not just LST but all of its "Affiliates" – in other words, the entire Coventry corporate family – promised "to cooperate with [the Contracting Plaintiffs] "to remarket and sell, transfer, convey or assign [the policies]." See Exhibit B to the MPPAs.

51.     And in a set of Investment Administration and Servicing Agreements, a Coventry affiliate named Montgomery Limited agreed to "give advice and make recommendations to the [Contracting Plaintiffs] concerning "(i) the identification of potential purchasers of . . . life insurance policies . . . (ii) the value and marketability of its portfolio of life settlement policies or of individual policies or groups of policies, (iii) the selection of . . . intermediaries by or through whom such transactions might be executed or carried out," as well as the securitization of the policies.

52.     Montgomery Limited is a mere alter ego, agency, and instrumentality of Montgomery Capital and the Coventry corporate family. The affairs of Montgomery Limited are completely dominated by Montgomery Capital and the Coventry corporate family. On information and belief, Montgomery Limited's officers and directors all are

officers and directors of Coventry First and Montgomery Capital. Montgomery Limited on information and belief conducts no business of its own but is merely a vehicle for Coventry's provision of advice on the resale of the policies.

53.     Plaintiffs, especially the Investing Plaintiffs, reposed their trust and confidence in Defendants, who were in a position of superior knowledge and information with respect to the purchase of the policies. Plaintiffs were not involved in the purchase of the policies from the insureds and had no information about what the insureds were told and what they knew in connection with the sale of their policies.

54.     Plaintiffs had no reason to believe that Defendants were engaging in misconduct in the purchase of the policies, much less that Coventry First was under investigation for that misconduct. Plaintiffs, acting through RCM, had conducted due diligence on Defendants and relied on them precisely because they had a reputation for integrity in the life settlements industry and projected an image of cleanliness. The Coventry executives with whom Plaintiffs dealt – in particular Defendants Reid Buerger, Antonio Muniz, and Alan Buerger – appeared to be legitimate businessmen and frequently assured RCM (as representative of the Investing Plaintiffs) that Coventry, unlike some of its competitors, was scrupulous about complying with regulatory requirements.

55.     In drafts of an MPPA between Ritchie I and LST sent by email on, among other occasions, June 20, 24, and 30, 2005, to, among others, John (Jeff) Mulholland of RCM (which was acting as the representative of the Investing Plaintiffs), Coventry First represented that:

> (a) "The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof will not violate any

United States federal, state or local law or regulation, violate, result in the breach of any terms and provisions of, nor constitute an event of default under, the certificate of formation or the operating agreement of the Seller, or violate or breach any of the terms or provisions of, or constitute an event of default under, any agreement to which the Seller is a party or by which it shall be bound; nor violate any order, judgment or decree applicable to the Seller of any United States federal or state court, regulatory body, administrative agency or other United States federal or state government instrumentality having jurisdiction over the Seller or its properties."

(b) "There is no action, suit or proceeding before or by any court, regulatory body, administrative agency or other governmental agency or body . . . now pending, or to the Seller's knowledge, threatened, against or affecting the Seller or its assets or properties: . . . seeking to prevent the consummation of any of the transactions contemplated by this Agreement, or . . . seeking any determination or ruling that might materially and adversely [a]ffect the performance by the Seller of its obligations under, or the validity and enforceability of, this Agreement."

(c) "With respect to each Life Settlement Policy: . . . Prior to the transfer of each Life Settlement Policy to [Ritchie I], the Seller shall have taken all action under applicable law in each relevant jurisdiction in order to protect and perfect the ownership of the Seller in such policy . . . ."

(d) "All Life Settlement Policies the purchases of which are being funded . . . have been (A) Originated by the Seller or an Affiliate of the Seller in one or more transactions that in all material respects were in accordance with and in compliance with all applicable United States federal, state and local laws, rules and regulations applicable to life settlement transactions and the purchase and resale of life insurance policies, or (B) purchased from an unaffiliated third party in one or more transactions that, to the Seller's knowledge, were in accordance with and in compliance with, in all material respects, all applicable United States federal, state and local laws, rules and regulations applicable to the purchase of life insurance policies from third persons that are not the Original Sellers."

56.    These drafts culminated in an MPPA between Ritchie I and LST for the sale of policies. The amended and restated version of that contract, dated as of September 8, 2005 (the "Ritchie I Policy Purchase Agreement") was signed for Coventry by Alex

14

Seldin. In this document, Coventry First and Montgomery Capital made representations substantially identical to those referred to in paragraph 55 above.

57.    In drafts of an MPPA between Ritchie II and LST sent by email on, among other occasions, December 7, 2005, to, among others, John (Jeff) Mulholland of RCM (which was acting as the representative of the Investing Plaintiffs), Coventry First made representations substantially identical to those referred to in paragraph 55 above.

58.    These drafts culminated in an MPPA between Ritchie II and LST dated as of December 15, 2005 (the "Ritchie II Policy Purchase Agreement"), and signed for Coventry by Alex Seldin. In this document, Coventry First and Montgomery Capital made representations identical to those made in the Ritchie I Policy Purchase Agreement.

## B.    Defendants' Fraud

59.    In fact, however, Defendants were engaged in pervasive fraud. The fraud was three-fold: first, Defendants systematically defrauded the insureds from whom Coventry First purchased policies; second, Defendants defrauded Plaintiffs in concealing from them the dishonest and unlawful conduct; and third, Defendants defrauded Plaintiffs in concealing from them that Coventry First was under investigation by the Attorney General of New York.

