the seller by law... the bottom line is that the broker's job is to fully represent the interests of the policy seller." (Life Insurance Settlement Association White Paper "Cashing in on Unneeded Life Insurance Policies," Aug. 22, 2006). Brokers hold themselves out as representatives of the Seller working to obtain the highest purchase price on his behalf. For example, AllSettled states on its website: "A broker works for you. A broker will check with several providers to find the best offer for you." (http://www.allsettled.com/sellerguide.html (last visited Apr. 27, 2006)). Another broker's website, Advanced Settlements, Inc ("Advanced"), states: "Having developed relationships with more than 20 funding institutions, the company works with financial professionals, attorneys and charitable organizations to obtain multiple offers on the secondary market in pursuit of the highest possible settlement for the client." (http://advancedsettlements.com /assets/pages/about.php (last visited Apr 3, 2006))[3].

      24.     Coventry recognizes that Brokers owe their clients a fiduciary duty When it is advantageous to Coventry, it steps in to ensure that duty is fulfilled. For example, on May 6, 2005, a Broker refused to present Coventry's offer to the Seller. In response, a Coventry regional vice president suggested, "perhaps I could push the fiduciary duty button and force him into presenting the offer to the client." (COVJD 00031940). In a similar situation earlier in 2005, Coventry was informed that another Broker would not present its higher offer to the Seller. Alan Buerger, Coventry's founder and CEO, directed that the Broker be reminded that it "is to act as a fiduciary for the client and we would be both disappointed and surprised if they chose not to act

---

[3] Advanced is one of the largest life settlement Brokers. It is a wholly-owned subsidiary of National Financial Partners Corporation, a publicly traded Delaware corporation headquartered in New York

as a fiduciary . . . This is all the more relevant given all Coventry's recent conversations with [the Broker] about Spitzer, disclosure and liability . . . you may quote me!" (COVJD 00021726).

## II.    Coventry's Bid Rigging Scheme

25.    In fact, the above auction model bears little relation to what really happens in the life settlement industry. Coventry has undermined competition in the life settlements business through a variety of schemes - - the most egregious of which involves rigged bids for insurance policies.

26    In late 2001, Coventry entered the life settlement industry as a Buyer (it had previously been a Broker). By early 2002, it had begun to pay undisclosed compensation, called co-broker payments, to Brokers who in exchange refrained from submitting bids, refrained from soliciting competitive bids or squelched higher bids, thus guaranteeing that Coventry won the "auction." A senior Coventry employee, Neal Jacobs, aptly described these payments as providing Coventry "insurance" that it would win the auction. (COVNJ 00012957). Some examples of the scheme are set out below.

### A.    A 79 year-old widower living in Hawaii

27    In mid-2003, a 79 year-old widower living in Hawaii decided to sell his $400,000 life insurance policy. The policy was ultimately sold to Coventry on April 16, 2003 for $102,000 - - the Seller received $78,000 and his Broker received $24,000.

28.    The Seller was not aware that another Broker, Florida-based Life Settlement Alliance ("LSA")[4] had a gross offer of $108,000, surpassing Coventry's, but refrained from presenting it in exchange for a co-broker fee. In a March 5, 2003 email Jim Dodaro, Coventry's Vice President of Financial Underwriting, wrote to Buerger:

> [Jim Nutt, a senior employee of LSA] said he spoke with you a while back about co-brokering the    case. He is frustrated that we have not gotten it accepted. He said he is sitting on a 27% gross offer [$108,000] from Mutual and can probably get more. If we can't close he said he could and pay us a co-broker fee. (COV 1136766).

Ultimately, Coventry closed with a gross offer of $102,000 ($78,000 to the Seller and $24,000 to his Broker) and, as arranged by Buerger and Nutt, LSA received a co-broker payment of $12,000 for not submitting the higher bid. LSA's sole contribution to the life settlement transaction was to "sit on" a competing offer to the detriment of the Seller. The co-broker fee was not disclosed to the Seller as part of Coventry's Purchase Agreement. (COV2 0006025)

29.    In September 2006, Buerger invoked the Fifth Amendment when asked whether he approved the co-broker payment to LSA in exchange for LSA to sit on the higher offer.

---

[4]    LSA dissolved in mid-2005 after the U.S. Securities and Exchange Commission ("SEC") alleged that Mutual Benefits Corporation, a life settlement and viatical Buyer that was shut down by the SEC in 2004, violated an asset-freeze order by diverting $2.8 million from Mutual Benefits to LSA. In May 2005, LSA's three senior officials left LSA and started a new Broker called Life Insurance Settlements, Inc. ("LIS") which continues to do business with Coventry.

