and they will order contracts today is (sic) we can offer $1.52M." A second e-mail sent from James Camper to Jim Dodaro on the same day stated, "Thanks, I heard we will pay a 5K override to either side is [sic] the other closes." Dodaro's response to this was "Yes."

(b)    In an e-mail from COVENTRY employee, Christina Carnevale, to Jim Dodaro she told Jim Dodaro that "Invescor used our # to go back to Lequity (sic)." Jim Dodaro's response in an e-mail dated July 29, 2005, stated, "It's in their best interest to work with us so we can protect them." Later that day, Jim Dodaro e-mailed Neal Jacobs, COVENTRY Vice President of Financial Underwriting, and stated, "I can't reward them for shopping our offer after I agreed to lock them in with some comp." Finally, James Camper e-mailed Jim Dodaro and stated, "Nice work, it took intervention from Sam Katz to convince Invescor that the co-broker arrangement was in their best interest."

(c)    The policy was sold to COVENTRY on August 29, 2005 for $1,350,000. COVENTRY paid Invescor compensation in the amount of $156,000 for the transaction. In addition, Samuel Katz and Associates was paid $25,000, and Life Insurance Settlements, Inc. received $10,000.

(d) No documents provided by COVENTRY to the OFFICE support COVENTRY's position that Samuel Katz and Associates or Life Insurance Settlements, Inc. added any compensable value to the transaction.

(e)    Had COVENTRY dealt with the viator in good faith, substantially more than $1,350,000 could have been paid to the viator.

## COUNT II

12.    The aforementioned General Allegations are hereby realleged and incorporated by reference herein.

4

13. As a result of the investigation the OFFICE has determined that COVENTRY violated provisions of the Insurance Code by engaging in fraudulent or dishonest practices, dealing in bad faith with viators and employing individuals who have been shown to be untrustworthy or dishonest and who have materially influenced COVENTRY's conduct, specifically:

(a) In a 2005 transaction, an 84 year-old Florida resident decided to sell his $400,000 life insurance policy. COVENTRY received illustrations from brokers John Nye and Advanced Settlements, Inc.

(b) COVENTRY made John Nye a gross offer of $135,000 with $120,000 going to the viator and $15,000 left for broker compensation. On February 2, 2005 John Nye accepted and returned the offer. On February 8, 2005 Jim Dodaro e-mailed Neal Jacobs and stated, "LSA can beat out 135K. How confident are we?" Another e-mail from Jim Dodaro to Meredith McMahon stated, "5K to LSA – Co broker [sic]." Jim Dodaro e-mailed Neal Jacobs again and stated, "I bought insurance for 5K." Neal Jacobs responded, "good idea even if they were bluffing." COVENTRY purchased the life insurance policy for $135,000. Reid Buerger approved the payment to John Nye in the amount of $15,000 and the $5,000 co-broker fee payment to The Life Settlement Alliance, Inc.

(c) No documents provided by COVENTRY to the OFFICE support COVENTRY's position that The Life Settlement Alliance, Inc. added any compensable value to the transaction.

(d) Had COVENTRY dealt with the viator in good faith, substantially more than $120,000 could have been paid to the viator.

## COUNT III

14. The aforementioned General Allegations are hereby realleged and incorporated by reference herein.

5

15. As a result of the investigation the OFFICE has determined that COVENTRY violated provisions of the Insurance Code by engaging in fraudulent or dishonest practices, dealing in bad faith with viators and employing individuals who have been shown to be untrustworthy or dishonest and who have materially influenced COVENTRY's conduct, specifically:

(a) In a 2003 transaction, an 83 year-old Florida resident decided to sell his $1,000,000 life insurance policy. COVENTRY received applications from brokers James Larschan of Wealth Planning Consultants and Advanced Settlements, LLC

(b) COVENTRY sent a declination to Advanced Settlements, LLC stating that the application was received from another source. James Larschan later returned the signed offer sheet to COVENTRY reflecting a $138,000 payment to the viator and $27,000 in compensation to himself. The compensation release form signed by Reid Buerger listed James Larschan as receiving $27,000 in compensation and Advanced Settlements, LLC receiving $40,000 in compensation.

(c) No documents provided by COVENTRY to the OFFICE support COVENTRY's position that Advanced Settlements, LLC added any compensable value to the transaction

(d) Had COVENTRY dealt with the viator in good faith, substantially more than $138,000 could have been paid to the viator.

