**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RITCHIE CAPITAL MANAGEMENT, L.L.C., RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED, RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND) II, LIMITED, WALKERS SPV LIMITED, as trustee for Ritchie Risk-Linked Life Strategies Trust I and Ritchie Life Strategies Master Trust, and RITCHIE RISK-LINKED STRATEGIES TRADING, LTD., ) ) ) ) ) ) ) ) ) ) | 07 Civ. 3494 (DLC)  ECF Case |
| Plaintiffs, ) ) | |
| v. ) ) | |
| COVENTRY FIRST LLC, THE COVENTRY GROUP, INC., MONTGOMERY CAPITAL, INC., LST I LLC, ALAN BUERGER, CONSTANCE BUERGER, REID S. BUERGER, ANTONIO MUNIZ, ALEX SELDIN, NEAL JACOBS, EILEEN SHOVLIN, and JIM DODARO, ) ) ) ) ) ) ) ) ) | |
| Defendants ) | |

**REVISED MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR RECONSIDERATION**
**AND FOR LEAVE TO FILE THEIR**
**PROPOSED SECOND AMENDED COMPLAINT**

Lawrence S. Robbins (LR-8917)
Gary A. Orseck
Rachel S. Li Wai Suen
Daniel R. Walfish
ROBBINS, RUSSELL, ENGLERT,
    ORSECK & UNTEREINER LLP
1801 K Street, N.W., Suite 411
Washington, D.C.  20006
Tel: (202)775-4500
Fax: (202)775-4510

Thomas P. Puccio
LAW OFFICES OF THOMAS P. PUCCIO
230 Park Avenue
New York, NY 10169
Tel:  (212) 883-6383
Fax:  (212) 883-6388

Dated:  August 24, 2007                    *Counsel for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ....................................................................................................... 1

I.    Breach of Fiduciary Duty: The Opinion Failed To Recognize That The Contractual Disclaimer Of A Partnership Relation Cannot Possibly Bind *Non-Contracting* Parties And, In Any Event, Did Not Constitute A General Disclaimer Of A Fiduciary Relationship In This Case.............................. 2

II.   Fraud: The Opinion Failed To Consider Claims By And Against Non-Contracting Parties And Overlooked Several Reasons Why The Fraud Claims Do Not Duplicate The Contract Claims ........................................................... 4

III.  Fraudulent Inducement: The Opinion Misapplied Controlling Law And Misapprehended The Claims By And Against Entities Not Party To The MPPAs ........................................................................................... 7

IV.   Personal Jurisdiction: The Court Overlooked That Montgomery Capital, Inc. Is Subject To Personal Jurisdiction On Any Claim, A Point Implicitly Conceded By Defendants .................................................. 9

CONCLUSION............................................................................................................ 10

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bagdon v. Phil. & Reading Coal & Iron Co.*, 217 N.Y. 432 (1916) ........................................... 10

*Bd. of Managers of 411 E. 53rd St. Condo. v. Dylan Carpet, Inc.*, 582 N.Y.S.2d 1022 (1st Dep't 1992) ..................................................................................................... 6

*Blue Chip Emerald LLC v. Allied Partners, Inc.*, 750 N.Y.S.2d 291 (1st Dep't 2002) ..................................................................................................... 4

*Brunetti v. Musallam*, 783 N.Y.S.2d 347 (1st Dep't 2004) ........................................... 3

*Cassata v. Brewster-Allen-Wichert, Inc.*, 670 N.Y.S.2d 552 (2d Dep't 1998)............................. 4

*Danann Realty Corp. v. Harris*, 5 N.Y.2d 317 (1959) .................................................. 8

*Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954 (1986) ........................ 6

*EEOC v. Waffle House, Inc.*, 534 U.S. 279 (2002)..................................................... 9

*First Bank of the Ams. v. Motor Car Funding*, 690 N.Y.S.2d 17 (1st Dep't 1999)...................... 6

*Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419 (S.D.N.Y. 2004) ............................................................................................. 7

*Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897 (2d Cir. 1980) ....................................... 5

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996)................................................. 8

*In re T.J. Ronan Paint Corp.*, 469 N.Y.S.2d 931 (1st Dep't 1984) ................................. 3

*M'Baye v. World Boxing Ass'n*, 429 F. Supp. 2d 652 (S.D.N.Y. 2006)................................. 10

*Meinhard v. Salmon*, 249 N.Y. 458 (1928)........................................................... 3

*Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310 (2d Cir. 1993) ................................... 8

*Shrader v. CSX Transp., Inc.*, 70 F.3d 255 (2d Cir. 1995) ......................................... 1

*Spodek v. Neiss*, 756 N.Y.S.2d 903 (2d Dep't 2003)................................................. 4

*Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175 (2d Cir. 2001) ........................... 4, 5

*Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737 (2d Cir. 1979) ...................... 7

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

**STATUTES AND RULES**

Fed. R. Civ. P. 9(b) ................................................................................................ 2, 5

Fed. R. Civ. P. 59(e) ................................................................................................ 1

Local Civ. R. 6.3 ...................................................................................................... 1

N.Y. Bus. Corp. L. § 1304 ...................................................................................... 10

Plaintiffs submit this Memorandum of Law in support of their motion for reconsideration of the Court's July 17, 2007 Opinion and Order ("Opinion"), and for leave to file their Proposed Second Amended Complaint, attached hereto as Exhibit A.[1]

## **INTRODUCTION**

On July 17, 2007, this Court issued its Opinion granting Defendants' motion to dismiss the Complaint as to all counts, and granting leave to amend the Complaint as to the breach of contract claim on behalf of two plaintiffs and the Section 1962(c) and 1962(d) claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") on behalf of all Plaintiffs. We respectfully ask that the Court reconsider its dismissal of the fraud, fraudulent inducement, and fiduciary duty claims without leave to amend, as well as its ruling that personal jurisdiction over Montgomery Capital, Inc. has not been established in relation to the remaining RICO claims.

A motion for reconsideration under Fed. R. Civ. P. 59(e) should be granted if "the moving party can point to controlling decisions or data that the court overlooked." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *see also* Local Civ. R. 6.3. We believe that the Opinion misapplied several precedents and overlooked key factual allegations in the Complaint. We recognize in retrospect that some of these allegations perhaps could have been more clearly drawn to show, among other things, that *some* Plaintiffs have claims that others may lack, while some Defendants lack defenses that others may have. The Proposed Second

---

[1]    At a conference on August 10, 2007, the Court invited Plaintiffs to file a proposed further amended complaint containing revised fraud, fraudulent inducement, and fiduciary duty claims, and correspondingly to revise the present motion. Accordingly, Plaintiffs here explain not only why reconsideration of certain matters in the Opinion is warranted, but also why leave should be given to replead the fraud, fraudulent inducement, and fiduciary claims as set forth in the Proposed Second Amended Complaint. With respect to the contract and RICO allegations, and the averments relating to personal jurisdiction, the Proposed Second Amended Complaint is identical or virtually so to the First Amended Complaint, in which Plaintiffs took advantage of the Court's leave to amend those allegations.

Amended Complaint is designed to clarify the differences among the parties and the relevant relationships, as well as to alleviate potential Rule 9(b) concerns.

Although we believe that the Court erred with regard to all of the claims in the Complaint and to personal jurisdiction, we respectfully ask the Court to reconsider the dismissal of Counts Four, Five, and Six (as well as its ruling regarding personal jurisdiction over Montgomery Capital), and to permit repleading on those claims in accordance with the Proposed Second Amended Complaint.

I. **Breach of Fiduciary Duty: The Opinion Failed To Recognize That The Contractual Disclaimer Of A Partnership Relation Cannot Possibly Bind *Non-Contracting* Parties And, In Any Event, Did Not Constitute A General Disclaimer Of A Fiduciary Relationship In This Case**

The Court dismissed the claim of breach of fiduciary duty (Count Six of the Complaint) based on a clause in the Master Policy Purchase Agreements ("MPPAs") that provides that "[n]othing contained in this Agreement is intended to . . . create the relationship of . . . a partnership or joint venture." Opinion at 15. We submit that this ruling overlooks several essential points.

The basic nature of the arrangement here – as Plaintiffs have endeavored to make clearer in the Proposed Second Amended Complaint ("SAC") (*e.g.*, SAC ¶¶ 4-8) – is that Ritchie Capital Management, L.L.C. ("RCM"), as adviser and fiduciary to (as well as holder of beneficial interests in) Ritchie Risk-Linked Life Strategies Trust I, Ritchie Life Strategies Master Trust, and Ritchie Risk-Linked Strategies Trading, Ltd. (all three entities collectively, the "Investing Plaintiffs"), caused the Investing Plaintiffs to become, together with Coventry, the de facto equity shareholders in Plaintiffs Ritchie Risk-Linked Strategies Trading (Ireland), Limited ("Ritchie I") and Ritchie Risk-Linked Strategies Trading (Ireland) II, Limited ("Ritchie II") (collectively, the "Contracting Plaintiffs").

Ritchie I and Ritchie II in turn each entered into a contract – an MPPA – with Coventry's special-purpose subsidiary LST I LLC ("LST") for the purchase of life insurance policies. These MPPAs were only two out of a large number of pertinent agreements governing the whole arrangement. (Plaintiffs have tried to make this point clearer in the SAC. *See* SAC ¶¶ 45, 48, 51.) Thus, accepting for present purposes that, in the MPPAs, Ritchie I and Ritchie II disclaimed a partnership or joint venture relation with LST, (1) *the Plaintiffs not party to the MPPAs did no such thing*, and (2) *the disclaimer does not apply to the Defendants not party to the MPPAs*.

