**EXHIBIT 1**

# MASTER POLICY PURCHASE AGREEMENT

by and between

LST I LLC,

as Seller

and

RICHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED.,
as Purchaser

Dated as of June 30, 2005

LA1:1077800.12

to each Conveyed Life Settlement Policy shall not be part of the Seller's estate in the event of the filing of a bankruptcy petition by or against the Seller under any bankruptcy law. As a precautionary measure, in the event that notwithstanding the contrary intention of the Seller and the Purchaser, the sale of any Life Settlement Policy or group of Life Settlement Policies is recharacterized as a loan, the parties intend that this Agreement constitute a security agreement under applicable law, and the Seller hereby grants to the Purchaser a first priority perfected security interest in, to and under each such Conveyed Life Settlement Policy and all related Conveyed Property and all proceeds of any of the same for the purpose of securing payment and performance of the Seller's obligations under this Agreement and the repayment of any amounts owed to the Purchaser by the Seller.

## ARTICLE III

## REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 3.01   Representations and Warranties of the Seller and Purchaser. (a) The Seller hereby represents and warrants to the Purchaser as of the Closing Date and each Funding Date that:

(i) Organization and Good Standing. The Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware and has organizational power and authority to own its properties and to conduct its business as such properties shall then be owned and such business is then conducted, and had at all relevant times, and shall then have, organizational power, authority and legal right to acquire, own and sell the Life Settlement Policies as contemplated by this Agreement.

(ii) Due Qualification. The Seller is duly qualified to do business as a foreign limited liability company in good standing, and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such qualifications, licenses or approvals.

(iii) Power and Authority. The Seller has full power, authority and right to execute and deliver this Agreement, and has full power and authority to perform its obligations hereunder, including the power and authority to transfer Life Settlement Policies to the Purchaser as contemplated hereby, and has taken all necessary action to authorize and has duly authorized the execution and delivery of this Agreement and the performance of such obligations.

(iv) Binding Obligation. This Agreement constitutes the legal, valid and binding obligations of the Seller enforceable against the Seller in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency,

reorganization, moratorium and other similar laws affecting creditors' rights generally or by general principles of equity.

(v) <u>No Violation</u>. The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof will not violate any United States federal, state or local law or regulation, violate, result in the breach of any terms and provisions of, nor constitute an event of default under, the certificate of formation or the operating agreement of the Seller, or violate or breach any of the terms or provisions of, or constitute an event of default under, any agreement to which the Seller is a party or by which it shall be bound; nor violate any order, judgment or decree applicable to the Seller of any United States federal or state court, regulatory body, administrative agency or other United States federal or state governmental instrumentality having jurisdiction over the Seller or its properties.

(vi) <u>No Proceedings</u>. There is no action, suit or proceeding before or by any court, regulatory body, administrative agency or other governmental agency or body, domestic or foreign, now pending, or to the Seller's knowledge, threatened, against or affecting the Seller or its assets or properties: (a) asserting the invalidity of this Agreement, (b) seeking to prevent the consummation of any of the transactions contemplated by this Agreement, or (c) seeking any determination or ruling that might materially and adversely effect the performance by the Seller of its obligations under, or the validity or enforceability of, this Agreement.

(vii) <u>No Consents</u>. No consent, approval, permit, license, authorization or order of or declaration or filing with any governmental authority is required to be obtained by the Seller for the consummation of the transactions contemplated by this Agreement, except such as have been duly made or obtained.

(viii) No Person or entity Affiliated with the Seller or that makes funds available to any Affiliate of the Seller that in order to allow the Seller to fulfill its obligations under the Transaction Documents or for the purpose of funding the investment in the Purchaser made by such Affiliate of the Seller is: (i) a Person listed in the Annex to Executive Order No. 13224 (2001) issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), (ii) named on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Assets Control, (iii) a non-U.S. shell bank or is providing banking services indirectly to a non-U.S. shell bank, (iv) a senior non-U.S. political figure or an immediate family member or close associate of such figure or (v) otherwise prohibited from investing in the Purchaser pursuant to applicable U.S. anti-money laundering, anti-terrorist and asset control laws, regulations, rules or orders.

the Purchaser's knowledge, threatened, against or affecting the Purchaser or its assets or properties: (a) asserting the invalidity of this Agreement, (b) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or (c) seeking any determination or ruling that might materially and adversely affect the performance by the Purchaser of its obligations under, or the validity or enforceability of, this Agreement.

