**EXHIBIT 3**

# MASTER POLICY PURCHASE AGREEMENT

by and between

LST I LLC,

as Seller

and

RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND) II, LIMITED,
as Purchaser

Dated as of December 15, 2005

adversely affect the performance by the Purchaser of its obligations under, or the validity or enforceability of, this Agreement.

(vii) <u>No Consents</u>. No consent, approval, permit, license, authorization or order of or declaration or filing with any governmental authority is required to be obtained by the Purchaser for the consummation of the transactions contemplated by this Agreement, except such as have been duly made or obtained.

(viii) <u>Investment Company Act</u>. The Purchaser is not required to be registered under the Investment Company Act of 1940 (as amended).

(ix) <u>Regulation S</u>. The Purchaser is purchasing the Conveyed Life Settlement Policies in reliance on, and satisfies the requirements of, Regulation S under the Securities Act of 1933.

(x) <u>Patriot Act</u>. No Affiliate or Person affiliated with the Purchaser or that makes funds available to any Affiliate of the Purchaser in order to allow the Purchaser to fulfill its obligations under the Transaction Documents or for the purpose of funding the investment in the Purchaser made by such Affiliate of the Purchaser is: (i) a Person listed in the Annex to Executive Order No. 13224 (2001) issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), (ii) named on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Assets Control, (iii) a non-U.S. shell bank or is providing banking services indirectly to a non-U.S. shell bank, (iv) a senior non-U.S. political figure or an immediate family member or close associate of such figure or (v) otherwise prohibited from investing in the Purchaser pursuant to applicable U.S. anti-money laundering, anti-terrorist and asset control laws, regulations, rules or orders.

(c) The representations and warranties set forth in this Section 3.01 shall survive for a period of one year following the last Funding Date under this Agreement.

SECTION 3.02   <u>Representations and Warranties of the Seller as to the Life Settlement Policies</u>.

(a) As of each Funding Date, the Seller conveying Life Settlement Policies represents and warrants to the Purchaser:

(i) <u>Eligible Life Settlement Policies</u>. All of the Life Settlement Policies the purchases of which are being funded on such Funding Date are Eligible Life Settlement Policies.

(ii) <u>Quality of Title/Valid Transfer</u>. With respect to each Life Settlement Policy:

    (A)    Prior to the transfer of each Life Settlement Policy to the Purchaser, the Seller shall have taken all reasonable actions under applicable law in each relevant jurisdiction in order to protect and perfect the ownership of the Seller in such policy and the related Conveyed Property against all creditors of, and purchasers from, the Seller;

    (B)    Upon the transfer of such Life Settlement Policy to the Purchaser, such policy and the related Conveyed Property shall be free and clear of any Lien imposed by Coventry or its Affiliates and, to the Seller's knowledge, free of any Lien imposed in favor of any third party (other than any Policy Loan or claim of the Issuing Insurance Company to any part of the cash surrender value or other value thereof, or any other lien if the amount of such lien has been taken into account in the pricing of the Life Settlement Policy);

    (C)    Subject to the preceding clause (B), upon transfer of each Life Settlement Policy, the Purchaser shall acquire a valid and perfected ownership or security interest in such policy and the related Conveyed Property.

(b)    <u>Compliance with Statutes and Regulations</u>. All Life Settlement Policies the purchases of which are being funded on such Funding Date have been (A) Originated by the Seller or an Affiliate of the Seller in one or more transactions that in all material respects were in accordance with and in compliance with all applicable United States federal, state and local laws, rules and regulations applicable to life settlement transactions and the purchase and resale of life insurance policies, or (B) purchased from an unaffiliated third party in one or more transactions that, to the Seller's knowledge, were in accordance with and in compliance with, in all material respects, all applicable United States federal, state and local laws, rules and regulations applicable to the purchase of life insurance policies form third persons that are not the Original Sellers.

(c)    The Seller makes no representation or warranty as to (i) the fitness of any Life Settlement Policy for any particular use or business purpose of the Purchaser, (ii) the accuracy of any assessment of Life Expectancy or the Mortality Rating provided by any Medical Underwriter, or the appropriateness of the methodology used by any Medical Underwriter to assess a Life Expectancy or assign a Mortality Rating, (iii) the accuracy of any Mortality Table, (iv) the amount the Purchaser ultimately will recover as proceeds of any Life Settlement Policy or the timing of its receipt of any such amounts, or (v) the amount of the premiums required to maintain any Life Insurance Policy in effect.

