UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
RITCHIE CAPITAL MANAGEMENT, L.L.C.,
RITCHIE RISK-LINKED STRATEGIES
TRADING (IRELAND), LIMITED, RITCHIE
RISK-LINKED STRATEGIES TRADING
(IRELAND) II, LIMITED, WALKERS SPV             07 Civ. 3494 (DLC)
LIMITED, as trustee for Ritchie Risk-Linked
Life Strategies Trust I and Ritchie Life Strategies    ECF Case
Master Trust, and RITCHIE RISK-LINKED
STRATEGIES TRADING, LTD.,

                          Plaintiffs,

          v.

COVENTRY FIRST LLC, THE COVENTRY
GROUP, INC., MONTGOMERY CAPITAL,
INC., LST I LLC, ALAN BUERGER,
CONSTANCE BUERGER, REID S.
BUERGER, ANTONIO MUNIZ, ALEX
SELDIN, NEAL JACOBS, EILEEN SHOVLIN,
and JIM DODARO,
                          Defendants.
------------------------------------------------------------x


## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNTS I AND II OF THE PROPOSED SECOND AMENDED COMPLAINT

Lawrence S. Robbins (LR-8917)
Gary A. Orseck
Daniel R. Walfish
Rachel S. Li Wai Suen
ROBBINS, RUSSELL, ENGLERT, ORSECK,
    UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411
Washington, DC 20006
Tel: (202) 775-4500
Fax: (202) 775-4510

Dated: October 19, 2007

Thomas P. Puccio
LAW OFFICES OF THOMAS P.
PUCCIO
230 Park Avenue
New York, NY 10169
Tel: (212) 883-6383
Fax: (212) 883-6388

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... iii

I.  THE COURT HAS PERSONAL JURISDICTION OVER THE INDIVIDUAL
    DEFENDANTS ....................................................................................................1

    A.  The Individual Defendants "Transacted Business" In New York .........................2

    B.  The Individual Defendants Committed Tortious Acts Outside New York
        Causing Injury Within New York...........................................................................4

    C.  18 U.S.C. § 1965 Confers Personal Jurisdiction Over The Individual
        Defendants ..............................................................................................................6

II.  PLAINTIFFS HAVE STANDING TO ASSERT RICO CLAIMS...................................7

    A.  Plaintiffs' Injuries Were Proximately Caused By Defendants' RICO
        Violations ................................................................................................................7

    B.  Plaintiffs Have Properly Alleged RICO Damages.................................................10

    C.  The Investing Plaintiffs Have Standing To Assert RICO Claims..........................12

III.  PLAINTIFFS PROPERLY ALLEGE A "PATTERN" OF PREDICATE ACTS.............13

    A.  Plaintiffs Sufficiently Allege Mail Fraud And Wire Fraud Predicates..................14

        1.  Plaintiffs Have Satisfied Rule 9(b) .........................................................14

        2.  Plaintiffs Sufficiently Allege Predicate Acts of Wire Fraud
            Based On Defendants' Direct Dealings With Plaintiffs .................................16

        3.  The Wire Fraud Allegations Satisfy
            The Interstate Transmission Requirement .......................................................18

        4.  Plaintiffs Properly Allege Reliance .........................................................19

    B.  Plaintiffs Have Satisfied The "Continuity" Requirement.......................................19

        1.  The Alleged Pattern Has Closed-Ended Continuity .......................................20

        2.  The Alleged Pattern Has Open-Ended Continuity...........................................20

IV.  THE CORPORATE DEFENDANTS CAN BE RICO "PERSONS"................................22

V.      PLAINTIFFS HAVE STATED A CLAIM UNDER 18 U.S.C. § 1962(d).......................24

CONCLUSION.............................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abraham v. Young & Rubicam, Inc.*, 79 F.3d 234 (2d Cir. 1996) ....................................8

*Am. Home Mortgage Corp. v. UM Sec. Corp.*, No. 05 Civ. 2279 (RCC),
     2007 WL 1074837 (S.D.N.Y. Apr. 9, 2007)........................................................11

*Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006).....................................7, 8, 10

*Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271 (7th Cir. 1989) ..........................................25

*Baisch v. Gallina*, 346 F.3d 366 (2d Cir. 2003).................................................8, 9, 19

*Bank of China v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004), *cert. dismissed*,
     546 U.S. 1026 (2005)........................................................................19

*Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988)................................12, 13

*Beck v. Prupis*, 529 U.S. 494 (2000)............................................................5

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001)............................22, 23

*Ceribelli v. Elghanayan*, 990 F.2d 62 (2d Cir. 1993) ......................................12, 13

*City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526 (S.D.N.Y. 2005) ....................19

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229 (2d Cir. 1999)............18, 20

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)..........................25

*Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226 (10th Cir. 2006), *cert. denied*,
     127 S. Ct. 2134 (2007).......................................................................6

*CutCo Indus., Inc. v. Naughton*, 806 F.2d 361 (2d Cir. 1986) ...................................3

*Detrick v. Panalina, Inc.*, 108 F.3d 529 (4th Cir. 1997)........................................25

*D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95 (2d Cir. 2006)..............................2, 3, 4, 7

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ...........................................9

*Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612 (S.D.N.Y. 2006)......................16, 19

*First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) ...................19, 20, 23

*First Interregional Advisors Corp. v. Wolff*, 956 F. Supp. 480 (S.D.N.Y. 1997)...................14, 15

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)...........................7, 11

*Fogie v. THORN Ams., Inc.*, 190 F.3d 889 (8th Cir. 1999) ........................................................25

*G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521 (S.D.N.Y. 2002)...............................23

*Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 Civ. 342 (DLC),
    1999 WL 544708 (S.D.N.Y. 1999)......................................................................................3

*Goldkrantz v. Griffin*, No. 97 Civ. 9075 (DLC), 1999 WL 191540 (S.D.N.Y. 1999), *aff'd*,
    201 F.3d 431 (2d Cir. 1999).............................................................................................12

*Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158 (2d Cir. 2005) ...........................2, 3

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) ....................................8, 24

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989)..........................................................14, 20, 21

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992)......................................................10, 12

*Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251 (2d Cir. 2004), *rev'd & vacated in part
    on other grounds*, 126 S. Ct. 1991 (2006) .........................................................................19

*In re Am. Express Co. S'holder Litig.*, 39 F.3d 395 (2d Cir. 1994)..............................................8

*In re Executive Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021 (S.D.N.Y. 1997)...........................12

*In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56 (2d Cir. 1998)..............................................11

*In re Sumitomo Copper Litig.*, 995 F. Supp. 451 (S.D.N.Y. 1998) ..............................................16

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981) ...........................................12

*Kirwin v. Price Commc'ns Corp.*, 391 F.3d 1323 (11th Cir. 2004)...............................................24

*Kreuter v. McFadden Oil Corp.*, 71 N.Y. 2d 460 (1988) ..............................................................4

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) .............................................................7

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ...........................................................16

*Manson v. Stacescu*, 11 F.3d 1127 (2d Cir. 1993) ..................................................................12

*M'Baye v. N.J. Sports Prod., Inc.*, No. 06 Civ. 3439 (DC),
    2007 WL 431881 (S.D.N.Y. Feb. 7, 2007) .......................................................16

*McNally v. United States*, 483 U.S. 350 (1987) ......................................................................17

*Metromedia v. Fugazy*, 983 F.2d 350 (2d Cir. 1992) ...................................................20

*Moore v. PaineWebber, Inc.*, 189 F.3d 165 (2d Cir. 1999) ........................................8

*Moses v. Martin*, 360 F. Supp. 2d 533 (S.D.N.Y. 2004) .........................................16, 22

*Motorola Credit Corp. v. Uzan*, 322 F.3d 130 (2d Cir. 2003).......................................11

*Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*,
    86 F. Supp. 2d 137 (E.D.N.Y. 2000) ...................................................................6

