UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
RITCHIE CAPITAL MANAGEMENT, L.L.C., et al.,

               Plaintiffs,

v.                                             07 Civ. 3494 (DLC)

COVENTRY FIRST LLC, et al.,

               Defendants.
------------------------------------------------------------------------x

## DECLARATION OF DANIEL R. WALFISH
## IN SUPPORT OF PLAINTIFFS' OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS
## COUNTS I AND II OF THE PROPOSED SECOND AMENDED COMPLAINT

I, Daniel R. Walfish, hereby declare:

       1.       I am associated with the law firm of Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, counsel to the plaintiffs in this action. I make this declaration on personal knowledge.

       2.       Attached hereto as Exhibit A is a true and correct copy of a memorandum decision issued by Justice Helen E. Freedman on September 25, 2007 in *People v. Coventry First LLC, et al.*, index number 404620/06, in the Supreme Court of New York, County of New York.

       3.       Attached hereto as Exhibit B is a true and correct copy of a press release available on Defendants' web site, in which Defendants represent that they have paid $175 million to New York consumers for their life insurance policies.

      I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, D.C. on October 19, 2007

                                                                     /s Daniel R. Walfish
                                                                    Daniel R. Walfish

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: Hon Helen E Freedman                      PART 39
                                Justice

The People of the State of New York,
by Eliot Spitzer, Attorney General
of The State of New York,
                                   Plaintiff,
-v-

Coventry First LLC, et al.          Defendants.

INDEX NO. 404620/06
MOTION DATE
MOTION SEQ. NO. 003, 001
MOTION CAL. NO.

The following papers, numbered 1 to _____ were read on this motion to/for _____

**PAPERS NUMBERED**

Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...

Answering Affidavits — Exhibits

Replying Affidavits

**Cross-Motion:** ☐ Yes  ☐ No

Upon the foregoing papers, it is ordered that ~~this~~ motion sequences 001 and 003 are hereby consolidated for joint disposition in accordance with accompanying memorandum decision

Dated: 9/25/07

                                                        HF
                                                        J.S.C.

Check one:   ☐ FINAL DISPOSITION    ☒ NON-FINAL DISPOSITION

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK                                             x

THE PEOPLE OF THE STATE OF NEW YORK            Index No. 404620106
by ELIOT SPITZER, Attorney General of
The State of New York,

                                  Plaintiff,

        -against-                                               :

COVENTRY FIRST LLC, MONTGOMERY
CAPITAL, INC., THE COVENTRY GROUP, INC.,
and REID S. BUERGER,

                              Defendants.        x

**Helen E. Freedman, J.:**

        The motions with sequence numbers 002 and 003 are consolidated for joint disposition.

        Introduction -- This lawsuit concerns the "life settlements" industry, in which owners of variable life insurance policies sell them to third parties for immediate cash. The purchasers then "securitize" the policies by selling them in groups to third-party investors, who pay the premiums as they come due and eventually receive the proceeds of the policies when the insureds die. The Attorney General of the State of New York brought this action on behalf of the people of the State of New York (the "State" or "plaintiff") against defendant Coventry First LLC ("Coventry First"), which purchases life insurance policies from individuals throughout the country for resale to investors. Along with Coventry First, the State sues Coventry First's Executive Vice President, defendant Reid Buerger, Coventry First's parent corporation, defendant Montgomery Capital, Inc. ("Montgomery Capital"), and a Coventry First affiliate, defendant The Coventry Group, Inc. ("Coventry Group").