### Defendants' Fraud Against Sellers of Policies

60.    Coventry First's fraud against those from whom it purchased policies took two general forms. First, when life settlement brokers pretended to conduct auctions, Coventry First would pay the brokers undisclosed fees not to relay or otherwise act on offers from Coventry First's competitors. Second, Coventry First would provide brokers with a "gross offer" – a lump sum to be divided between a broker and policy owner with

the seller never learning the amount of the sum and therefore the amount retained by the broker – and then falsify documentation in order to conceal from the seller part or all of the broker's compensation.

61.     Following are some illustrative examples, taken from the complaint filed by the Attorney General of New York in October 2006, of the first category of fraud against those from whom Coventry First purchased policies.

(a)     In 2003, a 79-year-old living in Hawaii decided to sell his $400,000 life insurance policy. He sold the policy to Coventry First on April 16, 2003 for $102,000, of which he received $78,000 and a broker received $24,000. But another broker, Life Settlement Alliance ("LSA"), had a better offer, for $108,000, from another buyer. Coventry First paid $12,000 to LSA not to present the higher bid, and never disclosed the fee to the seller of the policy. In September 2006, Reid Buerger invoked the Fifth Amendment when asked by the New York Attorney General whether he approved the payment to LSA in exchange for LSA to sit on a better offer.

(b)     A family trust hired a broker to put on the market a $4.9 million policy insuring an 80-year-old woman. The broker solicited bids from Coventry First and from AllSettled, a broker. In September 2004, Coventry First submitted an offer of $705,000 and learned the next month of a competing offer for $880,000 submitted by AllSettled. Neal Jacobs, Coventry First's Director of Financial Underwriting, contacted AllSettled's President Michael Krasnerman to work out a deal, and Krasnerman requested a 1.5% payoff to step aside. Coventry First and AllSettled eventually agreed that Coventry First would pay $49,000, or 1% of the death benefit, and in exchange AllSettled would stand down. An email from Jacobs to Krasnerman on November 2,

2004 stated: "for [insured's initials], the number is 49." On November 11, 2004, Lenore Saracino, a vice president at AllSettled, wrote a note: "Close file[.] Have a co-brokering fee with Coventry." On December 28, 2004, the trust received $800,000, of which $142,500 went to the broker.

   (c) In late 2004, Coventry First offered a broker $3.1 million for a policy with a $10 million death benefit. The policy insured a 79-year-old man from New Jersey and was owned by a family member. Near the end of the bidding process, AllSettled's Saracino forwarded a competing offer of $3,525,000 to Coventry's Jacobs, who forwarded it to Reid Buerger. Rather than compete with AllSettled, Coventry First entered into a side deal under which AllSettled would receive $200,000 in exchange for not presenting the higher offer. Jacobs sent AllSettled's Krasnerman an email on December 16, 2004 stating "number is 200" and then followed up with an email to Coventry First's accounting department: "[AllSettled is] now co-broker for $200K." The purchase closed on December 28, 2004 with Coventry First paying $3.1 million, of which the seller's broker received $153,053 and the seller received the remainder without ever learning of the better offer.

   62. The foregoing are merely illustrative examples. The New York Attorney General's complaint (attached hereto as Exhibit A) sets forth many more examples of bid-rigging – in connection with a number of which Reid Buerger invoked the Fifth Amendment – and notes (at paragraph 46) that beyond those, the Attorney General's office "has revealed literally dozens of other examples of bid rigging by Coventry and Brokers." Plaintiffs hereby incorporate by reference paragraphs 27 to 45 of the New York Attorney General's complaint as if fully set forth herein.

63.    The Florida Office of Insurance Regulation ("FOIR") also has uncovered numerous instances of bid-rigging, bribery, and fraud. The FOIR's charging document (attached hereto as Exhibit B) accuses Coventry First of violating the Florida Insurance Code and orders Coventry First to show cause why its license for providing life settlements should not be suspended or revoked. Paragraphs 10 to 31 of the FOIR notice are hereby incorporated by reference.

64.    The second type of fraud against those from whom Coventry purchased policies involved the allocation of payments as between policy sellers and their brokers. As the New York Attorney General's complaint explains, brokers, with the knowledge and assistance of Coventry First, frequently concealed from policy sellers the gross payment from Coventry First – and thus concealed as well the amount of their compensation.

65.    In some states – including Arkansas, Florida, Indiana, Kansas, Kentucky, Nebraska, Nevada, North Carolina, North Dakota, Ohio, Pennsylvania, Tennessee, and Utah – buyers of life insurance policies are required to disclose to sellers the amount of the broker's compensation. In other states, there is no such requirement. In both types of states, however, Coventry First presented sellers with false documentation.

66.    For example, in one case Coventry First purchased a policy insuring an 80-year-old man in New York. The seller of the policy received $317,000, the primary broker received $11,250, and another broker received $3,750. On July 27, 2004 Coventry First sent offer sheets to the brokers reflecting this compensation. The brokers signed and returned the sheets to Coventry First, and that ended the bidding process. But later an advisor of the seller inquired of the first broker how much compensation the broker had

or would receive. At the broker's request, Coventry First supplied falsified offer sheets making it appear as if the first broker had received only $1,250 in compensation instead of the $11,250 he actually received. On August 31, 2004 Coventry First emailed the falsified offer sheets to the second broker for his signature. The second broker signed and returned the new offer sheets on September 2, 2004.