### B.    A trust-owned policy insuring a New York woman in her eighties

30.    In another case, a family trust decided to put a $4.9 million policy insuring an 80 year-old woman on the market through a Broker. The Broker solicited bids directly from Coventry as well as from AllSettled, a New York Broker[5] In September 2004, Coventry made a gross offer of $705,000 for the policy. (COV 1142334). Coventry learned in October 2004 that it was competing against an offer from another Buyer of $880,000 submitted by AllSettled. Neal Jacobs, Coventry's Director of Financial Underwriting, contacted AllSettled's President, Michael Krasnerman ("Krasnerman"), to work out a deal. According to an October 28, 2004 email from Jacobs, Krasnerman requested a payoff of 1.5 percent of the death benefit to step aside in the bidding process. Jacobs reported, "[Krasnerman] claims he would go well over $1M. [H]e asked for 1.5 pts  I offered  5 pt. [D]o we want to do that much?" (COVNJ 00027506). Ultimately, Coventry and AllSettled reached an agreement that Coventry would pay $49,000, equal to 1% (or 1 point) of the death benefit of the policy and in exchange AllSettled would close the file. The agreement was memorialized in an encoded email from Jacobs to Krasnerman on November 2, 2004, stating "for [insured's initials], the number is 49." (COVNJ 00008934). On November 11, 2004, Lenore Saracino, AllSettled's Vice President of the Life Settlement Division, wrote by hand on the Status Report "[c]lose file[.] Have a co-brokering fee with Coventry." (AS 001166).

---

[5] At times, AllSettled is the Buyer itself, purchasing policies through vehicles such as AllSettled Assets LLC and National Consolidated Funding LLC II, which share common ownership.

31.    On December 28, 2004, the trust received $800,000 for a policy and the Broker received $142,500 as compensation. Unbeknownst to the Seller, Coventry also paid AllSettled $49,000 in exchange for stepping out of the bidding process. (COVNY 00013466).

## C.    A family-owned policy insuring a 79 year-old man

32.    In another transaction in late 2004 involving the policy insuring a 79 year-old man from New Jersey owned by a family member, Coventry offered directly to the Broker (the Seller's financial advisor) a $3,100,000 gross offer for a policy with a $10,000,000 death benefit. On December 15, 2004, near the end of the bidding process, AllSettled's Saracino forwarded Neal Jacobs a competing offer of $3,525,000 she had received from another Buyer. She added in her email to Jacobs: "Call Michael Krasnerman on Thursday." Jacobs immediately forwarded AllSettled's offer to Buerger with the message: "see below for what he says is his latest offer on [case name]." (COV 441616). Rather than compete with AllSettled and raise its gross offer by at least $425,000, Coventry took the cheaper way out, entering into a side deal with AllSettled: AllSettled would receive $200,000 in co-broker fees in exchange for not presenting its higher offer. Using the shorthand Coventry and AllSettled had developed for such matters, Jacobs sent an email to Krasnerman on December 16, 2004, stating "number is 200" (COVNJ 00010364) then followed up a few minutes later with an email to Coventry's accounting department: "[AllSettled is] now co-broker for $200K." (COV 441517). By paying AllSettled a co-broker payment of $200,000 for not competing, Coventry ensured that its gross offer remained unchanged at $3,100,000. The purchase closed on December 28, 2004 with the Seller receiving $2,946,947 and the Seller's original Broker receiving an additional $153,053.

14

The Seller never learned that another Buyer was willing to pay $3,525,000 for the policy, nor that AllSettled received a co-broker payment for $200,000. (COV2 0009660, COV 441517).

### D.    A trust-owned policy insuring an 81 year-old man

33.    In a transaction involving the sale of a trust-owned policy with a death benefit of $2.4 million policy, Stuart Kosloff ("Kosloff"), President of the East Coast Settlement Company, a Florida-based Broker, contacted Dodaro on October 13, 2004 and informed him that he had a $900,000 bid that had not yet been submitted to the Seller. Kosloff suggested that the two parties "work together" to ensure that Coventry would win the business. (COV 1132940) Dodaro sent an email on November 15, 2004 to Buerger seeking approval over the terms of the deal: "I told Stuart [Kosloff] we could pay 1 pt (24k). He said that wasn't enough (has around 920k gross) and asked for 50-60K." (COV 1132946). Three days later, having not heard from Coventry, Kosloff sent the following email to Dodaro threatening, "I need to hear a yes or a no before the end of the day or I have to up my offer to them." (COVJD 00025246) Dodaro repeated his request for Buerger's approval, and within a few hours, Buerger wrote back: "ok" (COV 1132946).

34.    Kosloff kept up his part of this collusive arrangement by not communicating this higher bid to the Seller and dropping out of the bidding. In a December 15, 2004 email from Kosloff to Dodaro, relating to a conversation Kosloff had earlier that day with the Seller's advisor, Kosloff wrote that the advisor "called this morning asking if I was all done bidding on [case name]. Told him I hated to say it but he should go with you." (COVJD 00017552) Coventry purchased the policy on January 31, 2005 for $825,000. As agreed,

15

Coventry then paid Kosloff $50,000. (COVJD 00025357). The Seller was never told about Kosloff's higher offer nor the co-broker payment to Kosloff. (COV2 0007151).