## COUNT IV

16. The aforementioned General Allegations are hereby realleged and incorporated by reference herein

17. As a result of the investigation the OFFICE has determined that COVENTRY violated provisions of the Insurance Code by engaging in fraudulent or dishonest practices, dealing in bad faith with viators and employing individuals who have been shown to be

6

untrustworthy or dishonest and who have materially influenced COVENTRY's conduct, specifically:

(a) In a 2003 transaction, a 73 year-old Massachusetts resident who's Trust situs was in Florida decided to sell her two (2) life insurance policies with a combined value of $19,400,000. COVENTRY made an offer of $1,500,000, at the maturity of the insured, for both policies.

(b) January 21, 2003 Kevin Cooper of broker Unisyn signed and returned an offer sheet to COVENTRY reflecting an offer to his client of a Guaranteed Paid-Up American General policy with a $1,500,000 death benefit. COVENTRY records related to the transaction include a final fee schedule submitted for the two (2) policies which reflects $968,832 being paid to insurer American General for the purchase of the replacement policy and $120,000 being paid as broker compensation to Kevin Cooper.

(c) COVENTRY's records further reveal that three (3) brokers, having apparently nothing to do with the transaction, were compensated by COVENTRY from proceeds received from the funder for this transaction. Broker Howard Kaye was paid $400,000 in conjunction with these policies and broker Barry Kaye Associates was paid an additional $400,000. Finally, COVENTRY paid Advanced Settlements, LLC an additional sum in the amount of $212,585. The amount of compensation paid on these two (2) policies totaled $1,132,585.

(d) The viator received $968,832 in current value for the two (2) policies; while compensation paid to brokers exceeded $1 million. Had COVENTRY dealt with the viator in good faith, the viator would have received substantially more than the $968,832 paid on their behalf to purchase the "settlement with a paid up policy".

7

(e)     COVENTRY received a $247,707 bonus on the account for keeping the total offer on the transaction, including compensation to brokers, under the $2,500,000 cap that the funder set for purchasing the policies.

(f)     No documents provided by COVENTRY to the OFFICE support COVENTRY's position that Barry Kaye Associates, Howard Kaye or Advanced Settlements, LLC added any compensable value to the transaction.

(g)     Had COVENTRY dealt with the viator in good faith, substantially more than $968,832 could have been paid to the viator or spent for the benefit of the viator.

## COUNT V

18.     The aforementioned General Allegations are hereby realleged and incorporated by reference herein.

19.     As a result of the investigation the OFFICE has determined that COVENTRY violated provisions of the Insurance Code by engaging in fraudulent or dishonest practices, dealing in bad faith with viators and employing individuals who have been shown to be untrustworthy or dishonest and who have materially influenced COVENTRY's conduct, specifically:

(a)     In a 2005 transaction, a Florida resident decided to sell her $7,000,000 life insurance policy. COVENTRY received applications and illustrations from four (4) brokers: Advanced Settlements, LLC; Capitas Financial, LLC; Trinity Financial Services, LLC; and All Settled Group, Inc.

(b)     Available documents indicate that COVENTRY offered the viator $1,850,000 for the policy and that broker's fees related to the transaction were $350,000. These same figures are also reflected on COVENTRY's escrow disbursement schedule.

8

(c) Reid Buerger later received an e-mail from a COVENTRY employee which stated that Advanced Settlements, LLC would receive $420,000 in compensation related to the transaction, with an addition $30,000 in compensation being deferred. In this e-mail the COVENTRY employee asked Reid Buerger "did we figure out where we can put the $30K." The e-mail also stated that Trinity Financial Services, LLC would receive a co-broker fee of $100,000. Reid Buerger approved this second fee schedule via e-mail that same day.

(d) COVENTRY authorized payment to the viator in the amount of $1,850,000 and issued a $100,000 check to Trinity Financial Services, LLC and a $420,000 check to Advanced Settlements, LLC. COVENTRY later authorized and issued a second check to Advanced Settlements, LLC in the amount of $18,000.

(e) When asked to explain the payment to Trinity Financial Services, LLC, COVENTRY responded that: "Trinity independently presented the policy to COVENTRY and worked with COVENTRY toward the closing of this transaction. Here, Trinity provided COVENTRY with documentation that included life insurance policy illustrations and other policy information."

(f) No documents provided by COVENTRY to the OFFICE support COVENTRY's position that Trinity Financial Services, LLC added any compensable value to the transaction.