The Court states that the Investing Plaintiffs "have pleaded no adequate bases for establishment of a fiduciary relationship absent one between the defendants and Ritchie I and II." Opinion at 16. But the Complaint and the SAC allege several grounds for a fiduciary relationship between, on the one hand, the Investing Plaintiffs and, on the other, LST's parents and affiliates, including: (a) the joint equity-like investment in Ritchie I and Ritchie II, and (b) the fact that Plaintiffs (specifically, the Investing Plaintiffs) provided the funding for an investment arrangement that Defendants in practice had the responsibility for managing. *See* Compl. ¶¶ 30-33; SAC ¶¶ 4-8, 45-53.

Plaintiffs cited several cases in their brief in opposition (*see* Pl. Mem. in Opp'n ("Pl. Mem.") 17-18, 21-22) demonstrating that these arrangements are textbook bases for a fiduciary relationship (*see Brunetti v. Musallam*, 783 N.Y.S.2d 347, 349 (1st Dep't 2004) (relationship between investors in a close corporation "imposes a high degree of fidelity"); *In re T.J. Ronan Paint Corp.*, 469 N.Y.S.2d 931, 936 (1st Dep't 1984) (same); *Meinhard v. Salmon*, 249 N.Y. 458, 462-64 (1928) (arrangement where one party provides the funding and the other manages the investment creates "fiduciary duties akin to those of partners")), and there is extensive additional authority supporting a finding of a fiduciary relationship in the circumstances

presented by this case. *E.g.*, *Spodek v. Neiss*, 756 N.Y.S.2d 903 (2d Dep't 2003) (finding a fiduciary relationship between shareholders in a close corporation); *Blue Chip Emerald LLC v. Allied Partners Inc.*, 750 N.Y.S.2d 291, 294 (1st Dep't 2002) (co-venturer managing the investment owed fiduciary duty to other co-venturer); *Cassata v. Brewster-Allen-Wichert, Inc.*, 670 N.Y.S.2d 552, 553 (2d Dep't 1998) ("The shareholders of a close corporation owe each other a duty to act in good faith"). The Opinion overlooks these points.

Similarly, the Opinion does not address the fact that the disclaimer does not apply to any of the *Defendants* not party to the MPPAs. The Complaint fairly alleges – although the SAC strives to make it clearer (*see* SAC ¶¶ 2, 6-8, 45) – that LST's parents were equity stake-holders in Ritchie I and Ritchie II and therefore owed the Investing Plaintiffs fiduciary duties. By the same token, the Coventry entities' role as de facto decision-makers with respect to the funds contributed by Plaintiffs also grounds a fiduciary relationship.

Even beyond these points, the disclaimer provision at issue says only that the parties have not formed a "partnership" or "joint venture." As Plaintiffs have explained (*see* Pl. Mem. 21), a fiduciary relation may be formed even when a "partnership" or "joint venture" is not. The allegations described in the preceding paragraphs allege circumstances that would create a fiduciary relation even without a partnership or a joint venture.

## II.    Fraud: The Opinion Failed To Consider Claims By And Against Non-Contracting Parties And Overlooked Several Reasons Why The Fraud Claims Do Not Duplicate The Contract Claims

The Court dismissed the fraud claims (Count Four of the Complaint) based on the theory that "a fraud claim will not lie if it arises 'out of the same facts as plaintiff's breach of contract claim.'" Opinion at 17 (quoting *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d

Cir. 2001)).[2] Citing this principle, the Court held that Plaintiffs did not identify a "separate legal duty" in support of the fraud claim, nor had Plaintiffs pointed to representations "collateral" to the contract. *Id.* at 18. Concluding that the fraud claim "appears to rest entirely on the subjects covered in the representations and warranties" contained in the two MPPAs, the Court ruled that any misrepresentations or omissions relating to the contracts must be pleaded as a breach of contract claim. *Id.* This reasoning overlooks several key points.

First, the Opinion misreads *Telecom International*, which did not make the sweeping pronouncement that under New York law, a contract claim and a fraud claim can never cover the same facts or subject matter. Rather, in that case the Second Circuit stated the well-settled (but here inapplicable) principle that an ordinary contract claim cannot be converted into a fraud claim merely by alleging that at the time of contracting, the defendant misrepresented its intention to perform the contract. *See Telecom Int'l,* 280 F.3d at 196. That rule is not so broad that an act that grounds a breach of contract claim can never be the basis for a claim sounding in tort. *E.g.*, *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir. 1980) (misrepresentation was actionable as both breach of contract and fraud); *see also* Pl. Mem. 15-16.

Second, the Opinion overlooks the fact that the fraud claim is asserted by a number of Plaintiffs *not party to the MPPAs* against a number of Defendants *not party to the MPPAs*. Even if the Court's reading of *Telecom International* were correct – and we believe that it is not – that would have nothing to do with the Investing Plaintiffs' fraud claims against the Coventry entities, or with the Contracting Plaintiffs' fraud claims against Coventry First LLC (the main

---

[2]    The Court also stated that Counts Four and Five suffered from Rule 9(b) pleading defects. Opinion at 17, 19. Plaintiffs respectfully disagree but have attempted in the Proposed Second Amended Complaint to alleviate potential Rule 9(b) difficulties.

operating vehicle for Defendants' dealings with Plaintiffs) and Montgomery Capital. The Opinion makes no mention of these claims.

Third, the Opinion overlooks the fact that Plaintiffs *have* identified a separate legal duty to disclose. As the opposition brief explained, the Complaint alleged that the Coventry entities owed Plaintiffs a duty of disclosure. Pl. Mem. 16-18. That duty arose either from the fiduciary relation created by the joint investment, partnership, or joint venture, or simply from the fact that the Coventry entities and their officers possessed superior knowledge even as the Plaintiffs were acting on the basis of mistaken information. Compl. ¶¶ 30-33, 38, 66, 87-89.

Fourth, Plaintiffs *have* alleged misrepresentations and omissions apart from and "collateral" to the main duty to perform under the contracts. To begin with, the Complaint alleges misrepresentations made *after* the execution of the purchase agreements relating to the New York Attorney General's investigation during a June 2006 telephone call. *Id.* ¶¶ 50-51. In the SAC, Plaintiffs have strived to give greater specificity to these allegations (*see* SAC ¶¶ 70-79). If not for the June 2006 misrepresentations, Plaintiffs would have terminated the arrangement with Defendants, and thereby saved significant sums of money. Plaintiffs have attempted to convey in the SAC (*see id.* ¶ 80) that the statements in the June 2006 call constituted misrepresentations of present facts collateral to the contract. *See First Bank of the Ams. v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 21 (1st Dep't 1999) (fraud claim predicated on post-contract representation was not duplicative of breach of contract claim) (citing *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954 (1986)); *Bd. of Managers of 411 E. 53rd St. Condo. v. Dylan Carpet, Inc.*, 582 N.Y.S.2d 1022, 1023 (1st Dep't 1992) (false statement of fact made after execution of contract was collateral to the contract).

Additionally, in documents sent to the Plaintiffs, including the Investing Plaintiffs, *before* the formation and execution of the purchase agreements, the Defendants not party to the MPPAs misrepresented existing, external facts about their products and business practices. *See* Compl. ¶¶ 27-33, 35-39, 87. These misrepresentations are clearly either "collateral" or "extraneous" to the MPPAs; the misrepresentations do not form any part of the primary performance obligation under the MPPAs, and they were made prior to the existence of the MPPAs. *See, e.g., Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 747 (2d Cir. 1979) (the fraud was collateral or extraneous to the contract because it consisted of "independent false representations, made before there ever was a contract between the parties, which led [plaintiff] to enter into it"); *see also* Pl. Mem. 15-16.

Finally, Plaintiffs are prepared to prove that at least some of them *did* suffer special damages. In the SAC, Plaintiffs have alleged the special damages that RCM and the Investing – as opposed to Contracting – Plaintiffs in particular suffered in connection with setting up the Ritchie IV arrangement and the securitization transaction. *See* SAC ¶¶ 92-94, 110, 116; *see also* Compl. ¶ 64. These damages, which are out-of-pocket expenses unrecoverable as damages for breach of contract, were a direct and proximate result of Defendants' fraud and fraudulent conduct. *See Great Earth Int'l Franchising Corp. v. Milks Dev.,* 311 F. Supp. 2d 419, 430 (S.D.N.Y. 2004) (special damages flow "directly and proximately from the fraud, rather than from the breach of contract").

### III.    Fraudulent Inducement: The Opinion Misapplied Controlling Law And Misapprehended The Claims By And Against Entities Not Party To The MPPAs

The essence of the fraud-in-the-inducement claim is that, had Plaintiffs known that the relevant representations were false, they never would have contracted with Defendants. The

Court dismissed the fraudulent inducement claim (Count Five of the Complaint) on the strength of the integration clause in the MPPAs. Opinion at 19-20. In this connection, the Court also ruled that:

> [s]ince the acts which the plaintiffs allege the fraud induced were the entry into the two agreements that Ritchie I and II executed, the [integration clause] is sufficient to bind not just the signatories but the other plaintiffs.

*Id.* at 20. This ruling overlooks three points.