(vii) **No Consents**. No consent, approval, permit, license, authorization or order of or declaration or filing with any governmental authority is required to be obtained by the Purchaser for the consummation of the transactions contemplated by this Agreement, except such as have been duly made or obtained.

(viii) The Purchaser is not required to be registered under the Investment Company Act of 1940 (as amended).

(ix) The Purchaser is purchasing the Conveyed Life Settlement Policies in reliance on, and satisfies the requirements of, Regulation S under the Securities Act of 1933.

(c) The representations and warranties set forth in this Section 3.01 shall survive for a period of one year following the last Funding Date under this Agreement.

SECTION 3.02   **Representations and Warranties of the Seller as to the Life Settlement Policies**.

(a) As of each Funding Date, the Seller conveying Life Settlement Policies represents and warrants to the Purchaser:

(i) **Eligible Life Settlement Policies**. All of the Life Settlement Policies the purchases of which are being funded on such Funding Date are Eligible Life Settlement Policies.

(ii) **Quality of Title/Valid Transfer**. With respect to each Life Settlement Policy:

(A) Prior to the transfer of each Life Settlement Policy to the Purchaser, the Seller shall have taken all reasonable actions under applicable law in each relevant jurisdiction in order to protect and perfect the ownership of the Seller in such policy and the related Conveyed Property against all creditors of, and purchasers from, the Seller;

(B) Upon the transfer of such Life Settlement Policy to the Purchaser, such policy and the related Conveyed Property shall be free and clear of any Lien imposed by Coventry or its Affiliates and, to the Seller's knowledge, free of any Lien imposed in favor of any third party (other

than any Policy Loan or claim of the Issuing Insurance Carrier to any part of the cash surrender value or other value thereof, or any other lien if the amount of such lien has been taken into account in the pricing of the Life Settlement Policy);

(C) Subject to the preceding clause (B), upon transfer of each Life Settlement Policy, the Purchaser shall acquire a valid and perfected ownership or security interest in such policy and the related Conveyed Property.

(b) Compliance with Statutes and Regulations. All Life Settlement Policies the purchases of which are being funded on such Funding Date have been (A) Originated by the Seller or an Affiliate of the Seller in one or more transactions that in all material respects were in accordance with and in compliance with all applicable United States federal, state and local laws, rules and regulations applicable to life settlement transactions and the purchase and resale of life insurance policies, or (B) purchased from an unaffiliated third party in one or more transactions that, to the Seller's knowledge, were in accordance with and in compliance with, in all material respects, all applicable United States federal, state and local laws, rules and regulations applicable to the purchase of life insurance policies form third persons that are not the Original Sellers.

(c) The Seller makes no representation or warranty as to (v) the fitness of any Life Settlement Policy for any particular use or business purpose of the Purchaser, (w) the accuracy of any assessment of Life Expectancy or the Mortality Rating provided by any Medical Underwriter, or the appropriateness of the methodology used by any Medical Underwriter to assess a Life Expectancy or assign a Mortality Rating, (x) the accuracy of any Mortality Table, (y) the amount the Purchaser ultimately will recover as proceeds of any Life Settlement Policy or the timing of its receipt of any such amounts, or (z) the amount of the premiums required to maintain any Life Insurance Policy in effect.

(d) Survival of Representations and Warranties. The representations and warranties set forth in this Section 3.02 as to each Life Settlement Policy shall survive until (i) $100,000,000 of the Expected Capital have been utilized to acquire Life Settlement Policies, or (ii) if all the Expected Capital is raised, all such Expected Capital has been utilized to acquire Life Settlement Policies, whichever occurs last.

SECTION 3.03  Covenants of the Seller.

(a) Acknowledgement of Conveyances. The Seller hereby covenants that (i) it will take no action inconsistent with the Purchaser's ownership of a Conveyed Life Settlement Policy, (ii) any financial statements of the Seller and its Affiliates that are published, made publicly available or delivered to creditors or investors (or potential creditors or investors) will not indicate or imply that the Seller or any Affiliate thereof has any ownership interest in the Conveyed Life Settlement Policies (other than the

servicing rights and other rights specified in the Transaction Documents, or rights arising from the ownership by the Seller or its Affiliates of debt of or equity or similar interests in the Purchaser), and (iii) if a third party that has a legal or equitable right to obtain such information (including any creditor, potential creditor, investor or potential investor in the Seller or its Affiliates, or any regulator or court of competent jurisdiction) should inquire, the Seller will promptly indicate that the Conveyed Life Settlement Policies have been sold to the Purchaser and will not claim ownership interests therein, and if any other third party should inquire, the Seller will not make any statement that implies that the Seller has retained any ownership interest therein.