(d)    <u>Survival of Representations and Warranties</u>. The representations and warranties set forth in this Section 3.02 as to each Life Settlement Policy shall survive until (i) $100,000,000 of the Expected Capital have been utilized to acquire Life

Settlement Policies, or (ii) if all the Expected Capital is raised, all such Expected Capital has been utilized to acquire Life Settlement Policies, whichever occurs last.

SECTION 3.03  Covenants of the Seller.

(a)  Acknowledgement of Conveyances. The Seller hereby covenants that (i) it will take no action inconsistent with the Purchaser's ownership of a Conveyed Life Settlement Policy, (ii) any financial statements of the Seller and its Affiliates that are published, made publicly available or delivered to creditors or investors (or potential creditors or investors) will not indicate or imply that the Seller or any Affiliate thereof has any ownership interest in the Conveyed Life Settlement Policies (other than the servicing rights and other rights specified in the Transaction Documents, or rights arising from the ownership by the Seller or its Affiliates of debt of or equity or similar interests in the Purchaser), and (iii) if a third party that has a legal or equitable right to obtain such information (including any creditor, potential creditor, investor or potential investor in the Seller or its Affiliates, or any regulator or court of competent jurisdiction) should inquire, the Seller will promptly indicate that the Conveyed Life Settlement Policies have been sold to the Purchaser and will not claim ownership interests therein, and if any other third party should inquire, the Seller will not make any statement that implies that the Seller has retained any ownership interest therein.

(b)  No Creation of Adverse Interests. Except for the conveyances hereunder and pursuant to the other Transaction Documents, the Seller will not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien on any interest in any Conveyed Life Settlement Policies, and the Seller shall defend the right, title, and interest of the Purchaser in, to and under the Conveyed Life Settlement Policies against all claims of third parties claiming through or under the Seller.

(c)  Records. The Seller shall keep complete and accurate records of the business transacted by it under this Agreement. The Seller shall retain such records until the later of (i) two (2) years after the termination of this Agreement pursuant to Section 6.01 hereof and (ii) the termination of the Servicing Agreement, or such longer period as may be required by applicable United States law.

(d)  Portfolio Target. The Seller agrees to exert commercially reasonable efforts to offer for purchase Life Settlement Policies as to which the related Acquisition Costs approximately equal the projected volume targets agreed to by the Seller and the Purchaser. The Seller will offer for purchase pursuant to Section 2.01(a) only Life Settlement Policies that, in the aggregate will not cause the Purchaser to have purchased Conveyed Life Settlement Policies as to which (measured by dividing the related Acquisition Costs of all relevant Conveyed Life Settlement Policies by the Expected Capital of the Purchaser) more than 15% of the Portfolio were issued by any one Issuing Insurance Company that is rated at or below "A+" by Standard & Poor's, or more than 20% of the Portfolio were issued by any one Issuing Insurance Company that is rated

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

LST I LLC,
as Seller

By: _____
Name: Alex E. Seldin
Title: Senior Vice President

RITCHIE RISK-LINKED STRATEGIES
TRADING (IRELAND) II, LIMITED,
as Purchaser

By: _____
Name:
Title:

S-1

Signature Page – Master Policy Purchase Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

LST I LLC,
as Seller

By: _____
    Name:
    Title:

RITCHIE RISK-LINKED STRATEGIES
TRADING (IRELAND) II, LIMITED,
as Purchaser

By: *John W Beham*
    Name: JOHN PERKOR
    Title: C.E.O.

S-1

Signature Page – Master Policy Purchase Agreement

**EXECUTION COPY**

## GLOSSARY OF DEFINED TERMS

"Acquisition Cost" means, with respect to any Life Settlement Policy, an amount, calculated as of the related Funding Date, the total of all amounts payable to or to the order of the Seller in connection with the sale and transfer thereof to the Purchaser on such Funding Date, which amount will not exceed an amount that will cause the related Policy IRR to be less than 10%.