*Panix Promotions, Ltd. v. Lewis*, No. 01 Civ. 2709 (HB),
    2002 WL 72932 (S.D.N.Y. 2002)..........................................................................23

*PC COM, Inc. v. Proteon, Inc.*, 906 F. Supp. 894 (S.D.N.Y. 1995)........................................6

*Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10 (2d Cir. 1989) .................20

*PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65 (2d Cir. 1998) ................................6

*Ray Larson Assocs., Inc. v. Nikko Am., Inc.*, No. 89 Civ. 2809 (BSJ),
    1996 WL 442799 (S.D.N.Y. 1996)........................................................................16

*Regency Capital, LLC v. Corpfinance Int'l, Inc.*, No. 02 Civ. 5615 (KTD),
    2003 WL 22400200 (S.D.N.Y. 2003)......................................................................2

*Salinas v. United States*, 522 U.S. 52 (1997)..............................................................24

*Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256 (2d Cir. 1995)......................................23

*Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*,
    985 F.2d 102 (2d Cir. 1993)...............................................................................13

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) ....................8

*Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17 (2d Cir. 2004).........................................1

*United States v. Pierce*, 224 F.3d 158 (2d Cir. 2000).................................................17

*Webster v. Omnitriton Int'l, Inc.*, 79 F.3d 776 (9th Cir. 1996)......................................................25

*Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196 (2d Cir. 2001) .....................................................2

*Yung v. Lee*, 432 F.3d 142 (2d Cir. 2005)......................................................................................18

*Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL),
    2004 WL 2211650 (S.D.N.Y. 2004)..........................................................................................2, 6

**Statutes and Rules:**

15 U.S.C. § 15...................................................................................................................................12

18 U.S.C. § 1341..........................................................................................................................17, 18

18 U.S.C. § 1343..........................................................................................................................17, 18

18 U.S.C. § 1961(5).........................................................................................................................14

18 U.S.C. § 1964(c).........................................................................................................................12

18 U.S.C. § 1965..........................................................................................................................1, 6

N.Y. C.P.L.R. § 302(a)(1)..................................................................................................................2

N.Y. C.P.L.R. § 302(a)(3).............................................................................................................4, 5

Fed R. Civ. P. 4(k)(1)........................................................................................................................2

**Other Authorities:**

I ABA Section on Antitrust Law,
    Antitrust Law Developments (6th ed. 2007).................................................................25

Defendants engaged in a protracted pattern of misconduct directed both at the elderly sellers of life insurance policies and at Plaintiffs, who invested in those policies. Because Defendants' business is permeated by a pattern of mail and wire fraud, Plaintiffs asserted claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Significantly, in moving to dismiss the original Complaint, Defendants never suggested that Plaintiffs had failed to allege a pattern of racketeering activity.[1] Now, faced with an amended complaint that cures the "enterprise" allegations that this Court granted leave to replead (see July 17, 2007 Opinion and Order, at 25), Defendants largely rehash *old* arguments that the Court previously declined to accept, or raise *new* responses to largely *unamended* allegations that should have been raised when Defendants moved to dismiss the original Complaint.

Defendants' challenges are not only untimely, but meritless as well. They rest in large part on mischaracterizations of the Proposed Second Amended Complaint ("SAC"), whose allegations must be presumed true and given every favorable inference at this stage. The RICO claims are sufficiently alleged, and Plaintiffs have amply established the Court's personal jurisdiction over the individual defendants.

# I. THE COURT HAS PERSONAL JURISDICTION OVER THE INDIVIDUAL DEFENDANTS[2]

Personal jurisdiction for purposes of the RICO claims can be established either under New York law, or pursuant to 18 U.S.C. § 1965. *See, e.g.*, *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004) ("In a federal question case, where the defendant resides outside the forum state, federal courts apply the forum state's personal jurisdiction rules if the applicable

---

[1]     Many of Plaintiffs' allegations derive from the complaint filed by the New York Attorney General ("NYAG"). The Supreme Court's Commercial Division substantially denied the motion to dismiss that action, explaining that the "alleged pattern of . . . misconduct . . . . gives rise to [the NYAG's] central claims for 'fraudulent business practices' under the Executive Law." Walfish Decl. Ex. A at 6.

[2]     The corporate Defendants have ceased to challenge personal jurisdiction.

federal statute does not provide for national service of process."); *see also* Fed. R. Civ. P. 4(k)(1) (service of process establishes personal jurisdiction if the defendant is subject to personal jurisdiction under the rules of the forum state, *or* when authorized by a federal statute).[3] At this early stage, when no discovery has occurred, a plaintiff need only make a "prima facie showing" of personal jurisdiction by "'pleading in good faith . . . legally sufficient allegations of [personal] jurisdiction.'" *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). All allegations and any affidavits "'are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor.'" *Id.*

### A.    The Individual Defendants "Transacted Business" In New York

The individual defendants have "transacted business" in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1), which requires that "a party purposely availed [himself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006) (internal quotation marks omitted). A court evaluating "transacts-business" jurisdiction "'must look at the totality of circumstances concerning the party's interactions with, and activities within, the state.'" *Id.* at 105. Even a single transaction can suffice. *E.g.*, *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005).

Here Plaintiffs' key personnel were based in New York. The relationship between the Defendants and Plaintiffs involved continual communication between the individual Defendants and the occupants of a New York office.[4] The individual Defendants also: (1) purchased

---

[3]    Section 1965 supplements rather than displaces other bases for personal jurisdiction. *See, e.g.*, *Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2004 WL 2211650, at *20 (S.D.N.Y. 2004); *Regency Capital, LLC v. Corpfinance Int'l, Inc.*, No. 02 Civ. 5615 (KTD), 2003 WL 22400200, at *1-3 (S.D.N.Y. 2003).

[4]    *See, e.g.*, SAC ¶¶ 17, 42-43, 54, 71, 73, 75, 76; *see also* Declaration of A.R. Thane Ritchie (Dkt. Item 24) ¶ 5 (defendants met with Plaintiffs in New York to discuss business relationship).

numerous life insurance policies through brokers in New York,[5] and (2) purchased $175 million worth of life insurance policies, including ones procured through the very misconduct challenged in the complaint, from sellers in New York.[6] Moreover, (3) the corporate entities, acting through specified individuals, entered into numerous contracts with Plaintiffs in New York,[7] many of which contained a New York choice of law provision,[8] and some of which were executed by Defendant Alex Seldin, who, as Coventry's general counsel (*id.* ¶ 32), "cannot plausibly be analogized to a ministerial signer," *Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 Civ. 342 (DLC), 1999 WL 544708, at *19 (S.D.N.Y. 1999).

All of this, alleged in ample and often minute detail, is more than sufficient to establish that each of the individual Defendants has transacted business in New York. *See, e.g.*, *D.H. Blair*, 462 F.3d at 105 (jurisdiction established over individuals who entered into account agreements with a broker in New York through whom they regularly placed stock trades); *Pryor*, 425 F.3d at 166-67 ("[T]he transacts-business standard can be satisfied where both the negotiations and execution of a contract took place within New York."); *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 367-68 (2d Cir. 1986) (prima facie showing of jurisdiction based on totality of defendant's extensive communication with plaintiff in New York, two visits to New York, and a choice of law clause).

Defendants do not dispute that the sets of allegations labeled (1), (2), and (3) above are sufficient. Instead, they attack only the allegations regarding dealings with Plaintiffs in New

---

[5]    *E.g.*, SAC ¶¶ 18-19, 61(b), (c); *id.* Ex. A ¶¶ 30-32, 50-51; Decl. of Lawrence S. Robbins (Dkt. Item 23) ("Robbins Decl.") Ex. 4 ¶ 5, Ex. D (specifying certain interactions with New York broker).