The complaint alleges that defendants, in concert with brokers acting as intermediaries, uses bid-rigging and other anti-competitive schemes to deprive policy holders of a fair marketplace in which to sell. In addition, the State alleges defendants and the brokers deliberately mislead sellers into believing that buyers are competing freely for their life settlements and that as a result sellers are receiving the best possible prices. Suing as *parens patriae*, the State asserts statutory claims against all defendants for fraudulent business practices under Executive Law § 63(12) (the "Executive Law"), for anti-competitive behavior under General Business Law § 340 et seq. (the "Donnelly Act"), and for securities violations under General Business Law § 352 et seq. (the "Martin Act"). Plaintiff also asserts common law claims for fraud, unjust enrichment, and inducing the brokers to breach their alleged fiduciary duty to policy sellers. The relief sought by the State includes an order (1) restraining defendants from further misconduct, (2) directing them to disgorge all gains and pay restitution and damages, (3) granting rescission rights to all parties who sold policies to Coventry First from 2001 to the present, and (4) awarding punitive damages, treble damages and plaintiffs costs and attorney's fees.

Claims – The State alleges the following in the complaint: Coventry First, a Delaware corporation headquartered in Pennsylvania, competes nationwide with other businesses to purchase life settlements through an auction-style bidding process. Sellers often employ the services of one or more brokers who specialize in marketing life settlements; according to the State, these brokers are fiduciaries of the sellers and act their agents to obtain the best prices for them.

The complaint alleges that Coventry First engages in two basic schemes that Buerger

oversees and directs. First, they allegedly rig the bidding process by secretly paying brokers to refrain from soliciting bids from Coventry First's competitors and refrain from relaying competing bids to the sellers. Also, until 2005, Coventry First allegedly paid brokers to provide it with the "right of last bid" on life settlements and to refrain from seeking better bids from other buyers.

To illustrate the alleged bid-rigging scheme, the complaint sets out nine transactions in detail. These transactions will be referred to as the "Bid-rigging Examples." As discussed further below, only two of the nine Bid-rigging Examples involved sellers or brokers who reside in New York.

The State alleges a second scheme in which Coventry First motivates brokers to act against the sellers' interests by submitting "gross offers" directly to the brokers. These offers are lump sum payments, from which the brokers draw their compensation before passing the remainder on to the sellers as the life settlement purchase prices. According to the State, although the brokers solicit gross offers, the brokers and Coventry First usually only disclose the net purchase prices to the sellers, and do not reveal the gross offer amounts and the amounts the brokers keep for themselves. This gross payment system allegedly motivates brokers to profit at the sellers' expense, and also encourages them "to advise their clients to sell their life insurance policies when, in fact, such sales may be against the client's financial interests." To further this scheme, plaintiff alleges, Coventry First refuses to disclose a broker's compensation to the seller unless required under state law, and has at times provided sellers with false documents indicating that their brokers received less than their actual compensation. Plaintiff outlines about five additional transactions involving gross offers to demonstrate how Coventry First employs them.

*Motions – In* separate motions, Coventry First and Buerger (the "Movants") apply for orders (1) dismissing the complaint for failure to state a claim and (2) compelling the State to arbitrate certain claims and staying this action pending arbitration.[1] In another motion (# 003), the Movants seek dismissal on the grounds that (1) the State lacks the authority to pursue most if not all of the claims because the alleged wrongdoing and injuries lack a sufficient connection to New York, (2) plaintiff bases its claims on a purported duty to disclose brokers' compensation that does not exist under New York law, (3) plaintiff fails to make out a common law fraud claim because it does not allege that the policy sellers suffered any out-of-pocket injury, (4) none of the parties to the transactions had any fiduciary obligations to the sellers, and (5) and plaintiff fails to state any claim under the Donnelly and Martin Acts or for equitable relief.

In another motion (# 002), the Movants seek an order compelling the State to arbitrate any claims connected with policy sellers who had executed sales agreements with Coventry First that required the parties to resolve their disputes through arbitration.

*Extent of the State's authority – In* seeking dismissal, the Movants first point out that they are not New York residents and that, in the case of seven of the nine Bid-rigging Examples, (1) the policy sellers and brokers reside outside New York and (2) none of the alleged wrongdoing or injuries occurred in New York. The exceptions include one Bid-rigging Example in which both the policy seller and his broker, AllSettled, reside in New York, and another in which AllSettled's misconduct in New York allegedly injured a seller that resides outside New York. The other seven transactions lack any direct connection with New York.