67.    In another case involving a policy insuring an 87-year-old man from Nevada, Coventry First agreed to pay $42,000 in broker compensation: $21,000 to LSA and $21,000 to a brokerage known as Advanced. A Coventry First vice president named Jim Dodaro emailed Reid Buerger and others at Coventry on December 22, 2004 to suggest that they falsify the disclosure forms attached to the purchase agreement: "Total comp is 42K to LSA (they were paying Advanced 21K of it). Looks like we have to do a new Ex A disclosing comp. Can we lower the gross offer by 22K, put 20K comp on the Ex A, defer 1K to LSA and pay 21K to Advance as a co-broker?" Following Dodaro's suggestion, Coventry First disclosed only $20,000 on the "Exhibit A" disclosure form attached to the purchase agreement. The remaining $22,000 was paid to the brokers as a co-broker payment and deferred compensation but was never disclosed to the seller. In September 2006, Reid Buerger invoked the Fifth Amendment when asked why he agreed to alter the Exhibit A.

### Defendants' Fraud Against Plaintiffs

68.    Defendants deceived Plaintiffs as to Defendants' practices in the purchase of life insurance policies. Plaintiffs knew nothing of, and in fact had no reason to know of, Defendants' systemic misconduct. Plaintiffs learned of the misconduct only when the Attorney General of New York brought suit against Coventry in October 2006.

69.    Defendants also deceived Plaintiffs as to the existence and target of the Attorney General's investigation. Defendants first of all failed to disclose to Plaintiffs that an investigation of Coventry was under way. Plaintiffs learned of the investigation from the Attorney General's lawsuit. In fact, the investigation began in or about June 2005, and Defendants, on information and belief, knew of it no later than August 2006 and quite possibly earlier. Defendants had a duty to disclose the investigation.

70.    Coventry First received a subpoena requesting documents from the New York Attorney General in early March 2006 but Defendants did not disclose the subpoena to Plaintiffs until a set of telephone conferences in June 2006.

71.    Reid Buerger and Alan Buerger subsequently stated to Mulholland of RCM (which represented the Investing Plaintiffs), among others, that Coventry had received no subpoenas since an earlier one in 2005 relating to the New York Attorney General's investigation of AIG and its accounting practices.

72.    Even in June 2006, Coventry did not describe the subpoena or the risks associated with it fully and accurately. Defendants, however, once they chose to speak had a duty to speak completely and truthfully about the investigation and the likely consequences of it.

73.    On June 22, 2006 Alan Buerger disclosed to Mulholland of RCM that Coventry had in fact received a subpoena in March 2006, but represented that the focus and target of the New York Attorney General's investigation were life settlement brokers, and in particular NFP, rather than Coventry. (NFP is "National Financial Partners," a network of financial planners that, according to a June 12, 2006 article in TheStreet.com, was being investigated by the New York Attorney General. NFP owns a brokerage

specializing in life settlements. On information and belief, some of NFP's members had worked with Coventry First on the sale of life insurance policies.)

74.    On June 22, 2006, Alan Buerger emailed to Mulholland the article from TheStreet.com. Buerger, in sending Mulholland the article, adopted the statements in the article as his own, and thereby made misleading statements. Buerger deliberately led Mulholland to believe that the New York Attorney General was interested only in NFP, and that Coventry First had nothing to do with the practices being investigated by the New York Attorney General. Buerger had a duty to disclose that not just NFP, but also Coventry, was under investigation and engaged in the practices targeted by the New York Attorney General

75.    On June 26, 2006, Alex Seldin, speaking on behalf of Coventry First and Montgomery Capital, stated in a telephone conference to Mulholland from RCM, among others, that there was "no action or investigation or anything against Coventry." Participants in the June 26, 2006 call included, in addition to Seldin and Mulholland, Coventry's outside counsel Dan Passage and RCM's outside and in-house counsel.

76.    On June 27, 2006, Coventry's outside counsel Brian Brooks, speaking on behalf of Coventry First and Montgomery Capital, stated in a telephone conference to Mulholland from RCM, among others, that "NFP was widely seen as the target" of the New York Attorney General's investigation and that Coventry was merely "a source of information."

77.    Speaking through Brooks, Coventry First and Montgomery Capital also stated to Mulholland from RCM, among others, that the focus of the Attorney General's request was compensation arrangements between providers and brokers, as well as

disclosure to sellers; that one question on the subpoena asked whether Coventry had paid fees to brokers to provide non-competitive bids; and that the Attorney General was looking for bid-rigging.

78.    Through counsel, Coventry First and Montgomery Capital stated as well that a "substantially completed" review of Coventry's emails had not revealed "anything like what [the New York Attorney General had previously] alleged against carriers" – that is, "fictitious bids to suppress competition." Participants in the June 27, 2006 call included, in addition to Mulholland and Brooks, RCM's outside and in-house counsel.

79.    These disclosures about the subpoena were false and misleading, because, among other reasons, Alan Buerger, Reid Buerger, Coventry First, and Montgomery Capital failed to disclose that Coventry First was engaged in precisely the conduct targeted by the subpoena, and indeed affirmatively implied the opposite.

80.    After the communications with Coventry in June 2006, Plaintiffs, relying on the above misrepresentations, continued to purchase policies from Coventry.