35.    In September 2006, Buerger invoked the Fifth Amendment when asked about the purpose of Coventry's payment to Kosloff

### E.    A company-owned policy insuring a 79 year-old woman

36    In a transaction involving a company-owned policy insuring a 79 year-old woman living in New Jersey, Coventry initially bid $620,000 on December 16, 2004. A few days later on December 22, 2004, Coventry increased its offer to $865,000. (COVNJ 00010495). Subsequently, Dodaro sent an email to Buerger on December 28, 2004 informing him that Pete Gaynor, another senior employee at LSA, told him: "We [Coventry] were one of 2 funders that offered on it. [A competing Buyer] was the other and are over 1M. Said he needs to hear from us by today or he is offering " (COVJD 00018719) In other words, LSA demanded to hear from Coventry or else it would compete with the higher offer it had from a competing Buyer  Even though LSA was not the Broker of record, it received $65,000 from Coventry in exchange for not presenting the higher offer. This payoff was directly approved by Reid Buerger. (COVJD 00022656) Ultimately, Coventry closed the deal on February 4, 2005 for a gross offer of $930,000, which was below the competing $1 million gross offer noted by Gaynor. (COV 1194765). Once again, the Seller was not informed of the payoff made to LSA  (COV2 0007161)

16

F.    **A family-owned policy insuring a couple in their eighties**

37.    In April 2005, Coventry extended a gross offer of $650,000 to the family owners of a variable life insurance policy insuring a Florida couple in their eighties with a $4 million death benefit. (COVJD 00032741). On or about May 17, 2005, Jason Wyatt, Vice President of Advanced, contacted Dodaro and told him he had a higher offer from another Buyer and followed up with an email proposing a co-broker payment of 1 percentage point, or $40,000. (COVJD 00032741). That same day, Dodaro reported the conversation to Buerger: "I told [Wyatt] 20K (½ pt). His offer (710K he says) is from [another Buyer] and we have a ton of room." (COVJD 00032741)

38.    Advanced's Wyatt continued to press for a full percentage point co-broker fee but Dodaro responded: "take the bird in the hand" because "a bird in the hand is worth two in the bush." (COVJD 00032760). In other words, a guaranteed one-half percentage point, $20,000, would be worth more to Advanced than submitting to the vagaries of actual competition, which could result in no commission to Advanced if Advanced failed to win the bidding war. Dodaro added: "I think what I offered is a no brainer for you." (COVJD 00032760)

39.    Two days later, on May 19, 2005, Dodaro reached out to Wyatt, asking: "we good?" On May 23, 2005, Wyatt responded: "I guess I will take the bird in the hand. I will call him Larry. I will send Eileen [Shovlin, Coventry Regional Vice President] the file so you can put us down for 20k. Good job!" (COVJD 00033623) Even after Wyatt agreed to the payment, doubts remained. Dodaro wrote to Neal Jacobs: "I am nervous that Advanced will try

17

to pull a fast one. Please make sure the regional [manager] stays on top of this – I want to know if Advanced tries anything to win the case " (COVJD 00033539). Both parties kept their word: Coventry closed the deal on July 18, 2005, Advanced received a co-broker fee of $20,000 (AS 0008072), and the Sellers never learned that Advanced had received a co-broker fee and had sold them out. (COV2 0005404).

### G.     A 79 year-old man living in California

40.     In another transaction in 2005, Coventry offered $135,000 to a California Broker on a policy belonging to a 79 year-old California man with a death benefit of $1.2 million. Upon learning that LSA had a higher competing gross offer for $185,000, on May 5, 2005, Dodaro sent an email to Buerger asking him, "Do you want me to work out with LSA or let them have it?" (COVJD 00033016). The following day, Dodaro sent the following email to Coventry's accountant, "2 pts to LSA - co-broker." (COVJD 00033116). In return, LSA's higher offer was not presented to the client. LSA did in fact receive a co-broker payment of 2 percent of the $1.2 million death benefit, or $24,000.

41.     Prior to closing this case, on May 20, 2005, Jacobs emailed Dodaro that a third Broker, Trinity Financial Services LLC, also had a higher gross offer of $150,000: "Trinity has 150k and want to cooperate . I think I could get away w/5k . " (COVJD 00033131). Like LSA, Trinity received a co-broker payment of $5,000 for "cooperating" with Coventry. (COVJD 00035057).

42.     With LSA and Trinity satisfied, Coventry purchased the policy on June 22, 2005 for a gross amount of $140,000. The Seller never learned that two higher offers were made

18

or that LSA and Trinity both received payoffs in exchange for suppressing the higher bids.
(COV2 0007162).