(g) Review of the documentation provided by COVENTRY to the OFFICE reveals that the illustrations provided by Capitas Financial, LLC and AllSettled Group, Inc. reflected the actual amount of insurance purchased by COVENTRY. In contrast, the illustrations submitted by Trinity Financial Services, LLC and Advanced Settlements, LLC did not correspond to the amount of insurance purchased by COVENTRY.

(h) COVENTRY's "deferred" compensation business practice required Advanced Settlements, LLC to bring COVENTRY a subsequent transaction in order to receive the balance

9

of compensation owed from this transaction. This practice resulted in the elimination of the opportunity for other buyers to bid on the subsequent viator's policy and ultimately prevented the subsequent viator from being able to maximize payment for the policy.

(i) Had COVENTRY dealt with the viator in good faith, substantially more than $1,850,000 could have been paid to the viator.

## COUNT VI

20. The aforementioned General Allegations are hereby realleged and incorporated by reference herein.

21. As a result of the investigation the OFFICE has determined that COVENTRY violated provisions of the Insurance Code by engaging in fraudulent or dishonest practices, dealing in bad faith with viators and employing individuals who have been shown to be untrustworthy or dishonest and who have materially influenced COVENTRY's conduct, specifically:

(a) In a 2003 transaction, a 78 year-old Florida resident decided to sell his $7,000,000 life insurance policy. COVENTRY received documents from four (4) brokers: Advanced Settlements, LLC; The Life Settlement Alliance, Inc.; Longterm Partners; and the Bollinger Group.

(b) COVENTRY sent the Bollinger Group an offer sheet for the transaction with a gross offer of $1,070,000. The Bollinger Group returned a signed offer sheet with the $1,070,000 figure crossed out and $1,400,000 written in reflecting that $1,200,000 was going to the client. COVENTRY's escrow disbursement schedule stated that the offer to client was $1,200,000 with $200,000 in broker fees. The related file log notes state, "Peter from Life Settlement Alliance called – Meredith explained comp situation and relayed same to LSA (LSA is getting an override)." COVENTRY sent a transmittal to Longterm Partners declining the case

10

due to a duplicate submission and reflecting that no compensation was to be paid to Longterm Partners. A Declined Case letter was also sent to The Life Settlement Alliance, Inc., however, COVENTRY records reflect that COVENTRY's Executive Vice President, Krista Lake, approved the payment of compensation to The Life Settlement Alliance, Inc. COVENTRY paid the Bollinger Group $200,000 in compensation and paid $35,000 to The Life Settlement Alliance, Inc.

(c)     No documents provided by COVENTRY support COVENTRY's position that The Life Settlement Alliance, Inc. added any compensable value to the transaction.

(d)     Had COVENTRY dealt with the viator in good faith, substantially more than $1,200,000 could have been paid to the viator.

## COUNT VII

22.     The aforementioned General Allegations are hereby realleged and incorporated by reference herein.

23.     As a result of the investigation the OFFICE has determined that COVENTRY violated provisions of the Insurance Code by engaging in fraudulent or dishonest practices, dealing in bad faith with viators and employing individuals who have been shown to be untrustworthy or dishonest and who have materially influenced COVENTRY's conduct, specifically:

(a)     In a 2004 transaction, a Florida resident decided to sell his two (2) life insurance policies with a value of $3,000,000. COVENTRY received a submission from Ash Brokerage Corporation. COVENTRY sent Ash Brokerage Corporation multiple offers for the policies ranging from $86,000 to $174,880. Ash Brokerage Corporation returned a signed offer sheet to COVENTRY reflecting an offer to the client in the amount of $126,000.

11

(b)     COVENTRY paid Ash Brokerage Corporation $14,120 as broker compensation related to the transaction. Philip Renison, an agent at Ash Brokerage Corporation received $48,880 and The Life Settlement Alliance, Inc. received $40,000. The only reference to The Life Settlement Alliance, Inc. is in the file log notes which indicate The Life Settlement Alliance, Inc. submitted the case on February 10, 2004 which was later declined on March 2, 2004.

(c)     Reid Buerger approved the payments related to the transaction resulting in $126,000 being paid to the viator and $103,000 or 81% of the offer to the viator being paid for compensation.

(d)     No documents provided by COVENTRY to the OFFICE support COVENTRY's position that The Life Settlement Alliance, Inc. added any compensable value to the transaction.

(e)     Had COVENTRY dealt with the viator in good faith, substantially more than $126,000 could have been paid to the viator.