First, as the Opinion recognizes (at 19), under New York law, an integration clause will bar a claim of fraudulent inducement *only* in the special case that the clause "contain[s] *explicit disclaimers of the particular representations that form the basis*" of the fraud claim. *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993) (emphasis added) (citing *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320 (1959)); *see also Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir. 1996) ("where a party specifically disclaims reliance upon a particular representation in a contract, that party cannot . . . claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon").

What the Opinion overlooks is that the integration clause in this case does not disclaim reliance on the representations that Plaintiffs have put at issue. To the contrary, it does the exact opposite: the clause states that LST "has not made any representations or warranties *other than as set forth herein*." MPPA § 7.12 (emphasis added). Plaintiffs have alleged that they were relying on (among other things) several of the very representations and warranties "set forth herein." As Plaintiffs have never disclaimed reliance on the representations in the contract, the integration clause cannot possibly bar them from claiming fraudulent inducement based on those very representations.[3]

---

[3] The Court also held as to the fraudulent inducement count that the alleged misrepresentations and omissions are "not extraneous to the contract" and should be pleaded as a breach of contract claim.

Second, the dismissal rests on the premise that the MPPAs were the only contracts alleged by Plaintiffs to be fraudulently induced. *See* Opinion at 20. But that is not true. The Complaint alleged (at ¶ 94) that the induced acts include the execution of *multiple* agreements between Plaintiffs and Defendants, not just the MPPAs, as well as the abortive Ritchie IV arrangement (*see id*. ¶ 64). Plaintiffs have attempted to make these allegations clearer in the SAC. *See* SAC ¶¶ 80, 92, 113, 115. For this reason, the Court was mistaken to conclude that the integration clause bars the fraudulent inducement claims by the Investing Plaintiffs, or any of the Plaintiffs' claims against a Defendant other than LST.

Third, a contract cannot bind a non-party (*EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)), and the Investing Plaintiffs, as well as most of the Coventry Defendants, are *not* signatories to the MPPAs. Therefore, these parties cannot possibly be affected one way or the other by the integration clause in the MPPAs. The integration clause is addressed only to information being furnished by LST to Ritchie I and Ritchie II. The Complaint, by contrast, is fairly read – and the SAC tries to make it even clearer, *see* SAC ¶¶ 53-58 – that Defendants other than LST are responsible for misrepresentations and omissions, and not just to Ritchie I and Ritchie II, but also to the Investing Plaintiffs.

### IV.    Personal Jurisdiction: The Court Overlooked That Montgomery Capital, Inc. Is Subject To Personal Jurisdiction On Any Claim, A Point Implicitly Conceded By Defendants

The Opinion states that personal jurisdiction as to Montgomery Capital, Inc. "has not sufficiently been pled . . . as to the remaining RICO claims." Opinion at 26. The Opinion does not indicate precisely what is deficient about the relevant allegations and evidentiary

---

Opinion at 21. This conclusion is incorrect for the reasons expressed above (at pp. 6-7) in relation to the fraud claim: The Complaint alleges misstatements and omissions that are plainly collateral or extraneous to the contracts. Many of Defendants' misrepresentations took place well before the formation of the agreements at issue and induced the Plaintiffs to enter into those agreements.

submissions. In any event, we submit that the Court has overlooked at least one point so incontestable that even Defendants have ceased to challenge it.

It is a completely settled matter of civil procedure that a corporation licensed to do business in New York is subject to personal jurisdiction in New York on *any* claim. Pl. Mem. 3 & n.3 (citing, *inter alia*, *Bagdon v. Phil. & Reading Coal & Iron Co.*, 217 N.Y. 432 (1916), and *M'Baye v. World Boxing Ass'n*, 429 F. Supp. 2d 652, 658 (S.D.N.Y. 2006) ("New York courts are in general agreement that a foreign corporation submits itself to the jurisdiction of New York courts when it registers to do business within this state under [N.Y. Bus. Corp. L.] § 1304")). Montgomery Capital, Inc. is such a corporation, which is undoubtedly why in the New York Attorney General action, Montgomery Capital expressly conceded that it is subject to personal jurisdiction in New York. *See id.* at 2-3. Indeed, after Plaintiffs' opposition brief called all of these points to the attention of Defendants' counsel (who did not represent Montgomery Capital in the Attorney General action), their reply brief quite pointedly *refrained from contesting* the Court's jurisdiction over Montgomery Capital. *See* Def. Reply Br. 1.

## CONCLUSION

For the foregoing reasons, the Court should reconsider its Opinion and Order of July 17, 2007, insofar as it dismisses Counts Four, Five, and Six of the Complaint without leave to amend and rules that personal jurisdiction has not been established over Defendant Montgomery Capital, Inc. The Court should grant leave to replead those claims as set forth in the attached Proposed Second Amended Complaint.

10

Respectfully submitted,


LAW OFFICES OF THOMAS P. PUCCIO

Thomas P. Puccio
230 Park Avenue
New York, NY 10169
Tel: (212) 883-6383
Fax: (212) 883-6388


ROBBINS, RUSSELL, ENGLERT,
    ORSECK & UNTEREINER LLP

By:   s/ Lawrence S. Robbins
        Lawrence S. Robbins (LR-8917)
        Gary A. Orseck
        Rachel S. Li Wai Suen
        Daniel R. Walfish
1801 K Street, N.W. Suite 411L
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510

*Counsel for Plaintiffs*


Dated: August 24, 2007

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RITCHIE CAPITAL MANAGEMENT, L.L.C., RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED, RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND) II, LIMITED, WALKERS SPV LIMITED, as trustee for Ritchie Risk-Linked Life Strategies Trust I and Ritchie Life Strategies Master Trust, and RITCHIE RISK-LINKED STRATEGIES TRADING, LTD., | 07 Civ. 3494 (DLC)<br><br>ECF Case |
| Plaintiffs, | **[PROPOSED] SECOND AMENDED COMPLAINT** |
| v. | |
| COVENTRY FIRST LLC, THE COVENTRY GROUP, INC., MONTGOMERY CAPITAL, INC., LST I LLC, ALAN BUERGER, CONSTANCE BUERGER, REID S. BUERGER, ANTONIO MUNIZ, ALEX SELDIN, NEAL JACOBS, EILEEN SHOVLIN, and JIM DODARO, | |
| Defendants. | |

Plaintiffs, through their attorneys, for their Second Amended Complaint against

Defendants allege as follows:

## NATURE OF THE ACTION

1.    This is an action under the federal Racketeer Influenced and Corrupt

Organizations Act ("RICO"), and for fraud, fraudulent inducement, breach of fiduciary

duty, and breach of contract. It is brought to recover damages caused to Plaintiffs by

Defendants' pervasive fraud in the "life settlements" industry – that is, the secondary

market for life insurance policies. In a life settlement transaction, an investor buys a life

insurance policy from the policy's owner at a discount, pays the policy's premiums as

they come due, and then collects the death benefits. Coventry First LLC is a major player in the life settlement industry, but its bid-rigging and fraud have resulted in civil proceedings by the New York Attorney General and the Florida Office of Insurance Regulation against itself and its affiliates.

2.      Defendants Coventry First LLC ("Coventry First") and LST I LLC ("LST") are owned by Defendant Montgomery Capital, Inc. ("Montgomery Capital") and affiliated with Defendant The Coventry Group, Inc. (all four entities, together with affiliates, to be referred to collectively as "Coventry"). Coventry First is the main operating subsidiary for Coventry's activities in the life settlement field. Montgomery Capital is a holding company, and LST is a special-purpose vehicle that serves an alter ego for Montgomery Capital and Coventry First.

3.      Coventry is owned and controlled by the Buerger family, which includes Defendants Alan Buerger, Constance Buerger, and Reid S. Buerger. Defendant Antonio Muniz is the chief financial officer of Coventry First and Montgomery Capital. The other individual defendants are or were executives and employees of Coventry First. Many if not all of these defendants, as well as Coventry's employees generally, held themselves out in emails and otherwise as representing "Coventry" rather than any particular entity or entities in the Coventry corporate family.

4.      Ritchie Capital Management, L.L.C. ("RCM"), as adviser and fiduciary to (as well as holder of pecuniary interests in the value of) Ritchie Risk-Linked Life Strategies Trust I, Ritchie Life Strategies Master Trust, and Ritchie Risk-Linked Strategies Trading, Ltd. (all three entities collectively, the "Investing Plaintiffs"), caused the Investing Plaintiffs to become de facto equity shareholders in Plaintiffs Ritchie Risk-

Linked Strategies Trading (Ireland), Limited ("Ritchie I") and Ritchie Risk-Linked Strategies Trading (Ireland) II, Limited ("Ritchie II").

5.      Coventry (through a shell company known as Sandy Run Ltd.) also became a de facto equity shareholder in Ritchie I and Ritchie II. (Sandy Run is a mere alter ego, agency, and instrumentality of Montgomery Capital and the Coventry corporate family. The affairs of Sandy Run are completely dominated by Montgomery Capital and the Coventry corporate family. On information and belief, Sandy Run's officers and directors all are officers and directors of Coventry First and Montgomery Capital. Sandy Run conducts no business of its own but is merely a vehicle for holding the subordinated securities of Ritchie I and Ritchie II.)

6.      Ritchie I and Ritchie II (collectively, the "Contracting Plaintiffs") each entered into a contract with the Coventry alter ego LST to purchase life insurance policies that Coventry First had acquired on the open market. These contracts – which were only one set out of a large number of contracts governing the relationship between the sides – were known as Master Policy Purchase Agreements, or "MPPAs."