(b) <u>No Creation of Adverse Interests</u>. Except for the conveyances hereunder and pursuant to the other Transaction Documents, the Seller will not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien on any interest in any Conveyed Life Settlement Policies, and the Seller shall defend the right, title, and interest of the Purchaser in, to and under the Conveyed Life Settlement Policies against all claims of third parties claiming through or under the Seller.

(c) <u>Records</u>. The Seller shall keep complete and accurate records of the business transacted by it under this Agreement. The Seller shall retain such records until the later of (i) two (2) years after the termination of this Agreement pursuant to Section 6.01 hereof and (ii) the termination of the Servicing Agreement, or such longer period as may be required by applicable United States law.

(d) <u>Portfolio Target</u>. The Seller agrees to exert commercially reasonable efforts to offer for purchase Life Settlement Policies as to which the related Acquisition Costs approximately equal the projected volume targets agreed to by the Seller and the Purchaser. The Seller will offer for purchase pursuant to Section 2.01(a) only Life Settlement Policies that, in the aggregate:

(i) will not cause the Purchaser to have purchased Conveyed Life Settlement Policies as to which (measured by dividing the related Acquisition Costs of all relevant Conveyed Life Settlement Policies by the Expected Capital of the Purchaser):

(A) more than 15% of the Portfolio were issued by any one Issuing Insurance Company that is rated at or below "A+" by Standard & Poor's, or more than 20% of the Portfolio were issued by any one Issuing Insurance Company that is rated above "A+" by Standard & Poor's (except that up to 30% of the Portfolio may have been issued by life insurance companies which are directly or indirectly wholly owned by American International Group, Inc. and which share the Standard & Poor's rating of its principal operating companies);

(B) more than 60% of the Portfolio have Mortality Ratings utilized by any single Approved Medical Underwriter other than AVS Underwriting LLC; or

(C) more than 50% of the Portfolio have related Insureds as to which the medical evaluation supplied by the applicable Medical Underwriter indicates the presence of any single Disease; but

(ii) in case the Conveyed Life Settlement Policies that remain in the Portfolio of the Purchaser do not comply with the standards in (A), (B) or (C) above, the Seller will offer for purchase only Life Settlement Policies that taken in the aggregate with Conveyed Life Settlement Policies that remain in the Portfolio, will bring the Portfolio closer to compliance with the standards in (A), (B) or (C) above.

SECTION 3.04 Covenants of Purchaser. (a) Limitation on Resale of Life Settlement Policies. Except as otherwise provided in this Section 3.04 and Exhibit B, the Purchaser will not sell, transfer, convey or assign (i) any Conveyed Life Settlement Policy to (A) any natural person or (B) any Person that does not have at least $100 million in Managed Assets immediately prior to such transaction, or (ii) any direct or indirect beneficial or ownership interest in any Conveyed Life Settlement Policy or a pool or group of Conveyed Life Settlement Policies to any Person in a transaction or series of transactions in which the transferee also receives information concerning the identity of the related Insureds that would or could reasonably be expected to allow (or be used by) such transferee to identify or contact such Insureds (including, without limitation, the names, addresses or social security numbers of the Insureds or their Representatives, the related insurance policy numbers or medical information (other than Life Expectancy delivered by a Medical Underwriter or other than in an aggregate or statistical presentation that does not relate the information to a specific Insured)). Each permitted transfer, sale, conveyance or assignment of a Conveyed Life Settlement Policy will be effectuated (i) in accordance with all federal, state, and local law governing the Underlying Sale Agreement under which the Seller or the originator, as applicable, Originated such Conveyed Life Settlement Policy, (ii) in accordance with the terms and remakerting and sale provisions set forth in Section 3.04(b), (iii) pursuant to a document or instrument in which the transferee agrees that the Servicer shall continue to service such Conveyed Life Settlement Policy under terms and conditions substantially similar to the set forth in the Servicing Agreement, (iv) pursuant to a document or instrument in which the transferee agrees to confidentiality provisions substantially identical to those set forth in Article V, and (v) in accordance with Exhibit B.