"Affiliate" means, with respect to any Person, any other Person controlling or controlled by or under common control with such specified Person. For purposes of this definition, "control," when used with respect to a specific Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the term "controlling" and "controlled" have meanings correlative to the foregoing; provided that, for purposes of the Transaction Documents, the Purchaser is not an Affiliate of the Seller or any of the Seller's affiliates.

"Additional Offering Materials" means the following information and data compiled and presented by the Servicer on a non-aggregated basis with respect to each Conveyed Life Settlement Policy within any specified group of Conveyed Life Settlement Policies or all Conveyed Life Settlement Policies pursuant to Section 3.04(c) of the Master Policy Purchase Agreement: (i) Insured Data, (ii) Issuing Insurance Company, (iii) most recently calculated Net Death Benefit, (iv) Death Benefit, (v) most recently calculated cash value, (vi) Life Expectancy determined as described in the Master Policy Purchase Agreement in connection with the purchase thereof by the Purchaser, (vii) Mortality Rating supplied in connection with the purchase thereof by the Purchaser, (viii) most recent projection of remaining Premiums, (ix) most recently calculated balance of any Policy Loans, (x) most recent projection of interest payable on any Policy Loans, (xi) Funding Date, (xi) Medical Underwriter and (xii) Servicing Fees.

"Approved Offering Materials" means:

(a) With respect to the offer or sale of Conveyed Life Settlement Policies to any third party:

(i) the related Insured Data;

(ii) information relating to relevant Conveyed Life Settlement Policies from the three most recently delivered Servicer's Settlement Reports relating to such Conveyed Life Settlement Policies;

(iii) to the extent specifically requested by a Potential Purchaser, the Servicing Agreement, the Securities Account Control Agreements, and relevant Entitlement Orders; and

(iv) such other materials as are agreed by the Seller, Servicer and Purchaser and that compile data on the Conveyed Life Settlement Policies in an aggregate format,

**EXECUTION COPY**

"Conveyed Property" shall have the meaning assigned to such term in Section 2.01(a) of the Master Policy Purchase Agreement.

"Coventry" means Coventry First LLC, a Delaware limited liability company.

"Death Benefit" means, with respect to any Life Settlement Policy, the face amount of such Life Settlement Policy (without taking into account any reduction thereof for any related Policy Loans).

"Deposit Entitlement Order" means an entitlement order as defined in Section 8-102(a)(8) of the UCC with respect to any Life Settlement Policy, as executed by the Purchaser in accordance with the Purchaser's Securities Account Control Agreement, pursuant to which, among other things, the Security Entitlement evidencing such Life Settlement Policy is transferred from the Seller to the Purchaser in exchange for the specified consideration.

"Disease" means each disease referenced in the ICD 9 manual or that is factored into the relevant Mortality Rating by the relevant Medical Underwriter.

"Draw Account" means the draw account established and maintained by the Policy Payment Agent pursuant to Section 2.1 of the Policy Payment Agency Agreement.

"Eligibility Certificate" means the certification to the Purchaser to be executed by the Seller in connection with any Life Settlement Policy, substantially in the form attached to the Master Policy Purchase Agreement as Exhibit A.

"Eligibility Criteria" with respect to each Life Settlement Policy means each of the criteria set forth in **Annex A** attached hereto. Any of these criteria may be waived by mutual agreement of the Seller and the Purchaser.

"Eligible Life Settlement Policy" means a Life Settlement Policy that, as of the applicable Funding Date, satisfies each of the Eligibility Criteria.

"Entitlement Order" means the Deposit Entitlement Order or the Seller's Entitlement Order, as indicated by the context.

"Expected Capital" means $259,076,922, or such greater amount as may be agreed by the Purchaser and Seller for the purchase of Life Settlement Policies.

"Expected Income" means, with respect to any Conveyed Life Settlement Policy, each individual payment of Probabilistic Monthly Net Death Benefits, Probabilistic Monthly Policy Loans and Probabilistic Monthly Cash Dividends, in each case, expected to be received in respect of such Conveyed Life Settlement Policy.

"Expected Outgo" means, with respect to any Conveyed Life Settlement Policy, the payment of the Acquisition Cost and each individual payment of Probabilistic Monthly Ongoing Servicing Costs, in each case, expected to be made in respect of such Conveyed Life Settlement Policy.