[6]    *E.g.*, SAC ¶¶ 18-19, 66; *id.* Ex. A ¶ 61; Robbins Decl. Ex. 4 ¶ 3, Ex. B (identifying policies purchased in New York); Walfish Decl. Ex. B (acknowledging $175 million paid to sellers in New York).

[7]    *E.g.*, SAC ¶¶ 13, 17, 42-53, 56, 58.

[8]    *E.g.*, Affidavit of Katherine G. Lindsey in Opp. to Mot. for Reconsid. (Dkt. Item 57) Exs. 7, 9 § 7.7; Aff. of George A. Borden in Supp. of Mot. to Dismiss (Dkt. Item 20) Exs. 2, 4 § 7.04(b).

York, and suggest, without any authority on point, that to sufficiently allege personal jurisdiction at the pleading stage, a plaintiff must actually set out the particulars of specific emails and telephone conversations, and then explicitly link each individual communication to the causes of action. Defs. Mem. 4-5. The SAC and Plaintiffs' affidavits actually do that to a large extent (*see, e.g.*, SAC ¶¶ 61(b), 61(c), 71-75, 84-85; *id*. Ex. A 30-32; *see also* Robbins Decl. Ex. 4 ¶ 5, Ex. D), but even if they did not, jurisdictional allegations need not be pled with such specificity.[9]

Defendants also suggest that even if the defendants transacted business in New York, that business lacks the requisite "substantial nexus," *D.H. Blair*, 462 F.3d at 105, with Plaintiffs' claims. But the nexus is quite strong. The purchase of life insurance policies and the negotiation of the contracts under which Plaintiffs invested in those policies has everything to do with claims based on misconduct in connection with those activities.

**B.    The Individual Defendants Committed Tortious Acts Outside New York Causing Injury Within New York**

Section 302(a)(3) of the C.P.L.R. creates jurisdiction over a defendant who:

commits a tortious act without the state causing injury to person or property within the state . . . if he

---

[9]    Defendants also assert (at 5) that Plaintiffs "fail to allege facts suggesting the individual defendants exercised control over Coventry First or LST I in the transaction at issue." But the SAC establishes § 302(a)(1) jurisdiction by relying overwhelmingly not on corporate control *per se* but on exquisitely specific allegations of personal transaction of business in New York. In any event, the allegations of "control" are sufficient. *See Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988) (§ 302(a)(1) jurisdiction over individual defendants is established if corporation is "engaged in purposeful activities in [New York] in relation to [an individual defendant's] transaction for the benefit of and with the knowledge and consent of [the individual defendants]" and individual defendants "exercised some control over [the corporation] in the matter."). The "transaction[s] at issue," Defs. Mem. 5, of course, are not just the "sale[s] of Policies to Ritchie I and II," *id.*, but also include the acquisition of life insurance policies from elderly sellers. The SAC amply alleges that the individual Defendants all are owners or officers and executives with direct responsibility for Coventry First's purposeful acquisition of life insurance policies in New York. SAC ¶¶ 18-19, 25, 30-35, 63; *id*. Ex. A ¶ 22; *id*. Ex. B ¶ 4, 5, 6, 8, 10. Accordingly, the SAC establishes knowledge, consent, benefit, and the requisite degree of control. *See Kreutter*, 71 N.Y.2d at 467.

> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce[.]

In this case, the tortious acts outside New York include numerous instances of misconduct specified in great detail throughout the SAC and its attachments. The injury in New York occurred when New York sellers became victims of Defendants' fraud and bid-rigging. SAC ¶ 18; Robbins Decl. Ex. 4 ¶ 3, Ex. B.

The individual Defendants, through multiple rounds of briefing, have never disputed that Plaintiffs have sufficiently alleged personal jurisdiction over them under C.P.L.R. § 302(a)(3)(i). Indeed, in addition to the elements just recited, the individual Defendants patently "regularly do[] or solicit[] business, or engage[] in [a] . . . persistent course of conduct, or derive[] substantial revenue from . . . services rendered, in the state." § 301(a)(3)(i). Defendants' limited attack on Plaintiffs' § 302(a)(3)(ii) allegations therefore is beside the point. It is also unfounded.

Defendants first argue (at 6) that, "[b]y its terms, § 302(a)(3)(ii) applies only to tort claims – not RICO." That is wrong. By its terms, § 302(a)(3) applies when a defendant commits a "tortious act" outside New York causing injury in New York. The alleged mail fraud and wire fraud predicates necessarily entail "tortious acts." *See Beck v. Prupis*, 529 U.S. 494, 505 (2000) (RICO predicate violations are inherently "act[s] of a tortious character."). Next Defendants protest that Plaintiffs do not specify which particular policies were procured by fraud, and who bought and sold those policies. Defs. Mem. 6. But Plaintiffs do not yet have access to those details, which is why this type of reticulated examination is a matter for proof, not pleading.[10]

---

[10]    Defendants also seem to argue that the "derives substantial revenue from interstate commerce" allegations are insufficient because Coventry First's and Montgomery Capital, Inc.'s interstate revenues are not necessarily "derived" by the corporations' employees. Defs. Mem. 6. But the individual Defendants are not ordinary employees; they are the owners and prime movers of a family-run business

### C.  18 U.S.C. § 1965 Confers Personal Jurisdiction Over The Individual Defendants

Under § 1965, a civil RICO action may be "brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant." *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998). Here, as the above discussion shows, "minimum contacts" are established as to *all* individual Defendants. Even if, for some individual Defendant, minimum contacts have not been established (and Plaintiffs insist that they have been), personal jurisdiction still exists. Section 1965(a) provides that a civil RICO claim may be brought in any district where any defendant "resides, is found, has an agent, or transacts his affairs." There is no dispute that the corporate defendants meet this description. Once § 1965(a) is satisfied, then, under § 1965(b), jurisdiction over "other parties" can be obtained on a "showing that the 'ends of justice' so require." *PT United*, 138 F.3d at 71.

The "ends of justice" criterion includes (but is not necessarily limited to[11]) situations in which, absent section 1965(b), "'it would be impracticable to bring all co-defendants together in a single action.'" *Zito*, 2004 WL 2211650, at *20 (citing *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.,* 86 F. Supp. 2d 137, 140 (E.D.N.Y. 2000) (Weinstein, J.)). Contrary to Defendants' suggestion, Defs. Mem. 2-3, this is such a situation. Defendants Coventry First and LST I LLC ("LST") (acting as alter ego of Defendant Montgomery Capital, Inc., *see* SAC ¶¶ 56, 58) consented to *exclusive* jurisdiction in Manhattan for disputes arising out of the relationship

---

with national scope. *E.g.*, SAC ¶¶ 19, 30-35, 40. In any case, the individual Defendants' revenues from interstate commerce need not come from the corporation or even the activity at issue in the lawsuit. Plaintiffs are entitled to discover whether, as alleged in good faith, *see id.* ¶ 13(3), the individual Defendants independently satisfy this jurisdictional element. *PC COM, Inc. v. Proteon, Inc.*, 906 F. Supp. 894, 905-06 (S.D.N.Y. 1995).

[11]    *See Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1232 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 2134 (2007).

6

with Plaintiffs.[12] S*ee, e.g.*, *D.H. Blair*, 462 F.3d at 103 ("forum-selection clauses are regularly enforced"). As the main operating vehicles for Defendants' purchases and sales of life insurance, *see* SAC ¶¶ 2, 39-40, 56, 58, Coventry First and LST/Montgomery Capital are crucial Defendants. Because they are unable to object to venue here, this district is positioned, as others are not, to adjudicate the entirety of the controversy.

## II.    PLAINTIFFS HAVE STANDING TO ASSERT RICO CLAIMS

The SAC alleges that Defendants engaged in a scheme pervaded by fraud, that (1) was directly targeted at Plaintiffs (among others), and (2) had the direct, foreseeable, and intended effect of inducing Plaintiffs to transfer hundreds of millions of dollars to Defendants. The fraud against Plaintiffs was an essential component of Defendants' unlawful scheme, and Plaintiffs suffered concrete injuries, cognizable under RICO, as a direct result of the RICO violations.