---

[1] In a separate motion, Montgomery Capital and Coventry Group move for an order dismissing the complaint as against them.

The *parens patraie* doctrine enables the State to seek damages, restitution and civil penalties on behalf of New York residents that are harmed by wrongful acts occurring within and outside this State, *see People* v. *Concert Connection, Ltd.,* 211 A.D.2d 310, 315-16 (2d Dept. 1995), and on behalf of non-residents of the State that have been harmed by wrongful acts in New York, *see People ex rel. Spitzer* v. *Telehublink Corp.,* 301 A.D.2d 1006, 1009-10 (3d Dept. 2003). However, the State's authority under the Executive Law does not extend to redressing injury to out-of-state residents that resulted from wrongdoing outside New York, because the citizens of New York lack any direct interest in the matter. *See* Exec. Law § 63(1) (authorizing the Attorney General to "[p]rosecute . . . all actions in which the state is interested.") Likewise, the State's authority to sue under the Martin Act is limited since the statute only regulates securities transactions occurring "within or from" New York. GBL § 352(1); *see also Lehman Bros. Comm. Corp. v. Minmetals Intl. Non-Ferrous Metals Trading Co.,* 179 F.Supp.2d 159, 164 (S.D.N.Y. 2001). The Donnelly Act applies to restraints on business "in this state." GBL § 340; *cf Goshen* v. *Mut. Life Ins. Co.,* 98 N.Y.2d 314, 326 (2002) (holding that GBL § 349(h), which also applies to conduct "in this state," precludes recovery for out-of-state injury.) Finally, the State lacks authority to prosecute the common law claims insofar as they are based only upon claims of wrongdoing outside New York by out-of-state residents.

In opposition, plaintiff submits an affidavit stating that 298 of 3,469 life settlement purchases by Coventry First between 2001 and March 2006 involved New York sellers. Plaintiff also asserts in his opposition brief that "many of the [the challenged transactions] were effectuated" through AllSettled, the New York broker. This additional submission further demonstrates that, insofar as New York sellers or brokers or misconduct in New York is

involved, the State has stated sufficient grounds to sue on behalf of citizens. However, the claims are partially dismissed insofar as they pertain to life settlement transactions that have no identified connection with New York brokers, New York sellers, or alleged misconduct in New York.

*Duty* to disclose – The Movants next contend that all of the State's claims fail because they are "premised entirely" on defendants' breach of a purported obligation to disclose to the sellers the details of the brokers' compensation. However, defendants argue, New York law does not affirmatively require life settlement buyers to disclose what they paid the sellers' brokers as compensation.

Defendants mis-characterize the thrust of the State's allegations. Plaintiff acknowledges that defendants had no statutory duty to disclose the broker payments, but contend that defendants' failure to disclose is merely one element of their alleged pattern of actionable misconduct. That pattern gives rise to plaintiffs' central claims for "fraudulent business practices" under the Executive Law. The thrust of the first alleged scheme is that

> Coventry creates the appearance of a legitimate auction for life settlements when, in fact, it pays hidden co-broker payments for purposes of fixing the bids. Nondisclosure of co-broker fees may be part of Coventry's scheme to defraud, but the claim is not for breach of an affirmative duty to disclose.

These allegations state a claim of "fraud" under the Executive Law, which uses the term very broadly "and includes acts which may be characterized as dishonest and misleading." St. *v. Solil* Mgt. Corp., 128 Misc.2d 767, 772 (Sup. Ct. N.Y. Co.), *aff'd*, 114 A.D.2d 1057 (1st Dept. 1985); see also People *v.* The Concert Connection, Ltd., 211 A.D.2d 310 at 320; St. *v.* Feldman, 210 F.Supp.2d 294, 299-301 (S.D.N.Y. 2002)(allegation that defendants rigged bidding at public

stamp auctions made out claim under Executive Law). Under the circumstances that the complaint sets forth, defendants' non-disclosure could be deemed as dishonest and misleading practice even if no statute or regulation requires disclosure.