## THE PATTERN OF UNLAWFUL RACKETEERING ACTIVITY

81.    As described in the preceding paragraphs, the Defendants conspired with one another to defraud the Plaintiffs and the policy owners from whom Coventry First purchased life insurance policies. The Defendants participated in numerous racketeering activities in order to accomplish the purposes of their fraudulent scheme, namely, to induce policy owners to sell their policies in an unfairly rigged bidding process and to induce institutional investors, such as Plaintiffs, to partner with Defendants to obtain those policies.

82.    As part of the scheme to defraud, Defendants conspired together to devise and participate in a plan of deception, whereby they would and did use false and fraudulent pretenses, representations, promises, and statements calculated to deceive persons of ordinary prudence and due care and make material nondisclosures and concealment of fact and information essential to policy owners in deciding whether and for how much to sell their policies, and essential to institutional investors in deciding whether and on what terms to partner with Coventry in the secondary life insurance market.

83.    Thus, Defendants unlawfully, intentionally, and willfully, and with the intent to defraud, that is, knowingly and with specific intent to deceive in order to cause financial gain, procured or caused Coventry First to procure life insurance policies, and sold or caused Coventry to sell those policies to institutional investors to the detriment of such investors, including Plaintiffs.

84.    In carrying out the scheme to defraud policy owners and Plaintiffs, Defendants engaged in conduct in violation of the federal laws, including mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, as set forth below.

(a)    Defendants have engaged in a scheme or artifice to defraud in which they have fraudulently and with fraudulent intent obtained life insurance policies and fraudulently induced institutional investors to purchase those policies from Defendants. This scheme entailed bid-rigging, bribery, and the falsification of documents pertaining to purchases of life insurance policies from policy

owners. The scheme also included concealing from Plaintiffs both that conduct and the New York Attorney General's investigation into that conduct.

(b)     Defendants' fraud was material, in that it influenced whether and at what price policy owners sold life insurance policies to Defendants. Defendants' fraud likewise influenced whether and on what terms Plaintiffs agreed to invest with Defendants in life insurance policies.

(c)     Defendants through their fraudulent scheme obtained property from policy owners and from Plaintiffs. From policy owners, Defendants obtained life insurance policies. From Plaintiffs, Defendants obtained payment for life insurance policies, and therefore a profit, because Plaintiffs paid Defendants more for each policy than Defendant had paid for it.

(d)     Defendants' fraudulent scheme was furthered by numerous uses of interstate wires and mail, some of which are described below.

(e)     Neal Jacobs's e-mail message to Michael Krasnerman on November 2, 2004, described in paragraph 61(b) of this complaint and paragraph 30 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(f)    Neal Jacobs's e-mail message to Michael Krasnerman on December 16, 2004, described in paragraph 61(c) of this complaint and paragraph 32 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(g)    The e-mailing of falsified offer sheets on August 31, 2004, described in paragraph 66 of this complaint and paragraph 62 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(h)    Jim Dodaro's e-mail message to Reid Buerger on December 22, 2004, described in paragraph 67 of this complaint and paragraph 64 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(i)    Jim Dodaro's e-mail message to Reid Buerger on March 5, 2003, described in paragraph 28 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(j)    Reid Buerger's e-mail message to Jim Dodaro on or about November 18, 2004, described in paragraph 33 of the New York

Attorney General's complaint, in which Reid Buerger approved a co-broker payment to the East Coast Settlement Company, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(k)    Each and every e-mail message sent by Jim Dodaro described in paragraphs 37 to 39 of the New York Attorney General's complaint violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(l)    Jim Dodaro's e-mail message to Coventry's accountant on May 5, 2005, described in paragraph 40 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(m)    Jim Dodaro's e-mail message to Eileen Shovlin on July 20, 2005, described in paragraph 43 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(n)    Eileen Shovlin's e-mail message to Jim Dodaro on July 20, 2005, described in paragraph 43 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. §

1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(o)    Jim Dodaro's e-mail message to Neal Jacobs on February 8, 2005, described in paragraph 44 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(p)    The "co-broker" payments discussed in paragraphs 42 to 47 of this complaint and paragraphs 27 to 45 of the New York Attorney General's complaint, as well as other such payments not specifically enumerated in the complaints, were made in furtherance of Defendants' fraudulent scheme. To the extent that any of those "co-broker" payments were made by interstate wires or mail, defendants violated 18 U.S.C. § 1343 and 18 U.S.C. § 1341, respectively. Each violation of these statutes is a predicate act of racketeering.

(q)    The purchase agreements relating to the transactions described in paragraphs 61 to 67 of this complaint or paragraphs 27 to 45 of the New York Attorney General's complaint, as well as other such purchase agreements not specifically enumerated in the complaints, made material misrepresentations and/or omissions of fact in furtherance of Defendants' fraudulent scheme. In particular, the purchase agreements did not disclose to policy holders that

27

Defendants had fraudulently influenced the purchase of their life insurance policies through tactics such as bid-rigging and co-broker payments. To the extent that any of those purchase agreements were transmitted by interstate wires or mail, defendants violated 18 U.S.C. § 1343 and 18 U.S.C. § 1341, respectively. Each violation of these statutes is a predicate act of racketeering.

(r)     In the negotiations that culminated in. among other things, the Ritchie I Policy Purchase Agreement and the Ritchie II Policy Purchase Agreement, as well as in the negotiations that culminated in the Ritchie IV arrangement (described and defined in paragraph 92 below), Alex Seldin, Reid Buerger, and Antonio Muniz transmitted or caused to be transmitted over email documents containing the statements set forth in paragraphs 55 to 58 above. The transmission of these statements violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes predicate acts of racketeering under 18 U.S.C. § 1961(b).