### H.   A company-owned policy insuring an 83 year-old man

43   In another case, Coventry and Advanced (acting on behalf of another
Buyer) were competing to purchase an $800,000 life insurance policy insuring an 83 year-old
Florida man. In June 2005, Advanced had a bid from another Buyer for $231,000, higher than
Coventry's offer at that time of $204,000. (AS008117). Scott Kirby, Co-President of Advanced,
contacted Eileen Shovlin, Coventry's Regional Vice President, to discuss the policy. On July 20,
2005, she sent an email to Buerger and Dodaro noting that although Coventry and Advanced had
been competing for the policy, "now that we are talking . they called me to discuss." Seeking
approval of a co-broker payment to Advanced, she wrote: "Scott thinks 2 pts is fair on this. Pls
advise." Dodaro responded by asking Jacobs whether there was any "room" to pay Advanced,
and Jacobs replied "you can throw them [a] little cash." (COVJD 00009237-38). That same day,
Dodaro sent an email to Shovlin and Coventry's accounting department, "1 5 pts to Advanced –
Co-broker" (COVJD 00038350). Coventry purchased the policy for less than Advanced's
$231,000 competing offer on September 8, 2005: it paid $185,000 to the Seller and $19,000 in
compensation to the Broker who closed the case. Coventry did "throw cash" to Advanced,
specifically Coventry paid Advanced $12,000 (1 5% of the death benefit). Not surprisingly, the
payoff to Advanced was not disclosed to the Seller. (COV2-0001267).

19

### I.     A policy insuring an 85 year-old man

44     In January 2005, Coventry made a gross offer of $135,000 on the policy

insuring an 85 year-old Florida man with a $400,000 death benefit. (COVNJ 00028146). On

February 8, 2005, Dodaro emailed Jacobs stating that LSA, representing a competing Buyer, had

received a higher offer for the policy: "LSA can beat our 135K. How confident are we?"

(COVNJ 00012075) Jacobs explained that he lacked confidence that the Seller would close with

Coventry if LSA did indeed have a higher offer noting, "Is LSA offer still good? if so, this guy

would switch in a second so [I am] not very confident." (COVNJ 00012075).

45     To ensure that Coventry would close the deal, Dodaro arranged for a

$5,000 co-broker payment to LSA and for Coventry to close the deal through another Broker,

telling Jacobs, "I bought insurance for 5K." (COVJD 00023061, COVNJ 00012075). The

$5,000 payoff, or "insurance," guaranteed that LSA would not submit a competing offer and

therefore allow Coventry to close the deal at the original gross offer of $135,000. Jacobs

responded, "good idea even if they were bluffing." (COVNJ 00012075). Coventry then

purchased the policy on March 28, 2005, paying the Seller $120,000 and the Broker who closed

the deal $15,000. Coventry also paid $5,000 to LSA as a co-broker payment The $5,000

payment to LSA was never disclosed to the Seller.

               *                    *                    *

46     The above are illustrative cases; this Office's investigation has revealed

literally dozens of other examples of bid rigging by Coventry and Brokers Coventry has

concluded that, in many cases, it is cheaper to pay off corrupted Brokers than to engage in

marketplace competition.

### III.    Coventry's Right of Last Offer

47.    Until 2005, Coventry required nearly every Broker with which it does business to sign an agreement (never disclosed to Sellers), providing among other things that the Broker will provide Coventry with a "right of last offer to contract for a Life Settlement in respect of such Policy on terms that with respect to purchase price of the policy are more favorable to the seller than those set forth in the Competing Offer." (AS 020704). By exercising this provision, Coventry has the right to hold back in early stages of the bidding process, and then swoop down at the last moment with a matching or better offer. Under the terms of Coventry's contracts, and in violation of duties owed by the Broker to the Seller, the Broker cannot then return to the market to shop for a higher offer. As one Coventry manager put it: "We will always get right of last offer. The bidding system is simply for aesthetic reasons." (COVJD 20709). In September 2006, Buerger invoked the Fifth Amendment when asked whether the purpose of the right of last offer clause was to prevent Brokers from soliciting competitive offers after Coventry invokes this right.

### IV.    Coventry's Corrupt Broker Compensation Practices

48.    Coventry's gross offers corrupt the Broker-Seller relationship by undermining the Broker's duties to the Seller and creating perverse incentives to negotiate lower, instead of higher, selling prices for Sellers. While the Broker may profess to represent the client, in many cases the Broker conceals its conflict of interest and hides the fact that both the Broker and the Seller are competing for a slice of Coventry's gross offer. Coventry benefits from this

21

scheme by obtaining lower prices for the policies it purchases and by creating incentives for Brokers to steer additional business to it.

49.    For example, if Coventry extends a gross offer of $100,000 to purchase a life settlement, the Broker may decide to pass on $70,000 to the Seller and keep $30,000. However, if the Broker wishes to increase its compensation, it may try to convince the Seller to accept only $60,000 for the policy, leaving $40,000 for the Broker. In many cases, the Seller is never informed of the full amount or mechanics of Coventry's gross offer, and so never learns the full amount that Coventry was willing to pay for the policy or the amount of compensation taken by the Broker.