## COUNT VIII

24    The aforementioned General Allegations are hereby realleged and incorporated by reference herein.

25.    As a result of the investigation the OFFICE has determined that COVENTRY violated provisions of the Insurance Code by engaging in fraudulent or dishonest practices, dealing in bad faith with viators and employing individuals who have been shown to be untrustworthy or dishonest and who have materially influenced COVENTRY's conduct, specifically:

(a)     In a 2004 transaction, an 83 year-old Florida resident decided to sell her two (2) life insurance policies with a total value of $3,000,000. COVENTRY received submissions from brokers Advanced Settlements, LLC. and Ash Brokerage Corporation. Robin F. Kippenberger of

12

BRAMCO was listed on the file log notes as the producer. COVENTRY made a gross offer of $930,000 which was accepted and signed by Paula Reeves on July 8, 2004. Paula Reeves submitted the case to COVENTRY on Advanced Settlements, LLC's application form.

(b) Reid Buerger approved the Compensation Release form effective November 14, 2004, to include compensation payment of $3,000 which was crossed out with the amount $63,000 written in. The transaction details show that $10,000 went to Robin Kippenberger (with $5,000 in deferred compensation to go toward the next case closed by that producer with COVENTRY), and $3,000 to Ash Brokerage Corporation. In addition, Advanced Settlements, LLC received $45,000 in compensation.

(c) Reid Buerger later e-mailed COVENTRY employee Meredith McMahon and asked, "what about the comp [sic] for Advanced?" Meredith McMahon e-mailed back, "OK to release Advanced comp [sic] of $45K today? I already have the check signed – I was just waiting for your approval but then I found this email." Reid Buerger responded that that was "ok". An e-mail from COVENTRY employee Chris Aguirre stated, "Pls [sic] note: Kippenberger does NOT know that there is an overide [sic] to Ash Brokerage. That should be kept confidential." A follow up to this e-mail from COVENTRY employee Brian Tafaro stated, "No...we built in a small override payable to ash (paula [sic] and robin [sic] cant [sic] know about this), but all comp outside of that goes to paula [sic] and robin [sic]...i [sic] did get agreement from neal [sic] to pay paula [sic] and robbing [sic] 10K override, plus 5K toward their next case."

(d) No documents provided by COVENTRY to the OFFICE support COVENTRY's position that Ash Brokerage Corporation added any compensable value to the transaction.

(e)     Had COVENTRY dealt with the viator in good faith, more could have been paid to the viator and proper disclosure of all broker fees could have been made by Robin Kippenberger and Paula Reeves.

(f)     COVENTRY's "deferred" compensation business practice requires Robin Kippenberger to bring COVENTRY a second transaction in order to receive the balance of compensation owed from this transaction. This practice results in the elimination of the opportunity for other buyers to bid on the subsequent viator's policy and ultimately prevents the subsequent viator from being able to maximize payment for the policy.

## COUNT IX

26.     The aforementioned General Allegations are hereby realleged and incorporated by reference herein.

27.     As a result of the investigation the OFFICE has determined that COVENTRY violated provisions of the Insurance Code by engaging in business practices that stifle competition and otherwise result in dealing with viators in bad faith, specifically:

(a)     COVENTRY states that "deferred" compensation to brokers relates only to a small fraction of its business, and is used for two principal purposes: (1) where the compensation amount combined with the purchase price paid to the viator exceeds the amount available under one of COVENTRY's third party funding agreements; and (2) where the compensation amount exceeds COVENTRY's self-imposed guideline that broker compensation should not typically exceed the lesser of 50% of what the viator receives or six percent of the net death benefit.

(b)     COVENTRY further states that "deferred" compensation paid to brokers is typically priced into a future transaction within a year of the transaction with respect to which the

14

deferred compensation was earned, and that it is usually funded by the investor on whose behalf COVENTRY purchases the future policy.

(c) COVENTRY's "deferred" compensation business practice requires a broker to bring COVENTRY a second transaction in order to receive the balance of compensation owed the broker on the first transaction. This practice results in the elimination of the opportunity for other buyers to bid on the subsequent viator's policy and ultimately prevents the subsequent viator from being able to maximize payment for the policy.

(d) COVENTRY's "deferred" compensation business practice results in viators being paid less than the fair market value of their policies based on competitive bidding and otherwise reflects that COVENTRY is not dealing in good faith with Florida viators.