7.      Coventry and the Investing Plaintiffs intended all along that the Contracting Plaintiffs would re-sell the life insurance products at a profit in a securitization transaction.

8.      The Investing Plaintiffs and Coventry, therefore, were carrying on, as the co-owners of Ritchie I and Ritchie II, in an arrangement in which profits and losses would be shared. The Investing Plaintiffs contributed the majority of the financing, while Coventry contributed the majority of the effort and expertise.

9.      Defendants, however, concealed from Plaintiffs that Coventry First was systematically defrauding the owners of the policies, and then further deceived Plaintiffs as to the existence of an investigation by the Attorney General of New York into Defendants' misconduct. Coventry First and its officers, moreover, falsely represented on numerous occasions that Coventry was in compliance with all applicable laws and regulations.

10.     After deceiving Plaintiffs as to the New York Attorney General's investigation, Defendant Reid Buerger repeatedly invoked the Fifth Amendment when questioned in September 2006 about the illegal acts that Coventry had committed in relation to its acquisition of life insurance products from sellers.

11.     Coventry's misconduct has damaged Plaintiffs, as described herein.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Plaintiffs bring claims under RICO, 18 U.S.C. § 1962. The Court has supplemental jurisdiction over the Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a). In the alternative, the Court has original subject matter jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1332(a). While Plaintiffs cannot yet calculate their damages with precision, it is likely at least 700 million dollars.

13.     The Court has personal jurisdiction over Defendants because: (1) Defendants regularly transact business in New York and have entered into contracts with Plaintiffs in New York; (2) Defendants have committed tortious acts within New York; (3) Defendants have committed tortious acts outside New York causing injury to Plaintiffs and others in New York as set forth in this complaint, and regularly do business

and derive substantial revenue from services rendered in New York, and expect or should reasonably expect their acts to have consequences in New York. Defendants derive substantial revenue from interstate commerce.

14.     Coventry First and LST submitted in a series of agreements with Plaintiffs to the jurisdiction of the courts sitting in the State of New York for purposes of disputes arising out of their relationship with Plaintiffs.

15.     Defendant Montgomery Capital, Inc. is subject to general personal jurisdiction in New York because it is licensed to do business in New York under Section 1304 of the New York Business Corporation Law. Indeed, Montgomery Capital explicitly conceded in an action brought by the New York Attorney General that "Montgomery Capital is subject to personal jurisdiction in New York."

16.     Defendant The Coventry Group, Inc. receives a substantial portion of the operating income of Coventry First and is under common control with the other Coventry entities. The Coventry Group, Inc. also facilitated Coventry First's misconduct in the marketplace. In particular, The Coventry Group, Inc. assisted Coventry First in its purchases by converting term life policies to universal life insurance, receiving fees from Coventry First in the process.

17.     Discussions between Coventry and representatives of RCM situated in New York began in March 2005. From March 2005 until November 2006, Coventry employees and executives frequently communicated by email and telephone with RCM employees in New York. Among the Coventry executives who frequently placed telephone calls and sent emails to RCM's New York employees were Alan Buerger, Reid Buerger, Antonio Muniz, and Alex Seldin.

18.     Each of the individual defendants has responsibility either for the overall management of Coventry or for Coventry First's acquisition of life insurance policies. These defendants bought hundreds, if not thousands, of life insurance policies – including, on information and belief, policies procured by fraud and bid-rigging, as alleged herein – from New York sellers. These defendants also purchased numerous policies through New York brokers, and communicated and negotiated with brokers in New York in connection with those purchases.

19.     The individual defendants had knowledge of, and control over, Coventry First's purchases of policies in New York. For instance, Neal Jacobs, Jim Dodaro, and Eileen Shovlin negotiated on behalf of Coventry First with brokers in New York for the purchase of policies. All purchases were approved by Reid Buerger.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and 1965(a). In the alternative, venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2). Coventry waived any objection to venue in this Court in a series of agreements with Plaintiffs.

## THE PARTIES

21.     Plaintiff RCM is a limited liability company with its principal place of business in Lisle, Illinois. Its members are citizens of Illinois, Wyoming, Utah, and Arizona.

22.     Plaintiffs Ritchie I and Ritchie II are Irish corporations with offices in Ireland.

23.     Plaintiff Walkers, a Cayman Islands company with its principal place of business in the Cayman Islands, is sole trustee of Ritchie Trust I and Ritchie Master

Trust, each of which is a class of Ritchie Risk-Linked Strategies Series Trust, a Cayman Islands unit trust.

24.    Plaintiff Ritchie Risk-Linked is a Bermudan limited company with its principal place of business in Bermuda.

25.    Defendant Coventry First is a limited liability company with its principal place of business in Fort Washington, Pennsylvania. Coventry First's sole member is Montgomery Capital. The officers of Coventry First include Alan Buerger, CEO and Treasurer; Constance Buerger, President and Secretary; and Reid S. Buerger, Vice President.

26.    Defendant Montgomery Capital is a Delaware corporation with its principal place of business in Fort Washington, Pennsylvania. The shareholders of Montgomery Capital are Alan Buerger, Constance Buerger, Reid S. Buerger, and the Reid S. Buerger Trust. The officers of Montgomery Capital include Alan Buerger, Constance Buerger, and Reid Buerger.

27.    Defendant The Coventry Group, Inc. is a Pennsylvania corporation with its principal place of business in Fort Washington, Pennsylvania. Its shareholders are Alan and Constance Buerger. Its officers include Alan Buerger, President, and Constance Buerger, Treasurer and Vice President.

28.    Defendant LST is a Delaware limited liability company. It is a wholly-owned subsidiary of Montgomery Capital, which is its sole member. LST's chief executive officer is Alan Buerger.

29.    LST is a mere alter ego, agency, and instrumentality of Montgomery Capital and the Coventry corporate family. The affairs of LST are completely dominated

by Montgomery Capital and the Coventry corporate family. On information and belief, LST – the name of which is believed to stand for "Life Settlement Transfers" – has no assets of its own, and its officers and directors all are officers and directors of Coventry First and Montgomery Capital. LST conducts no business of its own but was merely a conduit for Coventry's sale of life insurance policies to Ritchie I and Ritchie II.

30.    Defendants Alan Buerger, Constance Buerger, and Reid S. Buerger are individuals residing in Pennsylvania. They own and control Coventry. Reid Buerger is the son of Alan Buerger, the founder and chief executive of the Coventry group. Constance Buerger, Alan Buerger's wife and Reid Buerger's step-mother, is president of Coventry First and chief operating officer of the Coventry group.

31.    Defendant Antonio Muniz has served as chief financial officer of Coventry First and of Montgomery Capital since 2003. On information and belief, he is a resident of Pennsylvania.

32.    Defendant Alex Seldin is General Counsel of Coventry. On information and belief, he is a resident of Pennsylvania.

33.    Defendant Neal Jacobs is Coventry's Director of Financial Underwriting. On information and belief, he is a resident of Pennsylvania.

34.    Defendant Jim Dodaro is Coventry's Vice President of Financial Underwriting. On information and belief, he is a resident of Pennsylvania.

35.    Eileen Shovlin is a Coventry Regional Vice President. On information and belief, she is a resident of Pennsylvania.

## BACKGROUND: THE SECONDARY MARKET FOR LIFE INSURANCE

36.     The life insurance policies at issue in this case insured persons, typically wealthy individuals 65 years of age and older, who have determined that they prefer (a) an immediate, lump-sum payment to (b) a payment to their beneficiaries when they die, along with the ongoing expense of premium payments. In a typical situation, a policy owner's children have become financially independent, or the policy was purchased by a corporation that hired the insured as an executive but for which the insured no longer works.

37.     The life settlement payment will be more than the "surrender value" of the policy – the contractual price at which a policy owner can return the policy to the insurance company that issued it – but less than the death benefit. The buyer of the policy continues to pay premiums until the insured's death, at which point the buyer claims the death benefit. Thus the investor is wagering that the value of the future death benefit will exceed the life settlement payment and the costs of paying premiums until the insured's death.

38.     An insured can enter into a life settlement transaction in one of two ways. First, the insured (typically through a representative such as a financial advisor or planner, insurance agent, accountant, or attorney) might hire a life settlement broker to mount the equivalent of an auction, collecting bids on the policy from buyers (or from other brokers who in turn represent buyers). Second, the insured (again through a representative) might make direct contact with a buyer.

39.     Coventry First, together with any subsidiaries and affiliates, is one such buyer. Its work force includes persons with deep experience in the life insurance industry.

40.     Coventry First is a leading player in the secondary market for life insurance policies. It entered that market as a buyer in 2001, purchasing 436 policies representing $720 million in total death benefits in 2002. By 2005, Coventry First or its affiliates had purchased 1,318 life insurance policies representing more than $3 billion in death benefits.

41.     Coventry sells the policies that it purchases to institutional investors. Such investors have included the American International Group ("AIG"), Citigroup, Berkshire Hathaway, and the Ritchie group.

## DEFENDANTS' ILLEGAL CONDUCT

### A.    Coventry Partners With Ritchie

42.     Beginning in 2005, the Ritchie group began negotiating with Defendants an arrangement under which Ritchie would partner with Coventry for the purpose of investing in life insurance products and then re-selling them at a future point through a securitization transaction.

43.     In the spring and summer of 2005 and afterwards, Alan Buerger, Reid Buerger, Constance Buerger, and Antonio Muniz, in connection with the negotiations with the Ritchie group, represented to RCM (and in particular to John ("Jeff") Mulholland, Duncan Goldie-Morrison, and Thane Ritchie) that the life insurance policies in which Coventry First transacts have no legal taint and that Coventry purchases policies and otherwise conducts itself in accordance with law.