(b) Remarketing of Life Settlement Policies. In connection with any sale, transfer, conveyance or assignment of a Conveyed Life Settlement Policy, the Purchaser shall first provide the Seller or its Affiliates with the opportunity to make an offer for the purchase of such Conveyed Life Settlement Policy before offering to sell such Conveyed Life Settlement Policy to another Person. If the Seller and its Affiliates do not make an

SECTION 7.09   Counterparts.  This Agreement may be executed in two or more counterparts (and by different parties on separate counterparts), each of which shall be an original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopier or by e-mail image shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 7.10   No Petition.  The Seller, by entering into this Agreement, hereby covenants and agrees that it will not at any time institute against the Purchaser, or solicit or incite any other Person to institute for the purpose of joining in any such institution against the Purchaser, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law.  This Section 7.10 will survive the termination of this Agreement.

SECTION 7.11   Third-Party Beneficiaries.  This Agreement will inure to the benefit of and be binding upon the parties signatory hereto.  Except as otherwise provided in this Agreement, no other Person will have any right or obligation hereunder.

SECTION 7.12   Merger and Integration.  Except as specifically stated otherwise herein and the other Transaction Documents to which the parties hereto are a party, this Agreement sets forth the entire understanding of the parties hereto relating to the subject matter hereof, and all prior understandings, written or oral, are superseded by this Agreement.  This Agreement may not be modified, amended, waived or supplemented except as provided herein.  The Purchaser expressly acknowledges that the Seller has not made any representations and warranties other than as set forth herein and in the other Transaction Documents.  The Purchaser represents and warrants to the Seller that, independently and without reliance upon the Seller (other than its reliance on the Seller's representations, warranties and covenants set forth in the Transaction Documents) and based upon such documents and information as it has deemed appropriate, it has made and will continue (to the extent permitted hereunder) to make its own appraisal of and investigation into the business, operations, property, prospects, financial and other conditions and creditworthiness of the Seller, and its own decision to enter into this Agreement and to take, or omit to take, action under any Transaction Document.  Except for items specifically required to be delivered hereunder, the Seller shall not have any duty or responsibility to provide the Purchaser or any of its Affiliates any information that comes into the possession of the Seller or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.

SECTION 7.13   Headings.  The headings herein are for purposes of reference only and shall not otherwise affect the meaning or interpretation of any provision hereof.

SECTION 7.14   Tax Classification.  Nothing contained in this Agreement is intended to or shall be deemed or construed by the parties hereto or by any third person to

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

LST I LLC,
as Seller

By: _____
Name:
Title:

RICHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED,
as Purchaser

By: _____
Name: PETER HUGHES
Title: DIRECTOR

EXHIBIT B

## INFORMATION SHARING AND CONFIDENTIALITY

The Purchaser shall not, and will cause its Affiliates, subsidiaries and agents not to, supply any Confidential Information to any third Person. If the Purchaser determines that it would like to (or would like to cause or allow any of its Affiliates, subsidiaries or agents to) (a) sell, transfer, convey or assign any Conveyed Life Settlement Policy to any third party (a "Potential Purchaser") or (b) issue, undertake, sell, transfer, convey or assign any security or debt obligation to any third party (a "Potential Investor"), it shall deliver to both of the Principal Holders of Subordinated Securities (as defined in the Intercreditor Agreement), Seller and Servicer written notice of such determination providing reasonable detail of the identity of such Potential Purchaser or Potential Investor and of the Conveyed Life Settlement Policies and proposed transactions.

Both of the Principal Holders of Subordinated Securities shall have the right to approve or disapprove the Potential Purchaser or Potential Investor, but shall not unreasonably withhold their approvals and shall deliver notice of their approvals or disapprovals in writing within ten Business Day of receiving such notice and information. It shall be reasonable for a Principal Holder of Subordinated Securities to withhold its approval of any Potential Purchaser or Potential Investor if on the basis of any of the following considerations, among others, (i) such Person or any of its Affiliates is a present competitor of Coventry in its life settlement or premium finance businesses, (ii) the Principal Holder of Subordinated Securities reasonably believes that such Person or any of its Affiliates is likely to become or provide financing to such a competitor in the near future or (iii) such Person or any of its Affiliates has been denied (and not subsequently granted) any license relevant to originating or servicing life or viatical settlement policies in any relevant jurisdiction.