### A.    Plaintiffs' Injuries Were Proximately Caused By Defendants' RICO Violations

Proximate cause exists where, as here, the Defendants' acts "were 'a substantial factor in the sequence of responsible causation,'" and the injury to Plaintiffs was "'reasonably foreseeable or anticipated as a natural consequence'" of those acts. *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)). And injury is foreseeable when Plaintiffs are among the "targets . . . and intended victims of the racketeering enterprise." *Id.* at 124. "[T]he central question . . . is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991, 1998 (2006).

Defendants say, hyperbolically, that the predicate acts alleged in the complaint consist "almost entirely of mail and wire fraud against Policy owners." Defs. Mem. 7. They proceed to

---

[12]    *E.g.*, Lindsey Aff., *supra* note 8, Exs. 7, 9 § 7.7; Borden Aff., *supra* note 8, Exs. 2, 4 § 7.04(b).

argue as if "almost entirely" means "entirely." In fact, the SAC alleges predicate acts of fraud *against Plaintiffs*, and alleges that those acts (along with acts directed at the insureds) directly and foreseeably caused – in other words, "led directly to," *Anza*, 126 S. Ct. at 1998 – Plaintiffs' injuries. *See, e.g.*, SAC ¶¶ 55-58, 70-79, 84(a)-(c), (r)-(s), 86-97. Plaintiffs do not "theorize" (Defs.' Mem. 8) that the fraud diminished the value of all of the policies they purchased; they allege that as a fact, SAC ¶¶ 88-90, which must be accepted as true on this motion.

Defendants also advance the near-frivolous arguments that there can be no proximate cause if (1) a victim will not be injured until the defendants' fraud is exposed, and (2) the victim would have benefited if the fraud had not been exposed. Defs. Mem. 8-9. No case cited by Defendants supports those extravagant claims. The cases hold merely that third parties who suffer indirect and incidental injury as a result of violations targeted at others lack standing. *See In re Am. Express Co. S'holder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994) (shareholders lacked standing to sue corporation when the corporation engaged in wrongdoing directed against others); *Abraham v. Young & Rubicam, Inc.*, 79 F.3d 234, 238-39 (2d Cir. 1996) (plaintiff lacked standing where he was not "an intended target of the scheme"); *Hecht v. Commerce Clearing House*, Inc., 897 F.2d 21, 24 (2d Cir. 1990) (employee could not sue employer because he was fired for refusing to aid employer's RICO violations targeted at others). None of those cases involved misrepresentations directed at the plaintiff and producing direct and foreseeable injury. Those elements, alleged here, are more than sufficient to establish proximate cause. *See, e.g.*, *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999); *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 96-97 (2d Cir. 2001).

The fallacy of Defendants' arguments is apparent by considering "paradigmatic racketeering enterprises" such as Ponzi schemes. *See Baisch v. Gallina*, 346 F.3d 366, 376 (2d

Cir. 2003). An early investor in a Ponzi scheme, who is paid before it is exposed, may benefit from the scheme. That is no reason to deny standing to later investors who are injured, even though they, too, might have benefited if the scheme had been exposed later. *See id*. (discussing injury from racketeering "by the creation of a substantial risk of harm"). Similarly, the investor who purchases stock at a price inflated by accounting fraud may not be injured until the fraud is exposed, and may even benefit if she sells the stock to someone else before the fraud is exposed.[13] Likewise, perhaps Plaintiffs might not have been injured in a hypothetical world in which they re-sold the policies before Defendants' fraud was exposed. But there is no reason to deny standing to the party who *is* injured by fraud in the real world merely because, in a hypothetical world in which the fraud was exposed at a later time, the injury might have been transferred to another victim. When Peter is robbed to pay Paul, the robber should not be permitted to escape liability to Peter with the defense that he would have robbed Mary to pay Peter, had he not been apprehended.

Defendants claim, next, that Plaintiffs have not sufficiently alleged that "Ritchie I" or "Ritchie II" purchased improperly originated policies. Defs. Mem. 9-10. That claim is simply inaccurate and, even if it were true, irrelevant. The SAC alleges (at ¶ 83) that Defendants procured policies through fraud "and sold or caused Coventry to sell those policies to institutional investors . . . including Plaintiffs." *See also* SAC ¶ 84(a). Plaintiffs would have standing even without that allegation, based on the allegations that the value of the portfolio of policies purchased by Ritchie I and Ritchie II was impaired by Defendants' fraud. *Id*. ¶¶ 86-96. Defendants' factual contention that "there is no basis for" those allegations (Defs. Mem. 10) is plainly premature and out of place in this motion, which must assume the truth of the allegations.

---

[13]    Indeed, such an investor typically is *precluded* from bringing a fraud claim until the exposure of the fraud causes his loss. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005).

Defendants' final argument (Defs. Mem. 10) – that Plaintiffs are not "direct victims" of predicate acts – is patently wrong. Defendants cite *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 269 (1992), and *Anza*, *supra*, but unlike in those cases, here Defendants' false representations (and omissions) occurred in their *direct dealings* with Plaintiffs, for the purpose of inducing an investment of hundreds of millions of dollars in assets that are now worth much less because of Defendants' unlawful behavior. Defendants' evident intent to mount a challenge to the calculation of damages on the merits (Defs. Mem. 10) is surely not cognizable on a motion to dismiss.

### B.    Plaintiffs Have Properly Alleged RICO Damages

Defendants suggest that Plaintiffs have not suffered damages because the SAC "do[es] not dispute that Ritchie I and II are entitled to over $2.5 billion in death benefits under the Policies." Defs. Mem. 10. But this Court cannot dismiss a complaint because it fails to anticipate and "dispute" every factual argument the Defendants might advance on the merits. The question is whether the allegations that *are* in the complaint state a claim. The SAC alleges, among other things, that the value of the policies owned by Ritchie I and Ritchie II has greatly diminished since the New York Attorney General's action was commenced. SAC ¶ 86. And one reason, of course, is that because of Defendants' fraud, the NYAG has sought a "right of rescission [for] all Sellers who entered into Purchase Agreements with Defendant Coventry from 2001 to the present." *Id*. Ex. A at 32. As the SAC explains, "Defendants' misconduct has thus directly interfered with the salability and value of the life insurance policies at issue." *Id*. ¶ 90.

Defendants seek dismissal of the RICO claims on the grounds that Plaintiffs may not recover anticipated profits. Defs. Mem. 11. In doing so, they misdescribe the injury the Plaintiffs actually assert in connection with those claims – not the loss of "anticipated profits" as

Defendants insinuate, but injury arising from Plaintiffs' investments in policies "that, because of Defendants' racketeering activity, actually were worth, unbeknownst to Plaintiffs at the time, either nothing or a tiny fraction of what Plaintiffs paid for the policies." SAC ¶ 102.

Defendants also raise a factual defense that Plaintiffs' RICO claims are inconsistent with § 3.02(c) of the Master Policy Purchase Agreements ("MPPAs"). Defs. Mem. 11. This has nothing to do with RICO standing and is a complete non-sequitur. Arguably, § 3.02(c) would preclude (1) a contract claim (2) asserted by a party to the contract, (3) for breach of the specific representations and warranties referenced in that subsection of the MPAA. But nothing in that provision of the MPPA purports to preclude (1) a fraud/RICO claim, (2) asserted by plaintiffs who were not parties to the MPPA, (3) for fraudulent misrepresentations and omissions concerning subjects other than the representations and warranties disclaimed in § 3.02(c).