According to the State, non-disclosure also plays a key role in the "gross offer" payment scheme. Since the sellers never learn the how much brokers receive from defendants' gross offers, the State alleges that defendants conceal how the payment scheme benefits defendants and the brokers at sellers' expense.

*Donnelly* Act – Defendants argues that the State does not state a claim under the Donnelly Act claim because it fails to adequately allege how defendants' bid-rigging caused "antitrust injury" under the statute by "foreclos[ing] all meaningful opportunities" for policy holders to sell to Coventry First's competitors. However, the State does not need to allege "antitrust injury" in detail to state a Donnelly Act claim, because defendants' alleged scheme to use bid rigging to stifle competition in the life settlement market constitutes a "per se" violation of the Donnelly Act. See, *e.g.*, People v. Schwartz, 160 A.D.2d 964, 965 (2d Dept. 1990); *Schlottman* Agency, *Inc.* v. Aetna Cas. & Sur. Co., 70 A.D.2d 1041, 1041 (4th Dept. 1979).

Martin Act – The Movants correctly point out that the Martin Act claim fails because the variable annuity and life insurance policies that are sold in the life settlement market do not constitute "securities" under the statute. Although variable life insurance policies are considered "securities" under certain federal laws, see, *e.g.,* S.E.C. v. Variable Annuity Life Ins. Co., 359 U.S. 65, 71-73 (1959)(holding that variable annuities were regulated by the Securities and Exchange Commission), those policies are characterized as insurance products under New York law and comprehensively regulated by the Insurance Law and regulations. See Meagher v.

Metro. *Life* Ins. Co., 119 Misc.2d 615, 618 (Sup. Ct. N.Y. Co. 1983). Accordingly, the Martin Act claim is dismissed.

Common-law fraud *claim* -- Plaintiff fails to state a fraud claim because the alleged injury to the policy sellers is too speculative. In essence, plaintiff contends that the policy sellers might have received better prices for their policies if the Movants had not rigged the bidding process. However, "[w]ithout proof of an out-of-pocket loss, plaintiff cannot recover in [common law] fraud." Sardanis v. *Sumitomo* Corp., 279 A.D.2d 225, 229 (1st Dept. 2001).

Plaintiff effectively concedes that the "out-of-pocket" rule bars most of the common law fraud claims, but argues for an exception in the case of one transaction in which Coventry First allegedly misrepresented to a seller in writing that a broker had received $ 10,000 less from a gross offer than he actually did. In effect, plaintiff argues that if the seller knew how much the broker was being paid, he might have been able to negotiate a higher price for himself. Again, this claimed loss is too speculative to support any recovery for fraud. It bears emphasis, however, that failure to show out-of-pocket losses has no bearing on whether a claim is stated for fraudulent business practices under the Executive Law, since the term "fraud" is used far more broadly in the statute than in the common law.

Fiduciary claims – The Movants next contend that the State does not make out a claim for aiding and abetting brokers in breaching their fiduciary duties to sellers, because life settlement brokers owe no fiduciary duty to their clients. Instead, the Movants argue, brokers and sellers have an arms-length business relationship.

The question of whether a life settlement broker is the fiduciary of the selling client is apparently an issue of first impression in this jurisdiction. However, the well-settled principles