(s)     During the interstate telephone conferences occurring in or about June 2006, as described in paragraphs 70-79 of this complaint, Alex Seldin, Montgomery Capital, and Coventry First acted in furtherance of Defendants' fraudulent scheme by misrepresenting to Plaintiffs their own activities and the nature of the New York Attorney General's investigation. These misrepresentations

violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

85.     This enumeration of predicate acts of racketeering is not exhaustive. As explained in the New York Attorney General's complaint, Defendants used interstate wires and mail on numerous other occasions in furtherance of their fraudulent scheme.

## DAMAGE TO PLAINTIFFS CAUSED BY DEFENDANTS' ILLEGAL CONDUCT

86.     Ritchie I and Ritchie II own the life insurance policies at issue. The market value of those policies has greatly diminished since the New York Attorney General's action was commenced.

87.     Each of the plaintiffs anticipated a profit from the planned sale of the policies in a securitization transaction. For purposes of completing the securitization transaction, RCM and the Investing Plaintiffs, with the support and encouragement of Coventry, had obtained a pre-sale report and a rating from the Moody's service on a number of the policies.

88.     When the Attorney General's action became public, Moody's withdrew its rating "in light of the uncertainty surrounding the transaction in light of the complaint filed by the New York State Attorney General."

89.     On information and belief, Moody's had lost confidence in the health of the collateral – i.e., the policies. Specifically, Moody's no longer believed in the representations and warranties made by Ritchie I and Ritchie II to potential investors in the securitization, which themselves relied on representations and warranties made by

Coventry to Ritchie I and Ritchie II. Moody's, that is, no longer believed that the policies had been purchased in compliance with applicable legal requirements.

90.    Defendants' misconduct has thus directly interfered with the salability and value of the life insurance policies at issue. Defendants' misconduct therefore harmed not only the Contracting Plaintiffs, but the Investing Plaintiffs, which are beneficially interested in the Contracting Plaintiffs and were owed independent fiduciary duties and other duties breached by Coventry.

91.    Ritchie I and Ritchie II continue to pay enormous amounts in premiums and fees to service the policies, the salability of which has been impaired by Defendants' misconduct.

92.    Moreover, in or about June 2006, the Investing Plaintiffs committed additional capital to the arrangement with Coventry. The June 2006 commitment was known as "Ritchie IV." The Ritchie IV transaction never resulted in the purchase of policies, but the Investing Plaintiffs – which were induced to enter into the Ritchie IV arrangement by Coventry's fraudulent conduct in connection with Ritchie I and Ritchie II, including the representations described in paragraphs 55 to 58 above – suffered substantial transaction costs and opportunity costs in connection with Ritchie IV. The Investing Plaintiffs also incurred substantial transaction costs in connection with the contemplated securitization transaction, which was the subject of over a year's worth of legal, financial, and accounting work. These costs, and in particular the transaction costs, are special damages suffered by the Investing Plaintiffs.

93.    It was entirely foreseeable that Defendants' misconduct would damage Plaintiffs in these ways. Defendants represented that the policies had been purchased in

compliance with law. Defendants knew that Plaintiffs' reason for purchasing and investing in the policies was to realize a profit by securitizing and selling them. Defendants also knew that they were participating in fraud on the owners of the policies – fraud that, if it came to light, would greatly diminish the salability and value of the policies and destroy the possibility of realizing a profit through the securitization. Defendants therefore knew that they were creating serious risks for Plaintiffs.

94.     Coventry First in substance was using Plaintiffs' capital to acquire assets that, because of Coventry First's own misconduct, turned out to be worth far less than what Plaintiffs had reason to believe they were worth. At the same time, Coventry was profiting from its misconduct, because it sold the policies to Plaintiffs at prices higher than those Coventry First paid.

95.     Had Plaintiffs known that Coventry First engaged in bid-rigging and other illegal practices, Plaintiffs never would have done business with Coventry, let alone continued to commit additional capital to the arrangement with Coventry.

## COUNT ONE

**(Violation of RICO, 18 U.S.C. § 1962(c) – by all plaintiffs against all defendants)**

96.     Each of the foregoing allegations is incorporated herein by reference.

97.     There is an enterprise within the meaning of 18 U.S.C. § 1961(4) consisting of (a) Coventry First, or, in the alternative, of (b) all of the individual defendants.

98.     The enterprise referred to in the preceding paragraph is engaged in interstate commerce, as well as activities affecting interstate commerce, by purchasing

life insurance policies in several states, including California, Hawaii, Nevada, and Florida, for the purpose of transferring those policies to Plaintiffs in other states.

99.    Defendants are all persons within the meaning of § 1962(c), distinct from the enterprises referred to in paragraph 97 (except that defendant Coventry First is distinct only from the enterprise referred to in paragraph 97(b)), and employed by or associated with that enterprise. Defendants did conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5) and § 1962(c), to wit:

   (a)    Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and

   (b)    Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

100.    Plaintiffs were injured in their business or property within the meaning of 18 U.S.C. § 1964(c) by reason of the violation of 18 U.S.C. § 1962(c) committed by Defendants. Specifically, Plaintiffs were fraudulently induced to invest with Coventry in life insurance policies that, because of Defendants' racketeering activity, actually were worth, unbeknownst to Plaintiffs at the time, either nothing or a tiny fraction of what Plaintiffs paid for the policies. Indeed, because of Defendants' racketeering activities Plaintiffs have received essentially nothing in return for their investment. Moreover, Plaintiffs were injured when they committed capital to Ritchie IV, which turned out to be an abortive venture because of Defendants' racketeering activities.