50.    In one case already noted above, Coventry extended a gross offer of $3.1 million to the Seller of a $10 million life insurance policy. On or about December 6, 2004, prior to making the offer, a Coventry regional manager wrote to Neal Jacobs, asking whether the Broker, Eikonglobal, Inc., a New York City financial advisor, could allocate the $3.1 million gross offer as $2.8 million to the Seller and $300,000 to the Broker. However, in a prior communication the Seller had demanded $3,000,000 for his policy and Jacobs replied: "what happened to the client needing 3m." The Coventry regional manager replied: "I just want to let him [Eikonglobal] know whether he can keep the difference if [he] gets the offer accepted for less." (COV 462713). The next day, the Coventry regional manager updated Jacobs: "Client is holding out for 3m. [Eikonglobal] doesn't want to do the case for 100k comp. He is still trying to get client to take less." (COV 462717). Ultimately, Eikonglobal was successful in persuading the Seller to take less and thereby allowing Eikonglobal to take more: Coventry paid out a total

22

of $3.1 million, the Seller received $2,946,947 and Eikonglobal received $153,053 in

compensation. Coventry induced and participated in Eikonglobal's breach of duty to the Seller

and no disclosure was made to the Seller regarding the Broker's compensation. (COV2

0009660).

51.    To sweeten the offer, on or about December 8, 2004, Coventry also

promised Eikonglobal another $50,000 in deferred compensation contingent on Eikonglobal

agreeing that it would not use Coventry's offer "to entice competitors to beat this offer." (COV

441505). Eikonglobal accepted the no-shopping language and Coventry made a record to pay

Eikonglobal another $50,000 on the next case it closed for Coventry. (COV 1119841, COV1

10137).

52.    Brokers frequently negotiate gross offers for their sole benefit when they

know they have reached an agreeable offer in the eyes of the Seller. In one case involving a

family trust-owned policy on the life of a 77 year-old Nevada woman, Coventry was finalizing

the contracts on a life settlement in which the Seller would receive $275,000 for two policies and

the Broker, Cavalier Associates, would receive $31,000 in compensation. On or about June 20,

2005, Cavalier Associates emailed Coventry, stating "I just got an offer from Advanced [working

on behalf of a competing Buyer] at 400K for both policies    this is enough for me to stop the

Coventry paperwork    and start with [sic] over with the new offer    I don't need you to match

it    but I do expect you to increase your offer to something close to that.    I need to know today.

this is a great file and I know you have room    let me know asap." (COVNJ 00021301). Not

wanting to risk losing the case to the higher offer, the next day, Coventry increased Cavalier

23

Associates's compensation from $31,000 to $100,000 and also paid Advanced $100,000 as a co-broker payment. (COVNJ 00024690). All the while, the Seller's compensation remained the same and no disclosure was made to the Seller of the co-broker payment or the higher offer. (COV2 007156, 007165).

53.    Ostensibly to prevent Brokers from grabbing the lion's share of the compensation in every case, Coventry has adopted general "guidelines" that limit Broker compensation to the lesser of 6 percent of the life insurance policy's death benefit or 50 percent of its offer to the Seller. However Coventry frequently pays Brokers amounts in excess of these limits, using hidden deferred compensation or bonuses. Deferred compensation has two purposes: it allows Coventry to exceed its guidelines and it incentivizes Brokers to steer future clients to Coventry in order to collect the payoff.

54.    In one case, Coventry extended a gross offer of $2.535 million to purchase three policies with an aggregate death benefit of $8 million insuring the lives of a couple in their eighties. The Broker, Cale W. Carson (also known as "Kit" Carson), divided this amount between himself and the Seller, and ultimately offered the Seller $1,625,000, keeping $910,000 for himself. Carson's proposed compensation, however, exceeded 6 percent of the $8 million death benefit, and in a December 28, 2004 email, Reid Buerger told him that Coventry would not pay him more than 6 percent of the death benefit. Carson retaliated in an email to Coventry: "You are hereby notified that you are not to proceed further (send change forms to the carriers) on the above case until we speak, and get this situation clarified." (COV 1120238)

55.    Rather than lose the deal, Buerger wrote back the next day: "as a follow up to our conversation compensation for the above case will be 6%, or 480k. In addition, per our conversation we will be paying the 120k." (COV-1102963). Coventry's internal accounting records show that Carson, indeed, received $480,000 compensation plus an additional $120,000 in bonus for a total of $600,000 for the transaction. Coventry also awarded Carson an additional $75,000 in deferred compensation, for a total compensation package of $675,000. (COV 32402-32403). Notably, Coventry's records provide no indication that the Seller was informed that Coventry was actually willing to buy the policy for $2.535 million (as opposed to $1.625 million), and that at least $675,000 was siphoned off in Broker compensation. (COV2 0009657-58). In September 2006, Reid Buerger invoked the Fifth Amendment when asked why he agreed to pay Carson above the 6% guideline.

56.    In certain instances Broker compensation in fact exceeded the selling price offered to the Seller. The egregious nature of such deals was not lost on the participants in the life settlement. In an email dated October 20, 2004, a representative from Berkshire Hathaway, one Coventry investor, wrote to AIG, another Coventry investor, to question Broker compensation on a life settlement negotiated for them by Coventry: "Can I get a little color on this one, please. $130,875 to the seller, and $857,500 of commissions??? Am I missing something?" In separate emails, AIG and Coventry's CEO Alan Buerger responded, noting that deducting Coventry's $400,000 customary fee, Broker compensation was only $457,500, and taking into account a premium reimbursement payment, Seller's compensation would be

25

$365,000. (COV. 1066288). After these adjustments, Coventry still paid the Broker $92,500 more than the Seller.