## COUNT X

28. The aforementioned General Allegations are hereby realleged and incorporated by reference herein.

29. As a result of the investigation the OFFICE has determined that COVENTRY violated provisions of the Insurance Code by engaging in fraudulent or dishonest practices, dealing in bad faith with viators and employing individuals who have been shown to be untrustworthy or dishonest and who have materially influenced COVENTRY's conduct, specifically:

(a) In a transaction involving the sale of a trust-owned policy with a death benefit of $2.4 million, Stuart Kosloff, the President of Florida based broker East Coast Settlement Company, contacted Jim Dodaro on October 13, 2004 and informed him that he had a $900,000 bid that had not been submitted to the viator. Stuart Kosloff suggested that the two parties work together to ensure that COVENTRY would win the business. Jim Dodaro sent an e-mail to Reid Buerger seeking approval over terms of payment to Stuart Kosloff. (Stuart Kosloff wanted $50-

60,000 and Jim Dodaro offered him $24,000) Not having heard from COVENTRY, Stuart Kosloff sent an e-mail to Jim Dodaro stating that "I need to hear a yes or no before the end of the day or I have to up my offer to them." Jim Dodaro again sought Reid Buerger's approval, and within a few hours Reid Buerger e-mailed back "ok." Stuart Kosloff kept up his part of the agreement by not submitting the higher bid to the viator and dropping out of the bidding. On January 31, 2005 COVENTRY purchased the policy for $825,000. As agreed, COVENTRY paid Stuart Kosloff $50,000.

(b) In September 2006, Reid Buerger invoked the 5th Amendment when asked by representatives of the New York Attorney General's Office about the purpose of COVENTRY's payment to Stuart Kosloff.

## COUNT XI

30. The aforementioned General Allegations are hereby realleged and incorporated by reference herein.

31. As a result of the investigation the OFFICE has determined that COVENTRY violated provisions of the Insurance Code by engaging in fraudulent or dishonest practices, dealing in bad faith with viators and employing individuals who have been shown to be untrustworthy or dishonest and who have materially influenced COVENTRY's conduct, specifically:

(a) In a 2003 transaction, a 79 year-old man living in Hawaii decided to sell his $400,000 life insurance policy. The policy was sold to COVENTRY on April 16, 2003 for $102,000. The viator received $78,000 and the broker involved in the transaction received $24,000. The viator was not aware that Florida based broker The Life Settlement Alliance, Inc. had a gross offer of $108,000, but withheld presenting it to the viator in exchange for a co-broker

fee from COVENTRY. The Life Settlement Alliance, Inc. received a co-broker payment of $12,000 for not submitting the higher bid.

(b)  In September 2006, Reid Buerger invoked the 5th Amendment when asked by representatives of the New York Attorney General's Office whether he had approved the co-broker payment from COVENTRY to The Life Settlement Alliance, Inc. to not submit the higher offer.

IT IS THEREFORE CHARGED that COVENTRY FIRST LLC, in the conduct of business as a foreign insurer licensed in the State of Florida, and for reasons as set forth hereinabove, has violated the following provisions of the Florida Insurance Code, providing grounds for the suspension or revocation of its Viatical Settlement Provider License issued by the OFFICE:

(a)  Section 626.9914(1)(b), Florida Statute provides that the office shall suspend, revoke, deny, or refuse to renew the license of any viatical settlement provider if the office finds that the licensee has engaged in fraudulent or dishonest practices, or otherwise has been shown to be untrustworthy or incompetent to act as a viatical settlement provider;

(b)  Section 626.9914(1)(c), Florida Statutes provides that the office shall suspend, revoke, deny, or refuse to renew the license of any viatical settlement provider if the office finds that the licensee has demonstrated a pattern of unreasonable payments to viators;

(c)  Section 626.9914(1)(g), Florida Statutes, provides that the office shall suspend, revoke, deny, or refuse to renew the license of any viatical settlement provider if the office finds that the licensee has dealt in bad faith with viators;

(d)  Section 626.9914(1)(h), Florida Statutes, provides that the office shall suspend, revoke, deny, or refuse to renew the license of any viatical settlement provider if the office finds that the licensee has violated any provision of the insurance code or of this act; and,

(e)   Section 626.9914(1)(i), Florida Statutes provides that the office shall suspend, revoke, deny, or refuse to renew the license of any viatical settlement provider if the office finds that the licensee employs any person who materially influences the licensee's conduct and who fails to meet the requirements of this act..

WHEREFORE, you, COVENTRY FIRST LLC are hereby notified pursuant to Sections 626.9914 and 120.57, Florida Statutes, to show cause as to why the OFFICE should not enter a permanent Final Order suspending or revoking the Viatical Settlement Provider License of COVENTRY FIRST LLC issued by the OFFICE, or taking such other administrative action as provided by law that the OFFICE may deem appropriate.