44.    Rounds of negotiations were concluded in June 2005, September 2005, December 2005, and June 2006. Each round culminated in the commitment by the Investing Plaintiffs of additional capital.

45.    The purchasers of the policies were Plaintiffs Ritchie I and Ritchie II. The Investing Plaintiffs and Coventry jointly committed capital to, and became owners of subordinated securities in, Ritchie I and Ritchie II, which entitled the Investing Plaintiffs and Coventry pursuant to a set of Intercreditor Agreements, among other instruments, to receive the profits of Ritchie I and Ritchie II after other debts have been paid.

46.    The Ritchie group was a partner, joint venturer, and co-venturer of Coventry. While the Investing Plaintiffs contributed the great majority of the financing to the partnership and venture, Coventry's specialty was in analyzing and servicing life insurance policies.

47.    Plaintiffs relied at all times on Defendants' expertise, as well as their honesty and integrity. It was Coventry's responsibility to seek out and purchase individual policies that met certain pre-defined criteria that the parties had agreed on. Each month, pursuant to an elaborate series of contracts, Coventry would notify Ritchie I and Ritchie II that Coventry had a certain dollar amount's worth of qualifying policies to sell. Ritchie I and Ritchie II then would pay the necessary funds to Coventry, which would transfer the policies to Plaintiffs.

48.    It was, moreover, Coventry's responsibility to service the policies, including, among other things, tracking premium payments and claims for death benefits from the issuing life insurance companies, determining when a claim for a death benefit could be made and placing the claim, monitoring the health of the insureds, and

maintaining current information on the issuing life insurance companies. These obligations are set forth in Servicing and Monitoring Agreements between, on the one hand, the Contracting Plaintiffs, and on the other, Coventry First.

49.    Day-to-day administration of the policies, in other words, was in the hands of Coventry. Ritchie I and Ritchie II had only to send to a third-party intermediary a check for the total premium payments due each month, and Coventry First directed the intermediary to disburse the appropriate amounts to each issuing life insurance company.

50.    Coventry also assumed responsibility for helping to market the life insurance policies for resale. In the MPPAs, not just LST but all of its "Affiliates" – in other words, the entire Coventry corporate family – promised "to cooperate with [the Contracting Plaintiffs] "to remarket and sell, transfer, convey or assign [the policies]." See Exhibit B to the MPPAs.

51.    And in a set of Investment Administration and Servicing Agreements, a Coventry affiliate named Montgomery Limited agreed to "give advice and make recommendations to the [Contracting Plaintiffs] concerning "(i) the identification of potential purchasers of . . . life insurance policies . . . (ii) the value and marketability of its portfolio of life settlement policies or of individual policies or groups of policies, (iii) the selection of . . . intermediaries by or through whom such transactions might be executed or carried out," as well as the securitization of the policies.

52.    Montgomery Limited is a mere alter ego, agency, and instrumentality of Montgomery Capital and the Coventry corporate family. The affairs of Montgomery Limited are completely dominated by Montgomery Capital and the Coventry corporate family. On information and belief, Montgomery Limited's officers and directors all are

officers and directors of Coventry First and Montgomery Capital. Montgomery Limited on information and belief conducts no business of its own but is merely a vehicle for Coventry's provision of advice on the resale of the policies.

53.    Plaintiffs, especially the Investing Plaintiffs, reposed their trust and confidence in Defendants, who were in a position of superior knowledge and information with respect to the purchase of the policies. Plaintiffs were not involved in the purchase of the policies from the insureds and had no information about what the insureds were told and what they knew in connection with the sale of their policies.

54.    Plaintiffs had no reason to believe that Defendants were engaging in misconduct in the purchase of the policies, much less that Coventry First was under investigation for that misconduct. Plaintiffs, acting through RCM, had conducted due diligence on Defendants and relied on them precisely because they had a reputation for integrity in the life settlements industry and projected an image of cleanliness. The Coventry executives with whom Plaintiffs dealt – in particular Defendants Reid Buerger, Antonio Muniz, and Alan Buerger – appeared to be legitimate businessmen and frequently assured RCM (as representative of the Investing Plaintiffs) that Coventry, unlike some of its competitors, was scrupulous about complying with regulatory requirements.

55.    In drafts of an MPPA between Ritchie I and LST sent by email on, among other occasions, June 20, 24, and 30, 2005, to, among others, John (Jeff) Mulholland of RCM (which was acting as the representative of the Investing Plaintiffs), Coventry First represented that:

> (a) "The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof will not violate any

United States federal, state or local law or regulation, violate, result in the breach of any terms and provisions of, nor constitute an event of default under, the certificate of formation or the operating agreement of the Seller, or violate or breach any of the terms or provisions of, or constitute an event of default under, any agreement to which the Seller is a party or by which it shall be bound; nor violate any order, judgment or decree applicable to the Seller of any United States federal or state court, regulatory body, administrative agency or other United States federal or state government instrumentality having jurisdiction over the Seller or its properties."

(b) "There is no action, suit or proceeding before or by any court, regulatory body, administrative agency or other governmental agency or body . . . now pending, or to the Seller's knowledge, threatened, against or affecting the Seller or its assets or properties: . . . seeking to prevent the consummation of any of the transactions contemplated by this Agreement, or . . . seeking any determination or ruling that might materially and adversely [a]ffect the performance by the Seller of its obligations under, or the validity and enforceability of, this Agreement."

(c) "With respect to each Life Settlement Policy: . . . Prior to the transfer of each Life Settlement Policy to [Ritchie I], the Seller shall have taken all action under applicable law in each relevant jurisdiction in order to protect and perfect the ownership of the Seller in such policy . . . ."

(d) "All Life Settlement Policies the purchases of which are being funded . . . have been (A) Originated by the Seller or an Affiliate of the Seller in one or more transactions that in all material respects were in accordance with and in compliance with all applicable United States federal, state and local laws, rules and regulations applicable to life settlement transactions and the purchase and resale of life insurance policies, or (B) purchased from an unaffiliated third party in one or more transactions that, to the Seller's knowledge, were in accordance with and in compliance with, in all material respects, all applicable United States federal, state and local laws, rules and regulations applicable to the purchase of life insurance policies from third persons that are not the Original Sellers."

56.    These drafts culminated in an MPPA between Ritchie I and LST for the sale of policies. The amended and restated version of that contract, dated as of September 8, 2005 (the "Ritchie I Policy Purchase Agreement") was signed for Coventry by Alex

Seldin. In this document, Coventry First and Montgomery Capital (acting through its alter ego LST) made representations substantially identical to those referred to in paragraph 55 above.

57. In drafts of an MPPA between Ritchie II and LST sent by email on, among other occasions, December 7, 2005, to, among others, John (Jeff) Mulholland of RCM (which was acting as the representative of the Investing Plaintiffs), Coventry First made representations substantially identical to those referred to in paragraph 55 above.

58. These drafts culminated in an MPPA between Ritchie II and LST dated as of December 15, 2005 (the "Ritchie II Policy Purchase Agreement"), and signed for Coventry by Alex Seldin. In this document, Coventry First and Montgomery Capital (acting through its alter ego LST) made representations identical to those made in the Ritchie I Policy Purchase Agreement.

**B.    Defendants' Fraud**

59. In fact, however, Defendants were engaged in pervasive fraud. The fraud was three-fold: first, Defendants systematically defrauded the insureds from whom Coventry First purchased policies; second, Defendants defrauded Plaintiffs in concealing from them the dishonest and unlawful conduct; and third, Defendants defrauded Plaintiffs in concealing from them that Coventry First was under investigation by the Attorney General of New York.

**Defendants' Fraud Against Sellers of Policies**

60. Coventry First's fraud against those from whom it purchased policies took two general forms. First, when life settlement brokers pretended to conduct auctions, Coventry First would pay the brokers undisclosed fees not to relay or otherwise act on

offers from Coventry First's competitors. Second, Coventry First would provide brokers with a "gross offer" – a lump sum to be divided between a broker and policy owner with the seller never learning the amount of the sum and therefore the amount retained by the broker – and then falsify documentation in order to conceal from the seller part or all of the broker's compensation.

61.    Following are some illustrative examples, taken from the complaint filed by the Attorney General of New York in October 2006, of the first category of fraud against those from whom Coventry First purchased policies.

(a)    In 2003, a 79-year-old living in Hawaii decided to sell his $400,000 life insurance policy. He sold the policy to Coventry First on April 16, 2003 for $102,000, of which he received $78,000 and a broker received $24,000. But another broker, Life Settlement Alliance ("LSA"), had a better offer, for $108,000, from another buyer. Coventry First paid $12,000 to LSA not to present the higher bid, and never disclosed the fee to the seller of the policy. In September 2006, Reid Buerger invoked the Fifth Amendment when asked by the New York Attorney General whether he approved the payment to LSA in exchange for LSA to sit on a better offer.