Upon mutual written approval by both of the Principal Holders of Subordinated Securities of the Potential Purchaser or Potential Investor, the Seller and its Affiliates will cooperate with the Purchaser to remarket and sell, transfer, convey or assign such interests. In addition, the Purchaser shall be permitted to deliver to such Potential Purchaser or Potential Investor the Approved Offering Materials so long as prior to any such delivery, each Potential Purchaser and Potential Investor shall have executed and delivered in favor of the Seller and Servicer a confidentiality agreement containing substantially the same provisions as are set forth in Article V of the Master Policy Purchase Agreement.

If both of the principal holders of Subordinated Securities mutually agree in writing that such Potential Purchaser or Potential Investor has demonstrated financial capability and good faith intent to complete a proposed purchase of Conveyed Life Settlement Policies or securities or debt obligations of the Purchaser (or its subsidiaries), the Servicer will, in consultation with the Purchaser, prepare and deliver to such person or entity (with copies to the Purchaser or its agent), the related Additional Offering Materials. No offering

materials or orally delivered communications used to market or sell Conveyed Life Settlement Policies or securities of the Purchaser or its subsidiaries shall mention or use the names, trademarks or copyrighted materials of Coventry or its Affiliates without the express prior written consent of the Seller, provided that such consent will not be unreasonably withheld. The final sale documents used in connection with any public offering or private placement of securities issued by the Purchaser or its subsidiaries shall not contain any terms or make any representations that are binding on Coventry or its Affiliates as to which Coventry or its Affiliates have not given their prior written consent

Any sale, transfer, conveyance or assignment of any Conveyed Life Settlement Policy, and any issuance, offer or sale of securities or the issuance of debt obligations of the Purchaser or any of its subsidiaries that does not comply with this Exhibit B in every material respect, or as to which any agreement or document shall be void.

The Purchaser will (and hereby does) indemnify the Seller and its Affiliates, and agrees to hold each of them harmless, with respect to any issuance of debt or equity securities of the Purchaser or its subsidiaries or the marketing, offer or sale thereof or of any Life Settlement Policies to any persons not affiliated with Coventry by Ritchie, the Initiator, the Purchaser or any Affiliates or agents of any of them, whether arising under or based on the United States federal or state securities laws or the laws of any foreign jurisdiction, including any liabilities arising from or relating to the accuracy or sufficiency of any information delivered by the Purchaser or such subsidiaries or the agents thereof to prospective investors (but excluding any information contained therein that has been supplied for inclusion therein by the Seller, Servicer or any of their Affiliates), or any breach or alleged breach of agreements of the Purchaser or its agents with existing or potential investors or the accuracy or adequacy of any representations, projections or estimates of performance, yield, marketability or quality of such securities delivered to any potential investors.

LA1:1077800.12

*OMM Draft 6-17-05*

## ANNEX A

### Eligibility Criteria

An Eligible Life Settlement Policy is one that meets the following criteria:

(1)  The Life Settlement Policy is in force as of the related Funding Date, and must be a universal life, whole life or term policy (but each term policy must be convertible into permanent insurance), and may be a survivorship second-to-die policy;

(2)  As of the related Funding Date, the documentation containing the Mortality Ratings that are the basis for determining eligibility and pricing are not older than 180 days;

(3)  The Policy IRR calculated in accordance with the Seller's model projected in the Seller's model as of the assumed related Funding Date shall be at least 10% per annum;

(4)  As of the date of the most current related Life Expectancy Report, the related Insured has a Life Expectancy of no less than 24 months and no more than 180 months;

(5)  As of the related Funding Date, the applicable contestability and suicide periods have expired;

(6)  As of the related Funding Date, the related Insured is not less than 60 years of age;

(7)  The aggregate of the Acquisition Costs for all Life Settlement Policies relating to any one Insured shall not be greater than $7 million, provided that this limit shall be increased by the Purchaser based on the amount of additional capital raised in excess of $100,000,000 by the Purchaser;

(8)  The aggregate of the Death Benefits for all Life Settlement Policies relating to any one Insured shall not be less than $100,000; and

(9)  The Issuing Insurance Company (or its parent) shall be rated at least "A" by Standard & Poor's or A3 by Moody's.

Any of the foregoing criteria may be waived by mutual written agreement between the Seller and the Purchaser.