Finally, Defendants seek dismissal by asserting that the damages claims are "impermissibly speculative" because the SAC does not explain how damages could be determined, does not precisely quantify the damages, and because quantification would be "complex." Defs. Mem. 11-12. But nothing in the law requires a *complaint* to describe a methodology for quantifying damage, to apply that methodology to come up with a precise quantification, or to use only "simple" methods of quantification. Plaintiffs must allege, and eventually prove, an actual injury.[14] But if the fact of injury is proved at trial, Plaintiffs are

---

[14]    Plaintiffs' injury has already occurred and therefore is much different from the *potential* injuries alleged in the cases cited by Defendants. In *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994), the defendant's fraud allegedly induced plaintiff to extend loans secured by insufficient collateral. The plaintiff, however, had not yet exercised its right to foreclose in the event of a default. The Court of Appeals dismissed plaintiff's claim because "the fraud defendant is not liable for all losses that *may occur*, but only for those *actually suffered*." *Id*. at 768 (emphases added). *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135-36 (2d Cir. 2003), applied the same principle, as did *American Home Mortgage Corp. v. UM Securities Corp.*, No. 05 Civ. 2279 (RCC), 2007 WL 1074837, at *4 (S.D.N.Y. Apr. 9, 2007). Here, however, as in *In re Merrill Lynch Limited Partnerships Litigation*, 154 F.3d 56, 59 (2d Cir. 1998), the injury to plaintiffs arises from "the difference between the value of the [asset] they were

entitled to establish, through expert testimony, the effect of the fraud on the value of their investment (*see, e.g.*, *Goldkrantz v. Griffin*, No. 97 Civ. 9075 (DLC), 1999 WL 191540, at *5 (S.D.N.Y. 1999), *aff'd*, 201 F.3d 431 (2d Cir. 1999) (endorsing use of event study and regression analysis); *In re Executive Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1027 (S.D.N.Y. 1997) (same)), and even then, Plaintiffs are not required to prove the amount of damage with precision. S*ee, e.g.*, *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981).[15] *A fortiori*, there is no requirement to *allege* the amount of damage with precision, much less to allege a methodology for calculating damages or to use only a "simple" methodology.

### C.     The Investing Plaintiffs Have Standing To Assert RICO Claims

Defendants contend that the Investing Plaintiffs lack standing because their harm is derivative of the injury suffered by Ritchie I and Ritchie II. Defs. Mem. 12-14. Defendants mischaracterize the SAC and apply the wrong legal principle.

It is uncontroversial that "[a] share-holder generally does not have standing to bring an individual action under RICO to redress injuries to the corporation in which he owns stock." *Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir. 1993). However, the Second Circuit has held repeatedly that when, as here, a shareholder or other investor alleges "direct" injury by reason of a RICO violation – for example because the "defendant has violated an independent duty to the shareholder," *Ceribelli v. Elghanayan*, 990 F.2d 62, 63-64 (2d Cir. 1993), or perpetrated misconduct on an investor directly, *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988);

---

promised and the one they received." That is a concrete injury that has already occurred.

[15]     *J. Truett Payne* involved a suit filed under Section 4 of the Clayton Act, 15 U.S.C. § 15. The language of the RICO provision relevant here, 18 U.S.C. § 1964(c), was drawn directly from Section 4 of the Clayton Act, and Congress intended its words "to have the same meaning that courts had already given them." *Holmes*, 503 U.S. at 268.

*Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*, 985 F.2d 102 (2d Cir. 1993) – the shareholder or investor has RICO standing.

Thus, for example, in *Ceribelli*, the defendants allegedly concealed, from the purchasers of shares in a cooperative, information about the underlying property that the defendants were obligated to disclose. Writing for the panel, Judge Newman explained that, to the extent the omission had defrauded the shareholders in connection with their purchase, they could "maintain a direct action" notwithstanding the fact that the cooperative itself had also suffered injury. 990 F.2d at 63-64. To similar effect is *Standardbred Owners Ass'n*, in which horse owners, trainers, and others who invested in capital equipment in reliance on the defendants' fraudulent representations that a racetrack would stay open were permitted to sue directly for the injury they suffered when the defendants closed the track. 985 F.2d at 103-04. And in *Bankers Trust*, a creditor of a corporation had standing to recover for "injuries [the plaintiff] suffered directly" from, among other things, a series of frauds aimed directly at the plaintiff and other creditors, and designed to conceal from them the corporation's assets. 985 F.2d at 1098-99, 1101.

This case follows easily from those. The SAC amply alleges misrepresentations made to the Investing Plaintiffs, as well as fraudulent omissions where there was a duty to disclose. The Investing Plaintiffs parted with their funds as a result of acts of fraud and breaches of duty perpetrated directly on them (among others), and thereby suffered injury from Defendants' racketeering activities. *E.g.*, SAC ¶¶ 55, 57, 71-80, 92, 102. That suffices for RICO standing.

## III.    PLAINTIFFS PROPERLY ALLEGE A "PATTERN" OF PREDICATE ACTS

Defendants raise a barrage of brand-new challenges to the allegations of a pattern of racketeering activity that were equally available (though would have been equally meritless) at the time they moved to dismiss the original Complaint. A RICO plaintiff must show at least two

predicate acts committed over a ten year period, 18 U.S.C. § 1961(5), and they must be "related" and "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989). The SAC readily alleges precisely this. In the event the Court disagrees, it should grant Plaintiffs leave to amend in order to remedy, as Plaintiffs easily could do, any purported technical deficiency.

## A.    Plaintiffs Sufficiently Allege Mail Fraud And Wire Fraud Predicates

The complaint sufficiently alleges that, in furtherance of their scheme to defraud Plaintiffs and policy owners, Defendants committed multiple violations of federal law, including mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

### 1.    Plaintiffs Have Satisfied Rule 9(b)

It goes without saying that a complaint should be "read as a whole," rather than limiting the inquiry to "specific paragraphs of the complaint viewed in isolation." *First Interregional Advisors Corp. v. Wolff*, 956 F. Supp. 480, 485 (S.D.N.Y. 1997). Defendants' Rule 9(b) argument improperly singles out specific sentences in the SAC for attack, stripping them of the context provided by the remainder of the complaint. *See* Defs. Mem. 15-16.

First of all, Defendants do not even mention, much less challenge, a large number of extremely detailed allegations in the NYAG and Florida Office of Insurance Regulation ("FOIR") complaints that make out predicate acts of mail fraud and wire fraud. *See* SAC ¶ 62 (incorporating by reference NYAG and FOIR allegations); *id*. Ex. A ¶¶ 27-45; *id*. Ex. B ¶¶ 10-31; *see also id.* ¶ 85 ("This enumeration of predicate acts of racketeering is not exhaustive. As explained in the [NYAG] complaint, Defendants used interstate wires and mail on numerous other occasions in furtherance of their fraudulent scheme.").

Instead Defendants begin by attacking paragraphs 84(a) through (d) of the SAC for providing only "generalized allegations of fraud." Defs. Mem. 15-16. But sub-paragraphs 84(a)

through (d) clearly are not intended to set forth separate predicate acts. Rather, as the SAC explains, these sub-paragraphs describe the nature of the scheme by which Defendants defrauded Plaintiffs and the policy owners as background to detailed allegations of mail and wire fraud found in (among other places) paragraphs 84(e) through (s). *See* SAC ¶ 84(d) ("Defendants' fraudulent scheme was furthered by numerous uses of interstate wires and mail, *some of which are described below*") (emphasis added).

Defendants make a similar mistake with regard to sub-paragraph 84(g), asserting that it does not satisfy the requirements of Rule 9(b) because it fails to identify the sender of fraudulent statements or documents. Defs. Mem. 16. Not so. Paragraph 84(g) refers to an e-mail "described in paragraph 66 of this complaint," and paragraph 66 alleges that Defendant Coventry First sent the fraudulent offer sheets. SAC ¶ 66 ("Coventry First supplied falsified offer sheets . . . . On August 31, 2004, Coventry First emailed the falsified offer sheets to the second broker").