governing broker-principal relationships lead to the conclusion that life settlement brokers serve as fiduciaries of their clients. Under New York law, a "broker" is, among other things, an agent who for compensation negotiates on behalf of the principal to sell the principal's property while acting as the intermediary between the principal and third-party buyers. See BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 700 (2d Cir. 1993) (construing New York law). In general, agency law governs the rights and obligations between the broker and the principal, See UWC, Inc. v. Eagle *Indus.,* Inc., 213 A.D.2d 1009, 1010 (4th Dept. 1995). As the principal's agent, the broker is the principal's fiduciary with a duty of loyalty, and is obliged to act in the principal's best interests. See Dubbs v. Stribling & Assocs., 274 A.D.2d 32, 35 (1st Dept. 2000). The broker must remain faithful to the principal in all matters within the scope of the broker's employment. Id. Moreover, a broker acting as an agent "is charged with a duty of loyalty and may not have interests in the subject transaction which are adverse to those of his principal." TPL Assocs. v. Helmsley-Spear, *Inc.*, 146 A.D.2d 468, 470 (1st Dept. 1989). If conflicts of interest exists, a broker must disclose them to the principal. See Stevens Residential Sales, LLC, v. Oxford Cap. Corp., 306 A.D.2d 112, 112 (1st Dept. 2003) (broker's failure to disclose kickback payments constituted breach of fiduciary duty.)

In opposition, the Movants argue that life settlement brokers are merely finders of business opportunities, who as a rule hold no fiduciary duty to their clients. Under the law, the distinction between a broker and a finder is that

> The finder is required to introduce and bring the parties together, without an obligation or *power* to negotiate the transaction, in order to earn the finder's fee. . . . While a broker performs the same introduction task, the broker must ordinarily also bring the parties to an agreement.

*N.E. Gen. Corp. v. Wellington Advert., Inc.* 82 N.Y.2d 158, 163 (1993)(emphasis supplied). Here, the State alleges that the brokers do not merely find willing buyers, but "shop the policies", negotiate the transactions, and serve as auctioneers that solicit bids from competing buyers. In short, the brokers serve a central role in life settlement transactions that exceeds that of a business opportunity finder. The brokers' role in life settlements give rise to their fiduciary duties to the sellers, and accordingly the State states a claim that the Movants aided and abetted breaches of those duties.

   *Unjust enrichment* – The complaint alleges that the Coventry First was unjustly enriched because it purchased life settlements at less than fair-market prices without properly compensating the sellers. The claim for unjust enrichment is dismissed because Coventry First and the sellers entered into written life settlement contracts of sale, and the quasi-contractual claim of unjust enrichment cannot be asserted in a dispute that is governed by an express contract. *See, e.g., MJM Advert., Inc. v. Panasonic Indus., Inc.*, 294 A.D.2d. 265, 266 (2d Dept. 2002). In any event, the unjust enrichment claim is redundant, because the State can seek redress for the Movants' allegedly wrongful profit at the sellers' expense in its claim under the Executive Law.

   *Arbitration* – *In* the second motion, the Movants contend that the State is compelled to arbitrate its public enforcement action against Coventry First to the extent the State's claims are connected with individual life settlement sellers who entered into contracts with Coventry First that included arbitration agreements. This argument lacks merit, since the State is not a party to any of those arbitrations agreements. Both the Federal Arbitration Act (the "FAA") and New York statue governing arbitration are only enforceable against parties that have agreed to

Page 10 of 12

arbitrate. 9 U.S.C. § 2; CPLR § 7503(a). See also EEOC v. *Waffle* House, *Inc.*, 534 U.S. 279, 293-94 (2002) (holding that the FAA does not apply to an enforcement actions brought by a government entity unless it has agreed to arbitrate, even if it seeks victim-specific monetary relief). The Movants cite three cases from other jurisdictions which required state agencies that sought relief on behalf of individuals who had signed arbitration agreements to stand in the individuals' shoes and submit to arbitration. Olde Discount Corp. v. Tupman, 1 F.3d 202, 204 (3d Cir. 1993); Ropp v. 1717 Cap. Mgt. Co., No. 02-1701, 2004 WL 93945 (D. Del. Jan. 14, 2004); *Ralphs* Grocery Co. v. Massie, 116 Cal. App.4th 1031 (Cal. Ct. App., 4th Dist., 2004). This Court is unpersuaded by the reasoning of the courts in those cases and declines to follow them. Accordingly, the motion to compel arbitration is denied.