101.    Plaintiffs were injured in an as yet undetermined amount, believed to be not less than $700 million. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages and the cost of this suit, including a reasonable attorney's fee.

## COUNT TWO

### (Conspiracy to Violate RICO, 18 U.S.C. § 1962(d) – by all plaintiffs against all defendants)

102. Each of the foregoing allegations is incorporated herein by reference.

103. Defendants were all persons within the meaning of § 1962(d) and distinct from the enterprises referred to in paragraph 97 above (except that defendant Coventry First is distinct only from the enterprise referred to in paragraph 97(b)). Defendants conspired within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. §§ 1962(c). In particular, Defendants conspired to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5) and § 1962(c), to wit:

(a) Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and

(b) Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

104. Plaintiffs were injured in their business or property within the meaning of 18 U.S.C. § 1964(c) in an as yet undetermined amount, believed to be not less than approximately $700 million, by reason of Defendants' violation of § 1962(d). Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages and the cost of this suit, including a reasonable attorney's fee.

## COUNT THREE

### (Breach of Contract – by Ritchie I and Ritchie II against all corporate defendants)

105. Each of the foregoing allegations is incorporated herein by reference.

106. Pursuant to the Ritchie I Policy Purchase Agreement and the Ritchie II Policy Purchase Agreement, Coventry represented, among other things, that:

(i) Coventry's acquisition of policies was in compliance with all laws and regulations, there was no proceeding pending or threatened involving any agency or governmental body seeking to prevent the transactions contemplated by the agreements or seeking a determination that might affect the performance by Coventry of its obligations;

(ii) before conveying the life insurance policies to Ritchie I or Ritchie II, Coventry would take all reasonable actions under applicable law to protect and perfect its ownership of the policy; and

(iii) Coventry acquired the policies directly from the insureds in transactions that in all material respects complied with all applicable laws, or acquired the policies from third parties in transactions that to Coventry's knowledge complied in all material respects with all applicable laws.

107.    Coventry breached its contracts with Ritchie I and Ritchie II in that these representations and warranties were false as to some or all of the policies purchased by Ritchie I and Ritchie II from Coventry.

108.    Plaintiffs have performed their obligations under the policy purchase agreements.

109.    All conditions precedent to Defendants' contractual liability have been performed or have occurred.

110.    To the extent any written notice requirement set forth in the policy purchase agreements is applicable, Plaintiffs have satisfied the requirement.

111.    By reason of Coventry's breach, Plaintiffs have suffered damages in an amount believed to be not less than $700 million.

112.    Plaintiffs are entitled pursuant to the policy purchase agreements to rescind the life settlement transactions through which Coventry transferred the life insurance policies to them.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

(a)  All damages proven pursuant to RICO, trebled as permitted by law;

(b)  All other compensatory damages sustained by Plaintiffs;

(c)  Rescission of the relevant life settlement transactions between Plaintiffs and Defendants;

(d)  Attorneys' fees and costs;

(e)  Prejudgment and post-judgment interest; and

(f)  Such other relief as the Court may deem just and proper.

Respectfully submitted,

LAW OFFICES OF THOMAS P. PUCCIO

Thomas P. Puccio
230 Park Avenue
New York, NY 10169
Tel: (212) 883-6383
Fax: (212) 883-6388

ROBBINS, RUSSELL, ENGLERT,
ORSECK & UNTEREINER LLP

By: _____

Lawrence S. Robbins (LR-8917)
Gary A. Orseck
Rachel S. Li Wai Suen
Daniel R. Walfish
1801 K Street, N.W.
Suite 411
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510

*Counsel for Plaintiffs*

Dated: July 31, 2007
        Washington, D.C.

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK          :
by ELIOT SPITZER, Attorney General of
the State of New York,                        :

                   Plaintiff,          :          **COMPLAINT**

          -against-                    :          Index No.

                              :

COVENTRY FIRST LLC, MONTGOMERY
CAPITAL, INC., THE COVENTRY GROUP, INC., and   :
REID S. BUERGER,

                              :

               Defendants
-----------------------------------------------------------------------X

      1      Plaintiff, the People of the State of New York, by Eliot Spitzer, Attorney

General of the State of New York (the "State"), complaining of the above-named Defendants,

alleges upon information and belief, that:

### PRELIMINARY STATEMENT

      2      This case arises from pervasive fraud in what is called the "life

settlements" business, where investors buy life insurance policies from owners at a discount, pay

the premiums as they come due, and ultimately collect the death benefits for a profit. Defendant

Coventry First LLC, a wholly-owned subsidiary of Defendant Montgomery Capital, Inc. and an

affiliate of Defendant The Coventry Group, Inc. (collectively "Coventry"), is one of the major

purchasers of life settlements, and Defendant Reid S. Buerger ("Buerger") is its Executive Vice

President and son of its founder Alan Buerger. The Defendants and other participants in the life

1

settlement business prey on the owners of life insurance policies through two main schemes.