57.    Coventry and its founder Alan Buerger are familiar with gross offers because prior to becoming a Buyer, Coventry benefitted from gross offers as a Broker. In 2000, Coventry, as a Broker, worked out an arrangement whereby it would split 50-50 with a Buyer any savings it obtained by negotiating a lower sales price with a Seller of a policy insuring a 66 year-old man from California. Thus, in the September 2000 transaction, where Coventry negotiated a $20,000 reduction in the purchase price, the Buyer wrote Coventry: "On the 2mill policy we gave you an offer of $450,000 you negiotiated [sic] a new purchase price of $430,000 split 50/50 extra 10k to you." In other words, since Coventry convinced the Seller to take $20,000 less than what the Buyer offered, Coventry and Buyer would split the difference and each walk away with an extra $10,000. Not content with his 50 percent cut on the reduced purchase price, Reid Buerger responded, with a copy to Coventry's CEO Alan Buerger, "We were not supposed to split this one 50/50, it was to be 100% to us." The Buyer, confused by this departure from the usual practice of evenly splitting the savings, replied: "Why would we not split this one. Our policy was everything negiotiated [sic] down we always split 50/50. Who approved this!!!" (COV-1032560)

                *                              *                              *

58.    The above, again, are illustrative cases; this Office's investigation has revealed literally hundreds of examples of gross offers extended by Coventry and other Buyers

In more than 200 cases, the Broker receives half or more of what the Seller receives  The use of gross offers has become pervasive in the life settlement business.

## V.    Coventry Creates False and Misleading Documentation

59.    Coventry touts itself as having "exacting" due diligence and "conduct[ing] our business transparently." (COV1 00322)  However, in many instances it directly participates in the Broker's breach of its duty to the Seller by failing to disclose Broker compensation to the Seller and by falsifying any paperwork the Seller sees to show less compensation than is actually paid.

60    Coventry has two major incentives not to disclose the full measure of compensation to the Seller:  (1) providing sweetheart deals to Brokers incentivizes Brokers to continue to do business with Coventry, and (2) disclosing compensation, especially when compensation is high in relation to the purchase price, may cause a Seller to reconsider closing a deal or rescind a deal that is still within the rescission period[6]

61.    Coventry's standard practice when the Seller or a representative of the Seller inquires about Broker compensation is to direct the Seller to the Broker.  For example, on April 22, 2003,  the trustee of a New York life insurance trust contacted Coventry seeking information about how much Advanced, the Broker on the deal, would be paid on the life settlement  Reid Buerger responded: "just tell him this is not information we are at liberty to

---

[6]In most states, life settlements and viaticals are subject to a two-week rescission period, during which the Seller can unwind the transaction for any reason. (National Association of Insurance Commissioners (NAIC) model regulations providing for a fifteen day rescission period )

provide." (COV 1113128). In September 2006, Buerger invoked the Fifth Amendment when asked about this matter. In another email dated March 25, 2003, a Coventry Regional Director wrote to a Broker: "Compensation disclosure is determined by state regulation. Assuming the policy owner resides in the state of Wisconsin (life settlements are not regulated in Wisconsin), there would not be any compensation disclosure. Coventry First would direct any inquiries by the policy owner and/or insured regarding compensation to your office." (COV-1112858)

62. When pressed, Coventry has agreed to falsify documents. In one example, involving a policy insuring an 80 year-old New York man, the Seller received from Coventry $317,000, the primary Broker received $11,250 and another Broker in the distribution chain received $3,750. (BIS002136) On July 27, 2004, Coventry sent offer sheets to both Brokers reflecting the agreed-upon compensation. The next day, both Brokers signed and returned the offer sheets to Coventry, marking the end of the bidding process. (COV2 0009420-9425). Subsequently, one of the Seller's advisors contacted the first Broker and inquired as to the amount of compensation that he was to receive. In response to this inquiry and at the first Broker's request, Coventry falsified the offer sheets making it appear that the first Broker had only received $1,250 in total compensation instead of the $11,250 he actually received. In fact, the first Broker received the remaining $10,000 as an undisclosed "bonus." (BIS002207-2209). To cover up the scheme, on August 31, 2004, Coventry also emailed the falsified offer sheets to the second Broker for his signature. The second Broker signed and returned the new offer sheets to Coventry on September 2, 2004. (COV2 0009430) The false offer sheets were explicitly created to hide the full measure of compensation paid on this policy.

28

63.    Even in so-called "disclosure states"[7] where Coventry is statutorily required to disclose Broker compensation to the Seller, it often understates or misleads the Seller as to the Broker's compensation. This investigation has uncovered numerous occasions where co-broker fees and/or deferred compensation was not disclosed to the Seller. It was not until July 20, 2006 - - a year after this Office's investigation began - - that Coventry put in writing a policy requiring disclosure of all Broker compensation in such states. (COV2 0009661-662).