DONE AND ORDERED this __10th__ day of May 2007



_____
KEVIN M. McCARTY
Commissioner
Office of Insurance Regulation

18

## NOTICE OF RIGHTS

Pursuant to Sections 120.569 and 120.57, Florida Statutes and Rule Chapters 28-106 and 28-107, Florida Administrative Code (F.A.C.), you have a right to request a proceeding to contest this action by the Office of Insurance Regulation (hereinafter the "Office"). You may request a proceeding by filing a Petition. Your Petition for a proceeding must be in writing and must be filed with the General Counsel acting as the Agency Clerk, Office of Insurance Regulation. If served by U.S. Mail the Petition should be addressed to the Florida Office of Insurance Regulation at 612 Larson Building, Tallahassee, Florida 32399-4206. If Express Mail or hand-delivery is utilized, the Petition should be delivered to 612 Larson Building, 200 East Gaines Street, Tallahassee, Florida 32399-0300. The written Petition must be <u>received</u> by, and filed in the Office no later than 5:00 p.m. on the twenty-first (21) day after your receipt of this notice. Unless your Petition challenging this action is received by the Office within twenty-one (21) days from the date of the receipt of this notice, the right to a proceeding shall be deemed waived. Mailing the response on the twenty-first day will not preserve your right to a hearing.

If a proceeding is requested and there is no dispute of material fact the provisions of Section 120.57(2), Florida Statutes would apply. In this regard you may submit oral or written evidence in opposition to the action taken by this agency or a written statement challenging the grounds upon which the agency has relied. While a hearing is normally not required in the absence of a dispute of fact, if you feel that a hearing is necessary one will be conducted in Tallahassee, Florida or by telephonic conference call upon your request.

If you dispute material facts which are the basis for this agency's action you may request a formal adversarial proceeding pursuant to Sections 120.569 and 120.57(1), Florida Statutes. If you request this type of proceeding, the request must comply with all of the requirements of Rule Chapter 28-106.201, F.A.C., must demonstrate that your substantial interests have been affected by this agency's action, and contain:

- a) A statement of all disputed issues of material fact. If there are none, the petition must so indicate;

- b) A concise statement of the ultimate facts alleged, including the specific facts the petitioner contends warrant reversal or modification of the agency's proposed action;

- c) A statement of the specific rules or statutes the petitioner contends require reversal or modification of the agency's proposed action; and

- d) A statement of the relief sought by the petitioner, stating precisely the action petitioner wishes the agency to take with respect to the agency's proposed action.

These proceedings are held before a State hearing officer of the Division of Administrative Hearings. Unless the majority of witnesses are located elsewhere the Office will request that the hearing be conducted in Tallahassee.

In some instances you may have additional statutory rights than the ones described herein.

Failure to follow the procedure outlined with regard to your response to this notice may result in the request being denied. Any request for administrative proceeding received prior to the date of this notice shall be deemed abandoned unless timely renewed in compliance with the guidelines as set out above

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice and Order to Show Cause and Notice of Rights has been furnished by Certified Mail to Constance Buerger, President, Coventry First LLC, 7111 Valley Green Road, Fort Washington, Pennsylvania 19034-2209, and by U.S. Mail and Facsimile to Brian P. Brooks, Esq., O'Melveny & Myers, 1625 Eye Street NW, Washington, D.C. 20006-4001, (202) 383-5414 and to Frank J. Santry, Esq., Frank J. Santry, P.L., Post Office Box 16337, Tallahassee, Florida 32317-6337, (850) 385-3809, on this 10th day of May 2007.

*Jim Bennett*

Jim L. Bennett
Assistant General Counsel
Office of Insurance Regulation
200 E. Gaines Street
Tallahassee, Florida 32399-4206
Telephone: (850) 413-4170
Facsimile: (850) 922-2543
E-Mail: jim.bennett@fldfs.com

## CERTIFICATE OF SERVICE

I hereby certify that, on this 31st day of July, 2007, I caused true and correct copies of PLAINTIFFS' FIRST AMENDED COMPLAINT to be served via hand delivery on the following counsel:

Dane H. Butswinkas
Robert M. Cary
David A. Forkner
Kenneth J. Brown
Rachel R. Shanahan
Katherine G. Lindsey
Thomas P. Windom
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

*Attorneys for Defendants*

                                                                   Lawrence S. Robbins