(b)    A family trust hired a broker to put on the market a $4.9 million policy insuring an 80-year-old woman. The broker solicited bids from Coventry First and from AllSettled, a broker. In September 2004, Coventry First submitted an offer of $705,000 and learned the next month of a competing offer for $880,000 submitted by AllSettled. Neal Jacobs, Coventry First's Director of Financial Underwriting, contacted AllSettled's President Michael Krasnerman to work out a deal, and Krasnerman requested a 1.5% payoff to step aside. Coventry First and AllSettled eventually agreed

that Coventry First would pay $49,000, or 1% of the death benefit, and in exchange AllSettled would stand down. An email from Jacobs to Krasnerman on November 2, 2004 stated: "for [insured's initials], the number is 49." On November 11, 2004, Lenore Saracino, a vice president at AllSettled, wrote a note: "Close file[.] Have a co-brokering fee with Coventry." On December 28, 2004, the trust received $800,000, of which $142,500 went to the broker.

        (c)     In late 2004, Coventry First offered a broker $3.1 million for a policy with a $10 million death benefit. The policy insured a 79-year-old man from New Jersey and was owned by a family member. Near the end of the bidding process, AllSettled's Saracino forwarded a competing offer of $3,525,000 to Coventry's Jacobs, who forwarded it to Reid Buerger. Rather than compete with AllSettled, Coventry First entered into a side deal under which AllSettled would receive $200,000 in exchange for not presenting the higher offer. Jacobs sent AllSettled's Krasnerman an email on December 16, 2004 stating "number is 200" and then followed up with an email to Coventry First's accounting department: "[AllSettled is] now co-broker for $200K." The purchase closed on December 28, 2004 with Coventry First paying $3.1 million, of which the seller's broker received $153,053 and the seller received the remainder without ever learning of the better offer.

        62.     The foregoing are merely illustrative examples. The New York Attorney General's complaint (attached hereto as Exhibit A) sets forth many more examples of bid-rigging – in connection with a number of which Reid Buerger invoked the Fifth Amendment – and notes (at paragraph 46) that beyond those, the Attorney General's office "has revealed literally dozens of other examples of bid rigging by Coventry and

Brokers." Plaintiffs hereby incorporate by reference paragraphs 27 to 45 of the New York Attorney General's complaint as if fully set forth herein.

63.    The Florida Office of Insurance Regulation ("FOIR") also has uncovered numerous instances of bid-rigging, bribery, and fraud. The FOIR's charging document (attached hereto as Exhibit B) accuses Coventry First of violating the Florida Insurance Code and orders Coventry First to show cause why its license for providing life settlements should not be suspended or revoked. Paragraphs 10 to 31 of the FOIR notice are hereby incorporated by reference.

64.    The second type of fraud against those from whom Coventry purchased policies involved the allocation of payments as between policy sellers and their brokers. As the New York Attorney General's complaint explains, brokers, with the knowledge and assistance of Coventry First, frequently concealed from policy sellers the gross payment from Coventry First – and thus concealed as well the amount of their compensation.

65.    In some states – including Arkansas, Florida, Indiana, Kansas, Kentucky, Nebraska, Nevada, North Carolina, North Dakota, Ohio, Pennsylvania, Tennessee, and Utah – buyers of life insurance policies are required to disclose to sellers the amount of the broker's compensation. In other states, there is no such requirement. In both types of states, however, Coventry First presented sellers with false documentation.

66.    For example, in one case Coventry First purchased a policy insuring an 80-year-old man in New York. The seller of the policy received $317,000, the primary broker received $11,250, and another broker received $3,750. On July 27, 2004 Coventry First sent offer sheets to the brokers reflecting this compensation. The brokers signed and

returned the sheets to Coventry First, and that ended the bidding process. But later an advisor of the seller inquired of the first broker how much compensation the broker had or would receive. At the broker's request, Coventry First supplied falsified offer sheets making it appear as if the first broker had received only $1,250 in compensation instead of the $11,250 he actually received. On August 31, 2004 Coventry First emailed the falsified offer sheets to the second broker for his signature. The second broker signed and returned the new offer sheets on September 2, 2004.

67.    In another case involving a policy insuring an 87-year-old man from Nevada, Coventry First agreed to pay $42,000 in broker compensation: $21,000 to LSA and $21,000 to a brokerage known as Advanced. A Coventry First vice president named Jim Dodaro emailed Reid Buerger and others at Coventry on December 22, 2004 to suggest that they falsify the disclosure forms attached to the purchase agreement: "Total comp is 42K to LSA (they were paying Advanced 21K of it). Looks like we have to do a new Ex A disclosing comp. Can we lower the gross offer by 22K, put 20K comp on the Ex A, defer 1K to LSA and pay 21K to Advance as a co-broker?" Following Dodaro's suggestion, Coventry First disclosed only $20,000 on the "Exhibit A" disclosure form attached to the purchase agreement. The remaining $22,000 was paid to the brokers as a co-broker payment and deferred compensation but was never disclosed to the seller. In September 2006, Reid Buerger invoked the Fifth Amendment when asked why he agreed to alter the Exhibit A.

### Defendants' Fraud Against Plaintiffs

68.    Defendants deceived Plaintiffs as to Defendants' practices in the purchase of life insurance policies. Plaintiffs knew nothing of, and in fact had no reason to know

of, Defendants' systemic misconduct. Plaintiffs learned of the misconduct only when the Attorney General of New York brought suit against Coventry in October 2006.

69.     Defendants also deceived Plaintiffs as to the existence and target of the Attorney General's investigation. Defendants first of all failed to disclose to Plaintiffs that an investigation of Coventry was under way. Plaintiffs learned of the investigation from the Attorney General's lawsuit. In fact, the investigation began in or about June 2005, and Defendants, on information and belief, knew of it no later than August 2006 and quite possibly earlier. Defendants had a duty to disclose the investigation.

70.     Coventry First received a subpoena requesting documents from the New York Attorney General in early March 2006 but Defendants did not disclose the subpoena to Plaintiffs until a set of telephone conferences in June 2006.

71.     Reid Buerger and Alan Buerger subsequently stated to Mulholland of RCM (which represented the Investing Plaintiffs), among others, that Coventry had received no subpoenas since an earlier one in 2005 relating to the New York Attorney General's investigation of AIG and its accounting practices.

72.     Even in June 2006, Coventry did not describe the subpoena or the risks associated with it fully and accurately. Defendants, however, once they chose to speak had a duty to speak completely and truthfully about the investigation and the likely consequences of it.

73.     On June 22, 2006 Alan Buerger disclosed to Mulholland of RCM that Coventry had in fact received a subpoena in March 2006, but represented that the focus and target of the New York Attorney General's investigation were life settlement brokers, and in particular NFP, rather than Coventry. (NFP is "National Financial Partners," a

network of financial planners that, according to a June 12, 2006 article in TheStreet.com, was being investigated by the New York Attorney General. NFP owns a brokerage specializing in life settlements. On information and belief, some of NFP's members had worked with Coventry First on the sale of life insurance policies.)

74.     On June 22, 2006, Alan Buerger emailed to Mulholland the article from TheStreet.com. Buerger, in sending Mulholland the article, adopted the statements in the article as his own, and thereby made misleading statements. Buerger deliberately led Mulholland to believe that the New York Attorney General was interested only in NFP, and that Coventry First had nothing to do with the practices being investigated by the New York Attorney General. Buerger had a duty to disclose that not just NFP, but also Coventry, was under investigation and engaged in the practices targeted by the New York Attorney General.

75.     On June 26, 2006, Alex Seldin, speaking on behalf of Coventry First and Montgomery Capital, stated in a telephone conference to Mulholland from RCM, among others, that there was "no action or investigation or anything against Coventry." Participants in the June 26, 2006 call included, in addition to Seldin and Mulholland, Coventry's outside counsel Dan Passage and RCM's outside and in-house counsel.

76.     On June 27, 2006, Coventry's outside counsel Brian Brooks, speaking on behalf of Coventry First and Montgomery Capital, stated in a telephone conference to Mulholland from RCM, among others, that "NFP was widely seen as the target" of the New York Attorney General's investigation and that Coventry was merely "a source of information."

21

77.     Speaking through Brooks, Coventry First and Montgomery Capital also stated to Mulholland from RCM, among others, that the focus of the Attorney General's request was compensation arrangements between providers and brokers, as well as disclosure to sellers; that one question on the subpoena asked whether Coventry had paid fees to brokers to provide non-competitive bids; and that the Attorney General was looking for bid-rigging.

78.     Through counsel, Coventry First and Montgomery Capital stated as well that a "substantially completed" review of Coventry's emails had not revealed "anything like what [the New York Attorney General had previously] alleged against carriers" – that is, "fictitious bids to suppress competition." Participants in the June 27, 2006 call included, in addition to Mulholland and Brooks, RCM's outside and in-house counsel.

79.     These disclosures about the subpoena – which were separate from and collateral to any contract with any Plaintiff – were false and misleading, because, among other reasons, Alan Buerger, Reid Buerger, Coventry First, and Montgomery Capital failed to disclose that Coventry First was engaged in precisely the conduct targeted by the subpoena, and indeed affirmatively implied the opposite.

80.     After the communications with Coventry in June 2006, the Plaintiffs, relying on the above misrepresentations, continued to purchase policies from Coventry, and the Investing Plaintiffs entered into the Ritchie IV arrangement, defined and described in paragraph 92 below.

## THE PATTERN OF UNLAWFUL RACKETEERING ACTIVITY

81.     As described in the preceding paragraphs, the Defendants conspired with one another to defraud the Plaintiffs and the policy owners from whom Coventry First

purchased life insurance policies. The Defendants participated in numerous racketeering activities in order to accomplish the purposes of their fraudulent scheme, namely, to induce policy owners to sell their policies in an unfairly rigged bidding process and to induce institutional investors, such as Plaintiffs, to partner with Defendants to obtain those policies.