Finally, Defendants assert that paragraphs 84(p) and (q) are insufficiently particularized because they do not affirmatively plead transmission by wire or mail. Defs. Mem. 16. Paragraphs 84(p) and (q), however, state that Defendants made illegal "co-broker" payments and presented policy owners with false documentation, and allege mail and wire fraud predicates insofar as these payments or documents were transmitted over interstate wires or mail.

Ultimately, Defendants' extraordinarily fine-toothed objections are beside the point. Rule 9(b) does not require the complaint to spell out the particulars of each and every mailing or wire transmission. Without discovery, Plaintiffs cannot and need not identify the details of every single potential transmission by wire or mail in furtherance of the fraud. *See Wolff*, 956 F. Supp. at 485. As long as the plaintiff "delineate[s], with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme, . . . [t]he failure

to describe particular letters or telephone calls is not fatal to the complaint." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456-57 (S.D.N.Y. 1998) (citation omitted); *see also M'Baye v. N.J. Sports Prod., Inc.*, No. 06 Civ. 3439 (DC), 2007 WL 431881, at *7 (S.D.N.Y. Feb. 7, 2007*)* (where plaintiffs claim only that the mails or wires were "used in furtherance of a scheme to defraud, then the complaint does not have to be as specific with respect to each allegation of mail or wire fraud, so long as the RICO scheme is sufficiently pled to give notice to the defendants."); *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 624 (S.D.N.Y. 2006) (same).

Here the SAC, in addition to setting forth a very large number of specific predicate acts, describes the nature and mechanics of the overall scheme by which Defendants defrauded Plaintiffs and policy owners. *See, e.g.*, SAC ¶¶ 60-67, 83-84 (describing fraud on policy owners), ¶¶ 55-59, 68-84 (describing fraud on Plaintiffs), ¶¶ 61-62, 66-67 (providing detailed examples of illegal "co-broker" payments and falsification of documents). This is more than sufficient to put Defendants on notice and satisfy Rule 9(b).

### 2. Plaintiffs Sufficiently Allege Predicate Acts of Wire Fraud Based On Defendants' Direct Dealings With Plaintiffs

Defendants contend that the allegations on which Plaintiffs' dismissed common-law fraud claims were based cannot form part of a predicate wire fraud violation. Defs. 17-18. The argument is flawed. "Because '[t]he mail and wire fraud statutes are broader than a claim of common law fraud,' it is possible for a plaintiff to sufficiently plead mail or wire fraud while nevertheless failing to plead common law fraud." *Evercrete Corp.*, 429 F. Supp. 2d at 623 (citing *Moses v. Martin*, 360 F. Supp. 2d 533, 547-48 (S.D.N.Y. 2004)); *accord Ray Larsen Assocs., Inc. v. Nikko Am., Inc.*, No. 89 Civ. 2809 (BSJ), 1996 WL 442799, at *5 n.3 (S.D.N.Y. 1996).[16]

---

[16]    While common-law fraud generally applies only to a misrepresentation or omission, *see, e.g.*, *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291-92 (2d Cir. 2006), the federal wire fraud statute applies to "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining

For that reason, even if Plaintiffs' common-law fraud claims were somehow barred on the (in our view incorrect and inapplicable[17]) theory that a false representation incorporated into a written contract can never give rise to a fraud claim, Defs. Mem. 17 (citation omitted), a RICO claim may still be based on deliberate misrepresentations that, as alleged here (*see* SAC ¶¶ 84(r), (s)), were part of a scheme to "obtain[] money or property by means of false . . . pretenses, representations, or promises," 18 U.S.C. § 1343. That is the very definition of a RICO predicate. *Id*. § 1963(1) ("racketeering activity" includes "any act . . . indictable under" § 1341 or § 1343).

Defendants next argue that the integration clause in the MPPAs disclaims reliance on the specified representations. Defs. Mem. 17. As Plaintiffs have elsewhere explained, however, the integration clause (i) quite clearly does *not* disclaim reliance on the specified representations and on the contrary does just the opposite, (ii) releases only LST, not the other Defendants, and (iii) binds only the two plaintiffs that signed the MPPAs, not the others. *E.g.*, Mem. in Supp. of Reconsid. 8-9; Reply in Supp. of Reconsid. 4-5.

Last, Defendants claim that Plaintiffs have "disavowed any claim based on alleged misrepresentations concerning the fact or nature of the NYAG investigation or lawsuit." Defs. Mem. 17. This assertion is based on an improper reference to a document outside the pleading,[18]

---

money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings . . . or sound for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343. *See also United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) (elements of wire fraud are "(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate wires."); *McNally v. United States*, 483 U.S. 350, 359 (1987) (language of federal fraud statutes "reach[es] false promises and misrepresentations as to the future as well as other frauds involving money or property.").

[17]    Plaintiffs of course believe that they have valid common-law fraud claims. *See generally* Pls. Rev. Mem. in Supp. of Mot. for Reconsid., Dkt. Item 54 ("Mem. in Supp. of Reconsid."), at 4-9; Pls. Reply in Supp. of Reconsid., Dkt. Item 62 ("Reply in Supp. of Reconsid."), at 1-8. Among other issues, (i) Defendants' argument does not account for the dismissal of the fraud claims by non-contracting parties, and (ii) the SAC, perhaps more clearly than the original Complaint, alleges *post-contractual* collateral false statements. *See* Mem. in Supp. of Reconsid. 5-6; Reply in Supp. of Reconsid. 3 & n.5.

[18]    The "Intercreditor Agreement" to which Defendants refer is barely mentioned and nowhere

and in any event is both misleading and inaccurate. The clause to which Defendants refer provided only that the existence of the NYAG's action would not trigger certain defined events under certain transactional documents. The clause is not even a waiver of a claim of breach of the MPPAs, much less of a fraud or RICO claim. Most important of all, the clause certainly does not mean that Plaintiffs were not deceived to their detriment by earlier misrepresentations about the NYAG investigation and about the circumstances in which the policies were originated.

### 3. The Wire Fraud Allegations Satisfy The Interstate Transmission Requirement

Defendants assert (at 18-19) that paragraphs 84(h)-(o) of the SAC fail the requirement of the wire fraud statute, 18 U.S.C. § 1343, that the defendant have "communicate[d] by wire in 'interstate or foreign commerce' in furtherance of a scheme to defraud." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 243 (2d Cir. 1999). Even if that were true, the argument is irrelevant; the complaint identifies numerous other communications that plainly satisfy the interstate transmission requirement of §§ 1341 and 1343 and that Defendants do not and cannot challenge. *E.g.*, SAC ¶¶ 84(e) (communication between New York and Pennsylvania), (f) (same), (g) (interstate e-mailing of falsified offer sheets), (p) (communications between Pennsylvania and California, Florida, Hawaii, New Jersey and New York); (q) (same), (r) (communications between Pennsylvania and New York), (s) (same); *see also id*. Ex. A ¶¶ 30-32, 37-39, 44-45 (interstate emails and other communications); *id*. Ex. B ¶¶ 11(a), (b), 15(b), 17(b), 19(b), (d), 21(b), 23(a), 25(a) (same).

In any event, the argument is wrong. For one thing, Paragraph 84(k) plainly alleges a series of interstate transmissions: namely, e-mail communications between Defendant Jim

---

quoted in the complaint, *see* SAC ¶ 45, let alone relied on so heavily as to make it "integral" to the complaint, *see Yung v. Lee*, 432 F.3d 142, 146 (2d Cir. 2005).