Cross-motion – Finally, the State cross-moves without opposition for an order substituting Attorney General Andrew Cuomo for former Attorney General Eliot Spitzer in the caption. The cross-motion is granted without opposition.

ORDERED that the causes of action in the complaint are dismissed only insofar as they pertain to life settlement transactions that do not involve New York life settlement brokers, New York policy sellers, or alleged misconduct in New York, and it is further

ORDERED that, except to the extent stated above, the motion to dismiss the first, second, and sixth causes of action is denied, and it is further

ORDERED that the motion to dismiss the third, fourth, and fifth causes of action are granted and those causes of action are severed and dismissed, and it is further

ORDERED that the motion to compel plaintiff to arbitrate and stay this proceeding pending arbitration is denied, and it is further

ORDERED that the cross-motion for an order substituting Andrew M. Cuomo, the Attorney General of the State of New York, as plaintiff in the place of Eliot Spitzer, the former Attorney General, is granted without opposition, and it is further

ORDERED that Andrew M. Cuomo, the Attorney General of the State of New York, is substituted as plaintiff in the place of Eliot Spitzer, the former Attorney General, and it is further

ORDERED, that all papers, pleadings, and proceedings in the above-entitled action are amended by substituting the name of Andrew M. Cuomo as plaintiff in the place of Eliot Spitzer, without prejudice to the prior proceedings in this action, and it is further

ORDERED that plaintiff is directed to serve a copy of this order on the Clerk of the Court and the Trial Support Office (Room 158), who are directed to mark their records accordingly to reflect the substitution and change in the caption of this action, and it is further

ORDERED that the parties are directed to appear before the Court for a preliminary conference on October 16, 2007 at 9:30 a.m. (Courtroom 208, 60 Centre St., NY, NY).

**Dated:   September 25, 2007**

**Helen E. Freedman, J.S.C.**

# Exhibit B



**Coventry Delivers More than $175 million to New York Policyowners**

FORT WASHINGTON, Pa., Oct. 12 -- Coventry First, the leader in the secondary market for life insurance, announced today that it has paid New York consumers $175 million for their life insurance policies. Had the policies been surrendered to the life insurance companies, the consumers, who are typically over age 60, would have only received $45 million.

Nationally, Coventry has paid consumers $1.85 billion. Had the policies been surrendered to the life insurance companies, the consumers would have received less than $650 Million.

Historically, consumers have had only one option. They could sell their policy back to the insurance company. There was no other option, no choice. Instead, if they qualify, they can enter into a life settlement and sell the policy in the secondary market, where it will typically sell for an amount that is significantly higher than the cash surrender value.

"Life insurance is a valuable asset, and policyowners should keep their policies," stated Alan Buerger, Coventry's Chief Executive Officer. "If, however, for some reason, the coverage is no longer needed, policyowners should consider the benefits of selling their policies in the secondary market. A life settlement makes life insurance more flexible and more valuable. It makes insurance a powerful estate and business planning tool that enables the efficient reallocation of life insurance assets."

Life settlements are typically most appropriate for high net worth individuals, businesses or trusts when the life insurance policies are no longer needed or otherwise not performing up to expectations. Policyowners should consult with their financial advisors before making a decision to sell their policies in the secondary market. The insured must be age 60 or above and the face amount must be in excess of $250,000.

### 

**About Coventry**
Coventry (http://www.coventry.com) bridges insurance and capital markets to create groundbreaking products for the financial services industry. The



company is the leader in the secondary market for life insurance and pioneered the resulting life settlement industry. Fueled by bold ideas, impeccable standards and a deep understanding of structured finance and life insurance, Coventry has ignited a transformation by opening new opportunities for investors, consumers and the financial professionals who serve them. Based in Fort Washington, PA, Coventry is the first secondary market company to ever receive Standard & Poor's highest Servicer ranking and was ranked #1 in the insurance category of the INC. 500 listing of the fastest growing privately held companies in America.