3.      First, Defendants and brokers specializing in life settlements pretend to conduct auction-style bidding to get the highest price for owners considering selling their life insurance policies. In fact, the bidding is often rigged, with Coventry paying the brokers undisclosed fees, euphemistically called "co-brokering fees," to "sit on" or reduce competitive bids from other buyers. In a typical case involving a trust-owned policy insuring an elderly New York couple, Coventry offered $880,000 in October 2004 in return for the 80 year-old woman's life insurance policy, which would pay $4.9 million on her death. Shortly thereafter, Coventry learned that another buyer, acting through a broker, AllSettled Group, Inc. ("AllSettled"), was ready to offer over $1,000,000 for the same policy. Coventry offered AllSettled a $49,000 "fee" to suppress this competing bid, sending AllSettled an encoded email on November 2, 2004 stating "for [initials of insured], the number is 49." In return for this secret payment, AllSettled never informed the policy owner of the higher offer and closed its file on the matter. This Office's investigation has revealed dozens of similar examples involving Coventry making payments to suppress competing offers.

4.      Second, Coventry systematically participates in breaches of fiduciary duty by life settlement brokers that hold themselves out to policy owners as faithful agents who will go to the market and obtain the highest possible prices for their clients' insurance policies. In a typical transaction, Coventry secretly provides these brokers with what is called a "gross offer" for the seller's life insurance policy. The gross offer is a lump-sum amount to be divided between the broker and the seller at the broker's discretion. It is never disclosed to the seller

Unbeknownst to the seller, the less the seller gets, the more the broker keeps. The broker thus has every incentive to convince the owner that his or her policy is worth as little as possible. The results are not pretty: in one instance a broker took a gross offer of $822,500 for a policy purchased by Coventry and convinced his client to take $365,000 as a purchase price, keeping $457,500 for himself as a "commission."

5.    In most states, including New York, Coventry makes no disclosures about its gross offers. If a seller asks about broker compensation, Coventry typically refuses to answer. In states where the law requires disclosure, such as Ohio and Nevada, Coventry sometimes generates false documents that conceal all or a portion of what the broker is getting.

6.    This action seeks damages, including restitution and rescission, on behalf of the owners of life insurance policies who have been damaged by the schemes described above, as well as injunctive relief preventing further breaches of law by the Defendants.

## PARTIES

7.    This action is brought by the People of the State of New York by the Attorney General based upon his authority under the Executive law, the Donnelly Act, the Martin Act and the General Business Law of New York State.

8.    Defendant Coventry First LLC, a Delaware corporation domiciled in Fort Washington, Pennsylvania, is in the business of purchasing life insurance policies from sellers, a process also known as funding of life settlements. Coventry conducts business in New York State and throughout the United States. Coventry First LLC, formed in October 2001, a wholly-owned subsidiary of Defendant Montgomery Capital, Inc., is a privately held company owned by

3

(1) Alan Buerger, Chief Executive Officer, (2) Constance Buerger, President and Chief Operating Officer, and (3) Reid S. Buerger, Executive Vice President.  From 2001 through 2005, Coventry paid annual management fees roughly equaling its profits to Defendants The Coventry Group, Inc. and Montgomery Capital, Inc., which are owned by the Buerger family.

    9.  Coventry is a leader in the life settlement business and has touted itself as having a market share exceeding 50%.  (COV 1029983)[1].  It purchases life insurance policies on behalf of institutional investors such as American International Group ("AIG"), Citigroup, Inc. and Ritchie Capital, an Illinois hedge fund.  Coventry entered the market in 2002, purchasing 436 life insurance policies representing approximately $720 million in total death benefits.  By 2005, Coventry purchased 1,318 life insurance policies representing more than $3 billion in death benefits.

    10.  Defendant Reid S. Buerger is an individual residing in Pennsylvania. Buerger is the Executive Vice President of Coventry.  He owns 20% of Coventry directly and through a family trust

### JURISDICTION

    11.  The State has an interest in the economic health and well-being of those who reside or transact business within its borders.  In addition, the State has an interest in ensuring that the marketplace for insurance policies, securities and other financial products functions honestly and fairly with respect to all who participate or consider participating in it. The State, moreover, has an interest in upholding the rule of law generally.  Defendants' conduct

---

[1] Parenthetical citations refer to documents attached as exhibits hereto

injured these interests.

12.    The State sues in its sovereign and quasi-sovereign capacities, as *parens patriae*, and pursuant to Executive Law §§ 63(1) and 63(12), the New York Donnelly Act, General Business Law, § 340 *et seq.*, the Martin Act, General Business Law § 352 *et seq* and the common law of the State of New York  The State sues to redress injury to the State and to its general economy and citizenry-at-large  The State seeks disgorgement, restitution, damages, including rescission, punitive damages and treble damages, and costs and equitable relief with respect to Defendants' fraudulent and otherwise unlawful conduct

## FACTUAL ALLEGATIONS

### I.    The Life Settlement Industry

#### A.    Background

13.    A "life settlement" is the sale of a life insurance policy in return for a purchase price that typically exceeds the surrender value[2] of the policy  Such policies are typically involve insureds who are high net worth individuals 75 years or older with more than two years life expectancy  These policies are often owned by trusts or companies, though in some instances the owners are the elderly insured individuals themselves  Owners may want to sell their policies for a variety of reasons, including avoiding high premium payments or getting out of what are in essence poorly performing investments  The buyers are investors who, after buying the policy, continue to pay premiums until the insured dies  Upon the insured's death, the

---

[2] The surrender value is a contractual price set forth in a life insurance policy at which a policy owner can return or "surrender" the policy to the life insurance company which issued the policy

buyers claim the policy's death benefit

14     The economics of these deals are straightforward: the investor wagers that the value of the future death benefit will exceed the purchase price and costs of paying premiums until the insured dies. In turn, the seller prefers an immediate lump sum payment as opposed to the alternative of paying premiums for an eventual death benefit. Given this simple equation, a life settlement investor gets a higher rate of return the nearer the insured is to death and if the insured has experienced a decline in health since the policy had been issued. In certain transactions, for instance, Coventry makes its life settlement offer "contingent on receipt of letter signed by insured stating they are currently a [c]igarette smoker and how many cigarettes they smoke per day" (COV-1139212)