64.    For example, in one case involving a family-owned policy insuring an 87 year-old man from Nevada (which requires disclosure), Coventry agreed to pay a total of $42,000 in compensation, $21,000 to LSA and $21,000 to Advanced. Coventry, however, did not want to disclose the entire $42,000 in compensation on the Exhibit A disclosure form attached to the Purchase Agreement, and so, on December 22, 2004, Jim Dodaro emailed Reid Buerger and others at Coventry, suggesting that they could keep $22,000 off the Exhibit A by calling it deferred compensation and co-broker fees: "Total comp is 42K to LSA (they were paying Advanced 21K of it). Looks like we have to do a new Ex A disclosing comp. Can we lower the gross offer by 22K, put 20K comp on the Ex A, defer 1K to LSA and pay 21K to Advance as co-broker?" (COV 1120443). Following Dodaro's suggestion, Coventry disclosed only $20,000 on the Exhibit A to the Seller. The remaining $22,000 was paid to the Brokers as deferred compensation and co-broker payment and never disclosed to the Seller. (COVJD

---

[7] States currently requiring disclosure of Broker compensation include Arkansas, Florida, Indiana, Kansas, Kentucky, Nebraska, Nevada, North Carolina, North Dakota, Ohio, Pennsylvania, Tennessee and Utah. Statutes in these States, though not uniform. generally require that the Buyer of a life settlement disclose to the Seller the amount of Broker compensation being paid.

00025548, COV2 0007152). In September 2006, Buerger invoked the Fifth Amendment when asked why he agreed to alter the Exhibit A.

## FIRST CAUSE OF ACTION
(Fraudulent business practices – Executive Law § 63(12))

65. The acts and practices alleged herein constitute conduct proscribed by § 63(12) of the Executive Law, in that Defendants have engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

## SECOND CAUSE OF ACTION
(Anti-Competitive Behavior – Gen. Bus. L. § 340 et seq.)

66. Beginning no later than 2001 and continuing through in or about 2006, Defendants and others conspired unreasonably to restrain trade and commerce in violation of General Business Law § 340 et seq. by, among other things: (1) providing owners seeking to sell their life insurance policies in the secondary market with collusive, fictitious or otherwise non-competitive bids or other terms of sale; (2) allocating the opportunity to purchase, and the purchase of, life insurance policies to particular Buyers and Brokers; and (3) creating a scheme to pay Brokers to participate in and implement the unlawful conspiracy.

67. As a result of this conspiracy, Sellers received cash settlements on terms less favorable than would have been available in a competitive market and were denied to opportunity to offer their life insurance policies for sale, and to sell their policies, under free and open competitive conditions.

30

68.    Defendants' acts are *per se* violations of General Business Law § 340 *et seq.*

69.    Various persons, not named as defendants, participated as co-conspirators in the violations alleged and performed acts and made statements in furtherance of that conspiracy.

### THIRD CAUSE OF ACTION
(Securities Violations – Gen. Bus. L. § 352 *et seq.*)

70.    To the extent that Defendants engaged in life settlement transactions involving variable life insurance policies, the acts and practices of Defendants alleged herein violated Article 23-A of the General Business Law, in that Defendants engaged in the artifice, agreement, device or scheme to obtain money, profit or property by a means prohibited by § 352-c of the General Business Law.

### FOURTH CAUSE OF ACTION
(Common Law Fraud)

71.    The acts and practices of Defendants alleged herein constitute actual and/or constructive fraud under the common law of the State of New York.

### FIFTH CAUSE OF ACTION
(Unjust Enrichment)

72.    By engaging in the acts and conduct described above, Defendants unjustly enriched themselves and deprived policy owners and the investing public of a fair market place.

### SIXTH CAUSE OF ACTION
(Inducement of Breach of Fiduciary Duty)

73.    By engaging in the acts and conduct described above, Coventry aided and

31

abetted, participated in, and benefitted from Brokers and others' breach of their fiduciary duties to their clients

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

A.    Enjoining and restraining Defendants, its affiliates, assignees, subsidiaries, successors and transferees, their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with it, from engaging in any conduct, conspiracy, contract, or agreement, and from adopting or following any practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above.