82.    As part of the scheme to defraud, Defendants conspired together to devise and participate in a plan of deception, whereby they would and did use false and fraudulent pretenses, representations, promises, and statements calculated to deceive persons of ordinary prudence and due care and make material nondisclosures and concealment of fact and information essential to policy owners in deciding whether and for how much to sell their policies, and essential to institutional investors in deciding whether and on what terms to partner with Coventry in the secondary life insurance market.

83.    Thus, Defendants unlawfully, intentionally, and willfully, and with the intent to defraud, that is, knowingly and with specific intent to deceive in order to cause financial gain, procured or caused Coventry First to procure life insurance policies, and sold or caused Coventry to sell those policies to institutional investors to the detriment of such investors, including Plaintiffs.

84.    In carrying out the scheme to defraud policy owners and Plaintiffs, Defendants engaged in conduct in violation of the federal laws, including mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, as set forth below.

(a)    Defendants have engaged in a scheme or artifice to defraud in which they have fraudulently and with fraudulent intent obtained life insurance policies and fraudulently induced institutional investors to purchase those policies from Defendants. This scheme entailed bid-rigging, bribery, and the falsification of documents pertaining to purchases of life insurance policies from policy owners. The scheme also included concealing from Plaintiffs both that conduct and the New York Attorney General's investigation into that conduct.

(b)    Defendants' fraud was material, in that it influenced whether and at what price policy owners sold life insurance policies to Defendants. Defendants' fraud likewise influenced whether and on what terms Plaintiffs agreed to invest with Defendants in life insurance policies.

(c)    Defendants through their fraudulent scheme obtained property from policy owners and from Plaintiffs. From policy owners, Defendants obtained life insurance policies. From Plaintiffs, Defendants obtained payment for life insurance policies, and therefore a profit, because Plaintiffs paid Defendants more for each policy than Defendant had paid for it.

(d)    Defendants' fraudulent scheme was furthered by numerous uses of interstate wires and mail, some of which are described below.

(e)     Neal Jacobs's e-mail message to Michael Krasnerman on November 2, 2004, described in paragraph 61(b) of this complaint and paragraph 30 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(f)     Neal Jacobs's e-mail message to Michael Krasnerman on December 16, 2004, described in paragraph 61(c) of this complaint and paragraph 32 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(g)     The e-mailing of falsified offer sheets on August 31, 2004, described in paragraph 66 of this complaint and paragraph 62 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(h)     Jim Dodaro's e-mail message to Reid Buerger on December 22, 2004, described in paragraph 67 of this complaint and paragraph 64 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

25

(i)    Jim Dodaro's e-mail message to Reid Buerger on March 5, 2003, described in paragraph 28 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(j)    Reid Buerger's e-mail message to Jim Dodaro on or about November 18, 2004, described in paragraph 33 of the New York Attorney General's complaint, in which Reid Buerger approved a co-broker payment to the East Coast Settlement Company, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(k)    Each and every e-mail message sent by Jim Dodaro described in paragraphs 37 to 39 of the New York Attorney General's complaint violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(l)    Jim Dodaro's e-mail message to Coventry's accountant on May 5, 2005, described in paragraph 40 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(m)    Jim Dodaro's e-mail message to Eileen Shovlin on July 20, 2005, described in paragraph 43 of the New York Attorney General's

complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(n)    Eileen Shovlin's e-mail message to Jim Dodaro on July 20, 2005, described in paragraph 43 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(o)    Jim Dodaro's e-mail message to Neal Jacobs on February 8, 2005, described in paragraph 44 of the New York Attorney General's complaint, violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

(p)    The "co-broker" payments discussed in paragraphs 42 to 47 of this complaint and paragraphs 27 to 45 of the New York Attorney General's complaint, as well as other such payments not specifically enumerated in the complaints, were made in furtherance of Defendants' fraudulent scheme. To the extent that any of those "co-broker" payments were made by interstate wires or mail, defendants violated 18 U.S.C. § 1343 and 18 U.S.C. § 1341, respectively. Each violation of these statutes is a predicate act of racketeering.

(q)     The purchase agreements relating to the transactions described in paragraphs 61 to 67 of this complaint or paragraphs 27 to 45 of the New York Attorney General's complaint, as well as other such purchase agreements not specifically enumerated in the complaints, made material misrepresentations and/or omissions of fact in furtherance of Defendants' fraudulent scheme. In particular, the purchase agreements did not disclose to policy holders that Defendants had fraudulently influenced the purchase of their life insurance policies through tactics such as bid-rigging and co-broker payments. To the extent that any of those purchase agreements were transmitted by interstate wires or mail, defendants violated 18 U.S.C. § 1343 and 18 U.S.C. § 1341, respectively. Each violation of these statutes is a predicate act of racketeering.

(r)     In the negotiations that culminated in. among other things, the Ritchie I Policy Purchase Agreement and the Ritchie II Policy Purchase Agreement, as well as in the negotiations that culminated in the Ritchie IV arrangement (described and defined in paragraph 92 below), Alex Seldin, Reid Buerger, and Antonio Muniz transmitted or caused to be transmitted over email documents containing the statements set forth in paragraphs 55 to 58 above. The transmission of these statements violated the federal wire

fraud statute (18 U.S.C. § 1343) and constitutes predicate acts of racketeering under 18 U.S.C. § 1961(b).

(s)    During the interstate telephone conferences occurring in or about June 2006, as described in paragraphs 70-79 of this complaint, Alex Seldin, Montgomery Capital, and Coventry First acted in furtherance of Defendants' fraudulent scheme by misrepresenting to Plaintiffs their own activities and the nature of the New York Attorney General's investigation. These misrepresentations violated the federal wire fraud statute (18 U.S.C. § 1343) and constitutes a predicate act of racketeering under 18 U.S.C. § 1961(b).

85.    This enumeration of predicate acts of racketeering is not exhaustive. As explained in the New York Attorney General's complaint, Defendants used interstate wires and mail on numerous other occasions in furtherance of their fraudulent scheme.

**DAMAGE TO PLAINTIFFS CAUSED BY DEFENDANTS' ILLEGAL CONDUCT**

86.    Ritchie I and Ritchie II own the life insurance policies at issue. The market value of those policies has greatly diminished since the New York Attorney General's action was commenced.

87.    Each of the plaintiffs anticipated a profit from the planned sale of the policies in a securitization transaction. For purposes of completing the securitization transaction, RCM and the Investing Plaintiffs, with the support and encouragement of Coventry, had obtained a pre-sale report and a rating from the Moody's service on a number of the policies.

29

88.    When the Attorney General's action became public, Moody's withdrew its rating "in light of the uncertainty surrounding the transaction in light of the complaint filed by the New York State Attorney General."

89.    On information and belief, Moody's had lost confidence in the health of the collateral – i.e., the policies. Specifically, Moody's no longer believed in the representations and warranties made by Ritchie I and Ritchie II to potential investors in the securitization, which themselves relied on representations and warranties made by Coventry to Ritchie I and Ritchie II. Moody's, that is, no longer believed that the policies had been purchased in compliance with applicable legal requirements.

90.    Defendants' misconduct has thus directly interfered with the salability and value of the life insurance policies at issue. Defendants' misconduct therefore harmed not only the Contracting Plaintiffs, but the Investing Plaintiffs, which are beneficially interested in the Contracting Plaintiffs and were owed independent fiduciary duties and other duties breached by Coventry.

91.    Ritchie I and Ritchie II continue to pay enormous amounts in premiums and fees to service the policies, the salability of which has been impaired by Defendants' misconduct.

92.    Moreover, in or about June 2006, the Investing Plaintiffs committed additional capital to the arrangement with Coventry. The June 2006 commitment was known as "Ritchie IV." The Ritchie IV transaction never resulted in the purchase of policies, but the Investing Plaintiffs – which were induced to enter into the Ritchie IV arrangement by Coventry's fraudulent conduct in connection with Ritchie I and Ritchie

II, including the representations described in paragraphs 55 to 58 and 71 to 79 above –
suffered substantial transaction costs and opportunity costs in connection with Ritchie IV.

93.    The Investing Plaintiffs also incurred substantial transaction costs in
connection with the contemplated securitization transaction, which was the subject of
over a year's worth of legal, financial, and accounting work.

94.    The transaction costs relating to Ritchie IV and the attempted
securitization transaction are special damages suffered by the Investing Plaintiffs.

95.    It was entirely foreseeable that Defendants' misconduct would damage
Plaintiffs in these ways. Defendants represented that the policies had been purchased in
compliance with law. Defendants knew that Plaintiffs' reason for purchasing and
investing in the policies was to realize a profit by securitizing and selling them.
Defendants also knew that they were participating in fraud on the owners of the policies –
fraud that, if it came to light, would greatly diminish the salability and value of the
policies and destroy the possibility of realizing a profit through the securitization.
Defendants therefore knew that they were creating serious risks for Plaintiffs.

96.    Coventry First in substance was using Plaintiffs' capital to acquire assets
that, because of Coventry First's own misconduct, turned out to be worth far less than
what Plaintiffs had reason to believe they were worth. At the same time, Coventry was
profiting from its misconduct, because it sold the policies to Plaintiffs at prices higher
than those Coventry First paid.

97.    Had Plaintiffs known that Coventry First engaged in bid-rigging and other
illegal practices, Plaintiffs never would have done business with Coventry, let alone
continued to commit additional capital to the arrangement with Coventry.