Dodaro in Pennsylvania and a life settlement broker in Florida. *See id.* ¶ 84(k). More generally, "it is possible for a wire communication whose origin and ultimate destination are within a single state to be routed through another state. . . . [T]he question of whether [Plaintiffs] will be able to prove that pertinent wire communications by defendants traveled interstate is a matter for trial, not for resolution on a motion pursuant to Rule 12(b)(6)." *Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251, 265 (2d Cir. 2004), *rev'd & vacated in part on other grounds*, 126 S. Ct. 1991 (2006).

### 4. Plaintiffs Properly Allege Reliance

Defendants argue that Plaintiffs have failed to establish that they relied on certain specific misrepresentations made by Defendants to third-party policy owners and brokers. Defs. Mem. 19-20. But that is entirely irrelevant, because the SAC clearly alleges that Plaintiffs *did* rely on a number of other predicate acts. *E.g.*, SAC ¶¶ 84(r), 84(s), 102. A RICO plaintiff need not have relied on every last predicate act of fraud.[19] On the contrary, it suffices to allege, as Plaintiffs do here, a pattern of predicate acts directed at multiple parties, with reliance on the representations made directly to Plaintiffs. *E.g.*, *Baisch v. Gallina*, 346 F.3d 366, 370-71, 374 (2d Cir. 2003) ("The mail frauds against Baisch . . . directly promoted the fraud against Nassau County, and the fraud against Nassau county was the basis for the fraud against Baisch that led to his injury.").

### B. Plaintiffs Have Satisfied The "Continuity" Requirement

A pattern of racketeering activity must have either "open-ended" or "closed-ended" continuity. *E.g.*, *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 180 (2d Cir. 2004). The extensive and systematic pattern alleged in the SAC easily satisfies either requirement.

---

[19]    It is not clear that *any* immediate reliance on the underlying predicate fraudulent representations is necessary, provided of course that proximate cause requirements, *see* II.A., *supra*, are otherwise satisfied. *See Ideal Steel*, 373 F.3d at 260-64; *Evercrete Corp.*, 429 F. Supp. 2d at 624; *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 560 (S.D.N.Y. 2005); *but see Bank of China v. NBM LLC*, 359 F.3d 171, 176-78 (2d Cir. 2004), *cert. dismissed*, 546 U.S. 1026 (2005).

### 1.   The Alleged Pattern Has Closed-Ended Continuity

"Closed-ended" continuity requires (among other elements not challenged by Defendants) that past offenses extended over "a substantial period of time." *Id*. Defendants assert that "[e]xcluding intrastate e-mails and . . . retaining all other alleged predicate acts pleaded by Plaintiffs, the predicate acts lasted for 19 months," which is less than what Defendants say is the Second Circuit's "minimum two year threshold," Defs. Mem. 20-21.

But Defendants are wrong. Assuming without conceding that two years really is the minimum,[20] this case exceeds it by a wide margin. Even excluding – although there is no reason to do so at this stage, *see supra* – the intra-office emails, the alleged predicate acts span a period of at least three years and some months, beginning at the latest in March or April 2003 and quite possibly earlier (*see* SAC ¶¶ 61(a), 84(q); *id*. Ex. A ¶¶ 27-28; *see also id*. Ex. B ¶ 15(a), 17(a), 21(a), 31(a)), and continuing through at the earliest the end of June 2006 (*id*. ¶ 84(s)) and probably beyond (*see id*. ¶ 69). The duration made out in the SAC thus amply exceeds the two-year range that the Second Circuit has repeatedly recognized amounts to "a substantial period of time." *E.g.*, *Cofacredit*, 187 F.3d at 242; *Metromedia*, 983 F.2d at 369.

### 2.   The Alleged Pattern Has Open-Ended Continuity

Defendants' next argument is equally unavailing. Open-ended continuity means that there is or was a "'threat of continuing criminal activity beyond the period during which the predicate acts were performed.'" *Satinwood*, 385 F.3d at 180. This condition is satisfied "where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business." *H.J. Inc.*, 492 U.S. at 243; *accord Cofacredit*, 187 F.3d at 243.

---

[20]      *But see Metromedia v. Fugazy*, 983 F.2d 350, 369 (2d Cir. 1992) ("Periods of 19 or 20 months . . . have been held sufficient to support a finding of continuity."); *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 18 (2d Cir. 1989) (continuity requirement satisfied by pattern of predicate acts extending over "nearly two years").

That is this case. The SAC alleges, with many specific supporting examples, that, as part of their business of purchasing life insurance policies, Defendants routinely rigged bids, deceived policy sellers, paid kickbacks to brokers, and falsified documentation. *E.g.*, SAC ¶¶ 60-63, 64-67, 84(e)-(q) (numerous examples of misconduct); *id.* Ex. A ¶¶ 27-45 (same); *id.* Ex. B ¶¶ 10-30 (same); *see also id.* Ex. A ¶ 2 ("This case arises from pervasive fraud in . . . the 'life settlements' business. . . . The Defendants . . . prey on the owners of life insurance policies . . . ."), ¶ 4 ("Coventry systematically participates in breaches of fiduciary duty . . . ."), ¶ 5 ("Coventry sometimes generates false documents that conceal all or a portion of what the broker is getting."), ¶ 25 ("Coventry has undermined competition in the life settlements business through a variety of schemes—the most egregious of which involves rigged bids for insurance policies."); *id.* Ex. B ¶ 27(d) ("Coventry's 'deferred' compensation business practice results in viators being paid less than the fair market value of their policies based on competitive bidding and otherwise reflects that Coventry is not dealing in good faith . . . .").

The SAC, in other words, is replete with both specific and general allegations that, if proven, would overwhelmingly establish that the misconduct in question was "a regular way of conducting [D]efendant[s'] ongoing legitimate business," *H.J. Inc.*, 492 U.S. at 243. Most of Defendants' arguments to the contrary rest on an ostrich-like denial of the contents of the SAC. *See* Defs. Mem. 21-22. Defendants also argue that the fraud "against *Plaintiffs* was inherently terminable" because "the amount of capital Plaintiffs had agreed to provide was finite." *Id.* at 22 (emphasis added). Even if that were true,[21] it would be beside the point. The pattern of racketeering activity alleged here consisted of predicate acts committed against both policy

---

[21]     It is not true. The SAC alleges that in reliance on Defendants' misrepresentations as late as June 2006 (alleged as predicate acts in SAC ¶ 84(s)), Plaintiffs committed *additional* capital to Defendants via the Ritchie IV transaction. *Id.* ¶¶ 80, 92.

sellers *and* Plaintiffs,[22] and Defendants do not and cannot argue that there is anything "terminable" about that overall scheme.

## IV.    THE CORPORATE DEFENDANTS CAN BE RICO "PERSONS"

Defendants are wrong to contend that the RICO claims cannot be asserted against the corporate defendants. Liability under § 1962(c) requires that a "person employed by or associated with any enterprise" have "conduct[ed] or participate[d] . . . in the conduct of such enterprise's affairs" through a pattern of racketeering activity. The "person" – in other words, the defendant – "associated with" the enterprise must be distinct from the enterprise itself, but Plaintiffs' allegations are entirely consistent with this principle.

Plaintiffs allege two alternative enterprises. SAC ¶ 99. The first is Coventry First LLC.[23] Defendants mischaracterize the complaint when they state that "Plaintiffs claim that [Coventry First] is not distinct from any of the other corporate defendants," Defs. Mem. 23. Plaintiffs *nowhere* allege that Coventry First is indistinguishable from the other entities. *See id.* ¶¶ 25-28.[24]

To the extent Defendants are implying that the distinctness requirement is violated because the defendants are corporate entities that *own and are affiliated with* the corporate enterprise, the argument is inconsistent with *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001). There the Supreme Court held that the sole shareholder of a corporation alleged to

---

[22]    What is more, the SAC specifically alleges that Defendants sold policies to institutional investors besides Plaintiffs, thus creating a threat of ongoing violations. SAC ¶ 82; *see also id.* ¶ 41 ("Coventry sells the policies that it purchases to institutional investors," including "[AIG], Citigroup, Berkshire Hathaway, and the Ritchie group."); *id.* Ex. A ¶ 9.