**B.     History of Life Settlements**

15     In the 1980s, investors began purchasing life insurance policies from terminally ill individuals, often afflicted with the HIV virus and in need of immediate cash, in transactions known as viaticals. However, as HIV medical treatments improved and individuals lived longer, these types of policies were not as profitable to investors. Furthermore, various states moved to regulate the industry to curtail fraudulent practices typically involving middlemen who defrauded the purchasers of policies. Many states, including New York, enacted laws that require strict licensing and disclosure in all cases where the insured has "a catastrophic or life threatening illness or condition." See e.g. N Y Insurance Law Article 78.

16     The life settlement industry developed in the late 1990s as an outgrowth of viaticals, involving older individuals who were not on the brink of death. Under an industry

6

standard that is codified in some states (though not New York), sales in which the insured has

two or more years of life expectancy are life settlements and sales involving those with shorter

life expectancies are considered viaticals. Many states, including New York, do not require

licensing of life settlement brokers or disclosure of compensation practices, and so these

transactions largely occur without regulatory oversight.

17.     The life settlement industry has grown dramatically in the past ten years.

In 2005, for example, investors purchased life insurance policies with death benefits estimated at

$13 billion. One research analyst has predicted that the business will grow more than ten-fold to

$160 billion over the next several years. (Bernstein Research Call, March 4, 2005). An industry

newsletter recently compared the industry's fast dollars and lack of regulation to that of the Old

West:

> Saddle up partner 'cuz your [sic] in for some kind of ride. It's easy
> to compare the early days of the life settlement industry to the Wild
> West, with its mad rush for gold, freedom to roam, and cowboy-
> like bravado. But the industry has changed quite a bit since then.
> The dust has settled, boundaries have been drawn, and lone rangers
> replaced by corporate giants. Although the industry is much more
> sophisticated today, those early promises of golden nuggets still
> exist. (Cov 1027931).

Similarly, a life settlement broker's website offers a caricature of a prospector in front of a

saloon, with a banner overhead reading: "Welcome to Cashville." (http://www.tecsc.com (last

visited Mar. 29, 2006))

### C.    Structure of the Life Settlement Market

18.    The life settlement business has evolved into a multi-tiered industry, consisting of Sellers, Brokers, and Buyers. The role of each is described below.

19    First, there is the Seller. As described above, the Seller is an owner of a policy insuring the life of an elderly person with two or more years of life expectancy. In a typical case, the Seller discusses with a financial advisor, insurance agent, estate planner or other advisor the option of entering into a life settlement. If the Seller decides to proceed, the Seller's advisor may hire one or more intermediaries specializing in life settlements ("Brokers") to represent the Seller. In some cases, the Seller's insurance agent or other advisor may team up with the Broker to shop the policy. The Broker(s) submit the policy to different buyers ("Buyers") such as Coventry. If interested, the Buyers bid on the policy. Coventry and other Buyers may use their own capital to purchase life settlements. In most cases, however, Coventry acts as a Buyer for institutional investors. In some cases, Coventry cuts out the middlemen, negotiating Sellers and their representatives directly

20.    In theory, the industry operates on an auction model, with Brokers serving as auctioneers, soliciting bids from competing Buyers to submit to the Seller for the policy. Brokers act on the Seller's behalf to shop the policy to different Buyers. Buyers, including Coventry, will submit what is called a "gross offer" to a Broker, which represents a single lump sum offer to the Broker for the purchase of a life insurance policy. From this "gross" or lump sum amount, the Broker will then determine how much to extend to the Seller as the actual purchase price and how much to keep for itself, the Broker. Although a Broker solicits gross

8

offers, it usually only presents to the Seller a net price, keeping both the gross offer and the

Broker's compensation hidden from the Seller. Like an auction there may be multiple rounds of

gross offers submitted by competing Buyers who outbid each other in an effort to win the deal.

       21.    Buyers may seek to differentiate their bids by touting their superior credit

risk or ability to close transactions quickly, but as in any auction, the main driver for the Seller is

the selling price. When the Seller is satisfied that he or she has the highest offer the auction

ends. If the highest offer is inadequate, the Seller may decide to keep the policy or offer it for

sale in the future. If the offer is accepted, the Broker informs the Buyer of that fact and of how

the gross offer will be divided between the Seller and the Broker. The Buyer then pays the

selling price to the Seller.

       22.    In a typical case, a Broker submits a life settlement application to

Coventry  Coventry's Financial Analysis group processes the actuarial data, estimates life

expectancies and determines the pricing for the policy. The policy is then sent to the Financial

Underwriting group, headed by Defendant Buerger. Buerger and his team then determine the

gross offers  As described above, the gross offer encompasses broker compensation, however

any special compensation arrangements, including co-broker payments and bonuses, are

approved by Buerger himself  As one email explained, "Eileen [Shovlin, Coventry regional

manager] talks to [the Broker] about their cases and Reid [Buerger] about co-brokers." (COV JD

00022580).

       23.    Brokers owe a fiduciary duty to their client, the Seller. According to an

industry association: "It's important to recognize that the broker has a fiduciary role to represent

9