B.    Directing that Defendants, pursuant to section 63(12) of the Executive Law and the common law of the State of New York, disgorge all gains and pay all restitution and damages as provided by law and caused, directly or indirectly by the fraudulent and deceptive acts complained of herein;

C.    Directing that Defendants, pursuant to section 63(12) of the Executive Law, offer the right of rescission to all Sellers who entered into Purchase Agreements with Defendant Coventry from 2001 to the present;

D.    Directing that Defendants pay punitive damages;

E.    Directing that Defendants pay three-fold damages;

F.    Directing that Defendants pay Plaintiff's costs, including attorneys' fees as provided by law;

32

G. Directing such other equitable relief as may be necessary to redress

Defendants' violations of New York law; and

H. Granting such other and further relief as may be just and proper.

Dated: New York, New York
   October 26, 2006

        ELIOT SPITZER
        Attorney General of the State of New
        York
        120 Broadway, 23rd Floor
        New York, New York 10271
        (212) 416-8995

        By: _____
        David D. Brown, IV
        Assistant Attorney General

Of Counsel:
Maria Filipakis
David Axinn
J. Jennifer Koh
Assistant Attorneys General

# Exhibit B



**FILED**

OFFICE OF INSURANCE REGULATION

KEVIN M. MCCARTY
COMMISSIONER

IN THE MATTER OF:

COVENTRY FIRST LLC

_____/

CASE NO: 88270-06

### NOTICE AND ORDER TO SHOW CAUSE

TO:

Coventry First LLC
c/o Florida Chief Financial Officer
200 E. Gaines Street
Tallahassee, Florida 32399

Constance Buerger, President
Coventry First LLC
7111 Valley Green Road
Fort Washington, PA 19034-2209

YOU ARE HEREBY NOTIFIED that pursuant to the authority contained in Sections
624.307, 624.310, 624.317, 624.318, 624.321, 626.9561 and 626.9922, Florida Statutes, the
OFFICE OF INSURANCE REGULATION (hereinafter referred to as the "OFFICE") has
conducted an investigation of COVENTRY FIRST LLC (hereinafter referred to as
"COVENTRY"), and as a result thereof it is alleged that:

### GENERAL ALLEGATIONS

1. The OFFICE has jurisdiction over the subject matter of, and parties to, this
proceeding.

2. COVENTRY is a foreign insurer, domiciled in Delaware, with home offices in
Fort Washington, Pennsylvania. COVENTRY holds a License issued by the OFFICE to transact

business as a Viatical Settlement Provider pursuant to applicable provisions of the Florida Insurance Code and is subject to the jurisdiction and regulation of the OFFICE in accordance with the Florida Insurance Code

     3.    COVENTRY is in the business of purchasing life insurance policies on behalf of institutional investors  In the typical transaction the life insurance policy owner (hereinafter referred to as "viator") through the services of a broker solicits bids from various buyers such as COVENTRY to maximize the payment to a viator in exchange for transferring the rights of ownership of the policy to the buyer  The amount paid to the viator is calculated based on the specific life expectancy of the underlying insured.

     4.    In transactions where COVENTRY is the buyer, COVENTRY's Financial Analysis group processes the actuarial data, obtains estimates on the life expectancy of the insured and determines pricing for the policy.  The policy is then sent to COVENTRY's Financial Underwriting group, headed by Reid Buerger, where a gross offer amount is determined.  Any special compensation arrangements, including co-broker payments, deferred compensation and bonuses are approved by Reid Buerger.

     5.    Reid Buerger is a COVENTRY Executive Vice President and the son of its founder Alan Buerger. COVENTRY is 100% owned by Montgomery Capital, Inc. which in turn is owned by Alan Buerger, COVENTRY's CEO and Treasurer; Constance Buerger who is Reid Buerger's mother and COVENTRY's President; and Reid Buerger.

     6.    Jim Dodaro is the Vice President of Financial Underwriting for COVENTRY.

     7.    Krista Lake is a COVENTRY Executive Vice President and the wife of Reid Buerger

.

8.    Other employees of COVENTRY include, but are not limited to: James Camper, Regional Vice President; Brian Tafaro, Regional Vice President: Neal Jacobs, Vice President of Financial Underwriting; Meredith McMahon, Senior Associate of Finance, Christina Carnevale and Chris Aguirre, employees.

9.    The OFFICE conducted an investigation pursuant to Section 624.307, 624.310, 624.317, 624.318, 624.321, 626.9561 and 626.9922, Florida Statutes. In the investigation, emphasis was directed to the quality and integrity of COVENTRY's business practices. As a result of such investigation, the OFFICE has determined that COVENTRY violated provisions of the Florida Insurance Code (hereinafter referred to as "Insurance Code").

COUNT I

10.    The aforementioned General Allegations are hereby realleged and incorporated by reference herein.

11.    As a result of the investigation the OFFICE has determined that COVENTRY violated provisions of the Insurance Code by engaging in fraudulent or dishonest practices, dealing in bad faith with viators and employing individuals who have been shown to be untrustworthy or dishonest and who have materially influenced COVENTRY's conduct, specifically:

(a)    In a 2005 transaction, an 81 year-old woman living in Florida decided to sell her $5,000,000 life insurance policy. COVENTRY received identical illustrations of premium payment streams for current established premium payments and the minimum payment to carry the policy to age 100 from three (3) brokers: Ashar Group, LLC; Invescor and The Life Settlement Alliance, Inc  In an e-mail dated July 29, 2005 from James Camper, Regional Vice President for COVENTRY, to Jim Dodaro, he stated that, "Invescor has the exclusive offer from Life Equity, Ashar is not involved. They are willing to forgo addtl (sic) shopping on this case

3