## COUNT ONE

**(Violation of RICO, 18 U.S.C. § 1962(c) – by all Plaintiffs against all Defendants)**

98.    Each of the foregoing allegations is incorporated herein by reference.

99.    There is an enterprise within the meaning of 18 U.S.C. § 1961(4) consisting of (a) Coventry First, or, in the alternative, of (b) all of the individual defendants.

100.    The enterprise referred to in the preceding paragraph is engaged in interstate commerce, as well as activities affecting interstate commerce, by purchasing life insurance policies in several states, including California, Hawaii, Nevada, and Florida, for the purpose of transferring those policies to Plaintiffs in other states.

101.    Defendants are all persons within the meaning of § 1962(c), distinct from the enterprises referred to in paragraph 99 (except that defendant Coventry First is distinct only from the enterprise referred to in paragraph 99(b)), and employed by or associated with that enterprise. Defendants did conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5) and § 1962(c), to wit:

    (a)    Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and

    (b)    Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

102.    Plaintiffs were injured in their business or property within the meaning of 18 U.S.C. § 1964(c) by reason of the violation of 18 U.S.C. § 1962(c) committed by Defendants. Specifically, Plaintiffs were fraudulently induced to invest with Coventry in life insurance policies that, because of Defendants' racketeering activity, actually were

worth, unbeknownst to Plaintiffs at the time, either nothing or a tiny fraction of what Plaintiffs paid for the policies. Indeed, because of Defendants' racketeering activities Plaintiffs have received essentially nothing in return for their investment. Moreover, Plaintiffs were injured when they committed capital to Ritchie IV and incurred transaction costs in connection with the attempted securitization. Both Ritchie IV and the securitization turned out to be abortive ventures because of Defendants' racketeering activities.

103.    Plaintiffs were injured in an as yet undetermined amount, believed to be not less than $700 million. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages and the cost of this suit, including a reasonable attorney's fee.

## **COUNT TWO**

### **(Conspiracy to Violate RICO, 18 U.S.C. § 1962(d) – by all Plaintiffs against all Defendants)**

104.    Each of the foregoing allegations is incorporated herein by reference.

105.    Defendants were all persons within the meaning of § 1962(d) and distinct from the enterprises referred to in paragraph 99 above (except that defendant Coventry First is distinct only from the enterprise referred to in paragraph 99(b)). Defendants conspired within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. §§ 1962(c). In particular, Defendants conspired to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5) and § 1962(c), to wit:

(a)    Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and

(b)    Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

106.    Plaintiffs were injured in their business or property within the meaning of 18 U.S.C. § 1964(c) in an as yet undetermined amount, believed to be not less than approximately $700 million, by reason of Defendants' violation of § 1962(d). Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages and the cost of this suit, including a reasonable attorney's fee.

## COUNT THREE

### (Fraud – by all Plaintiffs against Coventry First, Montgomery Capital, LST, Alan Buerger, Reid S. Buerger, and Alex Seldin)

107.    Each of the foregoing allegations is incorporated herein by reference.

108.    As detailed herein, Coventry First, Montgomery Capital, LST, Alan Buerger, Reid Buerger, and Alex Seldin made material misstatements to Plaintiffs, and omitted to disclose material information that they were obligated to disclose to Plaintiffs, regarding (1) the circumstances under which owners of life insurance policies were induced to part with their policies, and (2) the existence and target of the New York Attorney General's investigation into Coventry.

109.    These misstatements and omissions were committed knowingly, intentionally, and willfully, and were intended to induce Plaintiffs to rely on them.

110.    Reasonably relying on these misstatements and omissions, Plaintiffs acted to their detriment by investing in life insurance policies worth much less than Plaintiffs had reason to believe they were worth, and committing capital to Ritchie IV and attempting a securitization transaction. The Ritchie IV and securitization arrangements resulted in special damages, as set forth above, that were a direct and proximate result of Defendants' fraud.

111.    As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered damages in an amount believed to be not less than $700 million.

## COUNT FOUR

**(Fraudulent Inducement – by all Plaintiffs against Coventry First, Montgomery Capital, LST, Alan Buerger, Reid S. Buerger, and Alex Seldin)**

112.    Each of the foregoing allegations is incorporated herein by reference.

113.    As detailed herein, in connection with, among other agreements, the Ritchie I Policy Purchase Agreement, the Ritchie II Policy Purchase Agreement, and the agreements relating to Ritchie IV, Coventry First, Montgomery Capital, LST, Alan Buerger, Reid Buerger, and Alex Seldin knowingly or recklessly made false and misleading statements to, and knowingly or recklessly concealed information from and did not disclose information to Plaintiffs regarding (1) the circumstances under which owners of life insurance policies were induced to part with their policies, and (2) the existence and target of the New York Attorney General's investigation into Coventry.

114.    Under the circumstances, Coventry had a duty to disclose the omitted information.

115.    The misstatements and omissions were intended to induce, and did induce, Plaintiffs to act to their detriment in that (1) the Investing Plaintiffs caused the Contracting Plaintiffs to enter into, and the Contracting Plaintiffs in fact entered into, among other agreements, the policy purchase agreements, and (2) the Investing Plaintiffs entered into the Ritchie IV arrangement and attempted a securitization transaction.

116.    Plaintiffs entered into these arrangements to their detriment, as described herein. The Ritchie IV arrangement and the attempted securitization, moreover, resulted

in special damages, as described above, that were a direct and proximate result of Defendants' fraudulent conduct.

117.   As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs have suffered damages in an amount believed to be not less than $700 million.

## COUNT FIVE

**(Breach of Fiduciary Duty – by RCM, Walkers SPV Limited, and Ritchie Risk-Linked Strategies Trading, Ltd. against Coventry First, Montgomery Capital, and LST)**

118.   Each of the foregoing allegations is incorporated herein by reference.

119.   The Investing Plaintiffs were the partners, joint venturers, and co-venturers of Coventry First and Montgomery Capital. The Investing Plaintiffs had reposed their trust and confidence in Coventry First, Montgomery Capital, and LST, which collectively occupied a position of superior knowledge and control with respect to the purchase and servicing of life insurance policies.

120.   The fiduciary duty owed by Coventry to Plaintiffs obligated Defendants to make full disclosure of all material circumstances surrounding the purchase of life insurance policies, and of the existence of the New York Attorney General's investigation.

121.   Defendants concealed this information and thereby misled Plaintiffs to their detriment in that they invested in life insurance policies worth much less than Plaintiffs had reason to believe they were worth, and committed capital to Ritchie IV. As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiffs have suffered damages in an amount believed to be not less than $700 million.

## COUNT SIX

**(Breach of Contract – by Ritchie I and Ritchie II against LST, Coventry First, and Montgomery Capital)**

122.    Each of the foregoing allegations is incorporated herein by reference.

123.    Pursuant to the Ritchie I Policy Purchase Agreement and the Ritchie II Policy Purchase Agreement, LST (an alter ego of Coventry First and Montgomery Capital), represented, among other things, that:

(i)    Coventry's acquisition of policies was in compliance with all laws and regulations, there was no proceeding pending or threatened involving any agency or governmental body seeking to prevent the transactions contemplated by the agreements or seeking a determination that might affect the performance by Coventry of its obligations;

(ii)    before conveying the life insurance policies to Ritchie I or Ritchie II, Coventry would take all reasonable actions under applicable law to protect and perfect its ownership of the policy; and

(iii)    Coventry acquired the policies directly from the insureds in transactions that in all material respects complied with all applicable laws, or acquired the policies from third parties in transactions that to Coventry's knowledge complied in all material respects with all applicable laws.

124.    Coventry breached its contracts with Ritchie I and Ritchie II in that these representations and warranties were false as to some or all of the policies purchased by Ritchie I and Ritchie II from Coventry.

125.    Plaintiffs have performed their obligations under the policy purchase agreements.

126.    All conditions precedent to Defendants' contractual liability have been performed or have occurred.

127.    To the extent any written notice requirement set forth in the policy purchase agreements is applicable, Plaintiffs have satisfied the requirement.

128.    By reason of Coventry's breach, Plaintiffs have suffered damages in an amount believed to be not less than $700 million.

129.    Plaintiffs are entitled pursuant to the policy purchase agreements to rescind the life settlement transactions through which Coventry transferred the life insurance policies to them.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

(a)  All damages proven pursuant to RICO, trebled as permitted by law;

(b)  All other compensatory damages sustained by Plaintiffs;

(c)  Punitive Damages, in an appropriate amount to be determined at trial;

(d)  Rescission of the relevant life settlement transactions between Plaintiffs and Defendants;

(e)  Attorneys' fees and costs;

(f)  Prejudgment and post-judgment interest; and

(g)  Such other relief as the Court may deem just and proper.

Respectfully submitted,

LAW OFFICES OF THOMAS P. PUCCIO

  Thomas P. Puccio
  230 Park Avenue
  New York, NY 10169
  Tel: (212) 883-6383
  Fax: (212) 883-6388


ROBBINS, RUSSELL, ENGLERT,
ORSECK & UNTEREINER LLP

By: _____
  Lawrence S. Robbins (LR-8917)
  Gary A. Orseck
  Rachel S. Li Wai Suen
  Daniel R. Walfish
  1801 K Street, N.W.
  Suite 411
  Washington, D.C. 20006
  Tel: (202) 775-4500
  Fax: (202) 775-4510

*Counsel for Plaintiffs*

Dated: August 24, 2007
      Washington, D.C.