[23]    Plaintiffs do not seek to hold that entity liable to the extent that it is also the enterprise. *Id.* ¶ 101.

[24]    Contrary to Defendants' implication (at 23), the SAC does not come anywhere close to alleging that Montgomery Capital, Inc. and The Coventry Group, Inc. are alter egos of Coventry First. The SAC can be read to allege, *see* SAC ¶ 2, that LST is an alter ego of Coventry First. At the pleading stage, however, that hardly vitiates the "distinctness" requirement for purposes of RICO. *See Moses v. Martin*, 360 F. Supp. 2d 533, 546-47 (S.D.N.Y. 2004) (sustaining both common-law veil-piercing and RICO "distinct legal entity" allegations as alternative pleading).

be a RICO enterprise could be liable as a 1962(c) defendant: "The corporate owner/employee . . . is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that." *Id*. at 163. In *Cedric Kushner*, the defendant owner was a natural person rather than a legal person, but that distinction does not matter. Congress defined a RICO "person" as either an individual *or* a corporate entity. 18 U.S.C. § 1961(3). Here Montgomery Capital, Inc. owns Coventry First, *see* SAC ¶ 25, and The Coventry Group, Inc. performs services for it and collects a portion of its profits, *id*. ¶ 16. Just as in *Cedric Kushner*, there is nothing unusual about saying that the owner (or affiliate) of the "legally different entity," 533 U.S. at 163, participates in the conduct of the entity's affairs.

Plaintiffs have also alleged an enterprise consisting of all of the individual defendants. Defendants do not (and cannot) argue that this association-in-fact fails the "distinctness" requirement. Instead they seem to suggest that a corporation cannot conduct an enterprise that consists of individuals. *See* Defs. Mem. 23-24. Defendants cite no authority for this proposition, and indeed, courts routinely recognize that a corporate entity can be a § 1962(c) "person" even when the enterprise consists in significant part of individuals. *E.g.*, *G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 546-47 (S.D.N.Y. 2002); *Panix Promotions, Ltd v. Lewis*, No. 01 Civ. 2709 (HB), 2002 WL 72932, at *5 (S.D.N.Y. 2002); *see also Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 262-64 (2d Cir. 1995).[25]

---

[25]    Defendants suggest (at 24 n.16) that Plaintiffs do not sufficiently allege the role played by each corporate Defendant in conducting the enterprise's affairs. There is no merit to this contention. A § 1962(c) defendant must have "'participated in the operation or management of the enterprise itself,'" but that "test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage. Ultimately . . . the RICO defendant must have played '*some* part in directing [the enterprise's] affairs.'" *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (citations omitted) (emphasis added). Here the SAC has numerous references to the functions performed by each defendant in connection with the enterprise at issue. *See, e.g.*, SAC ¶¶ 2, 6, 16, 29.

## V. PLAINTIFFS HAVE STATED A CLAIM UNDER 18 U.S.C. § 1962(d)

Defendants' challenge to the sufficiency of the RICO conspiracy claim is also unfounded.

First, contrary to Defendants' newly minted contention, Defs. Mem. 24-25, the allegations of conspiracy are not conclusory. The SAC describes the objectives and means of the conspiracy, and alleges that each Defendant intentionally, willfully, knowingly, and with a specific intent to defraud, participated in the conspiracy. SAC ¶¶ 81-83. And it does much more. It explains the relationships among the various members of the conspiracy (*e.g.*, *id*. ¶¶ 2, 16, 25-35, 52; *id*. Ex. A ¶ 22; *id*. Ex. B ¶¶ 4-6, 8, 10) and enumerates specific acts taken by each Defendant in furtherance of the conspiracy, *see, e.g.*, *id*. ¶¶ 16, 43, 55-58, 61-63, 66-67, 70-78, 84; *id*. Ex. A ¶¶ 28-45; *id*. Ex. B ¶¶ 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31. The SAC contains far more specifics than the complaints that were dismissed in the cases cited by Defendants, and easily satisfies the pleading standard for RICO conspiracy claims.[26] *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990) (RICO conspiracy allegations are "properly measured under the more liberal pleading requirements of Rule 8(a)."). If the Court disagrees, however, Plaintiffs should be granted leave to replead this claim.

Second, Defendants are incorrect that they "cannot conspire with one another," Defs. Mem. 25. The Second Circuit has never endorsed this "intra-corporate conspiracy" defense in a § 1962(d) case, and the district court cases cited by Defendants concerned only "conspiracies" that arose when a corporation's agents performed acts in the ordinary course of business on behalf of their employer – *not* conspiracies involving distinct corporate entities. When other circuits have considered this purported defense, they have usually rejected it.[27]

---

[26]    Insofar as cases cited by Defendants require allegations that each defendant committed, or agreed to commit, two predicate acts, those cases were overruled by *Salinas v. United States*, 522 U.S. 52 (1997).

[27]    *See, e.g.*, *Kirwin v. Price Commc'ns Corp*., 391 F.3d 1323 (11th Cir. 2004) (parent corporation

And with good reason. The intra-corporate conspiracy doctrine originated in 1984, long after RICO's enactment, as an antitrust doctrine that serves substantive purposes that are irrelevant in the context of RICO cases. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984); I ABA SECTION ON ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 26-27 (6th ed. 2007) (explaining history of doctrine). As the Seventh Circuit explained:

> [T]he Sherman Act is premised, as RICO is not, on the basic distinction between concerted and independent action. Since a subsidiary and its parent theoretically have a community of interest, a conspiracy "in restraint of trade" between them poses no threat to the goals of antitrust law – protecting competition. In contrast, intracorporate conspiracies do threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits.

*Ashland Oil*, 875 F.2d at 1281 (citations omitted).[28] This Court should follow the better-reasoned, majority rule. Under that rule, Plaintiffs have properly alleged a violation of § 1962(d).

## <u>CONCLUSION</u>

Counts I and II of the SAC state valid claims. The Court has personal jurisdiction over the individual Defendants.

---

can conspire with wholly owned subsidiary in violation of § 1962(d)); *Webster v. Omnitriton Int'l, Inc.*, 79 F.3d 776 (9th Cir. 1996); *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271 (7th Cir. 1989) (same). *But see Detrick v. Panalpina, Inc.*, 108 F.3d 529 (4th Cir. 1997) (corporate affiliates may not conspire, but noting an exception to that rule when the parties have an independent personal stake in the conspiracy); *Fogie v. THORN Ams., Inc.*, 190 F.3d 889 (8th Cir. 1999) (parent and wholly-owned subsidiary cannot conspire).

[28]    In the RICO context, conspiracy is a matter of concern not because the existence of the conspiracy itself transforms a lawful objective into an unlawful objective (as under the Sherman Act), but because the concerted efforts of multiple parties to achieve an unlawful objective pose greater dangers than the efforts of an individual to achieve the same unlawful objective. That enhanced danger is not mitigated merely because the RICO conspirators are affiliated through corporate ties.

Respectfully submitted,

ROBBINS, RUSSELL, ENGLERT, ORSECK,            LAW OFFICES OF THOMAS P. PUCCIO
   UNTEREINER & SAUBER LLP

By: s/ Lawrence S. Robbins                    Thomas P. Puccio
   Lawrence S. Robbins (LR-8917)          230 Park Avenue
   Gary A. Orseck                          New York, NY 10169
   Daniel R. Walfish                       Tel: (212) 883-6383
   Rachel S. Li Wai Suen                   Fax: (212) 883-6388
1801 K Street, N.W., Suite 411
Washington, DC 20006
Tel: (202) 775-4500
Fax: (202) 775-4510

Dated: October 19, 2007                        *Counsel for Plaintiffs*

26